**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

ANGELA JOHNSON,

        Petitioner,

vs.

UNITED STATES OF AMERICA,

        Respondent.

No. C 09-3064-MWB
(No. CR 01-3046-MWB)

**MEMORANDUM OPINION AND**
**ORDER REGARDING**
**PETITIONER'S MOTION UNDER 28**
**U.S.C. § 2255 TO VACATE, SET**
**ASIDE, OR CORRECT FEDERAL**
**CAPITAL CONVICTIONS AND**
**DEATH SENTENCES**

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *B. Criminal Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *C. Section 2255 Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . 22
   *D. Summary Of Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*II.* **VIABILITY OF "NEW" CLAIMS IN JOHNSON'S SECOND AND**
    *THIRD AMENDED § 2255 MOTIONS* . . . . . . . . . . . . . . . . . . . . . . . . . 38
   *A. "New" Claims In The Second Amended § 2255 Motion* . . . . . . . . . . . 39
      *1.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . 39
         *a.*   *The respondent's argument* . . . . . . . . . . . . . . . . . . 39
         *b.*   *The petitioner's argument* . . . . . . . . . . . . . . . . . . . 39
         *c.*   *The respondent's reply* . . . . . . . . . . . . . . . . . . . . 42
      *2.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
         *a.*   *Deadlines for § 2255 claims* . . . . . . . . . . . . . . . . . 44
         *b.*   *Timeliness of amendments* . . . . . . . . . . . . . . . . . . 56
            *i.*   *Rule 15(a)* . . . . . . . . . . . . . . . . . . . . . . . . 56
            *ii.*   *Rule 15(b)* . . . . . . . . . . . . . . . . . . . . . . . 63

    *iii.* **Rule 15(c) and "relation back."** . . . . . . . . . . . 68
   *c.* **Application of the standards** . . . . . . . . . . . . . . . . . 72
    *i.* **Preliminary matters** . . . . . . . . . . . . . . . . 72
    *ii.* **The challenged claims** . . . . . . . . . . . . . 75
 **B.** **The "New" Claim In The Third Amended § 2255 Motion** . 87
  **1.** **Arguments of the parties** . . . . . . . . . . . . . . . . . 88
   *a.* **The petitioner's argument** . . . . . . . . . . . . . . 88
   *b.* **The respondent's argument** . . . . . . . . . . . . 90
  **2.** **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
   *a.* **Timeliness** . . . . . . . . . . . . . . . . . . . . . . . 93
   *b.* **Futility** . . . . . . . . . . . . . . . . . . . . . . . . . 96
   *c.* **Summary** . . . . . . . . . . . . . . . . . . . . . . . 102
 **C.** **Summary Of Claims To Be Considered On The Merits** . . . . . . . . . 102

**III.** **STANDARDS APPLICABLE TO JOHNSON'S CLAIMS** . . . . . . . . . . . 110
 **A.** **Standards For § 2255 Relief** . . . . . . . . . . . . . . . . . . . 111
  **1.** **Scope of the remedy** . . . . . . . . . . . . . . . . . . . 111
  **2.** **Section 2255 relief in capital cases** . . . . . . . . . . . . 114
  **3.** **Appellate review** . . . . . . . . . . . . . . . . . . . . . 116
 **B.** **Ineffective Assistance Of Counsel** . . . . . . . . . . . . . . . . . 116
  **1.** **Ineffective assistance of trial counsel** . . . . . . . . . . 117
   *a.* **Overview** . . . . . . . . . . . . . . . . . . . . . . . 117
   *b.* **Deficient performance** . . . . . . . . . . . . . . . . 118
    *i.* **Strategic choices** . . . . . . . . . . . . . 119
    *ii.* **Presumption of adequate representation** . . . . 120
    *iii.* **Role of ABA standards** . . . . . . . . . . . . . 121
   *c.* **Prejudice** . . . . . . . . . . . . . . . . . . . . . . . 124
  **2.** **Ineffective assistance of appellate counsel** . . . . . . . . . . 126
 **C.** **Cumulative Error** . . . . . . . . . . . . . . . . . . . . . . . . 127
  **1.** **Arguments of the parties** . . . . . . . . . . . . . . . . . 128
   *a.* **The petitioner's argument** . . . . . . . . . . . . . . 128
   *b.* **The respondent's argument** . . . . . . . . . . . . 131
   *c.* **The petitioner's reply** . . . . . . . . . . . . . . . . 133
  **2.** **Cumulative effect of errors of counsel** . . . . . . . . . . 134
   *a.* **Rejection in the Eighth Circuit** . . . . . . . . . . 137
   *b.* **Conflict with Supreme Court precedent** . . . . . . . 140
   *c.* **Cumulative error vs. multifaceted error** . . . . . . . 146

          *i.*      **Strickland** *and multifaceted error* . . . . . . . . 146

          *ii.*     **Williams, Wiggins,** *and* **Porter** . . . . . . . . . . 150

          *iii.*    *"Balkanized" review* . . . . . . . . . . . . . . . 153

          *iv.*    *Extent of multifaceted claims* . . . . . . . . . . . 156

     *3.*     *Cumulative effect of other errors* . . . . . . . . . . . . . . 163

     *4.*     *Cumulative error and unfairness of the trial* . . . . . . . . . . 167

     *5.*     *The appropriate aggregations of alleged errors* . . . . . . . . 171

**IV. ERRORS IN THE PRETRIAL PHASE** . . . . . . . . . . . . . . . . . . . . . 181

  *A. Claim 1: Failure To Pursue A Disposition*
     *For A Sentence Less Than Death* . . . . . . . . . . . . . . . . . . . . . 181

     *1.*     *Deficient performance* . . . . . . . . . . . . . . . . . . . . . . . . 184

     *2.*     *Prejudice* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

          *a.*     *Whether the petitioner was willing to plead guilty* . . . 193

          *b.*     *Whether the prosecution would have accepted a*
                 *factual proffer that the petitioner was willing to*
                 *make* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

          *c.*     *Whether the Attorney General would have accepted a*
                 *plea* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

          *d.*     *Whether the prosecution ever offered a plea*
                 *agreement* . . . . . . . . . . . . . . . . . . . . . . . . 202

     *3.*     *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

  *B. Claim 2: Failure To Preclude A Timely Death Notice* . . . . . . . . . 206

  *C. Claim 3: Failure To Raise Pre-Trial Meritorious Motions, Objections,*
     *And Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

**V. ERRORS IN THE JURY SELECTION PHASE** . . . . . . . . . . . . . . . . 210

  *A. Claim 4: Counsel's Failure To Investigate*
     *And Voir Dire Juror No. 55 Adequately* . . . . . . . . . . . . . . . . . 211

  *B. Claim 5: Juror No. 55's Misconduct* . . . . . . . . . . . . . . . . . . 216

  *C. Claim 6: Errors Relating To Voir Dire On Pentecostal Religion And*
     *Women* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

  *D. Claim 7: Failure To Raise Timely Motions And Objections* . . . . . . 222

**VI. ERRORS IN THE MERITS PHASE** . . . . . . . . . . . . . . . . . . . . . 224

  *A. Claims Relating To Demeanor And Competence* . . . . . . . . . . . . 225

     *1.*     *Factual background* . . . . . . . . . . . . . . . . . . . . . . . . 225

      2.       *Errors of counsel involving demeanor and competence* . . . .  228
            *a.*    *Claim 8:  Failure to address the effect of medication* .  228
                 *i.*    *Arguments of the parties* . . . . . . . . . . . . . .  228
                 *ii.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . .  231
            *b.*    *Claim 9:  Failure to seek a competency hearing* . . . .  239
      3.       *Claim 10:  Trial while incompetent* . . . . . . . . . . . . . . . . .  244
   B.  **Claims 11 through 16:  Counsel's Errors Relating To Investigation**
       **And Presentation Of A Merits Phase Defense** . . . . . . . . . . . . .  245

**VII. ERRORS IN THE MITIGATION PHASE** . . . . . . . . . . . . . . . . . . . . . .  251
   **A. Counsel's Errors In Confronting Aggravating Evidence** . . . . . . . . .  252
      1.       *Applicable standards* . . . . . . . . . . . . . . . . . . . . . . . . . . .  252
      2.       *Claim 18:  Failure to challenge the prosecution's theory for*
           *DeGeus's murder* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  255
            *a.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .  255
            *b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  258
      3.       *Claims 19, 20, and 21:  Failure to confront the prosecution's*
           *arguments that Johnson was "worse" than Honken* . . . . . .  259
            *a.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .  260
            *b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  263
                 *i.*    *Admissions by the prosecutor* . . . . . . . . . . . .  263
                 *ii.*   *Other evidence that Honken was "worse" than*
                     *Johnson* . . . . . . . . . . . . . . . . . . . . . . . . . . .  288
      4.       *Claim  22:    Failure  to  confront  evidence  of  Johnson's*
           *threatening manner* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  293
            *a.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .  294
            *b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  296
      5.       *Untimely allegations of error* . . . . . . . . . . . . . . . . . . . . .  298
      6.       *Aggregate prejudice* . . . . . . . . . . . . . . . . . . . . . . . . . . .  299
   **B. Prosecutorial Misconduct** . . . . . . . . . . . . . . . . . . . . . . . . . . . .  301
      1.       *Claim 26:  Failure to correct false testimony about Honken*  302
            *a.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .  303
            *b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  306
      2.       *Claim 27:* **Brady** *violation* . . . . . . . . . . . . . . . . . . . . . .  311
            *a.*    *The undisclosed evidence* . . . . . . . . . . . . . . . . . . .  311
            *b.*    *Arguments of the parties* . . . . . . . . . . . . . . . . . . .  314
            *c.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  316

      **3.**     *Claim 28: Inconsistent argument violation* . . . . . . . . . . . 332
             **a.**    *Disclaimer and procedural default* . . . . . . . . . . . . 333
                 **i.**    *Arguments of the parties* . . . . . . . . . . . . . . 333
                 **ii.**   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 334
             **b.**    *The merits* . . . . . . . . . . . . . . . . . . . . . . . . . 336
                 **i.**    *Arguments of the parties* . . . . . . . . . . . . . . 336
                 **ii.**   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 338
      **4.**     *Cumulative prejudice from the prosecutor's misconduct* . . . 342
**C.**  *Counsel's Errors Involving The Mitigation Evidence Presented* . . . . 342
      **1.**     *Claims 29, 30, and 31: Poorly chosen mitigation witnesses* . 342
             **a.**    *The witnesses at issue* . . . . . . . . . . . . . . . . . . . 342
             **b.**    *Arguments of the parties* . . . . . . . . . . . . . . . . . 344
             **c.**    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 345
      **2.**     *Claim 32: Flawed use of the psychiatric pharmacologist* . . 348
             **a.**    *Arguments of the parties* . . . . . . . . . . . . . . . . . 348
             **b.**    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 351
      **3.**     *Claim 33: Untimely allegation of error regarding formulation of mitigating factors* . . . . . . . . . . . . . . . . . 356
      **4.**     *Aggregate prejudice* . . . . . . . . . . . . . . . . . . . . . . 363
**D.**  *Counsel's Errors In Investigating, Preparing, And Presenting Mitigation Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . 364
      **1.**     *Errors relating to Johnson's mental state at the time of the offenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 364
             **a.**    *Applicable standards* . . . . . . . . . . . . . . . . . . . . 365
             **b.**    *Claim 34: Failure to investigate and present evidence of Johnson's mental state at the time of the offenses* . 371
                 **i.**    *Arguments of the parties* . . . . . . . . . . . . . . 371
                 **ii.**   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 377
             **c.**    *Claim 35: Errors relating to Dr. Gelbort* . . . . . . . . 390
                 **i.**    *Arguments of the parties* . . . . . . . . . . . . . . 390
                 **ii.**   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 393
             **d.**    *Claim 37: Errors in failing to offer expert and lay testimony about Honken's influence over Johnson* . . 395
                 **i.**    *Arguments of the parties* . . . . . . . . . . . . . . 395
                 **ii.**   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 398
      **2.**     *Claim 38: Errors relating to statements of Phyllis Proscovec* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

     3.     *Claim 41: Failure to introduce Johnson's offer to plead guilty* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403
          a.    *Arguments of the parties* . . . . . . . . . . . . . . . . . . 403
          b.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 405
     4.     *Claims 36, 39, 40, 42, and 43: Untimely allegations of error* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 415
     5.     *Claim 44: Unbriefed allegation of error concerning failure to prepare mitigation evidence from lay witnesses* . . . . . . 418
     6.     *Aggregate prejudice* . . . . . . . . . . . . . . . . . . . . . . 419
  E.  *Claim 45: Counsel's Errors In Failing To Object To The Mitigation Phase Determination And Evident Juror Confusion* . . . . . . . . . 420

**VIII. ERRORS IN THE POST-TRIAL PHASE** . . . . . . . . . . . . . . . . . . . . . 421

**IX. ERRORS ON APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422

**X. EIGHTH AMENDMENT VIOLATIONS** . . . . . . . . . . . . . . . . . . . . . . 423
  A.  *Cognizability In § 2255 Proceedings* . . . . . . . . . . . . . . . . . . . 424
  B.  *Claims Not Cognizable Under § 2255* . . . . . . . . . . . . . . . . . . 426
  C.  *Cognizable Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 427

**XI. SUMMARY OF CLAIM DISPOSITION** . . . . . . . . . . . . . . . . . . . . 429

**XII. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 447

Angela Johnson seeks habeas relief from her 2005 federal convictions for five murders in furtherance of a continuing criminal enterprise (CCE murder),[1] resulting in four death sentences and one life sentence. On June 21, 2005, following a lengthy trial, a jury imposed these sentences for the brutal murders of two adults and two children on July 25, 1993, and for the murder of Johnson's ex-love interest, in a separate incident, on November 5, 1993. By the time Johnson went to trial, her separately tried co-defendant, Dustin Honken, had already been convicted as the "principal" on the same charges and sentenced to death for the killings of the children and life imprisonment for the killings of the adults. Even though Johnson was tried as an "aider and abettor," ironically, she received the death penalty not only for the killings of the two children, as Honken had, but also for the killings of two of the adults, and life imprisonment for the killing of the third adult. I affirmed both Honken's and Johnson's convictions and death sentences in lengthy rulings on their post-trial motions.[2]

Johnson now seeks post-conviction relief in a 176-page Second Amended Motion Under 28 U.S.C. § 2255 (Civ. docket no. 263) (§ 2255 Motion), asserting 63 grounds for relief, and a proffered Third Amended Motion Under 28 U.S.C. § 2255 (Civ. docket no. 339), asserting a sixty-fourth ground for relief. I initially limited post-hearing briefing on

---

[1]Johnson was convicted of violating 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

[2]*See United States v. Angela Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005) (297 page (175 page printed) opinion denying the defendant's request for post-trial relief); *United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005) (206 page (128 page printed) denying the defendant's motion for judgment of acquittal or new trial).

her claims to 100 pages, although I later waived the page limitation, so Johnson eventually filed a post-hearing brief on the merits of her § 2255 Motion consisting of some 209 pages of argument in which she chose to brief 29 grounds for relief, without waiving or abandoning any others. The grounds that Johnson chose to emphasize in her post-hearing brief include the following: her attorneys' failure to pursue a disposition for a sentence less than death before trial; her attorneys' failure to adjust her medications or otherwise address the effects of her medication on her demeanor and competence during the merits phase of her trial; her attorneys' failure to confront aggravating evidence, or to prepare and present an effective mitigation case, and prosecutorial misconduct during the penalty phase of her trial; and a claim that the Bureau of Prisons' method of carrying out her execution would violate the Fifth and Eighth Amendments to the United States Constitution, the Administrative Procedures Act, and the Controlled Substances Act.

This federal *habeas* proceeding nearly rivaled the complexity of Johnson's trial. It involved 18 days of evidence, in four different phases, spanning most of 2011. Fifty-nine witnesses testified and thousands of pages of exhibits were admitted, followed by hundreds of pages of briefing and a full day of oral arguments. Although I find shockingly numerous and disturbing constitutional deficiencies in the performance of Johnson's alarmingly dysfunctional trial team,[3] the most imposing decisions for me are whether

---

[3]The level of dysfunction in the defense team is demonstrated, for example, by a series of exhibits summarizing client contact with Johnson. Exhibit 66 details and totals the hours of in-person client contact by all members of the defense team during Johnson's incarceration from August 2000, when the attorney identified herein as Lead Counsel appeared to represent her on the original non-capital charges, through December 19, 2005, the day before her sentencing hearing after her conviction on capital charges. It shows the following hours of in-person client contact by the "core" defense team: Lead Counsel, 42 hours; Learned Counsel, 62.9 hours; Co-Counsel, 5.6 hours; Waterloo Counsel, 3.8

(continued...)

Johnson suffered any constitutional prejudice or demonstrated any other grounds for relief from either her convictions or death sentences.

The Assistant United States Attorney who single-handedly represented the United States in this *habeas* proceeding and was lead counsel in both the Honken and Johnson trial prosecutions has throughout these more than decade-long proceedings represented the Department of Justice with unsurpassed skill, determination, unparalleled hard work, zealousness, civility, and professionalism. If there is a Medal of Honor for AUSAs for service to the DOJ and the nation, it should surely be given and worn proudly by Northern District of Iowa AUSA C.J. Wiliams. Johnson's current *habeas* team was, unfortunately, the second one appointed. The first was removed for ethical reasons shortly before the scheduled hearing was to begin. This second team undertook the representation of Johnson literally at the eleventh hour and was forced to get up to speed on a case that literally had

---

[3](…continued)
hours; a paralegal, 371 hours; the mitigation specialist, 10.2 hours; and the original investigator, 4.6 hours. The gross imbalance between the hours of client contact by the paralegal and the other members of the defense team is obvious. That gross imbalance appears even more glaring from a bar chart, Petitioner's Exhibit 68, and a pie chart, Petitioner's Exhibit 69, which summarize all contacts with Johnson, including telephone contacts that she initiated, as well as in-person contacts, drawn from billing records. *See* Hearing Transcript, 1737-1743 (testimony of Russell Stetler, Federal Death Penalty Projects national mitigation coordinator). The pie chart indicates the following percentages of contact time, as follows: Lead Counsel, 17%; Learned Counsel, 12%; Co-Counsel, 1%; Waterloo Counsel, 1%; mitigation specialist, 3%; original investigator, 2%; and paralegal, 64%. There is no excuse for a paralegal to have three times as much contact with a capital defendant as all of the defendant's trial attorneys combined, and no excuse for a mitigation specialist and investigator to have so little contact time. The relatively small amount of contact that the attorneys, the mitigation specialist, and the original investigator had with Johnson indicates that there was little direct exchange of information between them and Johnson and little opportunity for these key members of Johnson's defense team to develop the necessary rapport with Johnson to represent her effectively.

been abandoned by the first team.  Indeed, I filed my first ethics complaint in my judicial career against the lead out-of-state lawyer on the first *habeas* team.  The second team, like AUSA Williams, responded with unsurpassed skill, determination, unparalleled hard work, zealousness, civility, and professionalism.   Their service to their client under extraordinarily difficult time pressures was remarkable and exemplified the highest calling of the capital defense bar and the legal profession.  They, too, earned my unyielding respect and admiration.  Lead counsel for the second *habeas* team was Michael Burt in San Francisco, California, who was ably assisted by Marcia A. Morrissey in Santa Monica, California, with additional support from Mohammed Ali Hamoudi and Nancy S. Pemberton, both in San Francisco, California.

I am sure that most who come across this decision will now simply skip to the table at the end of this lengthy opinion that summarizes my disposition of each of Johnson's claims for § 2255 relief—if they have not already done so.  I cannot blame them, because I have found the process agonizing and the results disturbing.  Nevertheless, I hope that those who do follow me step-by-step through all of the analysis that leads me to my often painful conclusions will understand those conclusions, even if they do not agree with them.

## I.  INTRODUCTION

### A.  Factual Background

The factual and procedural background to Johnson's convictions has been set forth in considerable detail, not only by this court, *see United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005), but by the Eighth Circuit Court of Appeals, *see United States v. Johnson*, 495 F.3d 951, 957-60 (8th Cir. 2007), *cert. denied*, ___ U.S. ___, 129 S. Ct.

32 (2008).[4] A much more succinct recitation is appropriate here, where the focus is not

[4]Indeed, the capital cases against Honken and Johnson generated more than two dozen published rulings on pre-trial, trial, and post-trial issues. *See United States v. Honken*, 477 F. Supp. 2d 1004 (N.D. Iowa 2007) (analysis of the procedure provided by Rule 10(c) of the Federal Rules of Appellate Procedure for reconstruction of the record when a transcript or other recording is unavailable); *United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005) (denying the defendant's request for post-trial relief); *United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005) (denying the defendant's motion for judgment of acquittal or new trial); *United States v. Johnson*, 378 F. Supp. 2d 1051 (N.D. Iowa 2005) (order on defendant's motion to exclude hearsay testimony during the penalty phase on the confrontation clause, due process clause, and statutory grounds); *United States v. Johnson*, 378 F. Supp. 2d 1049 (2005) (order denying defendant's renewed motion to strike death penalty where government was no longer asserting guilt as a "principal"); *United States v. Johnson*, 377 F. Supp. 2d 689 (N.D. Iowa 2005) (order granting in part and denying in part defendant's motion to exclude evidence and argument that she acted as a "principal" in the alleged killings); *United States v. Johnson*, 377 F. Supp. 2d 686 (N.D. Iowa 2005) (order denying defendant's motion to dismiss alleging failure to charge offenses owing to omission of "substantive connection" between killings and drug conspiracy or CCE); *United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005) (pretrial ruling on the proper degree of case-specific questioning, if any, that is permissible in the course of life- or death-qualifying prospective jurors); *United States v. Johnson*, 383 F. Supp. 2d 1145 (N.D. Iowa 2005) (order regarding intention of defendant, who had given notice of intent to rely on mental condition evidence in the penalty phase, to assert her Fifth Amendment right against self-incrimination to questions about her involvement in the charged murders during mental examinations by government mental health experts); *United States v. Johnson*, 379 F. Supp. 2d 1005 (N.D. Iowa 2005) (ruling denying defendant's motion to exclude evidence of identification of remains where defendant has stipulated to identity of remains); *United States v. Johnson*, 378 F. Supp. 2d 1041 (N.D. Iowa 2005) (order for return to defendant of privileged documents obtained by the law enforcement officers); *United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005) (ruling on second round of pretrial motions); *United States v. Johnson*, 354 F. Supp. 2d 939 (N.D. Iowa 2005) (ruling on first round of pretrial motions); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) (ruling on defendant's request for a "residual doubt" instruction in the penalty phase); *United States v. Honken*, 378 F.

(continued...)

[4] (...continued)

Supp. 2d 1010 (N.D. Iowa 2004) (ruling on the government's motion to have the defendant wear shackles at trial); *United States v. Honken*, 378 F. Supp. 2004) (ruling on the parties' second round of pre-trial motions regarding admissibility of evidence); *United States v. Honken*, 378 F. Supp. 2d 928 (N.D. Iowa 2004) (ruling on government's pre-trial motions regarding admissibility of evidence); *United States v. Honken*, 378 F. Supp. 2d 925 (N.D. Iowa 2004) (order denying motion to reconsider order for anonymous jury and determining degree of "anonymity"); *United States v. Honken*, 378 F. Supp. 2d 880 (N.D. Iowa 2004) (order for anonymous jury and determining degree of "anonymity"); *United States v. Honken*, 483 F. Supp. 2d 983 (N.D. Iowa 2004) (order closing hearing on government's motion for anonymous jury); *United States v. Honken*, 271 F. Supp. 2d 1097 (N.D. Iowa 2003) (death penalty case involving prosecution for, inter alia, "conspiracy murder" and "CCE murder"; defendant's motion to dismiss on double-jeopardy grounds: the "same analysis" is required for double-jeopardy claims based on successive prosecutions and successive punishments; Congress intended to punish, and hence to allow successive prosecution of, a drug conspiracy and either conspiracy murder or CCE murder; drug conspiracy and conspiracy murder are not the "same offense" under a *Blockburger* "same elements" test, where the underlying conspiracy is not the same, nor are they the "same offense" under a *Garrett* analysis; drug conspiracy and CCE murder are not the "same offense" under either *Blockburger* or *Garrett*); *United States v. Johnson*, 270 F. Supp. 2d 1060 (N.D. Iowa 2003) (Criminal prosecution for, inter alia, murder of witnesses in violation of 18 U.S.C. § 1512(a); defendant's motion to reconsider denial of motion to dismiss on statute of limitations grounds: whether *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) and *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003), require a different result); *United States v. Johnson*, 239 F. Supp. 2d 924 (N.D. Iowa 2003) (death penalty case involving prosecutions for murders of witnesses; defendant's challenge to constitutionality of death penalty provisions of 21 U.S.C. § 848 in the wake of the Supreme Court's decisions in *Ring v. Arizona*, ___ U.S. ___, 122 S. Ct. 2428 (2002), *Harris v. United States*, ___ U.S. ___, 122 S. Ct. 2406 (2002), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Jones v. United States*, 526 U.S. 227 (1999), in which the defendant contended that the death penalty provisions of 21 U.S.C. § 848 are unconstitutional, because they treat "aggravating factors," which permit imposition of the death penalty, as mere "sentencing factors," rather than as elements of capital offenses, and that what she calls the "relaxed evidentiary standard" in the penalty

(continued...)

[4](…continued)

phase for sentence determination under § 848 violates a defendant's due process, confrontation, and cross-examination rights.); *United States v. Johnson*, 239 F. Supp. 2d 897 (N.D. Iowa 2002) (death penalty case involving prosecutions for murders of witnesses; defendant's motion to dismiss counts: challenge to five counts of murdering witnesses on the ground that the counts were barred by the statute of limitations for non-capital crimes, where no constitutionally effective death penalty was available at the time of the alleged murders, and challenge to conspiracy count on the ground that it was untimely and duplicitous); *United States v. Johnson*, 236 F. Supp. 2d 943 (N.D. Iowa 2002) (death penalty case involving prosecutions for murders of witnesses; ruling on appeal of magistrate judge's disposition of motion to compel discovery pursuant to stipulated order: interpretation, pursuant to contract principles, of stipulation regarding copying of "non-interview documents"); *United States v. Johnson*, 225 F. Supp. 2d 1022 (N.D. Iowa 2002) (death penalty case involving prosecution for murders while engaging in a conspiracy and murders in furtherance of a continuing criminal enterprise (CCE); government's notice of intent to use evidence and defendant's motion to suppress that evidence: Determination of whether offenses charged in a second indictment, filed after a jailhouse informant obtained self-incriminating evidence from the defendant, were the "same offenses" as offenses charged in a first indictment pending at the time that the informant obtained the evidence "and as to which the evidence was suppressed by separate order" such that the Sixth Amendment right to counsel had also attached to the charges in the second indictment); *United States v. Johnson*, 225 F. Supp. 2d 1009 (N.D. Iowa 2002) (death penalty case involving prosecution for murders while engaging in a conspiracy and murders in furtherance of a continuing criminal enterprise (CCE); ruling on motion to dismiss indictment for failure to allege elements of underlying conspiracy and CCE: denying motion to dismiss counts of murder while engaging in a conspiracy, but granting dismissal of counts of murder in furtherance of a CCE without prejudice to a superseding indictment satisfying applicable standards); *United States v. Johnson*, 225 F. Supp. 2d 982 (N.D. Iowa 2002) (death penalty case involving prosecution for murders while engaging in a conspiracy and murders in furtherance of a continuing criminal enterprise (CCE); appeals of magistrate judge's rulings denying transfer to a different facility and granting in part and denying in part defendant's motion for a bill of particulars; affirming bill of particulars requiring identification of co-conspirators, supervisors, and supervisees, but reconsidering ruling denying "overt acts" information on CCE, instead requiring the

(continued…)

on the evidence leading to Johnson's conviction, but on the conduct of her trial counsel, the prosecution, and others before and during her trial. I will recount below any additional factual background specific to each of Johnson's grounds for § 2255 relief in my legal analysis.

The five persons murdered by Honken and Johnson in 1993 were Greg Nicholson, one of Honken's drug dealers; Lori Duncan, with whom Nicholson had taken up residence just a short time before; Lori Duncan's two daughters, Kandi (age 10) and Amber (age 6); and Terry DeGeus, another of Honken's drug dealers and Johnson's ex-boyfriend in what had been a stormy and physically abusive relationship. Nicholson and DeGeus were killed after Dustin Honken was indicted on drug charges, because Honken and Johnson feared that they had or might cooperate with law enforcement officers. Lori, Kandi, and Amber Duncan simply had the misfortune to be at home when Honken and Johnson came looking for Nicholson.

Somewhat more specifically, in April of 1993, Honken was indicted on drug-trafficking charges. Honken and Johnson, who was by then Honken's girlfriend and

---

4(…continued)
government to disclose the location(s), substance, time, place, and date of each overt act upon which the government intends to rely to prove the CCE underlying the CCE-murder offenses; affirming denial of defendant's motion to transfer pursuant to 18 U.S.C. § 3142(i) as to either travel time of attorneys or conditions of confinement); *United States v. Johnson*, 196 F. Supp. 2d 795 (N.D. Iowa 2002) (death penalty prosecution: suppressing incriminating evidence obtained from the defendant by a jailhouse informant pursuant to *Massiah v. United States*, 377 U.S. 201 (1964)), *rev'd*, 338 F.3d 918 (8th Cir. 2003), *reh'g granted* (Oct. 9, 2003); *United States v. Johnson*, 131 F. Supp. 2d 1088 (N.D. Iowa 2001) (joint motion on attorney representation: potential for conflict of interest in defense counsel's "successive representation" of a witness and the defendant, witness's waiver of privilege by debriefing, defendant's waiver of conflict, other methods to prevent conflict; prosecutor's appearance as a witness in a pre-trial matter.)

14

pregnant with his daughter, became concerned that Greg Nicholson had or would cooperate with law enforcement officers. Therefore, they made several attempts to find Nicholson, who had suddenly changed residences. They eventually discovered that Nicholson was living with Lori Duncan. On or about July 25, 1993, Johnson gained entry to the Duncans' house by a ruse, and Honken arrived a short time later. Johnson had acquired a gun for Honken some time earlier. There is conflicting evidence on whether Johnson initially had the gun, produced it after gaining entry to the house, and used it to hold Nicholson and the Duncans until Honken arrived, or whether Honken had the gun when he arrived. The evidence at trial showed that, at least initially, Honken and Johnson used threats to the Duncans to extort a videotaped statement from Nicholson exonerating Honken of any drug-trafficking activity. However, Nicholson and the Duncans were eventually removed from the house at gunpoint and driven into the country in a car that Johnson had borrowed from her babysitter. There, the adults were bound, gagged, and tortured, and all four victims were shot to death by Honken. Honken and Johnson then buried these four victims in a single shallow grave. In a separate episode, on or about November 5, 1993, approximately seven days after a grand jury had questioned Johnson about DeGeus's involvement in Honken's drug-trafficking activities, Johnson lured DeGeus to a meeting with Honken in a secluded location, where Honken shot him several times, then beat him with a baseball bat before he died. DeGeus was buried in another shallow grave a few miles from the burial site of Nicholson and the Duncans.

Although law enforcement suspected Honken and Johnson in the disappearances of these five people, the victim's bodies were not discovered at that time, and the 1993 drug charges against Honken were dropped. Honken was indicted again in 1996 on other federal drug charges, pleaded guilty to some of those charges in 1997, and commenced serving a long sentence, which I imposed on February 25, 1998. *See* Case No. CR 96-

3004-MWB (N.D. Iowa) (docket no. 183); *see also id.* (docket no. 219) (amended judgment dated February 1, 2000).

## B. Criminal Proceedings

On July 26, 2000, years after the disappearances of Nicholson, the Duncans, and DeGeus, Johnson was charged with seven non-capital crimes relating to their murders, even though their bodies still had not been found. On August 2, 2000, a very experienced federal criminal defense attorney from Cedar Rapids, Iowa, was appointed to represent Johnson. That attorney did not have any capital case experience, however.[5]

---

[5]To my knowledge, there were no living, practicing attorneys in Iowa in 2000 with capital case experience, because Iowa abolished the death penalty for state offenses in 1965. *See* Acts 1965 (61 (G.A.) ch. 435, § 4. Moreover, the last federal capital case in Iowa was the conviction of Victor Harry Feguer, who was tried in the United States District Court for the Northern District of Iowa on March 1 to 12, 1961, for violating the Kidnapping Act, 18 U.S.C. § 1201(a), convicted, sentenced to death by hanging upon a jury's recommendation pursuant to 18 U.S.C. § 3566 and IOWA CODE § 792.9 (1958), and executed on March 15, 1963. *See Feguer v. United States*, 302 F.2d 214, 216 (8th Cir.), *cert. denied*, 371 U.S. 972 (1962). For thirty-eight years, until the execution of Timothy McVeigh, on June 11, 2001, Feguer was the last person executed by the federal government. *See, e.g.*, Kate Santich, *Last Man To Die: Who Was Victor Feguer? Timothy McVeigh's Case Recalls The Government Execution 38 Years Ago*, ORLANDO SENTINEL, June 9, 2001, 2001 WLNR 10877397.

During more than a third of that hiatus, there was simply no federal death penalty—or no *effective* federal death penalty. This is so, because in 1972, the United States Supreme Court declared that the imposition of the death penalty under the capital offense statutes then existing in Georgia and other states was unconstitutional. *Furman v. Georgia*, 408 U.S. 238 (1972) (*per curiam*). Although "federal statutes authorizing the death penalty remained on the books, [they] were not invoked following [the Supreme Court's] decision in [*Furman*], which led to a hiatus in death penalty adjudications." *Jones v. United States*, 527 U.S. 373, 406. n.3 (1999) (Ginsburg, J., dissenting) (citing Rory K.

(continued...)

16

[5](...continued)

Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 FORD. URB. L.J. 347, 349, n. 5, 372-380 (1999)).

In the post-*Furman* era, Congress first passed a statute imposing the death penalty for certain acts of air piracy in the Antihijacking Act in 1974, Pub. L. No. 93-366, § 105, 88 Stat. 409, 411-13, originally codified at 29 U.S.C.App. § 1472, then later recodified at 29 U.S.C. § 46502. However, "the federal government never prosecuted anyone under the 1974 version of the law, [and] its validity was never tested in the courts." Eric A. Tirschwell and Theodore Herzberg, *Politics and Prosecution: a Historical Perspective on Shifting Federal Standards for Pursuing the Death Penalty in Non-Death Penalty States*, 12 U. PA. J. CONST. L. 57, 74 (Oct. 2009). In 1986, Congress passed two additional statutes including death penalty provisions, the Criminal Law and Procedure Technical Amendments Act of 1986, § 61, 100 Stat. 3614, which authorized the death penalty for killing witnesses, and the Department of Defense Authorization Act, 1986, § 534, 99 Stat. 634-635, which amended the Uniform Military Justice Act "to establish weighing procedures for courts-martial considering the death penalty for espionage." *Jones*, 527 U.S. at 406 n.3. "In the court-martial system, as of September 2010, there were seven individuals sentenced to the death penalty. The last military execution was in 1961." David S. Kris, *Law Enforcement as a Counterterrorism Tool*, J. NAT'L SECURITY L & POL'Y, 65 n.180 (2011) (citing Death Penalty Information Center, The U.S. Military Death Penalty, available at http://www.deathpenaltyinfo.org/ us-military-death-penalty). It would be difficult to describe the 1972 Act or the two 1986 Acts as either effective or comprehensive.

It was not until 1988 that Congress effectively reinstated the federal death penalty albeit for only "a small category of cases," involving "murder resulting from certain drug-related offenses," in the Anti-Drug Abuse Act of 1988 (ADAA), Pub.L. 100-690, 102 Stat. 4390, codified at 21 U.S.C. § 848(e). *Id.* at 406 & n.2; *Atkins v. Virginia*, 536 U.S. 302, 313-14 (2002). This is the death penalty statute under which both Honken and Johnson were convicted and sentenced to death. As of 1995, six individuals had been sentenced to death under the ADAA, but only one had been executed. Tracy L. Snell, Bureau of Justice Statistics, *Capital Punishment, 1994* (1995), *available at* http://bjs.ojp.usdoj.gov/ content/pub/pdf/cp94.pdf.

"Congress enacted comprehensive death penalty legislation in 1994," when it passed the Violent Crime Control and Law Enforcement Act of 1994, which contained the Federal

(continued...)

17

Unbeknownst to me, this attorney became Johnson's self-proclaimed "lead counsel" after I appointed additional attorneys to represent Johnson. Therefore, I will refer to this

---

<sup>5</sup>(...continued)

Death Penalty Act (FDPA), 108 Stat. 1959, codified at 18 U.S.C. § 3591-3599. *Jones*, 527 U.S. at 406-07. The FDPA and its procedures are "[a]pplicable to over 40 existing and newly declared death-eligible offenses." *Id.* at 407; Little, *The Federal Death Penalty*, 26 FORD. URB. L.J. at 391 & n.242; *see also* Eileen M. Connor, *The Undermining Influence of the Federal Death Penalty on Capital Policymaking and Criminal Justice Administration in the States*, 100 J. CRIM. L. & CRIMINOLOGY 149, 155 n.24 (Winter 2010) (providing a "non-exhaustive list of federal crimes that carry the death penalty," and adding that "[t]he FDPA prescribes procedures for implementing the death penalty in relation to over sixty substantive crimes"); Federal Death Penalty Information Center Website (http://www.deathpenalty info.org/ federal-laws-providing-death-penalty) (likewise identifying federal laws providing for a death penalty). Refinements have followed. "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) added four more crimes to the list of death-eligible federal offenses." Connor, *The Undermining Influence*, 100 J. CRIM. L. & CRIMINOLOGY at 155-56. Finally, in 2006, as part of the USA Patriot Act Improvement and Reauthorization Act, Pub. L. 109-177, 120 Stat. 231, the death penalty provisions of the ADAA were left in place, and still codified at 21 U.S.C. § 848(e), but the death penalty procedural provisions in other subsections of § 848 were repealed, because a § 848(e) capital offense became subject to the procedures of the FDPA, 18 U.S.C. § 3591(b).

According to statistics maintained by the Federal Death Penalty Resource Counsel on its website, as of February 22, 2012, there were 57 prisoners on federal death row, 18 of whom had appeals pending, and 39 of whom had § 2255 motions pending. *See* http://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=94&id=2094 (last accessed March 22, 2012). According to the same website, three federal prisoners have been executed since reinstatement of the federal death penalty in 1988, and one has received clemency. *Id.* Another 26 federal defendants are currently awaiting or are currently on trial on capital charges. *Id.* According to the Death Penalty Information Center, six of the people on federal death row, including Honken and Johnson, were convicted of federal capital offenses in states that do not have their own death penalty law. *See* http://www.deathpenaltyinfo.org/ federal-death-penalty?scid=29&did=147 (last accessed March 22, 2012).

18

attorney in this ruling as Lead Counsel. Another attorney, from Waterloo, Iowa, was appointed as co-counsel, but was later removed from the case, because of a potential conflict of interest arising from his prior representation of a possible witness against Johnson. Lead Counsel continued to represent Johnson through her indictment and trial on the capital charges against her.

While Johnson was incarcerated after her arrest on those charges, she became acquainted with a jailhouse informant, Robert McNeese. Despite specific warnings from Lead Counsel not to talk to McNeese, because McNeese had informed on one of Lead Counsel's prior clients, Johnson did talk to McNeese. McNeese convinced Johnson that he could get someone already serving a life sentence to confess to the killings, if she could give him information that would provide a credible basis for the false confession. Johnson provided McNeese with a map showing the locations where the five murder victims were buried and other information about the murders. McNeese turned the map and the other information over to law enforcement officers, and the bodies were recovered in October and November 2000. When Johnson heard the news that the first set of bodies had been recovered, she attempted to commit suicide.

After recovery of the bodies made the death penalty a real possibility in Johnson's case, but before capital charges were actually filed, I consulted the Federal Public Defender for the Northern and Southern Districts of Iowa, pursuant to 18 U.S.C. § 3005, concerning a recommendation for the appointment of counsel with the necessary qualifications to act as counsel "learned in the law applicable to capital cases. . . ." *See* 18 U.S.C. § 3005. On December 12, 2000, pursuant to 18 U.S.C. § 3005, and upon the recommendation of the Federal Public Defender and my determination that he was exceptionally well-qualified, I appointed an attorney from Kansas City, Missouri, to serve as "learned" co-counsel for Johnson in this case along with Lead Counsel and Waterloo

co-counsel. I will refer to that attorney in this ruling as Learned Counsel. Eventually, on March 12, 2001, at the request of Johnson's counsel, and after Waterloo counsel withdrew, I appointed another attorney from Des Moines, Iowa, as additional co-counsel. I will refer to that attorney in this ruling as Co-Counsel. I determined that an attorney with Co-Counsel's experience with the Sentencing Commission and his reputation for brief writing and appellate work would round out the skills of Johnson's defense team.

Honken and Johnson were eventually indicted in 2001, in separate indictments, on five capital charges of "conspiracy murder," that is, murder while engaging in a drug-trafficking conspiracy, and five capital charges of "CCE murder," that is, murder while working in furtherance of a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. They were tried separately, with Honken's trial first in the late summer of 2004. Honken was convicted on all counts on October 14, 2004, and, on October 27, 2004, the jury made a binding recommendation that he be sentenced to death for the murders of the two children, with life imprisonment for the murders of the adults. In part because Honken had already been convicted as a "principal" in the murders, the prosecution elected to go to trial against Johnson only on the theory that she "aided and abetted" the killings. The prosecution also dismissed the non-capital counts against Johnson, from the 2000 indictment, prior to her trial.

Jury selection in Johnson's case took fifteen days in April and May 2005, and her trial eventually began on May 4, 2005. Although I had suppressed McNeese's evidence, the Eighth Circuit Court of Appeals reversed that ruling, and Johnson's confession to McNeese and the maps that she gave him were presented at trial, as well as her alleged confessions to other jailhouse informants and to a close friend, and copious other evidence of her involvement in the crimes. After ten days of evidence and a day of deliberations in the merits phase of her trial, the jury found Johnson guilty of all ten capital counts on

May 24, 2005. In the eligibility phase, which began and ended on May 31, 2005, the jury returned a verdict finding Johnson "eligible" for the death penalty on all ten capital counts. The penalty or mitigation phase began on May 31, 2005, immediately after the eligibility phase verdict, and involved another six days of evidence and a hiatus before closing arguments. The jury began its deliberations on the penalty phase verdict on June 20, 2005, and returned a verdict on June 21, 2005, finding that Johnson should be sentenced to death for the murders of the two Duncan children, their mother, Lori Duncan, and Johnson's ex-boyfriend, Terry DeGeus, but that Johnson should be sentenced to life imprisonment for the murder of Greg Nicholson. Thus, Johnson, the "aider and abettor," received death sentences for four of the murders, including the murders of the two children, while Honken, the "principal," received death sentences only for the murders of the two children.

I denied Johnson's post-trial motions on December 16, 2005. *See United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005). Johnson continued to be represented on her direct appeal by Co-Counsel and Learned Counsel, but Lead Counsel did not participate further in the case. On July 30, 2007, the Eighth Circuit Court of Appeals affirmed Johnson's convictions for "CCE murder," but remanded the case to me to vacate Johnson's multiplicitous convictions and sentences for "conspiracy murder." *See United States v. Johnson*, 495 F.3d 951, 980-81 (8th Cir. 2007). The United States Supreme Court denied Johnson's petition for a writ of *certiorari* on October 6, 2008, *see Johnson v. United States*, ___ U.S. ___, 129 S. Ct. 32 (2008), and denied her petition for rehearing on December 8, 2008, *see Johnson v. United States*, ___ U.S. ___, 129 S. Ct. 756 (2008). On June 11, 2009, I vacated Johnson's five convictions and sentences for "conspiracy murder" as multiplicitous of her convictions and sentences for "CCE murder," pursuant to the September 28, 2007, Mandate from the Eighth Circuit Court of Appeals.

## C. Section 2255 Proceedings

On August 8, 2008, even before Johnson's petition for writ of *certiorari* on her convictions had been denied, Johnson filed a Motion For Appointment Of Counsel To Pursue Post-Conviction Remedies (Crim. docket no. 745) in her criminal case. I granted that motion on August 11, 2008, by appointing two attorneys to represent Johnson in her § 2255 proceedings. *See* Order (Crim. docket no. 749). Thus, Johnson had the assistance of counsel for more than a year before the deadline to file her anticipated § 2255 motion. On August 14, 2009, I also entered a Scheduling Order (Crim. docket no. 807) that set primary and back-up hearing dates on the anticipated § 2255 motion for May 3, 2010, and July 12, 2010, respectively.

On October 5, 2009, Johnson filed her original Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Original § 2255 Motion) (Civ. docket no. 1), through appointed counsel. On October 29, 2009, I entered an Initial Review Order (Civ. docket no. 7) that required the respondent to file a response to Johnson's § 2255 Motion by November 30, 2009, and the respondent did so. *See* Resistance To Plaintiff's Motion Under 28 U.S.C. § 2255 (Civ. docket no. 15). On January 12, 2010, Johnson, who was by then assisted by four attorneys, filed an Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Civ. docket no. 23), and on January 21, 2010, Johnson filed a Corrected, Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Corrected Amended § 2255 Motion) (Civ. docket no. 26). This prolix version of Johnson's § 2255 motion asserted more than a dozen claims of ineffective assistance of trial counsel, two claims of prosecutorial misconduct, one claim of juror misconduct, and five other constitutional challenges to Johnson's conviction or execution. The respondent filed an Amended Resistance To

Plaintiff's Corrected, Amended Motion Under 28 U.S.C. § 2255 (Civ. docket no. 27) on February 4, 2010. By Order (Civ. docket no. 28), dated February 11, 2010, I reiterated the primary and back-up evidentiary hearing dates of May 3, 2010, and July 12, 2010. Those hearing dates were eventually reset more than once.

On September 7, 2010, after the evidentiary hearing had been reset for October 4, 2010, I found it necessary to relieve Johnson's lead § 2255 counsel of that role, to appoint new lead counsel, and to continue the evidentiary hearing yet again to March 7, 2011, to allow new lead counsel reasonable time to prepare. *See* Order Regarding Rescheduling Of Evidentiary Hearing And Withdrawal Of Lead Counsel (Civ. docket no. 67). Eventually, Johnson's entire first team of § 2255 attorneys was replaced by her present team of four attorneys.

There were numerous bumps in the road, concerning budgeting, timing, and subpoenaing of witnesses, before Johnson's § 2255 motion came on for evidentiary hearing. On January 17, 2011, I entered an Order (Civ. docket no. 106) modifying the prior Scheduling Orders to set the evidentiary hearing in two parts, the first to begin on March 7, 2011, to run for seven consecutive days, and the second to begin on June 13, 2011, to run through June 21, 2011, including the weekend, if necessary, to accommodate scheduling of mental health testing, preparation and exchange of expert reports, and presentation of all of the anticipated evidence.

Part I of the evidentiary hearing began on March 7, 2011, with Johnson personally present, and continued for eight days, with testimony from numerous fact witnesses, including Johnson's three trial attorneys, and submission of voluminous exhibits. At the conclusion of Part I on March 15, 2011, it became apparent that the scheduled hearing days in June would not be sufficient to submit all of the remaining evidence anticipated. Therefore, by Order (Civ. docket no. 198) entered March 18, 2011, I rescheduled Part II

of the hearing for May 2, 2011, to run for six days, with what would be Part III to begin on June 13, 2011, and run through June 21, 2011.

Part II of the evidentiary hearing began on May 2, 2011, again with Johnson personally present, and concluded on May 5, 2011, earlier than anticipated, probably in large part because I denied most of Johnson's numerous requests for subpoenas for witnesses. Nevertheless, Part II of the hearing involved the testimony of twelve witnesses for Johnson, including prosecutors involved in plea negotiations, one of Dustin Honken's trial attorneys, certain fact witnesses, and the continuation of testimony by one of Johnson's trial attorneys. The respondent also presented brief testimony from the case agent assigned to the case. Numerous exhibits were also submitted by Johnson and by the respondent.

As anticipated at the conclusion of Part II of the evidentiary hearing, on June 1, 2011, Johnson filed a further amendment of her § 2255 Motion, her Second Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Second Amended § 2255 Motion) (Civ. docket no. 263). The Second Amended § 2255 Motion clarified some claims, divided other portions of claims into separate claims, and added additional claims of ineffective assistance of appellate counsel. After I pointed out during Part III of the evidentiary hearing that there were discrepancies between the table of contents to the Second Amended § 2255 Motion and the pages on which claims were actually presented in the body of the Motion, Johnson filed a Corrected Table Of Contents For Second Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Civ. docket no. 274) on June 14, 2011.

Part III of the evidentiary hearing began on June 13, 2011, also with Johnson personally present, and ended on June 17, 2011. Although I had anticipated that this part of the hearing would involve primarily, if not exclusively, testimony of mental health experts, the evidence presented was rather broader in scope. Specifically, over four and a half hearing days, Johnson presented the testimony of the three mental health experts who testified on her behalf at trial as well as the testimony of one mental health expert consulted by her trial team, but not used at trial; three mental health experts hired by her § 2255 team; an expert on the legal literature regarding handwriting analysis; a *Strickland* expert; and a presenter of a lecture on mental health issues in capital cases from a death penalty seminar attended by one of Johnson's trial attorneys. The respondent presented the testimony of one of Johnson's treating psychiatrists from the Bureau of Prisons. Of course, voluminous exhibits accompanied the testimony of these witnesses. In an Order (Civ. docket no. 280), filed after the conclusion of Part III, I noted that, on June 17, 2011, Johnson had made on the record what I found was a knowing and voluntary waiver of her physical presence at Part IV of the evidentiary hearing and at the subsequent oral arguments on the merits of her § 2255 Motion, set for October 24, 2011. Therefore, I directed the United States Marshal to provide for Johnson's return to the Bureau of Prisons facility in which she had been incarcerated, or to such other facility as the Bureau of Prisons determined was appropriate. Johnson did not appear personally at any of the further proceedings on her § 2255 Motion.

Before Part III of the evidentiary hearing, after Johnson made some additional revelations to one of her § 2255 mental health experts, it became clear that the respondent's mental health expert should be allowed to conduct a further interview of Johnson and to prepare a supplemental report before he testified. Therefore, I set Part IV of the evidentiary hearing for two days beginning August 11, 2011, to receive the

testimony of the respondent's mental health expert. However, Part IV was subsequently reset for August 9, 2011, owing to an unanticipated scheduling conflict. *See* Order (Civ. docket no. 290).

Although I had established a longer post-hearing briefing schedule before Part III of the evidentiary hearing, *see* Order (Civ. docket no. 255), it appeared to me at the conclusion of Part III that a shorter briefing schedule and shorter, more focused briefs would be appropriate in this case. Therefore, after some discussion with the parties concerning briefing deadlines and the issues on which I was particularly interested in receiving briefing, I entered an Order (Civ. docket no. 279) on June 17, 2011, setting a briefing schedule to be completed by October 21, 2011, limiting the petitioner's and the respondent's opening briefs to 100 pages each, limiting the petitioner's reply brief to 50 pages, and setting oral arguments on the merits of Johnson's § 2255 Motion for October, 24, 2011.

Owing to scheduling conflicts, the respondent was given an extension to and including July 8, 2011, to file a resistance to Johnson's Second Amended § 2255 Motion, but actually filed its Amended Answer To Petitioner's Second Amended Motion To Vacate, Set Aside, Or Correct Conviction And Sentence Pursuant To 28 U.S.C. § 2255 (Amended Answer To Second Amended § 2255 Motion) (Civ. docket no. 285) on July 5, 2011, before that deadline. As I had authorized during Part III of the evidentiary hearing, the respondent limited this Answer to disputing whether certain of Johnson's claims in her Second Amended § 2255 Motion related back to claims raised in her Original § 2255 Motion. By Order (Civ. docket no. 286), filed July 5, 2011, I found that the threshold question of whether certain claims related back and, thus, should be resolved on the merits, warranted separate briefing. Therefore, I set deadlines and page limits for such separate briefing. On August 19, 2011, Johnson filed her Reply To Government's

Amended Answer (Civ. docket no. 309), responding to the respondent's contentions that certain claims did not relate back. The respondent filed a Response To Petitioner's Reply To The Government's Amended Answer (Civ. docket no. 310) on August 26, 2011.

As I reviewed petitioner's claims after Part III of the evidentiary hearing, I found her claim identification, tied to headings in the various versions of her § 2255 Motion, to be cumbersome and confusing, and the order in which the claims were asserted to be haphazard. Consequently, I reorganized Johnson's claims for § 2255 relief by phases of her trial, rather than in the order in which her § 2255 counsel presented them, and renumbered them consecutively. While my reorganization may be as idiosyncratic as Johnson's, it at least has the advantage of addressing her claims in chronological order, thus more clearly defining what phase or phases of the trial are affected, if relief on one or more claims is appropriate. By Order (Civ. docket no. 287), filed July 6, 2011, I directed the parties to use the claim numbers that I had assigned in all further briefing, as indicated in a Claim Chart. That Claim Chart showed the petitioner's claims as I have renumbered them, then as identified in the table of contents to her Second Amended § 2255 Motion (Civ. docket no. 263). In that Claim Chart, I simplified Johnson's statements of her claims and inserted some summary "leaders" for claims that I had grouped together by topic (*e.g.*, "Juror No. 55," "Demeanor and competence," "Investigation and presentation").

On July 12, 2011, also after further review of Johnson's Second Amended § 2255 Motion and prior versions of her motion, I entered another Order (Civ. docket no. 291), inviting the parties to address in their "merits" briefs the effect of the petitioner's apparent disclaimer of Claim 28 in the earlier version of her § 2255 Motion.

Part IV of the evidentiary hearing began and ended on August 9, 2011. As anticipated, the only witness in that part of the evidentiary hearing was the respondent's

mental health expert, who had also been retained for Johnson's trial, but not used, and who had subsequently examined her in relation to the § 2255 proceedings.

At the conclusion of Part IV, I revisited the question of whether or not page limits were appropriate for the parties' "merits" briefs. I concluded that they were not, particularly because this was a capital *habeas* case. I did, however, indicate that there were certain claims on which I desired briefing and other claims on which I felt I did not need or want briefing, although I left the parties free to brief any issues they chose.

On September 2, 2011, Johnson filed her Corrected Post Hearing Briefing In Support Of Second Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody, And Request To File Additional Briefing (Corrected Post-Hearing Brief) (Civ. docket no. 314). This brief included 209 pages of argument on 29 of her 63 claims. By Order (Civ. docket no. 315), filed September 6, 2011, I denied Johnson's request for additional briefing, to which, ironically, she had dedicated all 5 pages of the "Introduction" to her Corrected Post-Hearing Brief. On October 3, 2011, the respondent filed its Post-Hearing Brief In Resistance To Petitioner's Motion Under 28 U.S.C. § 2255 (Post-Hearing Resistance Brief) (Civ. docket no. 325), consisting of 146 pages of argument. Johnson filed a Reply (Civ. docket no. 340) on October 21, 2011, consisting of 176 pages of argument.

Also on October 21, 2011, Johnson filed another Motion To Amend Second Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody Pursuant To Federal Rule Of Civil Procedure 15(a)(2) And (c) And Local Rule 15 (Civ. docket no. 339). In that motion, Johnson sought leave to file a Third Amended § 2255 Motion to add an additional claim that she was constitutionally entitled to an instruction that the "reasonable doubt" standard governed the jurors' decision about whether aggravating factors sufficiently outweighed mitigating factors to warrant

imposition of the death penalty, and that her trial and appellate counsel were ineffective in failing to raise this claim, relying on the August 3, 2011, decision of the Sixth Circuit Court of Appeals in *United States v. Gabrion*, 648 F. 3d 307, 325 (6th Cir. 2011). Because I was aware that counsel for the respondent had been involved in an evidentiary hearing on the § 2255 Motion filed by Johnson's co-defendant, Dustin Honken, shortly before the respondent's response to Johnson's motion to amend was due, I *sua sponte* extended the respondent's deadline to respond to that motion until November 18, 2011, so that the respondent could be fully heard on the matter. The respondent filed its Resistance To Petitioner's Motion To Amend, For The Third Time, Her Motion To Vacate, Set Aside, Or Correct Conviction And Sentence Pursuant To 28 U.S.C. § 2255 (Civ. docket no. 366) on November 14, 2011, ahead of the deadline.

I heard oral arguments on the merits of Johnson's § 2255 Motion, as amended, on October 24, 2011. As with all of the other proceedings in this case, Johnson's "new" § 2255 team and counsel for the respondent performed with consummate ability, zeal, and professionalism. Thus, the oral arguments provided invaluable observations about the merits of Johnson's claims. At the conclusion of the oral arguments, I found that only one issue required further briefing, the law applicable to "cumulative error" in the Eighth Circuit. Therefore, I set deadlines for briefing on that issue. Johnson filed her Brief On Cumulative Error In The Eighth Circuit (Civ. docket no. 345) on November 7, 2011; the respondent filed its Brief On Cumulative Error In The Eighth Circuit (Civ. docket no. 367) on November 15, 2011; and Johnson filed her Reply To Government's Brief On Cumulative Error In The Eighth Circuit (Civ. docket no. 368) on December 1, 2011.

In short, the evidentiary hearing on Johnson's § 2255 Motion involved four "phases" and 18 days of evidence, testimony of 58 witnesses, and submission of many thousands of pages of documentary evidence, and it concluded, on day 19, with six hours

of oral arguments on the merits of Johnson's claims for § 2255 relief. All briefs have now been filed, and this matter is now fully submitted.

### D. Summary Of Claims

As indicated above, Johnson makes 63 claims for post-conviction relief in her Second Amended § 2255 Motion (Civ. docket no. 263), including claims based on ineffective assistance of counsel, prosecutorial misconduct, juror misconduct, and other claims that her conviction or execution would violate the Eighth Amendment to the United States Constitution. She has asserted a sixty-fourth claim for relief in a proffered Third Amended § 2255 Motion (Civ. docket no. 339). However, she chose to brief only 29 of those claims in her Corrected Post-Hearing Brief (Civ. docket no. 314). The attached Claim Chart shows Johnson's claims as I have renumbered them, then as identified in the table of contents to her Second Amended § 2255 Motion. As also indicated above, I have simplified Johnson's statements of her claims and inserted some summary "leaders" for claims that I have grouped together (*e.g.*, "Juror No. 55," "Demeanor and competence," "Investigation and presentation"). Although I reorganized the 63 claims in the Second Amended § 2255 Motion into chronological order, at least by phases of the trial, the sixty-fourth claim, in the proffered Third Amended § 2255 Motion, is a mitigation phase claim. Therefore, Claim 64 has been interpolated after Claim 46 as the "last" claim concerning the mitigation phase. Claims that were ultimately briefed in Johnson's Corrected Post-Hearing Brief are shown in **bold**.

| GROUNDS FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL | | |
|---|---|---|
| **PRETRIAL PHASE** | | |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim**  (Claims in **bold** were briefed) |
| **1.** | **One, § A** | **Failure to pursue a disposition for a sentence of less than death** |
| 2. | One, § B | Failure to proceed to trial at a time that would have precluded the government from filing a timely notice of intent to seek the death penalty |
| 3. | One, § DD.a-c, f | Failure to timely and effectively make a number of meritorious motions, objections, and arguments |
| **JURY SELECTION** | | |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim**  (Claims in **bold** were briefed) |
| 4. | One, § C.1 | Juror No. 55:  Ineffective *voir dire* |
| 5. | Six | Juror No. 55:  Misconduct by Juror |
| 6. | One, § C.2 | Failure to structure *voir dire* to identify jurors with prejudicial views on Pentecostal religion and women |
| 7. | One, § DD.e, g | Failure to timely and effectively (a) re-urge Johnson's motion for change of venue and (b) object to the manner in which peremptory challenges were allocated |

| MERITS PHASE | | |
|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed) |
| **8.** | **One, § D** | **Demeanor and competence: Failure to reduce petitioner's medication or to address the effects of the medication on (a) her demeanor at trial and (b) her ability to participate in her own defense, in violation of her right to due process and a fair trial** |
| 9. | One, § E | Demeanor and competence: Failure to seek a competency hearing |
| 10. | Five | Demeanor and competence: Petitioner was tried while incompetent, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution |
| 11. | One, §§ F and H.1 | Investigation and presentation: Failure to investigate Robert McNeese or to impeach him with the court's findings regarding his credibility at the *Massiah* hearing |
| 12. | One, §§ F and H.2 | Investigation and presentation: Failure to investigate and effectively examine Christie Gaubatz |
| 13. | One, § T | Investigation and presentation: Failure to effectively cross-examine Wendy Jensen |
| 14. | One, §§ F and I | Investigation and presentation: Failure to present evidence of Terry DeGeus's involvement in the killing of Gregory Nicholson and the Duncans |
| 15. | One, § F | Investigation and presentation: Failure to use a forensic expert or to investigate Phyllis Proscovec, the gun shop owner, an after-acquired evidence theory, or an alibi |
| 16. | One, § G | Investigation and presentation: Presentation of a "mere presence" defense without investigation and despite petitioner's repeated assertions that she was not present at the Nicholson/Duncan killings |

| MERITS PHASE (continued) | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim  (Claims in **bold** were briefed) |
| 17. | One, § JJ, Seven | Cumulative errors render the petitioner's conviction constitutionally infirm |

| MITIGATION PHASE | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim  (Claims in **bold** were briefed) |
| **18.** | **One, § J** | **Confrontation of aggravating evidence:  Failure to present evidence of battered woman's syndrome to explain the relationship between petitioner and Terry DeGeus to rebut the prosecution's theory of her motive for killing him** |
| **19.** | **One, § M** | **Confrontation of aggravating evidence:  Failure to present readily available evidence about Dustin Honken to refute the prosecution's argument that Angela Johnson was "worse" than Honken** |
| **20.** | **One, § N** | **Confrontation of aggravating evidence:  Failure to use the prosecution's arguments at Dustin Honken's trial as party admissions to rebut the government's evidence that petitioner was "worse" than Honken** |
| **21.** | **One, § P** | **Confrontation of aggravating evidence:  Failure to discover and present information regarding Dustin Honken's plans to kill prosecutor Reinert and his family and Honken's membership in a white supremacist prison organization** |
| **22.** | **One, § Q** | **Confrontation of aggravating evidence:  Failure to address aggravating evidence at the merits and mitigation phases of the trial** |
| **23.** | **One, § R** | **Confrontation of aggravating evidence: Failure to limit future dangerousness evidence to future danger in prison** |

| | | MITIGATION PHASE (continued) |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed) |
| **24.** | **One, § S** | **Confrontation of aggravating evidence: Failure to object to Kathy Rick's triple hearsay testimony about petitioner's alleged possession of a gun** |
| **25.** | **One, § U** | **Confrontation of aggravating evidence: Failure to object to Kyla Davis's testimony that petitioner tried to find out where she lived and what car she drove** |
| **26.** | **Two** | **Prosecutorial misconduct: The prosecution's failure to correct false testimony at Angela Johnson's trial violated the Fifth and Eighth Amendments to the United States Constitution** |
| **27.** | **Three** | **Prosecutorial misconduct: The prosecution's violation of *Brady v. Maryland* by failing to disclose Dustin Honken's planned violent attack on the trial prosecutor and his association with a white supremacist prison organization** |
| **28.** | **Four** | **Prosecutorial misconduct: The prosecution's violation of the petitioner's rights under the Sixth and Eighth Amendments and the Due Process Clause by presenting inconsistent arguments at her trial and that of her co-defendant** |
| **29.** | **One, § BB.1** | **Ineffective mitigation: The testimony of Holly Dirksen** |
| **30.** | **One, § BB.2** | **Ineffective mitigation: The testimony of Douglas Book** |
| **31.** | **One, § BB.3** | **Ineffective mitigation: The testimony of Susan Marsolek** |
| **32.** | **One, § CC** | **Ineffective mitigation: Failure to provide psychiatric pharmacologist Roswell Lee Evans with data regarding petitioner's drug history, rendering his expert testimony virtually irrelevant** |

| MITIGATION PHASE (continued) | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed) |
| **33.** | **One, § EE** | **Ineffective mitigation: Use of multi-faceted, overly-complicated yet incomplete mitigating factors for the jury to weigh rather than simple, straight-forward facts that encompassed all of the mitigation** |
| **34.** | **One, § K** | **Failure to prepare mitigation: Failure to investigate and present evidence regarding Angela Johnson's mental state at the time of the offenses** |
| **35.** | **One, § Y** | **Failure to prepare mitigation: Delay in hiring Dr. Gelbort, and failure to follow-up on his recommendations, to instruct him to conduct a more thorough battery of neuropsychological tests, to retain another neuropsychologist when Dr. Gelbort inexplicably refused to testify, to incorporate his helpful findings and diagnosis into the testimony of the experts who did testify, and to conduct additional neuropsychological and neuroimaging testing of petitioner** |
| **36.** | **One, § Z** | **Failure to prepare mitigation: Failure to introduce evidence of, and give the trial experts records concerning, the 1996 diagnosis of petitioner with depression and dependent personality features** |
| **37.** | **One, § O** | **Failure to prepare mitigation: Failure to offer expert and lay testimony that Angela Johnson was under the substantial influence of Dustin Honken** |
| **38.** | **One, § L.1** | **Failure to prepare mitigation: Failure to introduce the statements of Phyllis Proscovec to support residual doubt** |
| **39.** | **One, § L.2** | **Failure to prepare mitigation: Failure to offer Dustin Honken's letters to impeach the mitigation phase testimony of Steven Vest to support residual doubt** |

| MITIGATION PHASE (continued) | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim  (Claims in **bold** were briefed) |
| **40.** | **One, § L.3** | **Failure to prepare mitigation:  Failure to impeach Steven Vest by presenting evidence that Honken lied about petitioner's role in the offenses to support residual doubt** |
| **41.** | **One, § V** | **Failure to prepare mitigation:  Failure to introduce petitioner's offer to plead guilty as evidence in mitigation** |
| **42.** | **One, § W** | **Failure to prepare mitigation:  Failure to present evidence of remorse through expert testimony** |
| **43.** | **One, § X** | **Failure to prepare mitigation: Failure to elicit evidence of the effect of petitioner's execution on her family members** |
| 44. | One, § AA | Failure to prepare mitigation:  Ineffective presentation of mitigation evidence through the lay witnesses |
| 45. | One, § DD.h-i | Failure to timely and effectively object to the mitigation phase determination and confusion evident from the jury's findings |
| 46. | One, § JJ, Seven | Cumulative errors render the petitioner's sentence constitutionally infirm |
| 64. | (3rd § 2255 Motion) Twelve | Petitioner was constitutionally entitled to have her penalty jury instructed that the reasonable doubt standard governed their decision whether aggravating factors sufficiently outweighed mitigating factors and to the extent that this claim cannot now be considered because trial or appellate counsel should have raised the claim, they were constitutionally ineffective for failing to do so |

| POST-TRIAL AND APPEAL | | |
|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed) |
| 47. | One, § DD.d | Ineffective post-trial motions: Failure to timely and effectively make a number of meritorious arguments in post-trial motions |
| 48. | One, § FF.2 | Ineffective post-trial motions: Failure to raise Juror No. 55's failure to honestly answer questions on *voir dire* |
| 49. | One, § GG | Ineffective appeal: Failure to raise all components of the misconduct by Juror No. 55 |
| 50. | One, § HH | Ineffective appeal: Failure to litigate the prosecution's inconsistent theories as to Dustin Honken and Angela Johnson |
| 51. | One, § II | Ineffective appeal: Failure to raise the unconstitutional skewing effect of multiplicitous counts |
| 52. | One, § DD.j-o | Ineffective appeal: Failure to raise a number of meritorious arguments |
| 53. | One, § JJ, Seven | Ineffective appeal: Cumulative errors of appellate counsel render the petitioner's sentence constitutionally infirm |
| EIGHTH AMENDMENT VIOLATIONS | | |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed) |
| 54. | Eight | The Eighth Amendment requires a heightened standard of proof for imposition of the death penalty |
| 55. | Nine | Petitioner suffers from severe mental illness and the Eighth Amendment precludes her execution |
| **56.** | **Ten** | **The Bureau of Prisons' method of carrying out the petitioner's execution by lethal injection violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act** |
| 57. | Ten, § A.1 | *Baze* claim: Executioner incompetence |

| EIGHTH AMENDMENT VIOLATIONS (continued) | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim   (Claims in **bold** were briefed) |
| 58. | Ten, § A.2 | *Baze* claim:  Drug administration deficiencies |
| 59. | Ten, § A.3 | *Baze* claim:  Lack of safeguards |
| 60. | Ten, § B | There are readily available alternatives that would substantially reduce the risks of maladministration and inhumane executions |
| 61. | Ten, § C | Whether the BOP's new protocol is constitutional even under *Baze* cannot be answered without further discovery |
| 62. | Ten, § D | The *Baze* decision does not have any impact on petitioner's Administrative Procedures Act and Controlled Substances Act Claims |
| 63. | Eleven | The death penalty violates the Eighth Amendment |

## II.  VIABILITY OF "NEW" CLAIMS IN JOHNSON'S SECOND AND THIRD AMENDED § 2255 MOTIONS

The respondent asserts that 21 of Johnson's claims in her Second Amended § 2255 Motion—20 claims of ineffective assistance of counsel and 1 claim of prosecutorial misconduct—are new, do not "relate back," and, consequently, are time-barred.  Johnson also seeks leave to add yet another claim in a Third Amended § 2255 Motion, which the respondent also argues should be barred.  Thus, before I consider the merits of any of Johnson's claims for § 2255 relief, I must determine whether or not all of her claims in her Second Amended § 2255 Motion "relate back" to the filing of her original § 2255 Motion or are otherwise deemed timely and whether or not her Third Amended § 2255 Motion should be allowed.

### A. "New" Claims In The Second Amended § 2255 Motion

### 1. Arguments of the parties

#### a. The respondent's argument

In its Amended Answer To Second Amended § 2255 Motion (Civ. docket no. 285), the respondent argues that § 2255 contains a one-year statute of limitations that, on its face, bars those portions of Johnson's Second Amended § 2255 Motion that advance new claims for relief, as opposed to a clarification or actual supplementation of an existing claim. The respondent argues that Johnson's Second Amended § 2255 Motion was filed well after the expiration of the applicable one-year limitations period on October 6, 2009, so that any new claims that do not "relate back" to claims raised in her original § 2255 motion are barred. The respondent argues that 21 claims in Johnson's Second Amended § 2255 Motion do not relate back, because they are based on entirely novel premises, do not merely clarify, amplify, or expand any timely claims, and are not grounded in facts or legal arguments made in her Original § 2255 Motion. The respondent points out that the Supreme Court has warned that expansive interpretations of a petitioner's pleadings would eviscerate the statute of limitations for § 2255 claims, thereby permitting virtually any amendment without regard to the statute of limitations. The respondent also argues that Johnson has made no attempt to show that extraordinary circumstances beyond her control prevented her from raising the 21 challenged claims earlier in these proceedings.

#### b. The petitioner's argument

In her Reply To Government's Amended Answer (Civ. docket no. 309), Johnson contends that the respondent myopically focuses not on the substance of her claims, but on whether, under Rule 15(c) of the Federal Rules of Civil Procedure, the 21 challenged claims can "relate back" to her Corrected Amended § 2255 Motion (Civ. docket no. 26),

filed by predecessor § 2255 counsel.[6]  Even if the proper focus is on what Johnson calls "procedural niceties," she argues that the "relation back doctrine" is just one procedural rule that I must consider.  She argues that Rules 8, 15, and 54(c) of the Federal Rules of Civil Procedure are also relevant to her novel set of circumstances and that the policies behind those rules favor considering on the merits the claims that respondent challenges as untimely.

More specifically, she contends that neither the letter nor the spirit of Rule 8, which requires only a short and plain statement of a claim, requires the court to concentrate on whether predecessor counsel spelled out each of the 21 challenged claims with the specificity that the respondent now demands.  She argues that the respondent's complaints about lack of specificity of the prior pleading ring hollow, where the respondent did not bring a Rule 12(e) motion for a more definite statement.  She also argues that the prior pleading asserted that her broadly-stated claims "include those stated as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing."  Corrected Amended § 2255 Motion at 86.  She also contends that the parties agreed that any expansion of the record, as provided in *Habeas* Rule 7,[7] should occur at the evidentiary hearing.  Johnson asserts that both parties took this stipulation to mean that she would be permitted to amend her pleading at the close of evidence to conform to proof at the hearing, subject to any objections by the respondent. She contends that these facts show that the purposes of Rules 8 and 12 were served in this case.

---

[6]I will address, *infra* at 72, whether the proper comparator for "relation back" is Johnson's Original § 2255 Motion or her Corrected Amended § 2255 Motion.

[7]References to the "Habeas Rules" or a particular "Habeas Rule" are to the Rules Governing Section 2255 Proceedings For The United States District Courts.

Next, she argues that Rule 15(a) permitted her to amend her pleadings once, as a matter of course, within 21 days after serving it, and with leave of court thereafter, so that her Corrected Amended § 2255 Motion, filed January 21, 2010, with leave of court, was an amendment as of right. She contends that, in that motion, she requested that, at the end of the hearing, she be permitted "to include any additional claims or allegations not presently known to her or her counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion." *Id.* at 123-124. She contends that the respondent's lack of objection to this request means that her present claims are timely. Johnson also argues that she did not file her Second Amended § 2255 Motion until June 1, 2011, because she was permitted to do so by the court and that, prior to that ruling, the actions and statements of the respondent led her to believe that she would be allowed to amend at the conclusion of the evidentiary hearing. She also contends that allowing the "new" claims in her Second Amended § 2255 Motion comports with "equitable tolling." Johnson contends, next, that deeming her amended claims timely comports with the policy under Rule 15(b) to liberally allow amendments to assert claims presented during the evidentiary hearing, where there is no surprise to the opposing party. She contends that all of the claims that the respondent challenges were certainly subsumed within the context of the case.

Johnson also argues that her claims necessarily "relate back," pursuant to Rule 15(c), because they were filed within the statutory time period set forth in 28 U.S.C. § 2255(f)(4), where the facts supporting at least one of those claims could not have been discovered through the exercise of due diligence at an earlier date. In other words, she contends that different claims may have different "triggering" dates for the running of the statute of limitations, but the deadline for her § 2255 motion is the latest of the triggering

dates for the various claims presented. She argues that her Second Amended § 2255 Motion, filed on June 1, 2011, is still within the statutory time period for her "new" *Brady* claim, Claim 27 (Petitioner's Claim Three) because that claim was not discovered, and could not have been discovered, until the respondent turned over exculpatory internal governmental memoranda to her present *habeas* counsel on March 5, 2011. She contends that the "triggering" date for this claim, pursuant to § 2255(f)(4), is March 5, 2011, so that it is timely. She argues, further, that, applying the proper meaning of § 2255(f), because this one claim is timely under the "latest" triggering date, the statute of limitations does not run for her entire petition until a year after March 5, 2011. Therefore, she contends that there is no need to address the "relation back doctrine" of Rule 15(c).

Finally, she argues that, if "relation back" is relevant, the government's "cramped" interpretation of the "relation back doctrine" under Rule 15(c) is at odds with the liberal thrust of the Federal Rules of Civil Procedure and Rule 15(c) in particular. She contends that her Corrected Amended § 2255 Motion contained some fairly broad and open-ended ineffective assistance of counsel claims and a broad *Brady* claim that the prosecution suppressed exculpatory evidence, then added that facts supporting these claims would be fully developed. She contends that her broad claims in the Corrected Amended § 2255 Motion are tied to the same core of operative facts underlying the 21 claims in her Second Amended § 2255 Motion challenged by the respondent.

### c. *The respondent's reply*

In its Response To Petitioner's Reply To The Government's Amended Answer (Civ. docket no. 310), filed August 26, 2011, the respondent points out that Johnson devoted most of her Reply (Civ. docket no. 309) to arguing that the "relation back doctrine" should not apply, then one paragraph asserting that the 20-page limit on her brief prevented her from providing a "claim-by-claim" explanation of why her new claims do "relate back."

The respondent asserts that my direction for separate briefing of the "relation back" issue required precisely the claim-by-claim analysis that Johnson did not provide. Nevertheless, the respondent states that its Response is directed to Johnson's arguments that the "relation back doctrine" should not apply.

The respondent argues that Rule 8 and the concept of "notice pleading" do not apply to *habeas* motions, which are instead governed by *Habeas* Rule 2, because that rule requires the petitioner to set forth all of the grounds for relief and state the specific facts supporting each ground. The respondent also asserts that no reasonable attorney could have understood the actions of the court or any "stipulation" in this case to authorize Johnson to file new claims almost two years after the expiration of the statute of limitations, and nothing in the transcript excerpts cited by Johnson demonstrates any such understanding. The respondent argues, next, that Rule 15(a) may permit equitable tolling of a claim that has not yet been discovered, and Rule 15(b) may allow amendment where the opposing party has fair notice of the new claim, but this court has recognized that Rule 15 only applies to a § 2255 motion made *before* the expiration of the one-year statute of limitations, while an *untimely* amendment must "relate back." The respondent argues that an amendment that adds additional facts only relates back if the proposed amendment does not seek to add a new claim or to insert a new theory into the case. Thus, the respondent contends that it has not waived any objection to untimely claims and that the untimely claims are not authorized by applicable law. The respondent also argues that there is, at best, a split among the Circuit Courts of Appeals as to whether an entire § 2255 motion is timely, if one "new" claim is timely, and the Eighth Circuit Court of Appeals has never so held. Finally, the respondent argues that broad, non-specific claims in the Original § 2255 Motion cannot provide the basis for "relation back" in the face of the

specificity requirement of *Habeas* Rule 2, nor was Rule 15(c) intended to be so broad as to allow an entirely new claim based on a different set of facts.

### 2. Analysis

#### a. Deadlines for § 2255 claims

As the Eighth Circuit Court of Appeals has explained, "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposed, among other things, a one-year statute of limitations on motions by prisoners seeking to modify, vacate or correct their federal sentences." *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) (citing *Johnson v. United States*, 544 U.S. 295, 299 (2005)); *see also Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010) ("Postconviction motions for relief must be filed within one year from the date that the judgment becomes final." (citing 28 U.S.C. § 2255(f)). As numerous courts have recognized, "Congress's overriding purpose in enacting AEDPA [was] '"to achieve finality in criminal cases, both federal and state."'" *Murphy v. United States*, 634 F.3d 1303, 1309 (11th Cir. 2011) (quoting *Jones v. United States*, 304 F.3d 1035, 1039 (11th Cir. 2002) (*per curiam*), in turn quoting *Brackett v. United States*, 270 F.3d 60, 69 (1st Cir. 2001)); *Matus-Leva v. United States*, 287 F.3d 758, 761 (9th Cir.) (rejecting resort to *coram nobis* by a petitioner who failed to meet AEDPA's gatekeeping requirements, because "[t]o hold otherwise would circumvent the AEDPA's overall purpose of expediting the presentation of claims in federal court and enable prisoners to bypass the limitations and successive petitions provisions."), *cert. denied*, 537 U.S. 1022 (2002). Thus, courts "give 'strict interpretation' to the one-year statute of limitations to avoid '"creat[ing] a loophole which is contrary to the legislative intent of insuring a greater degree of finality."'" *Id.* (again quoting *Jones*, 304 F.3d at 1039, in turn quoting *Brackett*, 270 F.3d at 69); *see also White v. Dingle*, 616 F.3d 844, 847 (8th Cir. 2010) (concluding that allowing a state prisoner's federal habeas claims to

relate back to the date of an original petition that was dismissed without prejudice "risks 'eviscerat[ing] the AEDPA limitations period [under § 2244(d)(1), which mirrors § 2255(f)] and thwart[ing] one of AEDPA's principal purposes,' which was to expedite federal habeas review" (quoting *Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir. 1999)).

In the case of federal prisoners, the AEDPA imposes this one-year statute of limitations in § 2255(f), which provides as follows:

> **(f)** A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> **(1)** the date on which the judgment of conviction becomes final;
>
> **(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> **(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> **(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). As Johnson contends, there are four different "triggers" for the running of the one-year period in § 2255(f). Only two such "triggers," the ones in § 2255(f)(1) and (f)(4), are at issue here.

As to the "final judgment" trigger in § 2255(f)(1), Johnson's conviction became final on October 6, 2008, when the Supreme Court denied her petition for certiorari. Crim. docket no. 257. Thus, the one-year deadline for her § 2255 motion, pursuant to § 2255(f)(1), expired on October 6, 2009. *See* 28 U.S.C. § 2255(f)(1). Johnson's Second Amended § 2255 Motion, which was only filed on June 1, 2011, was filed well after the expiration of this one-year deadline.[8]

Johnson argues, however, that a different "trigger" is also applicable here, pursuant to § 2255(f)(4). Specifically, Johnson argues that the "discovery" trigger in § 2255(f)(4) applies, because she did not, and could not, through the exercise of due diligence, discover the challenged *Brady* claim (Claim 27; Petitioner's Claim Three) until the respondent turned over exculpatory internal governmental memoranda to her present *habeas* counsel on March 5, 2011. She argues that the timeliness of this one claim, brought prior to March 5, 2012, also makes all of the other claims in her Second Amended § 2255 Motion timely, although she acknowledges that only one Circuit Court of Appeals has so held, citing *Walker v. Crosby*, 341 F.3d 1240, 1245, 1247 (11th Cir. 2003). The respondent

---

[8]Johnson also argues, in passing, that another "trigger" date pursuant to § 2255(f)(1) applies to the finality of the judgment in her case, because she contends that she was resentenced to death on June 11, 2009, *see* Crim. docket no. 777, and that judgment on that resentencing did not become final until 10 days later. The fallacy in this argument is that I did not "resentence" Johnson to death on June 11, 2009. Rather, I *vacated* Johnson's multiplicitous convictions and sentences on the charges of "conspiracy murder" pursuant to the September 28, 2007, Mandate from the Eighth Circuit Court of Appeals (Crim. docket no. 743), leaving untouched her convictions and sentences on the "CCE murder" charges. The entry of the amended judgment pursuant to the June 11, 2009, Order did not change the date on which Johnson's convictions and sentences for "CCE murder" became final. *See Burton v. Stewart*, 549 U.S. 147, 156-57 (2007) (noting that "'[f]inal judgment in a criminal case means sentence. The sentence is the judgment.'" (quoting *Berman v. United States*, 302 U.S. 211, 212 (1937)).

46

asserts that *Walker* stands alone, but does not confront Johnson's contention that her "new" *Brady* claim was diligently discovered.

In 2003, in *Walker*, the Eleventh Circuit Court of Appeals considered the proper construction of 28 U.S.C. § 2244(d)(1), which contains language analogous to § 2255(f), but for applications for federal writs of *habeas corpus* by persons in custody pursuant to the judgment of a state court.[9] The court concluded, first, that § 2244(d) "directs the court

_____

[9]Section 2244(d) provides, in pertinent part, as follows:

> **(1)** A 1-year period of limitation shall apply to *an application* for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

>> **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

>> **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

>> **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

>> **(D)** *the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.*

(continued…)

to look at whether the 'application' is timely, not whether the individual 'claims' within the application are timely." *Walker*, 341 F.3d at 1243. Thus, the court reasoned, "[t]he statute provides a single statute of limitations, with a single filing date, to be applied to the application as a whole," and that single deadline runs from the "latest of" the triggering dates in the following subparagraphs. *Id.* The court then held, "The statute of limitations in § 2244(d)(1) applies to the application as a whole; individual claims within an application cannot be reviewed separately for timeliness." *Id.* at 1245. In something of a concluding *apologia*, the court stated,

> We recognize that § 2244(d)(1) as written allows for the resurrection of what seem to be time-barred claims tagging along on the coattails of a timely claim. Nevertheless, Congress wrote the statute, and we cannot see how it can be read any other way without departing from the plain meaning of the words of the statute. The Supreme Court has advised that "[w]hatever merits . . . policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them." *Artuz [v. Bennett]*, 531 U.S. [4,] 10, 121 S. Ct. [361,] 365 [(2000)].

*Walker*, 341 F.3d at 1247.

It is not just the "coattails" effect of *Walker* that has led other courts to reject the interpretation of § 2244(d) in *Walker*. In 2004, in *Fiedler v. Varner*, 379 F.3d 113 (3d Cir. 2004), the Third Circuit Court of Appeals rejected the interpretation of § 2244(d)(1) in *Walker*, as follows:

> We do not agree with the interpretation advanced by Fielder and the *Walker* Court. Although Fielder and the *Walker* Court claim that this interpretation is dictated by the

---

⁹(...continued)

28 U.S.C. § 2244(d)(1) (emphasis added); *and compare* 28 U.S.C. § 2255(f).

language of 28 U.S.C. § 2244(d)(1), their interpretation (which, for convenience, we will simply call the *Walker* interpretation) actually disregards the language used in the portion of § 2244(d)(1) that is most critical for present purposes, i.e., subsection (D). Subsection (D), as noted, refers to "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D) (emphasis added). Applying this language in a case in which multiple claims are presented poses a problem, as Fielder's case illustrates.

Fielder's application, as noted, presented two claims, a prosecutorial misconduct claim and an after-discovered evidence claim. The factual predicate of the prosecutorial misconduct claim was presumably known to Fielder at the time of trial, but the factual predicate of the after-discovered evidence claim was not reasonably discoverable until years later. So which of these two dates should control?

If § 2244(d)(1) is applied, as we believe it must be, on a claim-by-claim basis, there is no problem, but if, as the *Walker* interpretation prescribes, the claim-by-claim approach is rejected, there is nothing in § 2244(d)(1) that provides a ground for picking one date over the other. The *Walker* interpretation implicitly reads subsection (D) as if it refers to "the latest date on which the factual predicate of any claim presented could have been discovered through the exercise of due diligence." But that is not what subsection (D) says.

Although neither Fielder nor the *Walker* Court explains the ground for their implicit conclusion that subsection (D) requires a court to pick the latest date when the factual predicate of a claim was reasonably discoverable, it is possible that their analysis is based on the statement in § 2244(d)(1) that the application runs from "the latest of" the four dates specified in subsections (A) through (D). However, this reference to "the latest" date does not appear in subsection (D) and it does not pertain to the issue at hand. The reference to "the latest" date in § 2244(d)(1) tells a court how to choose

49

from among the four dates specified in subsections (A) through (D) once those dates are identified. This language does not tell a court how to identify the date specified in subsection (D) in a case in which the application contains multiple claims. Accordingly, there is nothing in § 2244(d) that suggests that a court should follow the *Walker* interpretation and select the latest date on which the factual predicate of any claim presented in a multi-claim application could have reasonably been discovered. It would be just as consistent with the statutory language to pick the earliest date.

For these reasons, we believe that the *Walker* interpretation fails on its own terms. It purports to be based on the language of § 2244(d)(1) but actually neglects to pay close attention to the statutory language.

*Fiedler*, 379 F.3d at 117-18.

Looking beyond the language of the statute, the Third Circuit Court of Appeals found "two strong reasons for concluding that the statute of limitations set out in § 2244(d)(1) should be applied on a claim-by-claim basis." *Id.* at 1118. Those two reasons were that statutes of limitations are generally applied, in both civil and criminal cases, on a claim-by-claim or count-by-count basis, and there was no reason to suppose that Congress intended a departure from that scheme in § 2244(d)(1), just because the statute is, as is routinely the case, cast on the model of a single-claim case. *Id.* at 118-19. The Third Circuit Court of Appeals also reasoned that "a claim-by-claim approach is necessary in order to avoid results that [it] was confident Congress did not want to produce," specifically, "the strange effect of permitting a late-accruing federal habeas claim to open the door for the assertion of other claims that had become time-barred years earlier." *Id.* at 120. While the Third Circuit Court of Appeals could see a rationale for allowing a petitioner to assert the late-accruing claim, it could see no reason why time-barred claims should also thereby be resuscitated. *Id.*

The *Walker* analysis is also contrary to *dicta* observations of the Supreme Court concerning whether § 2255(d)(1) requires claim-by-claim analysis in a 2005 decision, *Pace v. DiGuglielmo*, 544 U.S. 408 (2005).[10] In *Pace*, the petitioner argued that, "because § 2244(d)(2) refers to a 'properly filed *application*,' then any condition that must be applied on a claim-by-claim basis, such as Pennsylvania's time limit, cannot be a 'condition of filing.'" *Pace*, 544 U.S. at 415 (emphasis in the original). The Court noted that, while other sections of § 2244(d) were cast in terms of "the application," specific requirements of those sections were not applicable to the application as a whole, but required inquiry into specific "claims." *See id.* at 416-17 (citing subsections of § 2244(b)(2)). The Court then observed, in a footnote:

> Similarly, § 2244(d)(1) provides that a "1-year period of limitation shall apply to an *application* for a writ of habeas corpus." (Emphasis added.) The subsection then provides one means of calculating the limitation with regard to the "application" as a whole, § 2244(d)(1)(A) (date of final judgment), but three others that require claim-by-claim consideration, § 2244(d)(1)(B) (governmental interference); § 2244(d)(1)(C) (new right made retroactive); § 2244(d)(1)(D) (new factual predicate).

*Pace*, 544 U.S. at 416 n.6. In a subsequent decision addressing whether or not § 2244(d)(1)(B) contains an unwritten "diligence" requirement like the one in § 2244(d)(1)(D), the Eighth Circuit Court of Appeals cited *Pace* as "not[ing] that § 2244(d)(1)(B) 'require[s] claim-by-claim consideration.'" *Earl v. Fabian*, 556 F.3d 717, 728 (8th Cir. 2009) (citing *Pace*, 544 U.S. at 416 n.6); *see also Bachman v. Bagley*, 487 F.3d 979 (6th Cir. 2007) (post-*Pace* decision rejecting *Walker*, without mentioning *Pace*,

---

[10]The Supreme Court did not mention *Walker* in *Pace*. While the parties here address *Walker*, they do not address *Pace*.

and adhering to the Sixth Circuit rule that "courts determine the beginning of the one-year statute of limitations period based on the content of the prisoner's claim," rather than allowing a single timely claim to open the door to all other claims, and noting that, even under *Walker*, all of the petitioner's claims were untimely).[11]

In the context of analogous language in § 2255(f), I agree with the reasoning of the court in *Fiedler* and the Supreme Court's *dicta* in *Pace* that there is no reason to conclude that *all claims* in a § 2255 motion are somehow timely if *one* claim is timely under § 2255(f)(4). It is true that § 2255(f) states that the time for filing a § 2255 "motion" runs from "the latest of" the four triggers, just as § 2244(d)(1) states that the time for filing "an application" runs from "the latest of" four comparable triggers. *See* 28 U.S.C. § 2255(f). It is also true that § 2255(f)(4) refers to "claim or claims," so that it does recognize that a "motion" may involve more than one claim. Nevertheless, this language recognizes the possibility that multiple claims might arise from facts discovered at the same time, as well as the possibility that different claims might arise from facts discovered at different times. What it does not do is require that the time runs from the date that the last claim is discovered. *Cf. Fiedler*, 379 F.3d at 117-18. Conspicuous by its absence is any reference

---

[11]Although the respondent is correct that a panel of the Ninth Circuit Court of Appeals also rejected *Walker* in *Soulites v. Evans*, 622 F.3d 1173 (9th Cir. 2010), that decision was vacated by the panel on August 17, 2011, in light of an intervening *en banc* decision in *Lee v. Lampert*, ___ F.3d ___, 2011 WL 3275947 (9th Cir. Aug. 2, 2011) (*en banc*), which concerned an equitable exception to an otherwise time-barred claim of actual innocence. *See Souliotes v. Evans*, ___ F.3d at ___, 2011 WL 3606632 (9th Cir. 2011). Thus, the position of the Ninth Circuit Court of Appeals on the viability of *Walker* for claims that do *not* include actual innocence is uncertain. Johnson asserts no claims of actual innocence. Moreover, while the first panel decision in *Soulites* did cite the Supreme Court's decision in *Pace*, it did not cite it in relation to the *Walker* analysis, but in relation to equitable tolling. *See Soulites*, 622 F.3d at 1180.

in § 2255(f)(4) to "the latest date on which the factual predicate of any claim presented could have been discovered through the exercise of due diligence."[12] There is no "latest of" language in § 2255(f)(4). The reference to "the latest" date is in § 2255(f). *Cf. id.* Plainly, the purpose of this language in § 2255(f) is to tell a court how to choose from among the four dates specified in subsections (1) through (4) once those dates are identified, but it does not tell a court how to identify the date specified in subsection (4) in a case in which the application contains multiple claims. *Cf. id.*

Moreover, much as the Supreme Court in *Pace* read analogous language in § 2244(d)(1), I read some subsections of § 2255(f) as plainly stating some methods for calculating the limitations period with regard to the "motion" as a whole and some methods for calculating the limitations period that require claim-by-claim consideration, notwithstanding the reference to the limitations period for a "motion" pursuant to § 2255 in § 2255(f). Specifically, I read § 2255(f)(1), the "date of final judgment" trigger, as stating a method for calculating the limitations period with regard to the "motion" as a whole, just as the Supreme Court read analogous language in § 2244(d)(1)(A) to consider the "motion" as a whole. *Cf. Pace*, 544 U.S. at 416 n.6. I also read § 2255(f)(3) (new right made retroactive) and § 2255(f)(4) (new factual predicate) as plainly stating means of calculating the limitations period that require claim-by-claim consideration. This is so, because § 2255(f)(3) (which is analogous to § 2244(d)(1)(C)) refers to a specific "right"

---

[12]While a question of statutory interpretation does not turn on the court's ability to identify *better* language to serve the purpose asserted by a party, Johnson's argument (and the *Walker* court's analysis) would also be much more persuasive if § 2255(f)(4) read "the date on which the facts supporting *any* claim presented could have been discovered through the exercise of due diligence," as such language would plainly convey that the limitation period for a § 2255 "motion" runs from the latest of the dates that *any* claim presented *in the motion* could have been discovered through the exercise of due diligence.

newly recognized by the Supreme Court, and different § 2255 claims plainly can be (and are here) based on different "rights," while § 2255(f)(4) (which is analogous to § 2244(d)(1)(D)) expressly refers to "claim or claims" based on newly-discovered factual predicates. *Cf. Pace*, 544 U.S. at 416 n.6. Notwithstanding the Supreme Court's *dicta*, however, I cannot read § 2255(f)(2) (which is analogous to § 2244(d)(1)(B)) as plainly requiring claim-by-claim consideration, because § 2255(f)(2) refers to governmental interference with the filing of "a motion," not governmental interference with the filing of "a claim."

I also agree with the court in *Fiedler* that statutes of limitations are generally applied, in both civil and criminal cases, on a claim-by-claim or count-by-count basis, and that there was no reason to suppose that Congress intended a departure from that scheme in § 2255(f), just because the statute is, as is routinely the case, generally cast on the model of a single-claim case. *Cf. id.* at 118-19. Moreover, "the strange effect of permitting a late-accruing [§ 2255] claim to open the door for the assertion of other claims that had become time-barred years earlier," *cf. id.* at 120, makes no sense in the context of a statutory scheme that otherwise dictates a one-year statute of limitations for the purpose of expediting federal *habeas* review and achieving finality in criminal cases, both federal and state. *See, e.g., Murphy*, 634 F.3d at 1309; *White*, 515 F.3d at 847; *Jones*, 304 F.3d at 1039; *Matus-Leva*, 287 F.3d at 761); *Brackett*, 270 F.3d at 69; *Graham*, 168 F.3d at 780. The purposes of such a statutory scheme would be undermined if every petitioner could simply allege a "newly-discovered" claim to make all otherwise time-barred claims timely. It makes still less sense where § 2255 makes provision for *legitimate* second or successive motions based on "newly discovered evidence," *see* 28 U.S.C. § 2255(h), so that there is no need to "save" all claims until the last claim is discovered. The *Walker* court's interpretation effectively eviscerates the one-year statute of limitations

imposed by AEDPA and is contrary to the principle that the AEDPA statute of limitations should be given "strict interpretation" to avoid creating a loophole that is contrary to the legislative purpose of greater finality. *Murphy*, 634 F.3d at 1309; *White*, 616 F.3d at 847.

Because I read § 2255(f) to require claim-by-claim consideration of timeliness, at least for § 2255(f)(4), the "trigger" that Johnson contends makes all of the "new" claims in her Second Amended § 2255 Motion timely, different claims may have different "trigger" dates for the running of the statute of limitations under § 2255(f). *Cf. Pace*, 544 U.S. at 416 n.6. More specifically, for present purposes, Johnson's "new" *Brady* claim has a different "trigger" date, pursuant to § 2255(f)(4), than the remainder of her claims, including the 20 "new" ineffective assistance of counsel claims that the respondent challenges as untimely. Again, the respondent has not expressly argued that the "new" *Brady* claim was not diligently discovered before the respondent produced the internal memoranda on which that claim is based on March 5, 2011, *see* 28 U.S.C. § 2255(f)(4) (a newly-discovered claim is timely within one year of the date the facts supporting the claim could have been discovered through the exercise of due diligence); the respondent argues only that the "new" *Brady* claim does not "relate back," which is not the question if the claim is timely pursuant to § 2255(f)(4). Thus, I will consider the "new" *Brady* claim timely filed, pursuant to § 2255(f)(4), because it was filed before March 5, 2012. Even so, the "new" *Brady* claim, even if timely pursuant to § 2255(f)(4), cannot make any otherwise time-barred claims timely, because § 2255(f)(4) requires claim-by-claim consideration. In other words, I find that § 2255(f)(4) claims have no "coattails" that can make otherwise time-barred claims timely, and, more specifically, the 20 ineffective assistance of counsel claims challenged by the respondent, filed well after the expiration of the applicable statute of limitations for those claims in § 2255(f)(1), are not timely,

because they cannot ride on the "coattails" of the "new" *Brady* claim. The remaining question is whether these 20 claims can nevertheless be considered on their merits.

### b. *Timeliness of amendments*

The question of whether the 20 "new" ineffective assistance of counsel claims, filed after the expiration of the applicable statute of limitations in § 2255(f)(1), can nevertheless be considered on their merits turns on whether those claims are proper amendments to Johnson's Original § 2255 Motion. As the Eighth Circuit Court of Appeals has recognized, "The Federal Rules of Civil Procedure govern habeas proceedings unless superseded by the rules governing section 2254 or 2255 cases." *Barnett v. Roper*, 541 F.3d 804, 807 (8th Cir. 2008) (citing FED. R. CIV. P. 81(a)(4)); *see also Habeas* Rule 12 ("The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."). The Eighth Circuit Court of Appeals has held that provisions of Rule 15 of the Federal Rules of Civil Procedure, which address amended and supplemental pleadings, apply to amendments to § 2255 motions. *See United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006) (Rule 15(a)); *Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010) (Rule 15(c)). Before turning to what the respondent asserts is the crux of the matter, the "relation back doctrine" of Rule 15(c), however, I must first consider Johnson's contentions that other provisions of Rule 15 authorize consideration of her amended claims.

**i.**      *Rule 15(a)*. Johnson relies, first, on Rule 15(a), which provides as follows:

> **(a) Amendments Before Trial.**
>> **(1)**      *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:
>>> **(A)**      21 days after serving it, or

> **(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>
> **(2)** *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. *The court should freely give leave when justice so requires.*
>
> **(3** *Time to Respond.* Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

FED. R. CIV. P. 15(a) (emphasis added).[13] Johnson does not argue that this provision of

---

[13] This version of Rule 15(a) became effective December 1, 2009, prior to Johnson's filing of her first amendment to her § 2255 motion, her Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Civ. docket no. 23), on January 12, 2010, and her Corrected Amended § 2255 Motion (Civ. docket no. 26), on January 21, 2010. As the notes to the 2009 Amendments explain, Rule 15(a)(1) was amended to make three changes: (1) the new rule terminates the right to amend once as a matter of course 21 days after service of a motion under Rule 12(b), (e), or (f), where the service of a motion attacking a pleading formerly did not terminate the right; (2) the new rule permits amendment once as a matter of course after the service of a responsive pleading, where the service of a responsive pleading formerly did terminate the right; and (3) the new rule "extends from 20 to 21 days the period to amend a pleading to which no responsive pleading is allowed and omits the provision that cuts off the right if the action is on the trial calendar." FED. R. CIV. P. 15, Advisory Committee Notes, 2009 Amendments. It does not appear that any of these changes affect Johnson's amendments, where the respondent filed its Resistance To Plaintiff's Motion Under 28 U.S.C. § 2255 (Civ. docket no. 15) on November 30, 2009, but no dispositive motion, and

(continued...)

Rule 15 authorized or made timely the challenged claims in her Second Amended § 2255 Motion. Rather, she argues that this provision made timely her *first* amendments, and those amendments gave notice of her intent to supplement her claims later.

Specifically, Johnson asserts that her *first* amendments to her Original § 2255 Motion, filed on January 12 and 21, 2010, were amendments as of right authorized by Rule 15(a)(2).[14] The gravamen of her argument on this point is that those first amendments expressly requested that, at the end of the evidentiary hearing, she would be allowed to amend her motion "to include any additional claims or allegations not presently known to her or her counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion." Corrected Amended § 2255 Motion (Civ. docket no. 26) at 123-24; *see also id.* at 86 (alleging that her claims "include those stated as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing"). She contends that the respondent never

---

[13](…continued)
Johnson did not amend her § 2255 motion until more than 21 days after the respondent filed its Resistance.

[14]Johnson contends that her *first* amendments of her Original § 2255 Motion, on January 12 and 21, 2010, were "as a matter of right" pursuant to Rule 15(a)(2), but they were not. Rule 15(a)(2) does not provide for amendment as of right or "as a matter of course," Rule 15(a)(1) does. Rule 15(a)(2) provides for "other amendments" "[i]n all other cases," that is, amendments *other than* as a matter of course or a matter of right. Indeed, although her first amendments were filed with permission of the court, *see* Order (Civ. docket no. 22), they were filed out of time, under either Rule 15(a)(1), *see* Order (Civ. docket no. 16) (noting that, under amended Rule 15(a), Johnson could amend without leave of court, as a matter of course, up to and including December 21, 2009), or the court order setting a deadline for amendments, *see* Order (Civ. docket no. 18) (granting Johnson to and including January 4, 2010, to file a *post-answer* amendment pursuant to Rule 15(a)).

responded to this request.  Similarly, she argues that she did not file her Second Amended § 2255 Motion (Civ. docket no. 263) until June 1, 2011, because she believed that she was permitted to do so by the court.  She also argues that the parties agreed to expansion of the record pursuant to *Habeas* Rule 7 at the evidentiary hearing.  Thus, she asserts that equitable tolling is appropriate, because she has diligently asserted her right to amend and the respondent has not previously objected.  The respondent argues that no reasonable attorney could believe that a stipulation to expand the record was a stipulation to amend her motion to assert new claims.  The respondent also argues that Rule 15(a) is inapplicable to amendments to a § 2255 motion made *after* the one-year statute of limitations has expired, so that the respondent was not required to respond to language attempting to expand Johnson's right to add untimely claims.

The Eighth Circuit Court of Appeals addressed equitable tolling and waiver arguments similar to Johnson's in *United States v. Hernandez*, 436 F.3d 851 (8th Cir. 2006).  As to equitable tolling, the court stated,

> Hernandez next argues that the court erred by not granting equitable tolling.  We review the decision to deny equitable tolling de novo.  *[United States v.] Martin*, 408 F.3d [1089,] 1093 [(8th Cir. 2005)].  While equitable tolling does apply to § 2255 motions, *see id.* at 1092, we do not find that the circumstances here warrant such relief.
>
> There are two tests for determining when equitable tolling is appropriate:  (1) if there are "extraordinary circumstances" beyond a movant's control that would keep him from filing in a timely fashion, *see id.* at 1093, or (2) if the government's conduct "lulled" the movant into inaction through reliance on that conduct, *see Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005) (rejecting movant's argument that the state court clerk's actions "lulled" him into inaction). Equitable tolling only applies when the circumstances that cause the delay in filing are "'external to the plaintiff and not

attributable to his actions.'" *Id.* (quoting *Flanders v. Graves*, 299 F.3d 974, 971 (8th Cir. 2002)). Hernandez relies on the latter of the two tests, contending that the district court's order allowing the filing of an amended claim by November 15, 2002, "lulled" him into inaction by causing him to believe he had until that date to file any and all claims, not just ones that related back to the original motion.

The court did not "lull" Hernandez into inaction. The order of the district court specifically stated that he had until November 15 to supplement his previous filings. This opportunity to supplement the original filings did not itself trigger a Rule 15(c)(2) analysis and the relation back doctrine because, on its face, it simply allowed Hernandez an opportunity to use his appointed counsel to further explain the issues raised in his pro se motion. Nothing in the order referred to the statute of limitations or to filing additional claims. We have held that "confusion about or miscalculations of the limitations period, or the failure to recognize the legal ramifications of actions taken in prior post-conviction proceedings are inadequate to warrant equitable tolling." *Shoemate v. Norris*, 390 F.3d 595, 598 (8th Cir. 2004) (internal marks omitted). There is no indication in this record that Hernandez could not have amended his motion prior to October 31, 2002, in order to bring forth new claims within the statutorily allowed time frame. Aside from the one new allegation, it appears the motion and brief filed on November 12 did just what was called for in the district court's order: supplement and explain the original filings. Whatever may have caused Hernandez to file a new claim past the statute of limitations period, they were not external to him. Based on the record, we do not find any action of the court that would have "lulled" Hernandez into inaction, and the district court's denial of equitable tolling was not in error.

*Hernandez*, 436 F.3d at 858-59.

Similarly, here, nothing in my actions "lulled" Johnson into believing that she could add "new" claims to her Second Amended § 2255 Motion, long after the expiration of the applicable statute of limitations. Although I allowed Johnson to supplement her Original § 2255 Motion, I did nothing to trigger a Rule 15(c)(2) "relation back" analysis. *Cf. id.* That trigger did not come until the respondent raised the issue in response to the Second Amended § 2255 Motion. Indeed, while Johnson clearly could *not* have filed any amendments to her § 2255 motion before the expiration of the statute of limitations, *compare id.*, because she filed her Original § 2255 Motion *just before expiration of the limitations period for her § 2255 motion*, when she made that last-minute filing, she clearly had to contemplate the likelihood that any "new" claims in subsequent amendments would be challenged as untimely or as not "relating back." Thus, Johnson was not "lulled" into any belief that she could add "new" claims long after the filing of her Original § 2255 Complaint at the statutory deadline.

In *Hernandez*, the Eighth Circuit Court of Appeals also addressed a "waiver" claim similar to Johnson's. As the court explained,

> The final claim raised by Hernandez is that the government waived the statute of limitations by not raising an objection to the November filing deadline. When determining if a party has waived his or her rights, we review the lower court's factual findings under a clearly erroneous standard, but we review de novo the ultimate determination of whether a waiver occurred. *United States v. Caldwell*, 954 F.2d 496, 504 (8th Cir. 1992), *cert. denied*, 506 U.S. 819, 113 S. Ct. 65, 121 L. Ed. 2d 32 (1992). Hernandez's argument is unpersuasive. "[T]here is an implied waiver of a defense or a right only where a party's conduct is 'so consistent with and indicative of an intention to relinquish [the right or defense] and so clear and unequivocal that no other reasonable explanation of the conduct is possible.'" *Garfield v. J.C.*

> *Nichols Real Estate*, 57 F.3d 662, 667 (8th Cir.) (quoting
> *Medicare Glaser Corp. v. Guardian Photo, Inc.*, 936 F.2d
> 1016, 1021 (8th Cir. 1991) (internal marks omitted)), *cert.
> denied*, 516 U.S. 944, 116 S. Ct. 380, 133 L. Ed. 2d 303
> (1995). Nothing in the district court's order would have put
> the government on notice that the statute of limitations was or
> would be an issue, such that would have required it to take an
> affirmative action to ensure that the statute of limitations was
> not waived. As such, we find no error in the district court's
> judgment that the government did not waive the statute of
> limitations.

*Hernandez*, 436 F.3d at 859.

Here, nothing in the parties' agreement to expand the record pursuant to *Habeas* Rule 7 could reasonably be understood to be an agreement to allow untimely claims or to be an express or implied waiver of objections to an amendment introducing untimely claims. *See id.* There is simply no indication of conduct consistent with and indicative of an intention to relinquish the timeliness defense, let alone such clear and unequivocal support that no other reasonable explanation of the respondent's conduct is possible. *Id.* This is so, because nothing in *Habeas* Rule 7 pertains to amendment at all or to the addition of any *claims*; rather, it pertains to submission to the record of additional *materials* relating to the motion. *See Habeas* Rule 7(a). Moreover, while Johnson contends that the parties agreed that any expansion of the record, as provided in *Habeas* Rule 7, should occur at the evidentiary hearing, she acknowledges that both parties took this stipulation to mean that she would be permitted to amend her pleading at the close of evidence to conform to proof at the hearing, *subject to any objections by the respondent*. The time for the respondent to challenge untimely claims was when they were presented and the respondent could reasonably determine whether they "relate back." Similarly, nothing in the respondent's failure to respond to an assertion that Johnson would

supplement her pleadings to assert new claims after discovery and the evidentiary hearing can be reasonably understood to mean that the respondent was intentionally withholding any challenge to the timeliness of any "new" claims. *See Hernandez*, 436 F.3d at 859.

In short, nothing in or related to Rule 15(a) makes Johnson's "new" claims timely, even if they were filed with the court's permission.

*ii.* ***Rule 15(b)***.  Johnson also contends that her "new" ineffective assistance of counsel claims should be allowed as amendments to conform to proof within the meaning of Rule 15(b).  Rule 15(b) provides as follows:

> **(b) Amendments During and After Trial.**
>
> (1)  ***Based on an Objection at Trial.***  *If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.*  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.  The court may grant a continuance to enable the objecting party to meet the evidence.
>
> (2)  ***For Issues Tried by Consent.***  *When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.*  A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

FED. R. CIV. P. 15(b) (emphasis added).  As the Eighth Circuit Court of Appeals has explained,

> Amendments under Rule 15(b) are to be "liberally granted 'where necessary to bring about the furtherance of justice and where the adverse party will not be prejudiced.'" *Mouser v. Caterpillar, Inc.*, 336 F.3d 656, 666 (8th Cir. 2003) (quoting *McLaurin v. F.C. Prater*, 30 F.3d 982, 985 (8th Cir. 1994)). The decision to permit or deny an amendment "remains within the discretion of the district court." *Id.*

*American Fed. of State, County and Municipal Employees v. City of Benton*, 513 F.3d 874, 883 (8th Cir. 2008). Thus, "[u]nder Rule 15(b), '[a]mendments are allowed when the parties have had actual notice of an unpleaded issue and have been given an adequate opportunity to cure any surprise resulting from the change in the pleadings.'" *Cook v. City of Bella Villa*, 582 F.3d 840, 852 (8th Cir. 2009) (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997), in turn quoting *Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 275 (8th Cir. 1978)).[15]

Johnson argues that an evidentiary hearing in *habeas corpus* proceedings is analogous to a "trial" for Rule 15(b) purposes. She also asserts that Rule 15(b) should be construed to allow the court to decide cases on the merits, rather than on the pleading skills of counsel, albeit also with the goal of avoiding possible prejudice to the opposing party. Johnson contends that, during the evidentiary hearing, the respondent made few objections to evidence on the ground that it exceeded the scope of pleaded claims and, just as importantly, that the respondent was on notice of her intent to amend her § 2255 motion to conform to proof and participated in the development of the record concerning some of

---

[15]Similarly, a final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." FED. R. CIV. P. 54(c). On the other hand, "[a] party will not be granted relief that is not pled when it would unduly prejudice the opposing party." *Trim Fit, L.L.C. v. Dickey*, 607 F.3d 528, 532 (8th Cir. 2010).

the "new" claims. The respondent argues that Rule 15(b) is inapplicable to § 2255 claims brought *after* expiration of the applicable statute of limitations, so that the question for all of Johnson's "new" claims is whether they "relate back" within the meaning of Rule 15(c) and applicable law in § 2255 cases.

I will assume, without deciding, that an evidentiary hearing in a § 2255 proceeding is sufficiently analogous to a "trial" to make Rule 15(b) applicable to these proceedings. *Cf. Banks v. Dretke*, 540 U.S. 668, 704-05 (2004) (observing, in a § 2254 proceeding, "that Rule 15(b)'s use in habeas proceedings is 'noncontroversial,'" that the Court has "assumed Rule 15(b)'s application to *habeas* petitions," and that the Court saw "no reason why an evidentiary hearing should not qualify [as a Rule 15(b) trial] so long as the respondent gave 'any sort of consent' and had a full and fair 'opportunity' to present evidence bearing on th[e] claim's resolution"). I will also assume, without deciding, that Johnson would otherwise be entitled to amend her § 2255 motion to assert the "new" claims in her Second Amended § 2255 Motion, filed in the midst of the episodic evidentiary hearing, either pursuant to Rule 15(b)(1) or Rule 15(b)(2). I do not, however, conclude that such assumptions resolve the question of whether the "new" claims can be considered on the merits. Rather, I conclude that Rule 15(b) is inapplicable to an amendment to § 2255 claims after the expiration of the statute of limitations for § 2255 claims, and, in the alternative, that even amendments pursuant to Rule 15(b) must satisfy the "relation back" requirements of Rule 15(c).

More specifically, the respondent is correct that I have observed,

> Rule 15 of the Federal Rules of Civil Procedure governs a motion to amend a § 2255 motion if it is made before the one-year limitation period for filing a § 2255 motion has expired. *See* 28 U.S.C. § 2255. Pursuant to Rule 15, a court should freely grant leave to amend when justice so requires."

> *Gillette v. Tansy*, 17 F.3d 308, 312 (10th Cir. 1994) (citations
> omitted) (reversing district court's denial of motion to amend
> § 2254 habeas application to add claim as an abuse of
> discretion). In contrast, however, "an untimely amendment to
> a § 2255 motion which, by way of additional facts, clarifies or
> amplifies a claim or theory in the original motion may, in the
> District Court's discretion, relate back to the date of the
> original motion if and only if the original motion was timely
> filed and the proposed amendment does not seek to add a new
> claim or to insert a new theory into the case." *See United
> States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000)
> (emphasis added). . . . Thus, the timeliness, or lack thereof,
> of [a § 2255 petitioner's amended claims] is interdependent
> upon the starting date for the one-year limitation.

*United States v. Ruiz-Ahumada*, 2006 WL 3050807, *2 (N.D. Iowa Oct. 24, 2006). Thus, Rule 15(b) is inapplicable to Johnson's amendments to her § 2255 claims made only *after* expiration of the § 2255 statute of limitations.

Other courts, including the Eighth Circuit Court of Appeals, have recognized that amendments pursuant to Rules 15(a) or 15(b) in § 2255 cases, offered after the expiration of the § 2255 statute of limitations, are still subject to the "relation back" requirements of Rule 15(c). *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999) (in a § 2255 action, considering whether claims asserted after the expiration of the statute of limitations related back pursuant to Rule 15(c), even where the amendment was permissible pursuant to Rule 15(a)); *accord United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000) (holding that "an untimely amendment to a § 2255 motion which, by way of additional facts, clarifies or amplifies a claim or theory in the [original motion] may, in the District Court's discretion, relate back to the date of the [original motion] if and only if the [original motion] was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case"); *United States v. Pittman*, 209 F.3d

314, 317 (4th Cir. 2000) (in a § 2255 case, holding that a claim might be futile within the meaning of Rule 15(a), if the new claim was barred by the statute of limitations, and that, "[w]hen proposed claims in an amendment are barred by the statute of limitations, Rule 15(c) provides for the relation back of amendments to the original pleading under certain circumstances"); *United States v. Bazile*, 2008 WL 4453106, *5 (N.D. Okla. Sept. 30, 2008).[16]

Although Rule 15(b)(2) states that a claim tried by consent "must be treated in all respects as if raised in the pleadings," FED. R. CIV. P. 15(b)(2), I do not read that language to eliminate the need for a Rule 15(c) "relation back" analysis of such a claim. Rules 15(a) and 15(b) explain the circumstances in which amendments are permitted, while Rule 15(c) considers, *as an independent inquiry*, whether those amendments "relate back" to the filing of the original pleadings. This is so, because subsection (a) pertains to "amendments before trial," and subsection (b) pertains to "amendments during and after trial," so that these two subsections cover the entire time frame of a lawsuit. Subsection (c) then provides for "relation back of amendments," that is, "amendments" authorized by either Rule 15(a) or Rule 15(b), when certain requirements are met. Thus, even when

---

[16]The Eighth Circuit Court of Appeals and other courts have also recognized, in other circumstances, that even where an amendment is permissible pursuant to Rule 15(b), if the time limit for filing a new claim has passed, Rule 15(c) allows the amended pleading to relate back to the date of the original complaint only if the claim arises out of the same conduct, transaction, or occurrence. *See Disch v. Rasmussen*, 417 F.3d 769, 776 (8th Cir. 2005); *accord Duane Smelser Roofing Co. v. Marshall*, 617 F.2d 448, 449 (6th Cir. 1980) (per curiam) (finding that claims were tried by consent within the meaning of Rule 15(b) and that they related back pursuant to Rule 15(c)); *Hilgraeve Corp. v. Symantec Corp.*, 212 F.R.D. 345, 349 (E.D. Mich. 2003) (considering, in succession, whether amendments were permissible under Rule 15(a), then whether they related back under Rule 15(c)); *Atkins v. Latanzio*, 918 F. Supp. 668, 671 (W.D.N.Y. 1995) (concluding that amendments by consent pursuant to Rule 15(b) also related back pursuant to Rule 15(c)).

an amendment is authorized by Rule 15(a) or 15(b), it must still satisfy the "relation back" requirements of Rule 15(c).  The point that Rule 15(a) or (b) and Rule 15(c) analyses are sequential for § 2255 claims was also made in *Hernandez*, where the Eighth Circuit Court of Appeals found that the opportunity to supplement the original filings pursuant to Rule 15(a) did not itself trigger a Rule 15(c)(2) analysis and the relation back doctrine because, on its face, it simply allowed the petitioner an opportunity to use his appointed counsel to further explain the issues raised in his *pro se* motion, but did not refer to or address the statute of limitations.  *Hernandez*, 436 F.3d at 858.

Therefore, I turn to what the respondent has correctly identified as the crux of the matter, whether the challenged "new" claims "relate back" to the filing of Johnson's earlier pleadings.

*iii.* **Rule 15(c) and "relation back."**  The Eighth Circuit Court of Appeals recently summarized the "relation back" analysis pursuant to Rule 15(c) for purposes of § 2255 claims and, in doing so, recognized the interplay between the "relation back doctrine" and the statute of limitations for such claims:

> Postconviction motions for relief must be filed within one year from the date that the judgment becomes final.  28 U.S.C. § 2255(f).  Claims made in an untimely filed motion under § 2255 may be deemed timely if they relate back to a timely filed motion as allowed by Federal Rule of Civil Procedure 15(c).  *See United States v. Hernandez*, 436 F.3d 851, 857 (8th Cir.) (concluding that Rule 15(c)'s relation back rules apply to § 2255 motions), *cert. denied*, 547 U.S. 1172, 126 S. Ct. 2341, 164 L. Ed. 2d 856 (2006).  The district court determined that eight of the nine ineffective assistance claims asserted in the amended motion were not sufficiently similar to the original claims for purposes of Rule 15(c)'s relation back rule.  "'We review a district court's application of Rule 15(c) for an abuse of discretion.'"  *Id.* (quoting *Mandacina v.*

*United States*, 328 F.3d 995, 1000 (8th Cir.), *cert. denied*, 540 U.S. 1018, 124 S. Ct. 592, 157 L. Ed. 2d 433 (2003)).

*Claims made in an amended motion relate back to the original motion when the amendment asserts a claim that arose out of the same "conduct, transaction, or occurrence set out . . . in the original" motion.* Fed. R. Civ. P. 15(c)(1)(B). *To arise out of the same conduct, transaction, or occurrence, the claims must be "tied to a common core of operative facts." Mayle v. Felix*, 545 U.S. 644, 664, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) (applying Rule 15(c) to a 28 U.S.C. § 2254 petition). An amended motion may raise new legal theories only if the new claims relate back to the original motion by "aris[ing] out of the same set of facts as [the] original claims." *Mandacina*, 328 F.3d at 1000. *The facts alleged must be specific enough to put the opposing party on notice of the factual basis for the claim. See Hernandez*, 436 F.3d at 858 (explaining the rationale for Rule 15(c)). *Thus, it is not enough that both an original motion and an amended motion allege ineffective assistance of counsel during a trial. See United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney misfeasance."), *cert. denied*, 547 U.S. 1217, 126 S. Ct. 2906, 165 L. Ed. 2d 936 (2006). *The allegations of ineffective assistance "must be of the same 'time and type' as those in the original motion, such that they arise from the same core set of operative facts." Hernandez*, 436 F.3d at 857 (quoting *Mayle*, 545 U.S. at 650, 657, 660, 125 S. Ct. 2562 and holding that ineffective assistance claim alleging that counsel inadequately cross-examined two witnesses did not relate back to a claim for ineffective assistance related to counsel's failure to object to the admission of evidence lacking a proper foundation); *see also Mandacina*, 328 F.3d at 1002 (concluding that counsel's alleged failure to investigate the police report of an interview naming potential

suspects was not a similar type of error as allegedly failing to discover exculpatory footprints during counsel's investigation of the case); *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999) (failure to file an appeal is not the same type of error as failure to seek a downward departure or challenge the drug type at sentencing).

*Dodd v. United States*, 614 F.3d at 512, 515 (8th Cir. 2010).

As the Eighth Circuit Court of Appeals had previously explained, it is not enough for the new claim to refer to the same trial, conviction, or sentencing being challenged:

> The Supreme Court rejected a similar claim in *Mayle*, where the petitioner argued that a claim related back "so long as the new claim stems from the habeas petitioner's trial, conviction, or sentence." *Mayle*, 125 S. Ct. at 2570. The Supreme Court held that this definition of "conduct, transaction, or occurrence" was too broad, as "virtually any new claim . . . will relate back, for federal habeas claims, by their very nature, challenge the constitutionality of a conviction or sentence, and commonly attack proceedings anterior thereto." *Id.* Section 2255 motions share this same attribute. In order for the claims in an amended motion to relate back, the Court held that they must be of the same "time and type" as those in the original motion, such that they arise from the same core set of operative facts. *Id.* at 2566, 2571, 2574 (quoting *Craycraft*, 167 F.3d at 457).
>
> Hernandez, like the petitioner in *Mayle*, argues that the trial itself is the "transaction" or "occurrence" that satisfies Rule 15. *See Mayle*, 125 S. Ct. at 2572. And like the petitioner in *Mayle*, this argument does not succeed. The activities in question are not tied to a "common core of operative facts" that would make relation back proper. See *id.* at 2574; *Craycraft*, 167 F.3d at 457.

*Hernandez*, 436 F.3d at 857; *accord Dodd*, 614 F.3d at 516 (also explaining, "It is not enough that the alleged errors arose during Dodd's trial," citing *Mayle*, 545 U.S. at 650,

and *Hernandez*, 436 F.3d at 858, "or relate generally to counsel's alleged inaction during trial," citing *Ciampi*, 419 F.3d at 24).

In *Dodd*, the court held that claims of ineffective assistance of trial counsel for failing to object to speculative testimony concerning drug quantities did relate back to assertions in the original complaint that trial counsel failed to cross examine more than half of the government witnesses and to object to the alleged drug amounts to which they testified, concluding that both claims refer to the same operative facts. *Id.* at 516. The court reasoned, "[t]he fact that the amended motion identifies the legal basis of the objectionable nature of the testimony as being too speculative does not change the factual similarity of the two complaints. Both the original and the amended motions identify the Government witnesses' drug quantity testimony as evidence counsel should have objected to but did not, allegedly rendering counsel's assistance ineffective." *Id.* On the other hand, the court held that "none of the remaining amended claims arose from the same operative facts as the allegations made in the original motion." *Id.* One "new" claim asserted that counsel had a conflict of interest, but no claim in the original motion addressed a conflict of interest or even referred to the witness giving rise to the purported conflict, and other new claims related to trial counsel's failure to challenge specific evidence or testimony, but the original claims identified different insufficiencies in trial counsel's challenges to different evidence or testimony in different circumstances. *Id.* at 516-17.

In *Hernandez*, the court also rejected the § 2255 petitioner's contentions that certain amended claims related back to his original claims:

> Hernandez's original claim referred to the admission of evidence. The amended claim referred to trial testimony and cross-examination of witnesses. The facts alleged in the original claim were not such that would put the opposition on

notice that cross-examination of witnesses was at issue. *See Mandacina*, 328 F.3d at 1000 (stating that "[t]he rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." (quoting *Craycraft*, 167 F.3d at 457)). These claims are not similar enough to satisfy the "time and type" test, nor do they arise out of the same set of operative facts. The district court did not abuse its discretion in finding that the claim of ineffective assistance of counsel on cross-examination did not relate back to the claims contained in the original motion.

*Hernandez*, 436 F.3d at 858.

### c. *Application of the standards*

*i.    Preliminary matters*.    Before applying the relevant Rule 15(c) "relation back" standards, I must first address some preliminary matters. One is the proper comparator for the amended claims, and the other is the effect of the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure on the "relation back" analysis.

The respondent identifies the comparator as Johnson's Original § 2255 Motion, while Johnson identifies the comparator as her Corrected Amended § 2255 Motion. The respondent did not assert that any claims in the Corrected Amended § 2255 Motion were untimely or that they did not relate back to the Original § 2255 Motion. Therefore, I will treat the Corrected Amended § 2255 Motion as the proper comparator for the challenged claims in Johnson's Second Amended § 2255 Motion.

Johnson also asserts that it is inappropriate to expect the kind of factual specificity of the *earlier* claims, which she concedes are broadly-stated or even vague, that the respondent thinks is necessary for the amended claims to relate back to them. She contends that this is so, because Rule 8 of the Federal Rules of Civil Procedure requires only a "short and plain statement" of her claims. Thus, she contends that the amended

claims do "relate back" precisely because the earlier claims are so broadly-stated or even vague as to encompass the later ones. I do not agree.

As I noted above, "The Federal Rules of Civil Procedure govern habeas proceedings unless superseded by the rules governing section 2254 or 2255 cases." *Barnett*, 541 F.3d at 807 (citing FED. R. CIV. P. 81(a)(4)); *see also Habeas* Rule 12 ("The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."). Rule 8 of the Federal Rules of Civil Procedure, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," is not applicable to pleading of § 2255 claims, because *Habeas* Rule 2 does supersede and is inconsistent with Rule 8 of the Federal Rules of Civil Procedure.

*Habeas* Rule 2(b) provides, in pertinent part, as follows:

> **(b) Form.** The motion must:
> **(1)** specify all the grounds for relief available to the moving party;
> **(2)** state the facts supporting each ground.

*Habeas* Rule 2(b). Although the Eighth Circuit Court of Appeals has not expressly said so, other Circuit Courts of Appeals have recognized that "the § 2254 Rules and the § 2255 Rules mandate 'fact pleading' as opposed to 'notice pleading,' as authorized under Federal Rules of Civil Procedure 8(a)." *Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011);[17] *Ellzey v. United States*, 324 F.3d 521, 523-24 (7th Cir. 2003) (holding that a § 2255 motion that claims ineffective assistance of counsel generally without factual detail or legal

---

[17]Rule 2(b) of the Rules Governing Section 2255 Proceedings For The United States District Courts is essentially identical to Rule 2(c) of the Rules Governing Section 2254 Proceedings In The United States District Courts.

elaboration does not comply with *Habeas* Rule 2(b)); *Taylor v. United States*, 287 F.3d 658, 661 (7th Cir. 2002) ("Rule 2 of the Rules Governing Section 2255 Proceedings for the United States District Courts is the closest parallel to Fed. R. Civ. P. 8, which creates a notice-pleading system for civil litigation. Rule 2(b) departs from Rule 8 by requiring some fact pleading. (It says that a motion 'shall specify all the grounds for relief which are available to the movant and of which he has or, by the exercise of reasonable diligence, should have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified.')"). Thus, the liberal pleading requirements of Rule 8 do not extend to a § 2255 motion and cannot be used to bootstrap "new," factually specific claims in an amended motion to vague or broad claims in an original motion. Indeed, I find that Johnson's argument that Rule 8 applies to the pleading of her § 2255 claims is simply a transformation of, and should be rejected for the same reasons as, the argument that a new claim relates back "so long as the new claim stems from the habeas petitioner's trial, conviction, or sentence." *Mayle*, 125 S. Ct. at 2570; *Hernandez*, 436 F.3d at 857. Elevating the "short and plain" pleading standard of Rule 8 over the "specificity" pleading standard of *Habeas* Rule 2 would define "conduct, transaction, or occurrence" so broadly that "virtually any new claim . . . will relate back, for [§ 2255] claims, by their very nature, challenge the constitutionality of a conviction or sentence, and commonly attack proceedings anterior thereto." *Id.*; *Hernandez*, 436 F.3d at 857.

*ii.*     ***The challenged claims***.  In the case of most of the challenged claims,[18] it is a relatively simple matter to identify in the earlier pleading factual allegations showing that amended claims arise out of the same "conduct, transaction, or occurrence set out . . . in the [Corrected Amended § 2255 Motion]," *see* FED. R. CIV. P. 15(c)(1)(B), that is, that the earlier and later claims are "tied to a common core of operative facts." *Dodd*, 614 F.3d at 515.  Where I find that claims do not relate back, I must simply note that I cannot find any allegations in the Corrected Amended § 2255 Motion that provide the common core of operative facts for a challenged claim in the Second Amended § 2255 Motion.  I will consider each of the challenged claims in turn, but in the reorganized order that they are listed in my Claim Chart, rather than in the order that they were presented in the Second Amended § 2255 Motion.

The respondent challenges Johnson's Claims 11 and 12 (Petitioner's Claims One, §§ F and H.1, and One, §§ F and H.2, respectively) as "new" and not relating back. Claims 11 and 12 are merits phase claims relating to failures in "presentation," based on allegations that trial counsel ineffectively failed to impeach Robert McNeese with my findings regarding his credibility in the *Massiah* hearing, and that trial counsel ineffectively impeached Christi Gaubatz.  As to impeachment of McNeese with my prior findings regarding his credibility, I find no comparable allegations in the Corrected Amended § 2255 Motion and no factual allegations identifying a common core of operative facts. *Dodd*, 614 F.3d at 515.  While McNeese is mentioned several times in the prior pleadings,

_____

[18]Again, the analysis here is limited to whether or not the 20 "ineffective assistance" claims challenged by the respondent relate back, because I found, *supra,* at page 55, that the "new" *Brady* claim, which the respondent asserts also does not relate back, is independently timely under § 2255(f)(4), so that the "relation back" analysis does not apply to that claim.

none of those references even hint at the present claim. A somewhat closer question may be presented by the "new" claim relating to Gaubatz. There are allegations in the Corrected Amended § 2255 Motion that "[e]vidence was available from Martin Cole and Cheryl Conroy Bachman Poole, as well as a number of other witnesses and court records, and counsel's own discovery file, that would have cast doubt on the credibility of Christi Gaubatz," Corrected Amended § 2255 Motion at 85, and that "[t]he Government . . . had an understanding with Christi Gaubatz, that she would not be prosecuted (*inter alia*, for perjury and obstruction of justice) if she testified against Johnson." *Id.* at 94. Nevertheless, such allegations did not reasonably put the respondent on notice that Johnson was claiming that trial counsel failed to impeach Gaubatz with a plethora of specific facts and circumstances, including her prior denials of knowledge about the crimes; the relationships among Gaubatz, Cole, and Johnson; Gaubatz's grand jury testimony about Johnson getting drugs from Honken; her knowledge of Honken's methamphetamine operation and Johnson's lack of involvement in it; or Gaubatz's knowledge of motives that Johnson had to be hostile to Honken. *Cf. Hernandez*, 436 F.3d at 858 (finding no relation back where the facts alleged in the original claim were not such that would put the opposition on notice of the issue in the "new" claim). The allegations about impeachment of Gaubatz in the Second Amended § 2255 Motion are not merely "clarifications" or "amplifications," but allegations of circumstances and theories that are different in "time and type." *Dodd*, 614 F.3d at 515. These claims do not relate back and are time-barred from consideration on the merits.

The respondent challenges Claim 13 (Petitioner's Claim One, § T), which is a merits phase claim of failure to investigate and present evidence to cross-examine Wendy Jensen. I agree with the respondent that the Corrected Amended § 2255 Motion does not

allege a common core of operative facts for this claim. *Dodd*, 614 F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent challenges Johnson's Claim 14 (Petitioner's Claim One, §§ F and I), which is a claim of failure to investigate and present evidence in the merits phase of Terry DeGeus's purported involvement in the killing of Nicholson and the Duncans. Like the respondent, I find nothing in the Corrected Amended § 2255 Motion that alleges a common core of operative facts. *Dodd*, 614 F.3d at 515. Rather, this claim is entirely "new," does not relate back, and is time-barred from consideration on the merits.

The respondent challenges Johnson's Claim 16 (Petitioner's Claim One, § G), which is a merits phase claim of failure in investigation and presentation of a defense, alleging that trial counsel was ineffective by presenting a "mere presence" defense without investigation and despite Johnson's repeated assertions that she was not present at the Nicholson/Duncan killings. As the respondent contends, the "mere presence" defense was mentioned in passing in various claims in the Corrected Amended § 2255 Motion, but not as an error by trial counsel. Indeed, I note that, on page 45 of her Corrected Amended § 2255 Motion, Johnson actually assumed, "for the sake of argument," that the strategy of pursuing a "mere presence" defense was reasonable. Corrected Amended § 2255 Motion at 45. Furthermore, the "new" claim is based on factual allegations that Johnson told trial counsel that she was not present at the Nicholson/Duncan killings; that the information she learned about the killings was after-acquired knowledge; that Honken gave her a map while he was in the federal prison in Florence, Colorado; that she was at work or at home the night of the killings; and that Christi Gaubatz assisted Dustin Honken in the Nicholson/Duncan killings, not her. Although the Corrected Amended § 2255 Motion does allege, on page 85, that counsel failed to explore how Angela Johnson could have obtained the information contained in the maps and statements that she provided to the

witnesses against her, that allegation does not reasonably put the respondent on notice that she was claiming that trial counsel failed to investigate a much more specific allegation that she told them that Honken gave her a map while he was in the federal prison in Florence, because it is different in "time and type." *Cf. Dodd*, 614 F.3d at 516-17 (finding no relation back when a new claim identified different insufficiencies in trial counsel's challenges to different evidence in different circumstances); *Hernandez*, 436 F.3d at 858 (finding no relation back where the facts alleged in the original claim were not such that would put the opposition on notice of the issue in the "new" claim). I have not found any other allegations in the Corrected Amended § 2255 Motion that would even arguably support this "new" claim in the Second Amended § 2255 Motion. Therefore, it does not relate back, and is time-barred from consideration on the merits.

The respondent also challenges Johnson's Claim 18 (Petitioner's Claim One, § J), which is a claim of failure to confront aggravating evidence in the mitigation phase, alleging the failure to present evidence of battered woman's syndrome to explain the relationship between Johnson and DeGeus, which would have rebutted the prosecution's theory about her motive for killing him. The respondent asserts that the claim is based on repeated beatings by DeGeus, but such factual allegations were not raised in Johnson's Corrected Amended § 2255 Motion in relation to battered woman's syndrome. While I consider it a close call, I do find that the Corrected Amended § 2255 Motion does allege a common core of operative facts for this claim. *See Dodd*, 614 F.3d at 515. There are allegations in the Corrected Amended § 2255 Motion of beatings or abuse by DeGeus, *see, e.g.,* Corrected Amended § 2255 Motion at 2-3, 31, 152, and other allegations that are close to the mark of identifying dysfunction based on abuse by DeGeus and other "bad boys," and the "coercive control" that such people had over Johnson, *see id.* at 31, 33, 152, even though those allegations do not use the magic words "battered woman's

syndrome." I believe that these allegations were sufficient to put the respondent on reasonable notice that Johnson was claiming that her dysfunction arose, in part, from repeated beatings by DeGues, yet she still loved him. *Cf. Hernandez*, 436 F.3d at 858. This claim does "relate back, " and it will be considered on the merits.

The respondent also challenges Claim 19 (Petitioner's Claim One, § M), which is a mitigation phase claim of failure to confront aggravating evidence, alleging the failure of trial counsel to present readily available evidence about Dustin Honken to refute the prosecution's argument that Johnson was "worse" than Honken. The respondent argues that Johnson alleged prosecutorial misconduct along these lines in her Corrected Amended § 2255 Motion, but never asserted an ineffective assistance of counsel claim in relation to the presentation of evidence to rebut the prosecution's claim that Johnson was "worse" than Honken, nor did she allege the facts upon which she now bases this claim. I disagree. On pages 50 to 58 of the Corrected Amended § 2255 Motion, I find allegations of essentially the same core of operative facts for this claim in the context of an ineffective assistance claim. *See Dodd*, 614 F.3d at 515. Thus, the Corrected Amended § 2255 Motion was sufficient to put the respondent on reasonable notice that Johnson was claiming ineffective assistance of counsel in relation to the prosecution's assertion that she was "worse" than Honken, a claim that was similar in both "time and type." *Id.*; *Hernandez*, 436 F.3d at 858. This claim does "relate back," and it will be considered on the merits.

The respondent also challenges Claim 20 (Petitioner's Claim One, § N), which is a mitigation phase claim of failure to confront aggravating evidence, alleging the failure of trial counsel to use the prosecution's arguments at Dustin Honken's trial as party admissions to rebut the prosecution's evidence that petitioner was "worse" than Honken. For essentially the same reasons that I found that Claim 19 does "relate back" I find that this claim also "relates back," and it will be considered on the merits.

The respondent also challenges Claim 21 (Petitioner's Claim One, § P), which is a mitigation phase claim of failure to confront aggravating evidence, alleging the failure of trial counsel to discover and present information regarding Honken's plans to kill prosecutor Reinert and his family and Honken's membership in a white supremacist prison organization, as lacking any relationship to allegations in the Corrected Amended § 2255 Motion. I disagree. While the Corrected Amended § 2255 Motion does not specifically mention a plan to kill a prosecutor and his family, the specific allegation of such a plan in the Second Amended § 2255 Motion is more in the nature of a factual clarification or amplification than a distinct, new claim. *See, e.g., United States v. Espinoza-Saenz*, 235 F.3d 501, 504 (10th Cir. 2000) (joining other Circuit Courts of Appeals to hold that untimely amendment to a § 2255 motion that, by way of additional facts, clarifies or amplifies a claim or theory in the original motion may, in the district court's discretion, relate back to the date of the original motion if and only if the original motion was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case). The Corrected Amended § 2255 Motion alleges, on pages 51 and 53, in the context of an ineffective assistance claim concerning failure to demonstrate who the real Honken was, that Honken was involved with the Odinists, a white supremacist prison group, and, on pages 52 to 53, it alleges Honken's plans to kill law enforcement officers and their families, which reasonably includes a prosecutor and his family, or at the very least, involves allegations of the same "time and type." *See Dodd*, 614 F.3d at 515. Thus, I conclude that the Corrected Amended § 2255 Motion alleges a core of operative facts for this claim in the context of an ineffective assistance claim, *see id.*, so that the Corrected Amended § 2255 Motion was sufficient to put the respondent on reasonable notice that Johnson was claiming ineffective assistance of counsel in relation to failure to reveal Honken's plans to kill law enforcement officers and their families,

80

including a prosecutor and his family. *Cf. Hernandez*, 436 F.3d at 858. Thus, this claim "relates back," and it will be considered on the merits.

The respondent also challenges Claim 23 (Petitioner's Claim One, § R), which is a mitigation phase claim of failure to confront aggravating evidence, alleging the failure of trial counsel to limit future dangerousness evidence to future danger in prison. I agree with the respondent that the Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim. *Dodd*, 614 F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 24 (Petitioner's Claim One, § S), which is a mitigation phase claim of failure to confront aggravating evidence, alleging the failure of trial counsel to object to Kathy Rick's triple hearsay testimony about Johnson's alleged possession of a gun. Again, I agree with the respondent that the Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim. *Dodd*, 614 F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 25 (Petitioner's Claim One, § U), which is a mitigation phase claim of failure to confront aggravating evidence, alleging the failure of trial counsel to object to Kyla Davis's testimony that Johnson tried to find out where she lived and what car she drove. Again, I agree with the respondent that the Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim. *Dodd*, 614 F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 32 (Petitioner's Claim One, § CC), which is a mitigation phase claim of "ineffective mitigation" (*i.e.*, a claim of ineffective assistance of counsel in the mitigation case actually presented), alleging the failure of trial counsel

to provide psychiatric pharmacologist Roswell Lee Evans with data regarding Johnson's drug history, rendering his expert testimony virtually irrelevant. The respondent argues that the Corrected Amended § 2255 Motion does not even mention Dr. Evans and that evidence, from the trial transcripts, of what Dr. Evans did testify about was known to Johnson and could have been introduced in prior pleadings. I agree that there is no specific mention of Dr. Evans in the Corrected Amended § 2255 Motion. Nevertheless, there are repeated references to Johnson's history of drug use, including methamphetamine use, and allegations about what use trial counsel could have made of such evidence. *See, e.g.,* Corrected Amended § 2255 Motion at page 2 ("Angela began using methamphetamine to self-medicate her underlying conditions."); 31 (Dr. Logan's testimony about the fact that methamphetamine withdrawal can cause a strong rebound depression); 70 (noting Alyssa Nelson's testimony that Johnson's occasionally bizarre behavior might be consistent with methamphetamine use, but alleging that diligent counsel would have offered the much more mitigating explanation that this behavior was the result of involuntary impairments in Johnson's mind); 133ff (Appendix C, laying out Johnson's history, including drug use). While these allegations may be at the outer limits of what would constitute allegation of a common core of operative facts or allegations sufficiently close in "time and type," *see Dodd*, 614 F.3d at 515, and, thus, at the outer limits of what would give the respondent reasonable notice of a claim related to specific deficiencies in the testimony elicited from Dr. Evans, *Hernandez*, 436 F.3d at 858, I conclude that this claim does "relate back" and that it will be considered on its merits.

The respondent also challenges Claim 33 (Petitioner's Claim One, § EE), which is a mitigation phase claim of ineffective mitigation, alleging the deficient performance of trial counsel in using multifaceted, overly-complicated yet incomplete mitigating factors for the jury to weigh rather than simple, straight-forward facts that encompassed all of the

mitigation. The respondent points out that nowhere in the earlier pleadings is there any claim relating to trial counsel's drafting of mitigating factors, so that the claim is a completely new theory that does not relate back to any prior claim or allegations. I agree. While there are certainly allegations in the Corrected Amended § 2255 Motion about trial counsel's failure to elicit evidence supporting a full range of mitigating factors, there are no allegations that trial counsel performed deficiently in drafting the mitigating factors submitted to the jurors. Thus, the Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim, and the theory of the claim is entirely new, so that there are no allegations of the same "time and type." *Dodd*, 614 F.3d at 515. I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 35 (Petitioner's Claim One, § Y). Claim 35 is a mitigation phase claim of failure to present mitigation evidence, alleging the failures of trial counsel in their delay in hiring Dr. Gelbort, failure to follow-up on his recommendations, failure to instruct him to conduct a more thorough battery of neuropsychological tests, failure to retain another neuropsychologist when Dr. Gelbort inexplicably refused to testify, failure to incorporate his helpful findings and diagnoses into the testimony of the experts who did testify, and failure to conduct additional neuropsychological and neuroimaging testing of petitioner. The respondent argues that Johnson previously alleged deficient performance only in the delay in hiring Dr. Gelbort, so that she is now attempting to tack on factually distinct additional claims unrelated to Dr. Gelbort's hiring. I do not agree. I find that page 29 and note 21, note 23 on page 30, and pages 40 through 42 of the Corrected Amended § 2255 Motion provide sufficient allegations of a common core of operative facts, and are of similar "time and type," *Dodd*, 614 F.3d at 515, so that they give the respondent reasonable notice of this claim. *Hernandez*, 436 F.3d at 858. These allegations in the earlier pleading do involve the delay

between initial contact with Dr. Gelbort and actually asking him to do any testing; Dr. Gelbort's notice to trial counsel of the need for additional testing, but that no further testing was performed; and the failure of trial counsel to follow up on "red flags" identified by Dr. Gelbort. There are copious other allegations in the Corrected Amended § 2255 Motion of the trial attorneys' mishandling of the mental health experts, both prior to and during trial. Indeed, I find that the more specific allegations of deficiencies with regard to Dr. Gelbort are more in the nature of a factual clarification or amplification than a distinct, new claim. *See, e.g., Espinoza-Saenz*, 235 F.3d at 504. I conclude that Claim 35 does "relate back," and it will be considered on the merits.

The respondent also challenges back Claim 36 (Petitioner's Claim One, § Z), which is a mitigation phase claim of failure to prepare mitigation, alleging trial counsel's failure to introduce evidence of, and to give the trial experts records concerning, Johnson's 1996 diagnosis of depression and dependent personality features. This claim is peculiar, because the Corrected Amended § 2255 Motion actually alleges that Dr. Hutchinson, one of Johnson's trial experts, *did* testify about Johnson's 1996 diagnosis of major depression, which causes, among other things, irritability, affect vulnerability, and thoughts of suicide. *See* Corrected Amended § 2255 Motion at 33-34. Nevertheless, I agree with the respondent that the Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim, *Dodd*, 614 F.3d at 515, because it nowhere alleges trial counsel failed to introduce evidence of the 1996 diagnosis or failed to give the trial experts records concerning that diagnosis, where it alleges the opposite, that the trial experts did have some information about the 1996 diagnosis and did present it to the jury. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 37 (Petitioner's Claim One, § O), which is a mitigation phase claim of failure to prepare mitigation, alleging trial counsel's failure to

offer expert and lay testimony that Johnson was under the substantial influence of Dustin Honken. Contrary to the respondent's contentions, on pages 45 and 47 of the Corrected Amended § 2255 Motion, I find allegations of a common core of operative facts for this claim in the context of an ineffective assistance claim relating to failure to offer testimony that Johnson was under Honken's substantial influence, so that it alleges a claim of the same "time and type." *See Dodd*, 614 F.3d at 515. Thus, the Corrected Amended § 2255 Motion was sufficient to put the respondent on reasonable notice of this claim, *cf. Hernandez*, 436 F.3d at 858, this claim does "relate back," and it will be considered on the merits.

The respondent also challenges Claims 38, 39, and 40 (Petitioner's Claim One, §§ L.1, L.2, and L.3). These claims are identified as mitigation phase claims of failure to prepare mitigation based, respectively, on allegations that trial counsel failed to introduce the statements of Phyllis Proscovec to support a "residual doubt" defense; that trial counsel failed to offer Dustin Honken's letters to impeach the mitigation phase testimony of Steven Vest to support "residual doubt"; and that trial counsel failed to impeach Steven Vest by presenting evidence that Honken lied about Johnson's role in the offenses to support "residual doubt." I find that some of these "residual doubt" allegations relate back, while others do not.

The respondent is simply wrong that there are no prior allegations relating to Proscovec and the events that preceded the Duncans' disappearance. Instead, I find that, on page 85 of the Corrected Amended § 2255 Motion, Johnson alleged that, "[h]ad Phyllis Prosovic [sic] been interviewed in a timely manner, her testimony, which is completely inconsistent with the Government's theory, could have been preserved prior to her death and presented at trial." Also, in the specific context of a claim that counsel unreasonably failed to introduce evidence in support of "residual doubt," Johnson alleged essentially the

same factual basis for this claim, *see* Corrected Amended § 2255 Motion at 86-87, as she does in the Second Amended § 2255 Motion, 59-61. Thus, the Corrected Amended § 2255 Motion does allege a common core of operative facts for this claim, of the same "time and type," *see Dodd*, 614 F.3d at 515, and it would have put the respondent on notice of the claim. *See Hernandez*, 436 F.3d at 858. Therefore, Claim 38 does relate back, and it will be considered on the merits.

On the other hand, like the respondent, I find nothing in the Corrected Amended § 2255 Motion alleging a common core of operative facts for either the claim that trial counsel failed to offer Dustin Honken's letters to impeach the mitigation phase testimony of Steven Vest to support "residual doubt," or the claim that trial counsel failed to impeach Steven Vest by presenting evidence that Honken lied about Johnson's role in the offenses to support "residual doubt." Thus, these "residual doubt" claims, Claims 39 and 40, do not "relate back," and they will not be considered on the merits.

The respondent also challenges Claim 42 (Petitioner's Claim One, § W), which is a mitigation phase claim of failure to prepare mitigation evidence, alleging the failure of trial counsel to present evidence of remorse through expert testimony. I note that the Corrected Amended § 2255 Motion does allege on pages 59 and 61 that the jury believed that Johnson lacked remorse and that her medications during trial prevented her from showing remorse, in the context of an ineffective assistance claim relating to failure to reduce Johnson's medications during trial. It also alleges, on pages 61-64, that capital jurors want to see remorse and that the jurors in this case saw something else, instead. Nevertheless, these allegations are different in "time and type" from a claim that trial counsel should have introduced remorse evidence through expert testimony, so that I have found no allegations of a common core of operative facts for the "new" claim. *Dodd*, 614

F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 43 (Petitioner's Claim One, § X), which is a mitigation phase claim of failure to prepare mitigation evidence, alleging the failure of trial counsel to elicit evidence of the effect that Johnson's execution would have on her family members. Again, I agree with the respondent that the Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim. *Dodd*, 614 F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

The respondent also challenges Claim 51 (Petitioner's Claim One, § II), which is a "post-trial and appeal" claim of ineffective assistance of appellate counsel, alleging failure to raise the unconstitutional skewing effect of multiplicitous counts. The respondent contends that the Corrected Amended § 2255 Motion does not mention anything close to ineffective assistance of counsel in relation to the multiplicity issue and the alleged skewing effect it might have had. I agree. The Corrected Amended § 2255 Motion does not allege a common core of operative facts for this claim. *Dodd*, 614 F.3d at 515. Thus, I find that this claim does not "relate back," and it will not be considered on the merits.

### B. The "New" Claim In The Third Amended § 2255 Motion

On October 21, 2011, Johnson filed her Motion To Amend (Civ. docket no. 339), seeking leave to file a Third Amended § 2255 Motion, pursuant to Rules 15(a)(2) and (c) of the Federal Rules of Civil Procedure and N.D. IA. L.R. 15, to add her sixty-fourth claim. That sixty-fourth claim is that she was constitutionally entitled to an instruction that the "reasonable doubt" standard governed the jurors' decision about whether aggravating factors sufficiently outweighed mitigating factors, and that her trial and appellate counsel

were ineffective in failing to raise this claim. For convenience, I will call this claim, encompassing both a substantive claim and an ineffective assistance of counsel claim, Johnson's "weighing instruction" claim. The respondent resists Johnson's motion for leave to amend to add her "weighing instruction" claim.

### 1. Arguments of the parties

#### a. The petitioner's argument

In support of her motion for leave to file her Third Amended § 2255 Motion, Johnson argues that, on August 3, 2011, the Sixth Circuit Court of Appeals became the first federal court in the country to hold that "a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionality required for all other findings of fact and mixed questions of law and fact." *United States v. Gabrion*, 648 F. 3d 307, 325 (6th Cir. 2011). That court also held that the district court's error in refusing to deliver a reasonable doubt weighing instruction to a jury in a federal capital case was a structural error not susceptible to harmless error analysis. *Id.* at 329. Such an instruction was not given in this case, because, as Johnson acknowledges, at the time of the appeal in her case, binding circuit precedent precluded the claim. *See United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Johnson also acknowledged that a petition for rehearing *en banc* in *Gabrion* is still pending before the Sixth Circuit Court of Appeals,[19] but she argues that, if the decision withstands *en banc* review, a circuit split will be created that will ultimately have to be resolved by the United States Supreme Court. Indeed, the Sixth Circuit Court

---

[19]The Sixth Circuit Court of Appeals did, in fact, grant rehearing *en banc* in *Gabrion* on November 17, 2011, and vacated the panel decision.

of Appeals granted the petition for rehearing *en banc* in *Gabrion*, and vacated the panel's opinion, on November 17, 2011.

Johnson recognizes that her proffered amendment is late in these proceedings, but she argues that she must seek leave to add this new claim now, or circuit precedent may preclude her from raising it in a separate petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2241. She also argues that the Eighth Circuit Court of Appeals has recognized that it is appropriate to grant a petitioner leave to amend, if the petitioner may be foreclosed from raising a new claim in a subsequent petition, and justice requires the amendment, citing *Williams v. Lockhart*, 849 F.2d 1134, 1139-40 (8th Cir. 1988). She argues that granting leave to amend is particularly appropriate under these circumstances in this death-penalty case. More specifically, she argues that Rule 15(a)(2) warrants amendment, because "justice so requires," even if Rule 15(a)(2) technically applies to pre-trial amendments. She argues that, in the circumstances of a § 2255 motion, in order to avoid the restrictive standards that govern successive petitions and piecemeal litigation, liberal amendment is appropriate where a claim only becomes available for the first time after the petitioner has filed her first federal petition.

Johnson also argues that the one-year statute of limitations does not bar the amendment, because her timely *Brady* claim makes all of her new claims, including this "weighing instruction" claim, timely (an argument that I have expressly rejected in Section II.A.2.a.). In the alternative, she argues that this new claim should be subject to equitable tolling, because the basis for this new claim did not exist until the decision in *Gabrion*, which establishes both that the circumstances are extraordinary and that she has diligently asserted the claim.

Johnson also argues that the claim is not procedurally defaulted, because there is both "cause" and "prejudice" for her failure to assert the claim at trial or on direct appeal.

As to "cause," she argues that not a single federal district court or circuit court had credited the claim she now advances, and the Eighth Circuit Court of Appeals had explicitly rejected it. In the alternative, she argues that she can establish "cause," because, if the claim should have been asserted below, both trial and appellate counsel were ineffective for not doing so. As to "prejudice," she contends that the failure to instruct on the reasonable doubt standard applicable to the weighing process is a structural constitutional error.

Finally, Johnson contends that her proffered claim does not constitute a "second or successive" § 2255 petition, because her claim had not yet arisen when she filed her original § 2255 motion.

### b.    The respondent's argument

The respondent argues that Johnson's new claim is untimely and that its untimeliness is not excused. More specifically, the respondent argues that Johnson's "weighing instruction" claim is a new claim, not a "clarification" of an existing claim, filed well after the one-year statute of limitations for § 2255 claims has expired. The respondent also argues that this "new" claim does not "relate back," because it is based entirely on a novel argument not previously raised, either factually or legally. The respondent argues that there is nothing in Johnson's original motion that can be construed as an allegation of error regarding the jury instructions, nothing in the original motion that sets forth a factual basis regarding this claim, and nothing relating to counsel's ineffectiveness in failing to advance the "weighing instruction" argument. The respondent points out that the test of timeliness of amendments is not whether the petitioner's life is now at stake, because if it were, the rules for timeliness of § 2255 claims would be nullities in capital cases.

The respondent also contends that Johnson has advanced no basis for equitable tolling of the statute of limitations for her "weighing instruction" claim, because she has

not demonstrated diligence. The respondent points out that her new claim is premised on information available within the record and that she merely argues that trial counsel were ineffective for failing to ask for a "weighing instruction," but such a claim is ultimately based on the Constitution, not the decision in *Gabrion*. The respondent then cites cases in which courts addressed (and rejected) this precise claim before Johnson's original § 2255 Motion was filed. Thus, the respondent contends that there was nothing preventing Johnson from timely raising the claim. The respondent also asserts that Johnson cannot demonstrate that any extraordinary circumstances stood in the way of her raising this claim in a timely manner.

Next, the respondent argues that Johnson cannot show "cause and prejudice" to resuscitate her procedurally defaulted "weighing instruction" claim. As to "cause," the respondent argues that the legal claim was available, just never before successful, and that counsel was not deficient in failing to assert a claim barred by circuit precedent. Nor has Johnson shown "prejudice," the respondent argues, because even if the jury had been given the "weighing instruction" that Johnson now claims was required, there is no reasonable probability that a jury would have voted not to impose the death penalty. This is so, the respondent argues, where the mitigators found by at least some of the jurors pale in comparison to the aggravating factors that the jurors found beyond a reasonable doubt.

Finally, the respondent argues that Johnson's "new" claim constitutes a second or successive § 2255 petition, because the proof and arguments concerning the existing claims had been fully presented, except for oral arguments, by the time Johnson sought to amend her § 2255 Motion yet again, and because she could have raised this claim in her original motion. The respondent argues that Johnson would need leave of the Eighth Circuit Court of Appeals to assert her "weighing instruction" claim in a successive petition.

## 2.    *Analysis*

A court should freely give leave to amend pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure "when justice so requires." Fed. R. Civ. P. 15(a)(2). Even in the *habeas* context, "[t]he court may disallow amendment for various reasons, however, including 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Moore-El v. Luebbers*, 446 F.3d 890, 901-02 (8th Cir. 2005) (§ 2254 case, quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

I think that it is reasonable to assume that justice would require granting leave to amend pursuant to Rule 15(a)(2) to allow a § 2255 petitioner to assert a *truly new* claim of a structural error in failure to instruct a jury or to require a jury to find beyond a reasonable doubt that aggravating factors outweigh the mitigating factors before imposing a death sentence in a federal capital case. Similarly, while I do not take a position on whether or not Johnson's failure to assert her "weighing instruction" claim would bar her from raising it in a subsequent § 2241 proceeding, I will assume that possible foreclosure of the claim is also a reason that justice might require me to grant Johnson leave to amend to assert the claim in question. *See Williams v. Lockhart*, 849 F.2d 1134, 1140 (8th Cir. 1988) ("Justice also requires that Williams be given leave to amend his petition because if amendment is denied then he may be foreclosed from ever raising this claim in a subsequent petition."). Nevertheless, for the reasons explained below, I find that leave to amend must ultimately be denied, because Johnson's "weighing instruction" claim is not truly new, so that justice does not require that leave be granted to amend her § 2255 Motion to assert the claim. Moreover, also for the reasons explained below, I find that the

claim is futile.  Consequently, leave to amend to assert the "weighing instruction" claim will not be granted.

### a.    *Timeliness*

As to timeliness, Johnson first reiterates here her argument that her "new" *Brady* claim in her Second Amended § 2255 Motion is timely, pursuant to 28 U.S.C. § 2255(f)(4), so that the "new" "weighing instruction" claim in her proffered Third Amended § 2255 Motion is also timely, riding on the "coattails" of the timely *Brady* claim.  For the reasons stated in Section II.A.2.a., concerning the effect of § 2255(f)(4), this timeliness argument fails.[20]

---

[20]Johnson does not argue, nor could she, that her "weighing instruction" claim, based on a recent decision of the Sixth Circuit Court of Appeals, is itself timely under 28 U.S.C. § 2255(f)(3) or (4).  As the Eighth Circuit Court of Appeals has explained,

> [P]aragraph 6(3) [now § 2255(f)(3)] further supports the conclusion that a decision taken from a federal court of appeals does not provide an independent basis to trigger the one-year statute of limitations provided under § 2255.  Paragraph 6(3) states that the statute of limitations will begin to run only where the Supreme Court recognizes a new right that it applies retroactively to cases on collateral review.  § 2255 para. 6(3).  We believe Congress, by limiting paragraph 6(3) in this fashion, impliedly rejected the notion that the creation of a new right by the Supreme Court that is not made retroactive to cases on collateral review, other rulings of law by the Supreme Court, *and decisions taken from the courts of appeal in all instances*, could trigger any of the limitations periods enumerated under § 2255.

*E.J.R.E. v. United States*, 453 F.3d 1094, 1098 (8th Cir. 2006) (emphasis added).  The decision of the Sixth Circuit Court of Appeals in *Gabrion*, which is not a decision of the United States Supreme Court, simply does not "trigger" the running of the statute of limitations under § 2255(f)(3) for Johnson's "weighing instruction" claim.  *Id.*

(continued…)

Johnson's second argument for the timeliness of her "weighing instruction" claim is that the statute of limitations on the claim was "equitably tolled." Johnson is correct that § 2255 claims may be subject to "equitable tolling." *See Hernandez*, 436 F.3d at 858 (noting that "equitable tolling does apply to § 2255 motions" (citing *Martin*, 408 F.3d at 1092)); *accord Byers v. United States*, 561 F.3d 832, 836 (8th Cir. 2009) ("To be sure, the Eighth Circuit has recognized that the doctrine of equitable tolling is available to a § 2255 movant. . . ."). The test for "equitable tolling" that Johnson invokes here, as to the "weighing instruction" claim, is whether there are "extraordinary circumstances" beyond her control that kept her from filing in a timely fashion. *Id.* at 858 (citing *Martin*, 408 F.3d at 1093). As the Eighth Circuit Court of Appeals explained in *Byers*,

> [S]uch extraordinary circumstances must not be attributable to the petitioner, *Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005), and must be "beyond a prisoner's control," *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000). Finally, "[t]he petitioner must also demonstrate he acted with due diligence in pursuing his petition." *E.J.R.E. v. United States*, 453 F.3d

---

[20](...continued)
Similarly, the "weighing instruction" claim is not itself timely under § 2255(f)(4), which starts the running of the statute of limitations from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). This is so, because the basis for the "weighing instruction" claim is not invalidation of an "operative fact." *E.J.R.E.*, 453 F.3d at 1098. In *E.J.R.E.*, the court concluded that a panel decision holding that a statute authorizing juvenile delinquent supervision could not be applied to acts of delinquency committed prior to the effective date of the statute, "unlike a predicate conviction, is a ruling exclusively within the domain of the courts and is inapplicable to being proved or disproved," so that it did not invalidate any operative facts. *Id.* Thus, the panel decision did not trigger the running of the statute of limitations under § 2255(f)(4). *Id.* (citing § 2255(f)(4) as § 2255 para. 6(4)). Likewise, the decision of the Sixth Circuit Court of Appeals in *Gabrion* did not invalidate any operative facts or trigger the running of the statute of limitations.

1094, 1098 [(8th Cir. 2006)] (citing *Martin*, 408 F.3d at 1095).

*Byers*, 561 F.3d at 836. "Equitable tolling is 'an exceedingly narrow window of relief.'" *Riddle v. Kemna*, 523 F.3d 850, 857 (8th Cir. 2008) (quoting *Jihad v. Hvass*, 267 F.3d 803, 805 (8th Cir. 2001)).

The Eighth Circuit Court of Appeals has recognized that "[t]he abrogation of an en banc precedent is an extraordinary circumstance, external to [the petitioner] and not attributable to [her]." *Id.* (citing *E.J.R.E.*, 453 F.3d at 1098). Such an "extraordinary circumstance" is not enough standing alone, however, because the petitioner must still show "diligence." *E.J.R.E.*, 453 F.3d at 1094. In *E.J.R.E.*, the court assumed that a panel decision on an issue of first impression, holding that a statute authorizing juvenile delinquency supervision could not be applied to acts of delinquency committed prior to the effective date of the statute, could constitute "extraordinary circumstances." *E.J.R.E.*, 453 F.3d at 1098. Nevertheless, the court affirmed the district court's rejection of equitable tolling:

> [W]e can reference no impediment whatsoever that would have inhibited Appellants' ability to file a timely § 2255 petition. The mere fact that our ruling in *J.W.T.* [the panel decision establishing a new rule] made it more likely that Appellants' collateral attack would be successful does not change the reality that Appellants were free, at any time, to file their § 2255 petitions after final judgment was entered and before the one-year statute of limitations period had expired. § 2255 para. 6(1). Further, Appellants' failure to file a direct appeal demonstrates a lack of diligence and, as such, the district court's ruling was proper.

*E.J.R.E.*, 453 F.3d at 1098.

Likewise, here, the fact that the Sixth Circuit Court of Appeals issued a decision in *Gabrion* supporting Johnson's "weighing instruction" claim, when no other federal court had done so, might make it more likely that Johnson's "weighing instruction" claim would be successful, but such an out-of-circuit decision is less likely to have that effect than an in-circuit decision on an issue of first impression, like the one at issue in *E.J.R.E. Cf. id.* Increased likelihood of success on the basis of a new circuit court decision, in-circuit or out-of-circuit, however, is not a basis for equitable tolling. *Id.* Still more importantly, even prior to the decision of the Sixth Circuit Court of Appeals in *Gabrion*, there was no impediment to Johnson bringing her "weighing instruction" claim that the *Gabrion* decision has removed. *Id.* The reality is that, even prior to the out-of-circuit decision in *Gabrion*, Johnson was free to assert that she was entitled to the "weighing instruction" that she now asserts should have been given and that the contrary in-circuit panel decision in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), was wrong.

I conclude, therefore, that Johnson's "weighing instruction" claim is untimely and not subject to equitable tolling. *See E.J.R.E.*, 453 F.3d at 1098. As such, it is not the sort of truly new claim that justice might require be introduced into these proceedings at this late date. *See Moore-El*, 446 F.3d at 901-02 (§ 2254 case, noting that the court may disallow amendment for various reasons, including "'undue delay'" (quoting *Foman*, 371 U.S. at 182)).

### b.    Futility

Although delay alone may not be sufficient to deny a motion to amend, it is a well-established principle under Rule 15 that futility of the proffered amendment certainly is sufficient. *See id.* at 902 (citing *Foman*, 371 U.S. at 182). Here, although I held above that Johnson could have *brought* her "weighing instruction" claim earlier, notwithstanding

contrary circuit authority, she cannot *prevail* on that claim in light of that contrary circuit authority.

As Johnson acknowledges, in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), a decision rendered on November 7, 2005, prior to my decision on her post-trial motions, a panel of the Eighth Circuit Court of Appeals considered a capital defendant's argument, on direct appeal, that the prosecution had not included as a necessary element in the indictment that the aggravating factors sufficiently outweighed any mitigating factors to justify a sentence of death. *See Purkey*, 428 F.3d at 748. The defendant's argument on this point, and the court's reasons for rejecting it, were as follows:

> To deal with Mr. Purkey's [necessary element] challenge, we begin with a bit of background. Under the FDPA, once the jury finds the defendant guilty of one of the offenses listed in 18 U.S.C. § 3591, the trial proceeds to a separate phase—the sentencing or penalty phase. In a homicide case, the jury must make three determinations in this latter phase before it can impose the death penalty: First it must find, unanimously and beyond a reasonable doubt, that the defendant acted with the requisite *mens rea*. *See* 18 U.S.C. § 3591(a)(2). Second, again unanimously and beyond a reasonable doubt, it must find the existence of at least one statutory aggravating factor. *See* 18 U.S.C. §§ 3592(c), 3593(d). If the above two requirements are satisfied, the jury must then determine whether the aggravating factors, both statutory and non-statutory, "sufficiently outweigh" the mitigating factors presented by the defendant to justify a death sentence, "or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify" that sentence. *See* 18 U.S.C. § 3593(e).
>
> *Mr. Purkey maintains that because the jury is required to take this third step before it may impose a sentence of death, the necessary elements for a capital prosecution under the FDPA include all aggravating factors, including non-statutory*

*aggravating factors, and the weighing of aggravating factors versus mitigating factors.* He therefore contends that because his superseding indictment did not include non-statutory aggravating factors or a determination that there exists probable cause to believe that aggravating factors sufficiently outweigh mitigating factors so as to justify a sentence of death, it falls short of what the fifth amendment requires. We disagree.

"[T]he same facts that the Sixth Amendment requires to be proven to the petit jury beyond a reasonable doubt in state and federal prosecutions must also be found by the grand jury and charged in the indictment in federal prosecutions." *Allen*, 406 F.3d at 943. For that reason, *Allen* held that to comport with the fifth amendment "at least one statutory aggravating factor and the mens rea requirement [must] be found by the grand jury and charged in the indictment" in a prosecution under the FDPA. *Id.* Mr. Purkey's superseding indictment satisfies both of these requirements.

The indictment must charge at least one of the statutory aggravating factors that is ultimately found by the petit jury because "that is what is required to elevate the available statutory maximum sentence from life imprisonment to death." *Id.* In other words, including that factor in the indictment is required to make the defendant *eligible* for the death penalty. *See United States v. Higgs,* 353 F.3d 281, 299 (4th Cir. 2003), *cert. denied,* 543 U.S. 1004, 125 S. Ct. 608, 160 L. Ed. 2d 465 (2004). We now make clear what *Allen* merely implied*: "There is no requirement that the indictment allege* all *of the factors that might be weighed by the jury when deciding whether to impose a death sentence." Higgs,* 353 F.3d at 299. *Non-statutory aggravating factors do not increase the maximum punishment to which a defendant is subject. They are neither sufficient nor necessary under the FDPA for a sentence of death.* Their purpose is merely to aid the sentencer "in selecting the appropriate sentence from the available options," *id.* at 298, "'on the basis of the character of the [defendant] and the circumstances of the crime,'" *id.* (quoting

> *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994)).
>
> > *Further, it makes no sense to speak of the weighing process mandated by 18 U.S.C. § 3593(e) as an elemental fact for which a grand jury must find probable cause. In the words of the statute, it is a "consideration," 18 U.S.C. § 3593(e),—that is, the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." Id.*
>
> We thus conclude that Mr. Purkey's arguments based on the indictment clause of the fifth amendment are without merit.

*Purkey*, 428 F.3d at 749-50 (emphasis added).[21]

In short, the court in *Purkey* rejected the argument that the weighing of aggravating factors against mitigating factors was a necessary element of a capital prosecution under the AEDPA, and because it was not—it was simply a "consideration"—it was not necessary for the indictment to charge or for the jury to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. Although the portion of the

---

[21]Johnson cites the relevant portion of the *Purkey* decision as 428 F.3d at 763. While that section of the opinion does discuss various alleged errors relating to the jury's special findings and recommendation of the death sentence, it does not discuss the burden of proof applicable to the weighing of aggravating factors against mitigating factors. What it does discuss is that aggravating factors must be proved by the prosecution "beyond a reasonable doubt," while mitigating factors must be found by the jury "by a preponderance of the information"; it rejects the defendant's request that the panel reconsider circuit precedent that approved jury instructions mandating that a jury recommend a sentence of death should it conclude, after balancing aggravating against mitigating factors, that the former sufficiently outweigh the latter to justify imposition of a death sentence; and it rejects a contention that jurors are required under the FDPA to identify the mitigating factors found to exist. *Purkey*, 428 F.3d at 762-63.

*Purkey* decision quoted above says nothing expressly about instructing the jurors on the burden of proof applicable to the "weighing" issue, it does make clear that an instruction requiring weighing beyond a reasonable doubt would not have been required or correct. While *Purkey* involved the FDPA, specifically, 18 U.S.C. § 3593(e), and Johnson was convicted under a different capital statute, 21 U.S.C. § 848(e), at the time of Johnson's trial, essentially identical language concerning the weighing of aggravating and mitigating factors appeared in § 848(k) as appeared in § 3593(e). Compare 18 U.S.C. § 3593(e) (stating, in pertinent part, "the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence."), *with* 21 U.S.C. § 848(k) (2004) (superseded) (stating, in pertinent part, "the jury, or if there is no jury, the court, shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence."). Thus, *Purkey* forecloses, on its merits, the argument that Johnson was entitled to an instruction that the jurors must find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt before a death sentence could be imposed.

*Purkey* also forecloses an ineffective assistance of counsel claim based on counsel's failure to request a "weighing instruction" to that effect, because failure to press such an argument was not deficient performance on post-trial motions or direct appeal, after *Purkey* was handed down, and failure to press the argument at any time would not have been prejudicial, where the argument was foreclosed by *Purkey* while the case was pending on post-trial motions. Ineffective assistance claims cannot succeed where the argument counsel failed to make was without merit. *See, e.g., Dodge v. Robinson*, 625 F.3d 1014, 1019 (8th Cir. 2010) ("Having found Dodge's double-jeopardy claim to be without merit, we have no difficulty deciding that his counsel's failure to raise the claim at trial could not constitute ineffective assistance. *See Thomas v. United States*, 951 F.2d 902, 905 (8th Cir. 1991) (per curiam) ('Counsel's failure to raise these meritless issues does not constitute ineffective assistance.')."); *Graves v. Ault*, 614 F.3d 501, 507 (8th Cir. 2010) ("[T]rial counsel could not have been ineffective for failing to raise a state law claim with no merit." (citing *Dyer*, *infra*)); *Thai v. Mapes* 412 F.3d 970, 978-79 (8th Cir. 2005) ("Because the promise of leniency argument was factually meritless, his counsel was not ineffective for failing to make this argument, and his counsel's trial strategy cannot be challenged on the basis of a meritless claim." (citing *Dyer, infra*)); *Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002) ("[B]ecause the underlying objection would have been without merit, a claim of ineffective assistance is not viable."); *Dyer v. United States*, 23 F.3d 1424, 1428 (8th Cir. 1994) (a claim of ineffective assistance of counsel failed because the court had rejected as meritless the claim that the petitioner asserted that counsel should have pursued).

Johnson's "weighing instruction" claim, either as a substantive claim or an ineffective assistance of counsel claim, is futile. Justice does not require leave to amend

to assert such a futile claim. *See Moore-El*, 446 F.3d at 902 (citing *Foman*, 371 U.S. at 182).

### c.    Summary

Johnson's October 21, 2011, Motion To Amend Second Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody Pursuant To Federal Rule Of Civil Procedure 15(a)(2) And (c) And Local Rule 15 (Civ. docket no. 339) is denied. The new claim asserted therein is untimely, because the statute of limitations on the claim was not equitably tolled, and the claim is futile, either as a substantive claim or as an ineffective assistance of counsel claim. I will not consider Johnson's "weighing instruction" claim further on the merits.[22]

### C.    Summary Of Claims To Be Considered On The Merits

Perhaps the most useful way to summarize my conclusions on the "relation back" and "amendment" issues, and to identify which of Johnson's 64 claims for post-conviction relief pursuant to § 2255 will be considered on the merits, is to reiterate the Claim Chart, with some modifications. This time, in addition to indicating in **bold** which claims were ultimately briefed in Johnson's Corrected Post-Hearing Brief, I will indicate in *italics* which claims I find *do not* "relate back" or otherwise will not be considered on the merits. This indication of claims in **bold** (briefed) and *italics* (time-barred) will continue through the remainder of this opinion.

---

[22]I find it unnecessary to reach any of Johnson's other arguments in support of this proffered amendment, concerning whether or not the "weighing instruction" claim is procedurally defaulted and whether or not it constitutes a second or successive § 2255 motion. Furthermore, were I to allow the proffered amendment, for the reasons that I find that the new "weighing instruction" claim is futile, I would also find that the claim is without merit, thus affording Johnson no basis for § 2255 relief.

| GROUNDS FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL | | |
|---|---|---|
| **PRETRIAL PHASE** | | |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| **1.** | **One, § A** | **Failure to pursue a disposition for a sentence of less than death** |
| 2. | One, § B | Failure to proceed to trial at a time that would have precluded the government from filing a timely notice of intent to seek the death penalty |
| 3. | One, § DD.a-c, f | Failure to timely and effectively make a number of meritorious motions, objections, and arguments |
| **JURY SELECTION** | | |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| 4. | One, § C.1 | Juror No. 55:  Ineffective *voir dire* |
| 5. | Six | Juror No. 55:  Misconduct by Juror |
| 6. | One, § C.2 | Failure to structure *voir dire* to identify jurors with prejudicial views on Pentecostal religion and women |
| 7. | One, § DD.e, g | Failure to timely and effectively (a) re-urge Johnson's motion for change of venue and (b) object to the manner in which peremptory challenges were allocated |

| MERITS PHASE | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| **8.** | **One, § D** | **Demeanor and competence:  Failure to reduce petitioner's medication or to address the effects of the medication on (a)  her demeanor at trial and (b) her ability to participate in her own defense, in violation of her right to due process and a fair trial** |
| 9. | One, § E | Demeanor and competence:  Failure to seek a competency hearing |
| 10. | Five | Demeanor and competence:  Petitioner was tried while incompetent, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution |
| *11.* | *One, §§ F and H.1* | *Investigation and presentation:  Failure to investigate Robert McNeese or to impeach him with the court's findings regarding his credibility at the Massiah hearing* |
| *12.* | *One, §§ F and H.2* | *Investigation and presentation: Failure to investigate and effectively examine Christie Gaubatz* |
| *13.* | *One, § T* | *Investigation and presentation:  Failure to effectively cross-examine Wendy Jensen* |
| *14.* | *One, §§ F and I* | *Investigation and presentation:  Failure to present evidence of Terry DeGeus's involvement in the killing of Gregory Nicholson and the Duncans* |
| 15. | One, § F | Investigation and presentation:  Failure to use a forensic expert or to investigate Phyllis Proscovec, the gun shop owner, an after-acquired evidence theory, or an alibi |
| *16.* | *One, § G* | *Investigation and presentation:  Presentation of a "mere presence" defense without investigation and despite petitioner's repeated assertions that she was not present at the Nicholson/Duncan killings* |

| MERITS PHASE (continued) | | |
|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| 17. | One, § JJ, Seven | Cumulative errors render the petitioner's conviction constitutionally infirm |

| MITIGATION PHASE | | |
|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| **18.** | **One, § J** | **Confrontation of aggravating evidence: Failure to present evidence of battered woman's syndrome to explain the relationship between petitioner and Terry DeGeus to rebut the prosecution's theory of her motive for killing him** |
| **19.** | **One, § M** | **Confrontation of aggravating evidence: Failure to present readily available evidence about Dustin Honken to refute the prosecution's argument that Angela Johnson was "worse" than Honken** |
| **20.** | **One, § N** | **Confrontation of aggravating evidence: Failure to use the prosecution's arguments at Dustin Honken's trial as party admissions to rebut the government's evidence that petitioner was "worse" than Honken** |
| **21.** | **One, § P** | **Confrontation of aggravating evidence: Failure to discover and present information regarding Dustin Honken's plans to kill prosecutor Reinert and his family and Honken's membership in a white supremacist prison organization** |
| **22.** | **One, § Q** | **Confrontation of aggravating evidence: Failure to address aggravating evidence at the merits and mitigation phases of the trial** |
| *23.* | *One, § R* | *Confrontation of aggravating evidence: Failure to limit future dangerousness evidence to future danger in prison* |

| MITIGATION PHASE (continued) | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| *24.* | *One, § S* | *Confrontation of aggravating evidence: Failure to object to Kathy Rick's triple hearsay testimony about petitioner's alleged possession of a gun* |
| *25.* | *One, § U* | *Confrontation of aggravating evidence: Failure to object to Kyla Davis's testimony that petitioner tried to find out where she lived and what car she drove* |
| 26. | Two | **Prosecutorial misconduct: The prosecution's failure to correct false testimony at Angela Johnson's trial violated the Fifth and Eighth Amendments to the United States Constitution** |
| 27. | Three | **Prosecutorial misconduct: The prosecution's violation of *Brady v. Maryland* by failing to disclose Dustin Honken's planned violent attack on the trial prosecutor and his association with a white supremacist prison organization** |
| 28. | Four | **Prosecutorial misconduct: The prosecution's violation of the petitioner's rights under the Sixth and Eighth Amendments and the Due Process Clause by presenting inconsistent arguments at her trial and that of her co-defendant** |
| 29. | One, § BB.1 | **Ineffective mitigation: The testimony of Holly Dirksen** |
| 30. | One, § BB.2 | **Ineffective mitigation: The testimony of Douglas Book** |
| 31. | One, § BB.3 | **Ineffective mitigation: The testimony of Susan Marsolek** |
| 32. | One, § CC | **Ineffective mitigation: Failure to provide psychiatric pharmacologist Roswell Lee Evans with data regarding petitioner's drug history, rendering his expert testimony virtually irrelevant** |

| **MITIGATION PHASE** (continued) | | |
|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| *33.* | *One, § EE* | *Ineffective mitigation: Use of multi-faceted, overly-complicated yet incomplete mitigating factors for the jury to weigh rather than simple, straight-forward facts that encompassed all of the mitigation* |
| **34.** | **One, § K** | **Failure to prepare mitigation: Failure to investigate and present evidence regarding Angela Johnson's mental state at the time of the offenses** |
| **35.** | **One, § Y** | **Failure to prepare mitigation: Delay in hiring Dr. Gelbort, and failure to follow-up on his recommendations, to instruct him to conduct a more thorough battery of neuropsychological tests, to retain another neuropsychologist when Dr. Gelbort inexplicably refused to testify, to incorporate his helpful findings and diagnosis into the testimony of the experts who did testify, and to conduct additional neuropsychological and neuroimaging testing of petitioner** |
| *36.* | *One, § Z* | *Failure to prepare mitigation: Failure to introduce evidence of, and give the trial experts records concerning, the 1996 diagnosis of petitioner with depression and dependent personality features* |
| **37.** | **One, § O** | **Failure to prepare mitigation: Failure to offer expert and lay testimony that Angela Johnson was under the substantial influence of Dustin Honken** |
| **38.** | **One, § L.1** | **Failure to prepare mitigation: Failure to introduce the statements of Phyllis Proscovec to support residual doubt** |
| *39.* | *One, § L.2* | *Failure to prepare mitigation: Failure to offer Dustin Honken's letters to impeach the mitigation phase testimony of Steven Vest to support residual doubt* |

| MITIGATION PHASE (continued) | | |
|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| *40.* | *One, § L.3* | *Failure to prepare mitigation: Failure to impeach Steven Vest by presenting evidence that Honken lied about petitioner's role in the offenses to support residual doubt* |
| **41.** | **One, § V** | **Failure to prepare mitigation: Failure to introduce petitioner's offer to plead guilty as evidence in mitigation** |
| *42.* | *One, § W* | *Failure to prepare mitigation: Failure to present evidence of remorse through expert testimony* |
| *43.* | *One, § X* | *Failure to prepare mitigation: Failure to elicit evidence of the effect of petitioner's execution on her family members* |
| 44. | One, § AA | Failure to prepare mitigation: Ineffective presentation of mitigation evidence through the lay witnesses |
| 45. | One, § DD.h-i | Failure to timely and effectively object to the mitigation phase determination and confusion evident from the jury's findings |
| 46. | One, § JJ, Seven | Cumulative errors render the petitioner's sentence constitutionally infirm |
| *64.* | *(3rd § 2255 Motion) Twelve* | *"Weighing instruction" claim that Johnson was constitutionally entitled to have her penalty jury instructed that they must find beyond a reasonable doubt that aggravating factors sufficiently outweighed mitigating factors to impose the death penalty and any procedural default of this claim resulted from ineffective assistance of counsel* |

| | | POST-TRIAL AND APPEAL |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| 47. | One, § DD.d | Ineffective post-trial motions:  Failure to timely and effectively make a number of meritorious arguments in post-trial motions |
| 48. | One, § FF.2 | Ineffective post-trial motions:  Failure to raise Juror No. 55's failure to honestly answer questions on *voir dire* |
| 49. | One, § GG | Ineffective appeal:  Failure to raise all components of the misconduct by Juror No. 55 |
| 50. | One, § HH | Ineffective appeal:  Failure to litigate the prosecution's inconsistent theories as to Dustin Honken and Angela Johnson |
| *51.* | *One, § II* | *Ineffective appeal:  Failure to raise the unconstitutional skewing effect of multiplicitous counts* |
| 52. | One, § DD.j-o | Ineffective appeal:  Failure to raise a number of meritorious arguments |
| 53. | One, § JJ, Seven | Ineffective appeal: Cumulative errors of appellate counsel render the petitioner's sentence constitutionally infirm |

| | | EIGHTH AMENDMENT VIOLATIONS |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| 54. | Eight | The Eighth Amendment requires a heightened standard of proof for imposition of the death penalty |
| 55. | Nine | Petitioner suffers from severe mental illness and the Eighth Amendment precludes her execution |
| **56.** | **Ten** | **The Bureau of Prisons' method of carrying out the petitioner's execution by lethal injection violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act** |
| 57. | Ten, § A.1 | *Baze* claim:  Executioner incompetence |

| EIGHTH AMENDMENT VIOLATIONS (continued) | | |
|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) |
| 58. | Ten, § A.2 | *Baze* claim:  Drug administration deficiencies |
| 59. | Ten, § A.3 | *Baze* claim:  Lack of safeguards |
| 60. | Ten, § B | There are readily available alternatives that would substantially reduce the risks of maladministration and inhumane executions |
| 61. | Ten, § C | Whether the BOP's new protocol is constitutional even under *Baze* cannot be answered without further discovery |
| 62. | Ten, § D | The *Baze* decision does not have any impact on petitioner's Administrative Procedures Act and Controlled Substances Act Claims |
| 63. | Eleven | The death penalty violates the Eighth Amendment |

## III.  STANDARDS APPLICABLE TO JOHNSON'S CLAIMS

Having determined what claims can be considered on the merits, I turn next to the question of how the claims properly before me should be resolved.  Analysis of that question begins with the standards for § 2255 relief, generally, and the standards for relief on an ineffective assistance of counsel claim, in particular, as the majority of Johnson's claims are "ineffective assistance" claims.  It also requires me to consider Johnson's contention that she is entitled to relief based on "cumulative error" and what, if any, of her allegations can properly be aggregated into distinct, multifaceted claims.

## A. Standards For § 2255 Relief

### 1. Scope of the remedy

Section 2255 of Title 28 of the United States Code provides as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground [1] that the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255; *Watson v. United States,* 493 F.3d 960, 963 (8th Cir. 2007) ("Under 28 U.S.C. § 2255 a defendant in federal custody may seek post conviction relief on the ground that his sentence was imposed in the absence of jurisdiction or in violation of the Constitution or laws of the United States, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."); *Bear Stops v. United States*, 339 F.3d 777, 781 (8th Cir. 2003) ("To prevail on a § 2255 motion, the petitioner must demonstrate a violation of the Constitution or the laws of the United States."). Thus, "Section 2255 'was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'" *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (*en banc*) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)).[23]

---

[23]Section 2255 is a direct descendant of the English common-law writ system and, specifically, the writ of *habeas corpus*, popularly referred to as "the Great Writ." Benjamin R. Orye, *The Failure of Words: Habeas Corpus Reform, the Antiterrorism and Effective Death Penalty Act, and When a Judgment of Conviction Becomes Final for the Purposes of 28 U.S.C. 2255(1)* (Orye, *The Failure of Words*), 44 Wm. & Mary L. Rev. 441 (2002). *Habeas corpus* translates literally as "produce the body," and is the legal

(continued...)

action through which a prisoner challenges the lawfulness of his detention. *Id*. at 444 n.22. Under the English common law, a writ of *habeas corpus* was issued in the name of the king and compelled the official detaining the prisoner to produce him in front of the court whose jurisdiction was being challenged to present proof that the detention was lawful. *Id*. at 444-45. Early Americans broadly accepted the English tradition of habeas corpus by the end of the seventeenth century. Max Rosenn, *The Great Writ—A Reflection of Societal Change,* 44 OHIO ST. L.J. 337, 337-38 (1983). Although the drafters of the Constitution did not expressly enumerate the writ of *habeas corpus* among the powers of the federal courts, they did allow for its suspension only in the most exigent of circumstances, implying that it was assumed to exist at all other times. *Id*.

Congress first codified *habeas corpus* in the Judiciary Act of 1789 and extended it to state prisoners with the Judiciary Act of 1867. *Id*. at 340. Originally, like the English common-law writ of *habeas corpus*, a challenge to a conviction under federal *habeas corpus* was only successful if the sentencing court lacked jurisdiction. *See Powell v. Stone*, 428 US 465, 475 (1976). Over time, however, federal *habeas corpus* began to include attacks based on constitutional grounds beyond jurisdiction. *Id*.

Recognizing the high volume of *habeas* petitions and perceived prisoner abuses of the writ, Congress passed the statute codified at 28 U.S.C. § 2255 in 1948, 62 Stat. 967, for the purpose of creating a post-conviction remedy that was the equivalent in nature to traditional *habeas corpus*, but providing a "more convenient forum." *United States v. Hayman*, 342 U.S. 205, 214-19 (1952). In 1988, Chief Justice Rehnquist created a committee to contemplate further legislation that would avoid undue delay and enhance finality in capital cases. Orye, *The Failure of Words*, 44 Wm. & Mary L. Rev at 455. In 1996, with the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Congress adopted many of the conclusions of the 1988 committee and placed restrictions on the § 2255 post-conviction remedy, most notably a general one-year statute of limitations, already addressed in detail, in Section II.A.2.a, above, and a limitation to one § 2255 motion for most federal prisoners. *Id*. at 456.

Another federal statute, 28 U.S.C. § 2241, still expressly refers to the power of the federal courts to grant "writs of habeas corpus." 28 U.S.C. § 2241. The difference between § 2241 and § 2255, in a nutshell, is this: "A petitioner may attack the execution of his sentence through § 2241 in the district where he is incarcerated; a challenge to the validity of the sentence itself must be brought under § 2255 in the district of the sentencing

(continued...)

The scope of § 2255 relief is not unlimited, however:

> Like habeas corpus, this remedy "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). It provides a remedy for jurisdictional and constitutional errors. . . . Beyond that, the permissible scope of a § 2255 collateral attack on a final conviction or sentence is severely limited; "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.*, quoting *Hill v. United States*, 368 U.S. 424, 428 (1962).

*Sun Bear*, 644 F.3d at 704 (affirming the district court's denial of § 2255 relief, rejecting a claim that a question of sentencing guidelines interpretation could be cognizable under the "miscarriage of justice" standard).

One "well established principle" of § 2255 law is that "'[i]ssues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255.'" *Theus v. United States*, 611 F.3d 441, 449 (8th Cir. 2010) (quoting *United States v. Wiley*, 245 F.3d 750, 752 (8th Cir. 2001)); *Bear Stops*, 339 F.3d at 780. One exception to that principle arises when there is a "miscarriage of justice," although the Eighth Circuit Court of Appeals has "recognized such an exception only when petitioners have produced convincing new evidence of actual innocence," and the Supreme Court has not extended the exception beyond situations involving actual innocence. *Wiley*, 245 F.3d at 752 (citing cases, and also noting that "the Court has emphasized the narrowness of the exception and has expressed its desire that it remain 'rare' and available

---

[23](...continued)
court." *Matheny v. Morrison*, 307 F.3d 709, 711 (8th Cir. 2002) (citing *Bell v. United States*, 48 F.3d 1042, 1043 (8th Cir. 1995)).

only in the 'extraordinary case.'" (citations omitted)). Another well established principle of § 2255 law is that § 2255 also ordinarily "is not available to correct errors which could have been raised at trial or on direct appeal." *Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (*per curiam*). In other words, such "procedurally defaulted" claims cannot be the basis for § 2255 relief, unless the petitioner shows "cause and prejudice" or "actual innocence" to overcome the procedural default. *See Bousley v. United States*, 523 U.S. 614, 622 (1998). I will address any contentions that specific claims are improper attempts to "relitigate" claims addressed on appeal or are "procedurally defaulted" prior to addressing the merits of those claims.

### 2. *Section 2255 relief in capital cases*

The Supreme Court has long recognized that the death penalty is "different," so that capital trial and appeal proceedings require special scrutiny. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion of Burger, C.J.) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases."); *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion of Stevens, J.) (recognizing that "death is a different kind of punishment from any other that may be imposed in this country"); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion of Stewart, J.) (recognizing "the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long," and explaining, "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a

specific case."); *see also Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.  It is unique in its total irrevocability.  It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.  And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.").

The principle that "death is different" applies equally to *habeas* proceedings.  *See, e.g., Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) (observing, in *habeas* proceedings pursuant to § 2254, that "we have consistently required that capital proceedings be policed *at all stages* by an especially vigilant concern for procedural fairness and for the accuracy of factfinding" (emphasis added)); *Stumpf v. Houk*, 653 F.3d 426, ___ (6th Cir. 2011) (observing, in capital *habeas* proceedings, "The principle is beyond dispute, both legally and logically, that there exists a 'heightened "need for reliability in the determination that death is the appropriate punishment in a specific case."'" (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985), in turn quoting *Woodson*, 428 U.S. at 305 (plurality opinion)).

Thus, my "review in this [*habeas*] case is predicated on the awesome responsibility entrusted to the federal judiciary in its habeas jurisdiction." *Stouffer v. Reynolds*, 168 F.3d 1155, 1173 (10th Cir. 1999).  "'[My] duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)).  My duty of "heightened attention parallels the heightened demands on counsel in a capital case." *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004) (citing ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993), which states, "Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.").

### 3.    Appellate review

The Eighth Circuit Court of Appeals will review the district court's decision on a
§ 2255 motion *de novo*, regardless of whether the district court's decision grants or denies
the requested relief.  *Compare United States v. Hilliard*, 392 F.3d 981, 986 (8th Cir.
2004) ("We review the district court's decision to grant or deny relief on a petitioner's
ineffective assistance of counsel claim de novo.") (citing *United States v. White*, 341 F.3d
673, 677 (8th Cir. 2003)); *with United States v. Hernandez*, 436 F.3d 851, 854 (8th Cir.
2006) ("'We review de novo the district court's denial of a section 2255 motion.'")
(quoting *Never Misses A Shot v. United States*, 413 F.3d 781, 783 (8th Cir. 2005)).
However, "[a]ny underlying fact-findings are reviewed for clear error.'" *Hernandez*, 436
F.3d at 855 (quoting *United States v. Davis*, 406 F.3d 505, 508 (8th Cir. 2005)).

## B.    Ineffective Assistance Of Counsel

As is the case with most § 2255 motions, the majority of Johnson's claims for
§ 2255 relief are claims of ineffective assistance of trial or appellate counsel.  Moreover,
to the extent that Johnson's claims are not directly ineffective assistance claims, and were
not asserted on direct appeal, Johnson may rely on ineffective assistance of counsel to
attempt to show "cause and prejudice" to save them from procedural default.  *Theus*, 611
F.3d at 449.  Therefore, I will recount the standards for determining whether counsel
provided ineffective assistance.

The Sixth Amendment to the United States Constitution provides that "[i]n all
criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of
Counsel for his defence."  U.S. CONST. AMEND. VI.  Thus, a criminal defendant is
constitutionally entitled to the effective assistance of counsel both at trial and on direct
appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Steele v. United States,* 518 F.3d 986,

988 (8th Cir. 2008); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003). The Eighth Circuit Court of Appeals has recognized that, if a defendant was denied the effective assistance of counsel guaranteed by the Sixth Amendment, "then his sentence was imposed 'in violation of the Constitution,' . . . and he is entitled to relief" pursuant to § 2255(a). *King v. United States*, 595 F.3d 844, 852 (8th Cir. 2010). Both the Supreme Court and the Eighth Circuit Court of Appeals have expressly recognized that a claim of ineffective assistance of counsel should be raised in a § 2255 proceeding, rather than on direct appeal, because such a claim often involves facts outside of the original record. *See Massaro*, 538 U.S. at 504-05 (2003); *United States v. Hughes*, 330 F.3d 1068, 1069 (8th Cir. 2003) ("When claims of ineffective assistance of trial counsel are asserted on direct appeal, we ordinarily defer them to 28 U.S.C. § 2255 proceedings.").

### 1. *Ineffective assistance of trial counsel*

#### a. *Overview*

The Supreme Court has reiterated that "'the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial.'" *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). That being the case, "'[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* (quoting *Strickland*, 466 U.S. at 686, with emphasis added). To assess counsel's performance against this benchmark, the Supreme Court developed in *Strickland* a two-pronged test requiring the petitioner to show "both deficient performance by counsel and prejudice." *See Strickland*, 466 U.S. at 687-88, 697; *see also Knowles v. Mirzayance*, ___ U.S. ___, 129 S. Ct. 1411, 1419 (2009). "'Unless a defendant makes both showings,

117

it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.'" *Gianakos v. United States*, 560 F.3d 817, 821 (8th Cir. 2009) (quoting *Strickland*, 466 U.S. at 687). The two prongs of the "ineffective assistance" analysis are usually described as sequential. Thus, if the movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003). On the other hand, courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice." *Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir. 1999) (citing *Pryor v. Norris*, 103 F.3d 710 (8th Cir. 1997)); *accord Gianakos*, 560 F.3d at 821 ("'We need not inquire into the effectiveness of counsel, however, if we determine that no prejudice resulted from counsel's alleged deficiencies.' *Hoon v. Iowa*, 313 F.3d 1058, 1061 (8th Cir. 2002) (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. 2052).").

### b.    *Deficient performance*

As to the deficient performance prong, "The Court acknowledged [in *Strickland*] that '[t]here are countless ways to provide effective assistance in any given case,' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689). Thus,

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [*Strickland*,] 466 U.S. at 688, 104 S. Ct. 2052. . . . The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, at 687, 104 S. Ct. 2052.

*Harrington v. Richter*, ___ U.S. ___, ___, 131 S. Ct. 770, 787 (2011); *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 739 (2011) (quoting *Richter*). Also, the court "'must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."'" *King*, 595 F.3d at 852-53 (quoting *Ruff v. Armontrout*, 77 F.3d 265, 268 (8th Cir. 1996), in turn quoting *Strickland*, 466 U.S. at 690).

There are two substantial impediments to making the required showing of deficient performance. First, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Second, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689); *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir. 2005) ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance."). These two impediments deserve some further consideration in this case.

*i.* ***Strategic choices***. As the Eighth Circuit Court of Appeals recently reiterated, "'strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (quoting *Strickland*, 466 U.S. at 690–91). "On the other hand, strategic choices 'resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.'" *Armstrong v.*

*Kemna*, 534 F.3d 857, 864-65 (8th Cir. 2008) (quoting *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991), and also citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003), as stating, "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision. . . . Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."); *Kenley*, 937 F.2d at 1304 ("The Supreme Court requires that counsel make a reasonable investigation in the preparation of a case or make a reasonable decision not to conduct a particular investigation." (citing *Strickland*, 466 U.S. at 691)). "In other words, the strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy of counsel's investigation.'" *Francis v. Miller*, 557 F.3d 894, 901 (8th Cir. 2009) (quoting *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005), in turn relying on *Strickland*, 466 U.S. at 690-91).

     ***ii.***    ***Presumption of adequate representation****.* As the Supreme Court recently explained,

> Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," [*Strickland*, 466 U.S. at 689], the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.,* at 690, 104 S. Ct. 2052. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.,* at 688, 104 S. Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." *Id.,* at 690, 104 S. Ct. 2052.

*Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403. To put it another way, the Supreme Court has emphasized that "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure

of deference to counsel's judgment.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002) (reiterating that "that '[j]udicial scrutiny of a counsel's performance must be highly deferential' and that 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time'" (also quoting *Strickland*, 466 U.S. at 689)).

      *iii.*     **Role of ABA standards**. In both her Second Amended § 2255 Motion and her Corrected Post-Hearing Brief, Johnson has repeatedly measured the performance of her trial counsel against the ABA Guidelines For Appointment and Performance Of Defense Counsel in Death Penalty Cases. Indeed, in the course of the episodic evidentiary hearing in this case, Johnson's current *habeas* counsel went so far as to assert that "[t]here are circuit cases . . . that have said these are binding standards that must be followed." Hearing Transcript at 4325. Johnson's counsel cited no cases so stating in her Corrected Post-Hearing Brief, however. Instead, she cited cases in which she contends that the "U.S. Supreme Court has observed that the ABA Death Penalty Guidelines establish the 'prevailing norms of practice' that serve to measure counsel's performance under the Sixth Amendment." *Id.* The respondent contends that the Supreme Court has clearly rejected Johnson's assertion that the ABA Guidelines constitute "binding standards."

      Although I observed, above, that my duty of "heightened attention parallels the heightened demands on counsel in a capital case," *Smith*, 379 F.3d at 939 (citing ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993)), that does not necessarily mean that the ABA standards or guidelines for death penalty counsel establish binding standards for the "performance" prong of the *Strickland* analysis in a death penalty case.

As the Supreme Court recently explained, "Restatements of professional standards . . . can be useful as 'guides' to what reasonableness [of counsel's performance] entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, ___ U.S. ___, ___, 130 S. Ct. 13, 16 (2009) (citing *Strickland*, 466 U.S. at 688); *accord Missouri v. Frye*, 566 U.S. ___, ___, 2012 WL 932020, *8 (March 21, 2012) ("Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides."). The Court found in *Bobby* that the Sixth Circuit Court of Appeals had ignored this principle by relying on a version of the ABA Guidelines announced 18 years after the defendant went to trial. *Id.* at ___, 130 S. Ct. at 16-17. The Court continued,

> To make matters worse, the Court of Appeals (following Circuit precedent) treated the ABA's 2003 Guidelines not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel "'must fully comply.'" 560 F.3d [523,] 526 [(6th Cir. 2009)] (quoting *Dickerson v. Bagley*, 453 F.3d 690, 693 (C.A.6 2006)). *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U.S., at 688, 104 S. Ct. 2052. We have since regarded them as such. See *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000).

*Bobby*, ___ U.S. at ___, 130 S. Ct. at 17 (footnote omitted). Moreover,

The narrow grounds for our opinion should not be regarded as accepting the legitimacy of a less categorical use of the [2003] Guidelines to evaluate post-2003 representation. For that to be proper, the Guidelines must reflect "[p]revailing norms of practice," *Strickland*, 466 U.S. at 688, 104 S. Ct. 2052, and "standard practice," *Wiggins v . Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), and must not be so detailed that they would "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions," *Strickland, supra*, at 689, 104 S. Ct. 2052. We express no views on whether the 2003 Guidelines meet these criteria.

*Bobby*, ___ U.S. at ___, 130 S. Ct. at 17 n.1. The Supreme Court's decision in *Bobby* makes clear that reliance on either the 1989 or the 2003 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as "binding" or "inexorable commands" would be to repeat the error of the Sixth Circuit Court of Appeals; the ABA Guidelines are "'only guides' to what reasonableness means, not its definition." *Id.* at 17 (quoting *Strickland*, 466 U.S. at 688). The overriding standard remains whether counsel made "'objectively reasonable choices.'" *Id.* (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)).

Even Johnson's retrenched position on the relevance of the ABA Guidelines goes too far. Those Guidelines do not necessarily "establish the 'prevailing norms of practice.'" Corrected Post-Hearing Brief at 5. Rather, the ABA Guidelines must be shown to [1] *reflect* "prevailing norms of practice," and [2] *reflect* "standard practice," and [3] "not be so detailed that they would [a] 'interfere with the constitutionally protected independence of counsel and [b] restrict the wide latitude counsel must have in making tactical decisions.'" *Bobby*, ___U.S. at ___, 130 S. Ct. at 17 n.1. Johnson comes nearer the mark when she asserts, "As all of [her] *Strickland* experts testified, and as the trial

team itself acknowledged, the prevailing standards of practice governing death penalty litigation are set forth in the [1989 and 2003 ABA Guidelines]." Corrected Post-Hearing Brief at 5. That is, she has pointed to evidence *suggesting* that the ABA Guidelines do *reflect* "prevailing norms" and "standard practice." *Bobby*, ___ U.S. at ___, 130 S. Ct. at 17 & n.1.

Thus, I will consider the ABA Guidelines as *guides* to whether counsel made "objectively reasonable choices," subject to my determination of whether specific ABA Guidelines are so detailed that they interfere with the constitutionally protected independence of counsel or restrict counsel's wide latitude to make tactical decisions. *Id.*

### c.     *Prejudice*

The second prong of the *Strickland* analysis requires the challenger to prove prejudice. *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (citing *Strickland*, 466 U.S. at 691-92). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Gianakos*, 560 F.3d at 821 (quoting *Strickland*, 466 U.S. at 691). As the Supreme Court has explained,

> "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [*Strickland*, 466 U.S.] at 694, 104 S. Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, 562 U.S., at ----, 131 S. Ct., at 791.

*Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403. Indeed, in *Strickland*, the Supreme Court explained what "prejudice" means in a case, such as this one and *Strickland*, in which the petitioner challenges his or her conviction of a capital offense and the imposition of a death

sentence.  *Strickland*, 466 U.S. at 695.  The Court in *Strickland* established that the question of whether the "prejudice" standard has been met is slightly different, depending upon whether counsel's "errors" are a basis for challenging a conviction or a basis for challenging a death sentence:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 695.  Still more specifically,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

Even where the petitioner "suffered prejudice from his lawyer's error," he is not entitled to § 2255 relief unless the lawyer's error was also the result of conduct that was professionally unreasonable at the time. *King*, 595 F.3d at 852-53.

## 2. *Ineffective assistance of appellate counsel*

As noted above, a criminal defendant is constitutionally entitled to the effective assistance of counsel both at trial and on direct appeal. *Evitts*, 469 U.S. at 396. A claim of ineffective assistance of appellate counsel is also appropriately raised on a § 2255 motion. *United States v. Ramirez-Hernandez*, 449 F.3d 824, 827 (8th Cir. 2006). Such an ineffective assistance claim also requires proof of deficient performance and prejudice, but the Eighth Circuit Court of Appeals applies a "rigorous" standard to each prong of the analysis when the conduct of appellate counsel is at issue:

> The deficient performance standard is rigorous. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). Therefore, absent contrary evidence, "we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *Roe v. Delo,* 160 F.3d 416, 418 (8th Cir. 1998) (quotation omitted). The prejudice standard is equally rigorous. [The petitioner] must show that "the result of the proceeding would have been different" had he raised the [specified] issue on direct appeal. *Becht v. United States,* 403 F.3d 541, 546 (8th Cir. 2005), *cert. denied,* 546 U.S. 1177, 126 S. Ct. 1346, 164 L. Ed. 2d 59 (2006).

*United States v. Brown*, 528 F.3d 1030, 1033 (8th Cir. 2008).

### C.  Cumulative Error

In her Second Amended § 2255 Motion, Johnson asserts, in the first instance, that she is entitled to relief on each of her claims, but she also asserts that she is entitled to relief based on the cumulative effect of all of her attorneys' alleged errors and based on the cumulative effect of all of the alleged errors in her trial.  The Eighth Circuit Court of Appeals has "repeatedly rejected the cumulative error theory of post-conviction relief." *Brown*, 528 F.3d at 1034 (citing *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006), *cert. denied*, 549 U.S. 1134 (2007), and rejecting *habeas* relief based on the cumulative errors of appellate counsel).  Nevertheless, at oral arguments, Johnson argued that many of her ostensibly separate claims of error by counsel constituted a single claim of ineffective assistance of counsel in the mitigation phase.  She argued that this is so, because I must ultimately consider all of the mitigation evidence that was presented with all of the evidence that could have been presented, had counsel performed competently, and weigh it against the aggravating evidence presented to decide whether there is a reasonable probability that at least one juror might have reached a different result.  At the oral arguments, the respondent argued that the bar to relief on a "cumulative error" theory in the Eighth Circuit means that each claim of error by counsel stands or falls on its own.

In light of this dispute, I requested separate briefing from the parties concerning the "cumulative error" rule in the Eighth Circuit.  I begin my discussion of "cumulative error" with a summary of the parties' positions on that issue.  As will become clear from my eventual analysis of each of Johnson's claims of error—including alleged errors by trial counsel and the prosecution, alleged misconduct of a juror, and other alleged constitutional infirmities—disposition of this case does not ultimately turn on whether any "cumulative error" theory is viable.  Nevertheless, I believe that this discussion of "cumulative error" will help clarify the relationship among Johnson's various allegations of error, that is,

which are analytically separate and which are part of "multifaceted" claims involving related errors.

### 1. Arguments of the parties

#### a. The petitioner's argument

Johnson contends that she has not presented sixty-four discrete claims for § 2255 relief under the Eighth Circuit rule concerning cumulative error, but eleven discrete claims for relief, some involving multiple "areas." She contends that the multiple "areas" of her ineffective assistance of counsel claim should be considered in the aggregate. She also contends that all of her claims of error, including prosecutorial misconduct and juror misconduct, as well as ineffective assistance of counsel, should be considered in the aggregate.

More specifically, she argues that Claim One of her Second Amended § 2255 Motion advances thirty-five "areas" in which her trial and appellate counsel provided ineffective assistance, with an additional assertion that those errors, cumulatively, require relief. She also argues that Claims Two through Six of her Second Amended § 2255 Motion assert trial errors other than ineffective assistance of counsel, while Claim Seven of her Second Amended § 2255 Motion alleges that *all* of the trial errors described in her motion, cumulatively, require relief. She contends that Claims Eight through Eleven of her Second Amended § 2255 Motion raise more general—and presumably separate—attacks on her death sentences that do not rely on errors in the proceedings leading to her convictions and sentences. It would follow that Claim Twelve in her Third Amended § 2255 Motion would also be such a separate claim, although she does not specifically address that claim.

Johnson contends that I must address two questions concerning the scope of cumulative error review: (1) Can and should I consider the prejudice arising from several

individual errors of defense counsel in the aggregate in assessing prejudice under *Strickland* and its progeny? and (2) Can and should I consider the cumulative prejudice arising from all of the errors leading to her convictions and death sentences, alleged in her Second and Third Amended § 2255 Motions, in assessing whether she was denied her right to a fair trial under the Fifth, Sixth, and Eighth Amendments?

Johnson argues that Supreme Court precedent, including *Strickland*, clearly requires a court to consider the prejudice arising from all of the individual errors of defense counsel in the aggregate or cumulatively in assessing prejudice. She argues that this is so, for example, because *Strickland* repeatedly refers to "errors" of counsel as the basis for determining prejudice. She also argues that a standard intended to guarantee the ultimate reliability of the outcome cannot achieve its purpose unless a reviewing court is obliged to weigh the collective impact of all of counsel's errors. She contends that the Eighth Circuit Court of Appeals has embraced this interpretation of *Strickland* by stating, "To be sure, 'it is necessary to consider *all* the relevant evidence that the [factfinder] would have had before it if [counsel] had pursued the different path.'" *See Worthington v. Roper*, 631 F.3d 487, 506 n.12 (8th Cir. 2011) (emphasis in the original) (quoting *Wong v. Belmontes*, ___ U.S. ___, ___, 130 S. Ct. 383, 386 (2009)). She argues that *Strickland* also repeatedly cautions that prejudice must be assessed by considering *all* of the evidence before the judge and jury and *all* of the evidence that should have been presented, had counsel not erred. Thus, she argues that, under controlling Supreme Court precedent, the answer to the first question she poses is that I can and should consider the prejudice arising from all individual errors of defense counsel in the aggregate or cumulatively in assessing prejudice under *Strickland*.

Turning to the second question that she poses, Johnson argues that Supreme Court precedent also authorizes consideration of the cumulative effect of all errors or flaws in

the proceedings, such as errors in the court's instructions or prosecutorial misconduct, to determine whether or not the fairness of the proceedings was so undermined as to warrant relief, even if individual errors or flaws did not rise to the level of reversible error. She argues that there is no rational basis for treating the issue of cumulative error differently, depending upon whether the issue is raised on direct or collateral review. Thus, she argues that I should consider the cumulative prejudice arising from all of the errors alleged in her Second Amended § 2255 Motion in assessing whether she was denied her right to a fair trial under the Fifth, Sixth, and Eighth Amendments.

Johnson argues that Eighth Circuit precedent is not to the contrary as to her answers to either of the questions that she poses, even though she acknowledges that the Eighth Circuit Court of Appeals has held that *habeas* relief cannot be granted on the basis of the cumulative effect of individual constitutionally insignificant errors. She asserts that only the Eighth and the Fourth Circuit Courts of Appeals preclude *habeas* relief based on cumulative error, while all other Circuit Courts of Appeals permit cumulative error review in one form or another in *habeas* cases. She argues that the Eighth Circuit bar is limited in scope: It precludes relief only where none of the attorney's errors, considered separately, constitutes ineffective assistance, but it does permit consideration of cumulative errors of counsel so long as the court first determines that the specific action or inaction of counsel does constitute deficient performance. She argues that a contrary reading of Eighth Circuit law would violate *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993).

Johnson argues that she has alleged that each of her claims separately warrants relief, such that the Eighth Circuit cumulative error rule is inapplicable in the first instance. In the alternative, she contends that, under the logic of Eighth Circuit precedent, her Claim One, which broadly alleges ineffective assistance of counsel, constitutes a single claim. She contends that my reorganization of this claim to address broad subtopics in the

mitigation phase should not disguise the fact that all of the subtopics comprise one mitigation phase claim. Furthermore, she argues that, in this case, the egregious errors by trial counsel in the mitigation phase, in combination with the prosecutorial misconduct involving a misleading portrayal of Dustin Honken (Claims 26, 27 and 28), trial counsel's failure to pursue a disposition for a sentence less than death (Claim 1), and failure to reduce her medication or address its effect (Claim 8), so infected the integrity of the proceeding as to warrant *habeas* relief. She also argues that, if I find that I am in equipoise about whether to grant or deny relief, that equipoise is the sort of "grave doubt" about the harmlessness of the various errors that demonstrates a substantial and injurious effect or influence in determining the jury's verdict and warrants relief.

### b.     The respondent's argument

The respondent counters that Johnson is asking me to ignore controlling Eighth Circuit precedent, which has clearly—and repeatedly—rejected the cumulative error theory. The respondent also asserts that Johnson's argument is premised on a tortured interpretation of both Supreme Court and Eighth Circuit precedent and an inappropriate interpretation of her own claims. The respondent argues that I must determine whether each of Johnson's claims stands or falls on its own merits.

The respondent points out that the Eighth Circuit Court of Appeals has held that, even if a court found some aspect of counsel's performance sufficient to support a claim under *Strickland*, any prejudice analysis would have to be limited to consideration of the consequences of the constitutionally defective aspects of representation, not the accumulated prejudice from asserted but unproven errors. Similarly, the respondent points out that the Eighth Circuit Court of Appeals has recognized that a petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test. The respondent also argues that Johnson has tried to morph her original

argument, based on *Worthington v. Roper*, 631 F.3d 487, 506 n.12 (8th Cir. 2011)—that the court must consider all of the relevant mitigation evidence that was presented at trial and that should have been presented at trial, but for the deficient performance of trial counsel, to determine prejudice—into a quite different argument that the court must consider the cumulative effect of all of counsel's errors. The respondent points out that *Worthington* squarely rejected a cumulative error argument where the petitioner had failed to prove constitutionally deficient performance on one of his allegations of ineffective assistance of counsel, such that that allegation added nothing to the consideration of the prejudice flowing from another allegation of ineffective assistance of counsel. The respondent argues that *Worthington* and the Supreme Court case on which it relies, *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386, make clear that, in the case of a petitioner who establishes that a reasonably competent lawyer would have introduced more mitigation evidence, the court may then look at all relevant evidence that the jury would have had before it, had the petitioner's lawyer been reasonably competent, when evaluating prejudice. Nevertheless, the respondent argues that, when evaluating ineffective assistance claims, the prejudice inquiry is limited in scope to the conduct of counsel that the petitioner has proved to be deficient.

The respondent argues that none of the decisions on which Johnson relies stands for the proposition that a *habeas* court must consider the prejudice arising from several individual errors of defense counsel in the aggregate in assessing prejudice. Rather, the respondent argues that those cases all are limited to a single error, ineffective assistance of counsel for failing to present mitigation evidence. Moreover, the respondent argues that the references to "errors" in *Strickland* do not support Johnson's contention that the *Strickland* Court intended that all of counsel's errors be considered cumulatively when determining whether counsel's overall performance was deficient and whether this deficient

performance prejudiced the defendant. Rather, the respondent argues that, even where a cumulative error theory is adopted, it is limited to the assessment of whether the defendant was prejudiced by deficient performance of trial counsel. Thus, the respondent argues that nothing supports expanding cumulative error review to counsel's alleged errors that were not found to be deficient or to all allegations of error, whether or not they involve ineffective assistance of counsel.

The respondent also objects to Johnson's attempt to "corral" her multitude of ineffective assistance of counsel claims into one broad claim, because allowing her to do so would permit an "end run" around the Eighth Circuit rule against cumulative error analysis. Moreover, the respondent argues that the various claims of ineffective assistance of counsel are based on separate factual allegations of deficient performance and are distinguished from each other in time and nature. Thus, the respondent argues that each claim must be considered as a separate claim.

### c. *The petitioner's reply*

Johnson disputes the respondent's characterization of her arguments concerning cumulative error. She contends that Eighth Circuit and Supreme Court precedent is clear, and the respondent concedes, that when a reasonably competent lawyer would have introduced more mitigating evidence, the court, when evaluating prejudice, must look at *all* of the relevant evidence that the jury would have had before it, had the attorney been reasonably competent. Thus, she asserts that her interpretation of such precedent is not "tortured." She also clarifies that she is not asking me to consider unproven allegations of deficient performance as a basis for granting relief, because she has expressly acknowledged it is only appropriate to cumulate attorney errors that in fact constitute deficient performance. That being so, she contends that the respondent is attacking a strawman by reiterating an undisputed point. Next, she argues that *Worthington* clearly

supports her argument that all of her claims of ineffective assistance of counsel must be considered as a single claim. She also argues that *Strickland* and subsequent Supreme Court precedent require reviewing courts to consider prejudice from aggregate errors of counsel in determining whether relief is required, as is made clear by *Strickland's* repeated references to "errors." She also identifies the multiple errors of counsel at issue in *Williams* that prompted the Supreme Court's approval of the trial court's finding of prejudice, in light of the totality of the omitted evidence, rather than based on a single item of evidence. She reiterates that a standard intended to guarantee the ultimate reliability of the outcome cannot achieve its purpose unless a reviewing court is obliged to weigh the collective impact of all of counsel's errors. Finally, she argues that the Eighth Circuit Court of Appeals arbitrarily excludes cumulative error review in § 2255 cases, but approves relief based on cumulative error in direct appeal cases, permitting relief where the case as a whole presents an image of unfairness, even though none of the claimed errors alone was sufficient to require reversal. She argues that, in her case, protection of her right to a fair trial and her other fundamental constitutional rights requires that she be granted relief.

### 2.    *Cumulative effect of errors of counsel*

I note that the Supreme Court has *never* expressly accepted or rejected cumulative error review, in any form, of ineffective assistance of counsel claims in the *habeas* context—and the parties here do not contend that it has—leaving courts and litigants to rely on inferences from what the Court has said and done. On the other hand, as I noted, above, the Eighth Circuit Court of Appeals has expressly stated that it rejects the cumulative error theory of post-conviction relief, at least as to errors of counsel. *See*

*Brown*, 528 F.3d at 1034.[24] Notwithstanding this express rejection, Johnson contends that

<hr />

[24] While some other Circuit Courts of Appeals do allow relief based on cumulative error of counsel, the different ways in which they formulate their standards for relief based on cumulative error can be bewildering. Part of what makes cumulative error cases bewildering in ineffective assistance of counsel cases is the lax manner in which courts use terms like "error," "constitutional error," "harmless error," or "cumulative effect," rather than the *Strickland* criteria, "deficient performance" and "prejudice." *See, e.g., Welch v. Workman*, 639 F.3d 980, 1016 (10th Cir. 2011) (explaining, "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless,'" (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002), with quotation marks omitted)), but finding that the cumulative effects of the errors in that case did not deprive the petitioner of a fair trial); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) ("'*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced.'" (quoting *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989)); *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) ("It is true that, although [counsel's] individual errors may not rise to the level of a constitutional violation, a collection of errors [by counsel] might violate a defendant's constitutional rights." (citing *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995)); *see also United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (cautioning that "'a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors'" (quoting *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990)); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) (reiterating that Circuit's rule that "ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions"); *Fisher v. Angelone*, 163 F.3d 835, 852 n.9 (4th Cir. 1998) (reading the "cumulative error" rule of the Tenth Circuit Court of Appeals to consider only the aggregation of actual constitutional errors, "not the cumulative effect of all of counsel's actions deemed deficient").

Similar laxity in nomenclature—too common for useful citation—involves indiscriminate use of "ineffective performance" or "constitutionally ineffective performance," rather than "deficient performance" or "constitutionally deficient performance." In light of *Strickland*, "ineffectiveness" or "constitutional error" *should* refer only to conduct that is *both* "deficient" and "prejudicial," *see Strickland*, 466 U.S. at 687-88, 697, while "deficiency" should refer only to "unreasonable performance,"

(continued...)

cumulative error review *is* recognized in the Eighth Circuit, at least by implication from reliance by the Eighth Circuit Court of Appeals on Supreme Court precedent that she contends, in turn, implicitly recognizes such review. In the alternative, she argues that, if cumulative error review is not recognized in the Eighth Circuit, Eighth Circuit precedent is contrary to Supreme Court precedent.

In the context of *Strickland's* two-prong analysis of ineffective assistance claims, requiring both "deficient performance" and "prejudice" to prevail, *see Strickland*, 466 U.S. at 687-88, 697, cumulative error analysis of ineffective assistance claims might take at least the following forms: (1) consideration of all of counsel's alleged errors to determine whether their cumulative effect was deficient performance; (2) consideration of all of counsel's alleged errors to determine whether their cumulative effect was prejudicial, whether or not those errors were found to constitute deficient performance; and (3) consideration of all errors of counsel actually found to be deficient performance to determine whether their cumulative effect was sufficiently prejudicial. It appears to me that the Eighth Circuit Court of Appeals has foreclosed or would foreclose *habeas* relief based on any of these variants of cumulative error. Another—and I believe distinct—issue is the extent to which ostensibly separate claims of ineffective assistance of counsel are really different facets of the *same* claim of ineffective assistance of counsel, such that they may properly be considered in the aggregate to determine whether deficiencies of counsel found by the reviewing court caused sufficient prejudice to warrant relief, without violating the Eighth Circuit rule against relief based on cumulative error of counsel.

---

[24](...continued)
*id*. at 688.

### a. *Rejection in the Eighth Circuit*

First, as to whether a court may consider all of counsel's alleged errors to determine whether their cumulative effect was *deficient performance*, the question is whether individual decisions of counsel that were not unreasonable in isolation could nevertheless sink to the level of deficient performance when considered cumulatively or in the aggregate. *See Strickland*, 466 U.S. at 688 (holding that, to establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness"). There can be little doubt that the Eighth Circuit Court of Appeals would reject relief based on this form of cumulative error, where it has explicitly rejected cumulative consideration of ineffective assistance claims to determine prejudice, *see Middleton v. Roper*, 455 F.3d 838, 846-51 (8th Cir. 2006) (finding no deficient performance on any of the petitioner's four claims of ineffective assistance of counsel, then rejecting his argument that the district court erred by analyzing individually instead of cumulatively the prejudice resulting from his multiple claims), *cert. denied*, 549 U.S. 1134 (2007), and where it has repeatedly held that "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," *see United States v. Robinson*, 301 F.3d 923, 925 (8th Cir. 2002) (citing *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir.), *cert. denied*, 519 U.S. 968 (1996)). Moreover, cumulative determination of deficient performance, standing alone, would provide no basis for relief, because prejudice must also be proved. *Strickland*, 466 U.S. at 687-88, 697. The question of whether this form of cumulative error analysis is permitted under Eighth Circuit law requires no further consideration here, however, where I do not read Johnson's Second Amended § 2255 Motion or briefing on cumulative error to seek a determination of *deficient performance* based on the cumulative effect of multiple alleged errors of counsel.

137

As the respondent argues, the Eighth Circuit Court of Appeals has explicitly foreclosed the second form of cumulative error review, consideration of all of counsel's alleged errors to determine whether their cumulative effect was *prejudicial*, whether or not those errors were found to constitute deficient performance. *See Worthington*, 631 F.3d at 506 n.12 (rejecting the petitioner's argument that the district court "artificially truncated" his ineffective assistance claim into separate claims that his counsel was constitutionally ineffective (1) for failing to pursue expert psychological testimony and (2) for failing to present additional lay witness mitigation testimony, and refusing to assess prejudice by balancing the aggravating evidence against the mitigating evidence presented at the sentencing phase as well as the entire mitigating evidence adduced post-conviction, "because [the appellate court] earlier held that Worthington's ineffective-assistance claim regarding investigating and presenting psychological expert mitigation testimony did not amount to constitutionally deficient representation," so that "his 'cumulative error argument' [wa]s without merit"); *Becker v. Luebbers*, 578 F.3d 907, 914 n.5 (8th Cir. 2009) ("Becker also argues that the cumulative effect of the alleged errors establishes prejudice. Because we hold none of Becker's individual claims of error amount to constitutionally defective representation, Becker's cumulative error argument is without merit. Even if we were to deem some aspect of counsel's performance deficient under *Strickland*, any prejudice analysis would have to be limited to consideration only of the consequences of the constitutionally defective aspects of representation, not an accumulated prejudice based on asserted but unproven errors as urged by Becker."); *Sherron v. Norris*, 69 F.3d 285, 291 (8th Cir. 1995) ("Because we have found only one instance of deficient performance, we need not discuss the question whether the cumulative effect of counsel's alleged errors prejudiced Sherron."). Moreover, Johnson has now made clear that she

138

does not seek such cumulative consideration of unproven deficiencies for purposes of determining prejudice.

What remains to be resolved is whether Eighth Circuit law permits consideration of *all errors of counsel actually found to be deficient performance* to determine whether their cumulative effect was sufficiently *prejudicial*. In other words, can several deficiencies of counsel that, individually, do not cause sufficient prejudice to warrant relief, be considered cumulatively or in the aggregate to determine whether the petitioner was sufficiently prejudiced by counsel's deficient performance to obtain relief? Again, the Eighth Circuit Court of Appeals has expressly foreclosed this variant of cumulative error review. *See Middleton*, 455 F.3d at 851 ("We repeatedly have recognized 'a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test.'" (quoting *Hall,* 296 F.3d at 692). This is the controlling rule in this Circuit, and I will adhere to it. Nevertheless, I believe that the Eighth Circuit rule fails to recognize that several performance deficiencies that individually do not result in *Strickland* prejudice could cumulatively cause *Strickland* prejudice—that is, could generate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different—and thus warrant relief, because they satisfy both prongs of the *Strickland* standard. *See Strickland*, 466 U.S. at 694. That circumstance is properly distinguished from one in which several reasonable decisions nevertheless result in cumulative prejudice, which fails to satisfy both prongs of the *Strickland* standard, because there is no demonstration of deficient performance. While I am sympathetic to the notion that the whole of the prejudice from numerous deficiencies of counsel may be greater than the sum of its parts, Eighth Circuit precedent is not. Nevertheless, my disposition of claims in this case would not change, even if the Eighth Circuit Court of Appeals were to adopt this variant of cumulative error review, because

my determinations of whether or not Johnson is entitled to relief stand or fall claim-by-claim, not on the basis of the cumulative prejudice from multiple deficiencies.

### b. Conflict with Supreme Court precedent

Johnson argues that the rejection in this Circuit of relief based on cumulative error of counsel is contrary to Supreme Court precedent, which she argues implies the validity of, if it does not expressly authorize, review for cumulative error. She relies principally on the Supreme Court's decision in *Strickland*, 466 U.S. at 695-696, which she points out refers repeatedly to the need to assess whether sufficient prejudice arose from counsel's "errors"; the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000), *Wiggins v. Smith*, 539 U.S. 510, 536 (2003), *Wong v. Belmontes*, ___ U.S. ___130 S. Ct. 383, 386 (2009), and *Porter v. McCollum*, ___U.S.___, 130 S. Ct. 447, 453-454 (2009), each of which requires a *habeas* court to reweigh all of the mitigating evidence that was and that could have been presented, but for counsel's unreasonable performance, against the aggravating evidence presented to determine whether the petitioner's right to a fair trial was violated; and the adoption of *Belmontes* by the Eighth Circuit Court of Appeals in *Worthington*, 631 F.3d at 506 n.12.

One problem with Johnson's argument for cumulative error review based on *Strickland* is that it was not until *after* the *Strickland* decision came down that the Eighth Circuit Court of Appeals overruled its prior recognition of cumulative error review. *See Girtman v. Lockhart*, 942 F.2d 468, 475 (8th Cir. 1991). The court in *Girtman* did not expressly reject the petitioner's contention that neither *Fink v. Lockhart*, 823 F.2d 204 (8th Cir. 1987), on which the lower court had relied, nor *Strickland* explicitly overruled the cumulativeness test. *See Girtman*, 942 F.2d at 475. Nevertheless, the court in *Girtman* did expressly reject the petitioner's cumulativeness claim in light of post-*Strickland* circuit precedent holding that "'cumulative error does not call for habeas relief, as each habeas

claim must stand or fall on its own.'" *Girtman*, 942 F.2d at 475 (quoting *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990), *cert. denied* 499 U.S. 978 (1991)).

Admittedly, neither *Girtman*, the decision on which it relied, nor either of the decisions on which that case in turn relied addressed the "errors" language in *Strickland* in rejecting a cumulative error claim. *See id.* (relying on *Scott*, 915 F.2d at 1191, which in turn relied on *Byrd v. Armontrout*, 880 F.2d 1, 11 (8th Cir. 1989), and *Lee v. Lockhart*, 754 F.2d 277, 279 (8th Cir. 1985)). More troubling still, each of these decisions provides, at best, scant reasoning or authority for rejecting cumulative error claims, so that the rejection is little more than *ipse dixit*.

Even so, immediately prior to its rejection of a cumulative error theory, the *Scott* court agreed with the lower court that the petitioner's "second trial counsel's decisions were not unreasonable and that they did not result in ineffective assistance under [*Strickland*]," and found that *Strickland* review "prove[d] nothing of constitutional magnitude." *Scott*, 915 F.2d at 1191. The court's use of "counsel's *decisions*" parallels the *Strickland* Court's use of "counsel's errors" as the basis for a prejudice analysis, suggesting that the *Scott* court did not read the references to "errors" in *Strickland* as authorizing cumulative error review.[25] However, where the court in *Scott* found no deficient performance, there were no "errors" on which to base a cumulative prejudice determination. Subsequently, the Eighth Circuit Court of Appeals has never recognized any tension between the "errors" language in *Strickland* and rejection of a cumulative error claim.

---

[25]It may be that the *Scott* court read the "errors" language in *Strickland* as "each of the errors," that is, simply as a caution to consider the prejudice flowing from each of counsel's errors, rather than as authorizing consideration of the prejudice flowing from multiple errors cumulatively or in the aggregate.

Another, perhaps more significant problem with Johnson's reliance on *Strickland* as the authority for cumulative error review is that, as I will explain more fully below, Johnson confuses consideration of a *single*, multifaceted claim of ineffective assistance of counsel in *Strickland* with consideration of several claims of ineffective assistance of counsel for cumulative error. *Strickland* actually involved a *single* claim of ineffective assistance of counsel at the sentencing proceeding involving multiple alleged errors. *See, e.g., Strickland*, 466 U.S. at 675-78 (noting that, on collateral review in state court, the prisoner asserted a claim "that counsel had rendered ineffective assistance at the sentencing proceeding . . . in six respects," and on *habeas* review in federal court, he again advanced "ineffective assistance of counsel based on the same errors, except for the failure to move for a continuance [of the sentencing proceeding]").

Similarly, the problem with Johnson's reliance on *Wiggins* and *Williams* is that the Eighth Circuit Court of Appeals expressly held in *Middleton* that those decisions are not authority for cumulative error review. In *Middleton*, the Eighth Circuit Court of Appeals explained,

> Notwithstanding the deficiencies of each ineffective assistance of counsel claim, Middleton argues the district court erred by analyzing individually the prejudice resulting from his multiple claims and by concluding each claim must rise or fall on its own merits. Citing *Strickland* and its progeny, including *Wiggins v. Smith,* 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), and *Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), Middleton contends the district court should have considered the cumulative effect of trial counsel's errors in determining *Strickland* prejudice.
>
> We reject Middleton's argument for two reasons. First, Middleton advances an erroneous interpretation of Supreme Court precedent. Neither *Wiggins* nor *Williams* stand for the proposition courts should accumulate the prejudice from

> separate ineffective assistance claims in determining whether
> to grant habeas relief. Rather, both decisions involved only a
> *single claim* of ineffective assistance of counsel—namely, trial
> counsel's failure to investigate and present mitigating evidence
> during the trial's penalty phase. *See Wiggins,* 539 U.S. at
> 514, 123 S. Ct. 2527; *Williams,* 529 U.S. at 390, 120 S. Ct.
> 1495.

*Middleton,* 455 F.3d at 851 (emphasis in the original) (identifying conflict with Eighth Circuit precedent as the second ground for rejecting cumulative error claims).[26] Again, although Johnson contends that "[t]he failings of trial counsel in *Williams v. Taylor* were manifold," *see* Johnson's Reply To Government's Brief On Cumulative Error In The Eighth Circuit (Civ. docket no. 368), 4 (citing *Williams*, 529 U.S. at 395-96), as I will explain more fully below, Johnson confuses the *Williams* Court's consideration of a *single*, multifaceted claim of ineffective assistance of counsel in failing to investigate and present mitigating evidence during the mitigation phase with consideration of several claims of ineffective assistance of counsel for cumulative error. I find that the same is true of her reliance on *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447 (2009).

The problem with Johnson's reliance on *Wong v. Belmontes*, ___ U.S. ___ 130 S. Ct. 383, 386 (2009), as the basis for cumulative error review is somewhat different: It is not clear to me how *Belmontes*—or *Worthington's* adoption of *Belmontes*—supports a

------

[26] The "multiple" claims of ineffective assistance of counsel at issue in *Middleton* were the following: "failing to contact four former employers and two family members or call them as witnesses during the penalty phase," *see Middleton*, 455 F.3d at 846; "failing to elicit additional mitigating evidence during the penalty phase from Middleton's mother," *id.* at 847; "failing to present expert testimony during the guilt phase that Middleton was not guilty by reason of mental disease or defect or suffered from diminished capacity," *id.* at 848; and "failing to object during penalty phase closing arguments following the prosecution's reference to society's drug problems," *id.* at 849.

cumulative error analysis, because the "relevant evidence that the [factfinder] would have had before it if [counsel] had pursued the different path" in *Belmontes* all involved the *same* claim of ineffective assistance of counsel in presenting insufficient mitigation evidence. *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386. Moreover, the evidence in question was not different, just "more." *Id.* at ___, 130 S. Ct. at 386-87. Indeed, the Supreme Court characterized all of the additional mitigation evidence that the Ninth Circuit Court of Appeals had held should have been presented as simply "cumulative" of evidence of the same kinds that counsel *had* presented. *Id.* at ___, 130 S. Ct. at 388-89.[27]

Also contrary to Johnson's contentions, the recognition of *Belmontes* by the Eighth Circuit Court of Appeals in *Worthington*, 631 F.3d at 506 n.12, does not amount to recognition of cumulative error review. The pertinent footnote in *Worthington* states the following:

> Worthington also argues that the district court erred by "artificially truncating" his ineffective-assistance claim into two separate issues: whether counsel was constitutionally ineffective for failing to pursue expert psychological

---

[27]If the decision in *Belmontes* adds or clarifies anything, it is that "all the relevant evidence that the jury would have had before it if [counsel] had pursued the different path" includes "not just the mitigation evidence [counsel] could have presented, but also [other] evidence that almost certainly would have come in with it." *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386 (holding that, in evaluating whether the petitioner was prejudiced by counsel's failure to introduce "more" mitigation evidence, "it is necessary to consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued the different path—not just the mitigation evidence [counsel] could have presented, but also the [previously excluded] Howard murder evidence that almost certainly would have come in with it." (emphasis in the original) (citing *Strickland*, 466 U.S. at 695-696, 700)). Thus, the mitigating effect of additional evidence that counsel could have presented may be offset, as it was in *Belmontes*, by additional aggravating evidence to which the additional mitigating evidence would have opened the door.

testimony, and whether counsel was constitutionally ineffective for failing to present additional lay witness mitigation testimony. According to Worthington, in assessing prejudice the district court should have balanced the aggravating evidence against the mitigating evidence presented at the sentencing phase as well as the entire mitigating evidence adduced post-conviction. To be sure, "it is necessary to consider all the relevant evidence that the [factfinder] would have had before it if [counsel] had pursued the different path." *Wong v. Belmontes*, ––– U.S. ––––, 130 S. Ct. 383, 386, 175 L. Ed. 2d 328 (2009). But because we earlier held that Worthington's ineffective-assistance claim regarding investigating and presenting psychological expert mitigation testimony did not amount to constitutionally deficient representation, *supra* Section II.A, his "cumulative error argument" is without merit, *Becker v. Luebbers*, 578 F.3d 907, 914 n. 5 (8th Cir. 2009), *cert. denied*, 561 U.S. ––––, 130 S. Ct. 3520, 177 L. Ed. 2d 1103 (2010); *see also Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996). Worthington's argument also fails because cumulative testimony, by its very nature, adds nothing to the evidence considered by the sentencing court. Consequently, the duplicative testimony of Worthington's parents would not have impacted the balance of mitigating and aggravating evidence under any circumstances.

*Worthington*, 631 F.3d at 506 n.12. Thus, *Worthington* stands for the unremarkable proposition—under the law of the Eighth Circuit and the law of circuits that *do* recognize "cumulative error," *see supra*, note 24—that alleged errors that do not amount to deficient performance cannot be cumulated for purposes of determining prejudice. In short, separately or together, *Belmontes* and *Worthington* do not signal adoption by the United States Supreme Court or the Eighth Circuit Court of Appeals of cumulative error review of ineffective assistance of counsel claims.

Johnson has not convinced me that the Eighth Circuit Court of Appeals or, for that matter, the Supreme Court, recognizes any form of cumulative error review of ineffective assistance of counsel claims.

### c.    *Cumulative error vs. multifaceted error*

I observed, above, that I believe that Johnson has confused consideration of a *single*, multifaceted claim of ineffective assistance of counsel in failing to investigate and present mitigating evidence during the mitigation phase with consideration of several claims of ineffective assistance of counsel for cumulative error. I also believe that the respondent takes the opposite, but equally untenable position of treating multiple facets of a *single* claim of ineffective assistance of counsel as *separate* claims. I will now explain in more detail why I believe that review of a multifaceted claim of ineffective assistance of counsel is not only permissible under Supreme Court precedent, but distinguishable from either cumulative error review, precluded by Eighth Circuit precedent, or review of each claim of ineffective assistance of counsel on its own, as required by Eighth Circuit precedent.

### i.    **Strickland *and multifaceted error*.**

First, I find that *Strickland* stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim, not for the proposition that courts must perform cumulative error analysis of all claims of ineffective assistance of counsel. The key to this reading of *Strickland* is the way that the Supreme Court characterized the ineffective assistance of counsel claim actually presented in that case. As the Court explained,

> Respondent . . . sought collateral relief in state court on numerous grounds, among them that *counsel had rendered ineffective assistance at the sentencing proceeding. Respondent challenged counsel's assistance in six respects.* He asserted that counsel was ineffective because he failed to

146

> move for a continuance to prepare for sentencing, to request a psychiatric report, to investigate and present character witnesses, to seek a presentence investigation report, to present meaningful arguments to the sentencing judge, and to investigate the medical examiner's reports or cross-examine the medical experts.

*Strickland*, 466 U.S. at 675 (emphasis added). Thus, at least initially, the Court in *Strickland* characterized the prisoner's state petition as involving a *single* claim of "ineffective assistance at the sentencing proceeding," consisting of failure "in six respects." *Id.* This understanding of the ineffective assistance of counsel claim as having multiple facets carried through the Court's description of the state courts' rejection of the claim, because the Court noted that the state trial court found that "[f]our of the assertedly prejudicial errors required little discussion," but "dealt at greater length with the two other *bases* for the ineffectiveness *claim.*" *Id.* at 676-77 (emphasis in the original).

The Court in *Strickland* noted that, after the state courts denied relief, the prisoner next filed a petition for a writ of habeas corpus in federal court, in which "[h]e advanced numerous grounds for relief, among them ineffective assistance of counsel based on the same errors, except for failure to move for a continuance, as those he had identified in state court." *Id.* at 678. The Court noted that the federal district court "held an evidentiary hearing to inquire into trial counsel's efforts to investigate and to present mitigating circumstances." *Id.* at 679 (also noting that the federal district court ultimately rejected the ineffective assistance claim on the grounds that "'there does not appear to be a likelihood, or even a significant possibility,' that any errors of trial counsel had affected the outcome of the sentencing proceeding" (quoting the district court)). Thus, even in the federal *habeas* proceedings, the alleged errors of counsel in the sentencing proceeding were perceived as a single, multifaceted claim.

The Court granted *certiorari* in *Strickland*, in part, "to consider the standards by which to judge a contention that the Constitution requires that a criminal judgment be overturned because of the actual ineffective assistance of counsel," where the Supreme Court had "not had occasion to squarely decide" the proper standard for such a claim. *Id.* at 684. Johnson is correct that, in its discussion of the standards for granting relief on an ineffective assistance of counsel claim, the Court in *Strickland* often referred to "errors" causing the requisite "prejudice." However, those references to "errors" simply do not indicate adoption of cumulative error review. To the contrary, the Court had previously characterized the petitioner's collateral attack as involving a single claim of ineffective assistance of counsel in the sentencing proceeding in several "respects," resting on several "bases," and consisting of several "errors." *See id.* at 675-78.

As noted above, in the standards for ineffective assistance of counsel claims, the Court in *Strickland* also established that the question to determine whether the "prejudice" standard has been met is slightly different, depending upon whether counsel's "errors" in a capital case are a basis for challenging a conviction or a basis for challenging a death sentence:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 695. The different formulations in *Strickland* of the question to determine prejudice depending upon the context of the established performance deficiencies

suggest that it is improper to consider all of the deficiencies of counsel throughout the trial as facets of a *single* claim to determine prejudice. Rather, they suggest that, at a minimum, errors of counsel *in a particular phase of the trial* must be considered separately from errors of counsel *in another phase of the trial*.

Moreover, in *Strickland*, the Court actually applied the "deficient performance" and "prejudice" prongs of the ineffective assistance analysis to *a single claim of ineffective assistance* "at and before respondent's sentencing proceeding," concluding that counsel's conduct was not unreasonable, but even assuming that it was unreasonable, the prisoner "suffered insufficient prejudice to warrant setting aside his death sentence." *Id*. at 698-99. As to deficient performance, the Court concluded that "[c]ounsel's strategy choice [to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes] was well within the range of professional reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable." *Id*. at 699. Thus, the allegedly deficient performance involved two facets, failure to seek more character evidence and failure to seek more psychological evidence, not two claims of ineffective assistance of counsel, each involving failure to seek one of those categories of evidence. *See also id*. at 675 (identifying the "six respects" in which counsel was allegedly ineffective at the sentencing proceeding as including failure "to request a psychiatric report [and] to investigate and present character witnesses"). The Court also found insufficient prejudice, because "[t]he evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge." *Id*. at 699-700. Thus, the Court concluded, "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats *the ineffectiveness claim*." *Id*. at 700 (emphasis added).

In short, *Strickland* is not a cumulative error case, it is a case involving a single, multifaceted claim of ineffective assistance of counsel.

   *ii.*   **Williams, Wiggins, and Porter**.  Similarly untenable is Johnson's contention that "[t]he failings of trial counsel in *Williams v. Taylor* were manifold," so that the Court's determination of prejudice based on those "manifold" failings in that case necessarily constituted cumulative error review.  *See* Johnson's Reply To Government's Brief On Cumulative Error In The Eighth Circuit (Civ. docket no. 368), 4 (citing *Williams*, 529 U.S. at 395-96).  In *Williams*, the Supreme Court detailed the evidence supporting the state trial judge's conclusion that the representation provided by the petitioner's trial counsel *during the sentencing phase* "fell short of professional standards," as follows:

> The record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial. [Appendix] at 207, 227.  They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.  Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.
>
> Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school.  *Id.*, at 595.  They failed to seek prison records recording Williams'

150

commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." *Id.*, at 569, 588. Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison. *Id.*, at 563-566.

*Williams*, 529 U.S. at 395-96 (footnote omitted) (also identifying additional evidence that was not favorable to the petitioner). Notwithstanding that this is an extensive and varied list of the kinds of evidence that counsel failed to discover and present, the Court held that counsel's "omissions . . . clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background," and that it was this *single* deficiency—failing to investigate and present available mitigation evidence—that the Court held "prejudiced [the petitioner] within the meaning of *Strickland*." *Id.* at 396; *see also id.* at 399 (agreeing with the state trial judge that there was a reasonable probability that the result of the sentencing proceeding would have been different "if competent counsel had presented and explained the significance of all the available [mitigation] evidence"). Thus, as the Eighth Circuit Court of Appeals recognized, *Williams* "involved only a *single claim* of ineffective assistance of counsel—namely, trial counsel's failure to investigate and present mitigating evidence during the trial's penalty phase." *Middleton*, 455 F.3d at 851 (emphasis in the original) (citing *Williams,* 529 U.S. at 390).

*Wiggins* also involved only a *single* claim of ineffective assistance of counsel, described at the outset of the decision as "failure to investigate [the petitioner's]

background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings." *Wiggins*, 539 U.S. at 514; *see also id.* at 519-20 (describing the claim as "his attorneys' performance at sentencing violated his Sixth Amendment right to effective assistance of counsel"); *Middleton*, 455 F.3d at 851 (recognizing that *Wiggins* did not support cumulative error review, because it "involved only a *single claim* of ineffective assistance of counsel—namely, trial counsel's failure to investigate and present mitigating evidence during the trial's penalty phase" (emphasis in the original) (citing *Wiggins,* 539 U.S. at 514). This is so, notwithstanding that the Court in *Wiggins* noted various kinds of evidence that an adequate investigation by trial counsel of the petitioner's life history would have uncovered, had counsel looked beyond the presentence investigation report (PSI) and department of social services (DSS) information that they did have available. For example, the Court noted that counsel failed to commission a detailed social history report, despite the availability of funds to do so, and failed to investigate further facts revealed in the DSS report. The additional information that counsel would have discovered included that "[p]etitioner's mother was a chronic alcoholic; [petitioner] was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Wiggins*, 539 U.S. at 525. Moreover, the Court observed, "[h]ad counsel investigated further, they might well have discovered the sexual abuse later revealed during state postconviction proceedings." *Id.*; *see also id.* at 516-17 (detailing information about the petitioner's social history in a report developed by a licensed social worker in support of his state post-conviction relief proceedings). The Court ultimately held that the petitioner's trial counsel's "investigation did not meet *Strickland's* performance standards," *see id.* at 533 (emphasis added), thus treating counsel's failure to discover various kinds of mitigating evidence as a *single* deficiency.

The Court also based its determination of prejudice on counsel's "fail[ure] to discover and present" mitigating evidence, thus also addressing only a *single* claim. *Id.* at 534-35.

Similarly, in *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447 (2009), the Supreme Court treated counsel's failure to investigate and present mitigation evidence concerning the petitioner's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity," *Porter*, ___U.S. at ___, 130 S. Ct. at 449, as a *single* claim of ineffective assistance of counsel in investigating and presenting of mitigating evidence in the mitigation phase, *id.* at 452-53 ("deficiency" analysis, finding a single deficiency in "fail[ure] to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service"); *id.* at 453-56 ("prejudice" analysis, considering whether the petitioner was or "was not prejudiced by that deficiency"). Again, this was true, even though the evidence not presented was varied and involved different periods of the petitioner's life.

Thus, *Strickland*, *Williams*, *Wiggins*, and *Porter* each involved only a *single*, albeit multifaceted, claim of ineffective assistance of counsel. As such, they support review of a *multifaceted* claim, not cumulative error review of separate ineffective assistance of counsel claims.

      ***iii.***     *"Balkanized" review*. The decisions in *Strickland, Williams*, *Wiggins*, and *Porter* also do not support the sort of "balkanized" review of individual facets of a single claim of ineffective assistance of counsel that the respondent contends is required by the Eighth Circuit rule that "'each habeas claim must stand or fall on its own.'" *Girtman*, 942 F.2d at 475 (quoting *Scott*, 915 F.2d at 1191). In *Porter*, the Supreme Court considered the case as presenting a single, multifaceted claim of ineffective assistance of counsel in failing to investigate and present mitigating evidence in the mitigation phase, *see Porter*,

___ U.S. at ___, 130 S. Ct. at 452-56, even though the Eleventh Circuit Court of Appeals had "separately considered each category of mitigating evidence and held it was not unreasonable for the state court to discount each category as it did." *Id.* at 452. Moreover, the single ineffective assistance of counsel claim in *Porter* involved various categories of evidence from different witnesses and relating to different stages of the petitioner's life, rather than evidence from a single source or involving a single event or issue. *Id.* at 452-53 (recognizing that the missing categories evidence, which gave rise to a single claim of ineffective assistance of counsel, involved the petitioner's mental health or mental impairment, his family background, and his military service).

The same is true of *Strickland*, *Williams*, and *Wiggins*. *See Strickland*, 466 U.S. at 699 (identifying the two most significant respects in which counsel's assistance with the mitigation case was allegedly ineffective were failure to seek more character evidence and failure to seek more psychological evidence); *Williams*, 529 U.S. at 395-96 (identifying the respects in which counsel failed to investigate and present mitigation evidence as involving extensive records graphically describing Williams's "nightmarish" childhood, evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school, Williams's commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way," and evidence from a witness involved in a prison ministry program that Williams "seemed to thrive in a more regimented and structured environment" and that Williams was proud of the carpentry degree he earned while in prison); *Wiggins*, 539 U.S. at 525 (identifying the additional information that counsel would have discovered, had counsel performed an adequate investigation, as including that "[p]etitioner's mother was a chronic alcoholic; [petitioner] was shuttled from foster home to foster home and displayed some

emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food"; and "the sexual abuse later revealed during state postconviction proceedings.").

Thus, even if the various aspects or facets of counsel's ineffective assistance in the investigation and presentation of mitigation phase evidence are factually and temporally distinct, they do not constitute separate claims that must be considered individually. It is the entire multifaceted claim of ineffective assistance of counsel in the investigation and presentation of mitigation phase evidence that "'must stand or fall on its own,'" *see Girtman*, 942 F.2d at 475 (quoting *Scott*, 915 F.2d at 1191), not each *facet* of that claim. Of course, only facets of the claim that are actually found to involve unreasonable, and therefore deficient, performance must be considered to determine whether the "prejudice" prong of the ineffective assistance of counsel claim has been met. *See Becker*, 578 F.3d at 914 n.5 ("Even if we were to deem some aspect of counsel's performance deficient under *Strickland*, any prejudice analysis would have to be limited to consideration only of the consequences of the constitutionally defective aspects of representation, not an accumulated prejudice based on asserted but unproven errors as urged by Becker.").[28]

---

[28]I do not believe that there is irreconcilable tension between my conclusion that a multifaceted claim of ineffective assistance of counsel in the mitigation phase is properly reviewed as a *single* claim and the "relation back" doctrine for determination of the timeliness of an amended claim. As explained above, the "relation back" doctrine allows only "new" claims involving the same "core of operative facts" as previously pleaded claims to "relate back" to the filing of the previous pleading, but does not treat merely alleging ineffective assistance of counsel during trial in both pleadings to be enough. *See Dodd v. United States*, 614 F.3d at 512, 515 (8th Cir. 2010); *see supra*, Section II.A.2.b.iii, beginning at page 68. The purpose of this "common core of operative facts" requirement for a "new" claim to "relate back" is to be sure that the opposing party has been put on notice, in the original pleading, of the factual basis for the "new" claim.

(continued...)

*iv.*    ***Extent of multifaceted claims.***   What remains to be determined is what allegations of error constitute a single, multifaceted claim of ineffective assistance of counsel, rather than separate claims.   This question follows not only from my own conclusion that the Supreme Court cases discussed in this section support analysis of multiple allegations of error in the investigation and presentation of mitigation evidence in the mitigation phase as a single, multifaceted claim of ineffective assistance of counsel, but from Johnson's assertion that all thirty-five "areas" in which she has alleged error by trial and appellate counsel actually present only a single claim of ineffective assistance of counsel.

*Strickland*, *Williams*, *Wiggins*, and *Porter* support review of a multifaceted claim of ineffective assistance of counsel in the investigation and presentation of mitigation evidence in the mitigation phase as a single claim.   On the other hand, none of them suggest that all of the alleged errors of counsel *throughout the case*, or even that *all of the allegations of errors, of various types, in the mitigation phase* can be considered as a single, multifaceted claim of ineffective assistance of counsel.   Those cases simply did not present those issues.   Rather, they stand most clearly for the proposition that a single,

---

[28](...continued)

*Dodd*, 614 F.3d at 516-17 (finding no relation back when a new claim identified different insufficiencies in trial counsel's challenges to different evidence in different circumstances); *Hernandez*, 436 F.3d at 858 (finding no relation back where the facts alleged in the original claim were not such that would put the opposition on notice of the issue in the "new" claim).   The "relation back" standards would certainly bar a petitioner from attempting to allege "new" aspects or facets of ineffective assistance of counsel that were factually or temporally distinct from previously pleaded facets, because the opposing party would not have notice of the new factual basis for that facet of the ineffective assistance claim.   Nevertheless, the "relation back" standards do not require that all facets of a single claim arise from a common core of operative facts for the opposing party to have notice of the factual basis for that claim.

multifaceted claim of ineffective assistance of counsel is presented by allegations of multiple errors of counsel in the investigation and presentation of mitigating evidence in the mitigation phase.

Nevertheless, as I observed above, the different formulations in *Strickland* of the question to determine prejudice depending upon the context (merits or mitigation phase) of the established performance deficiencies, *see Strickland*, 466 U.S. at 695, suggest that it is improper to consider all of the deficiencies of counsel throughout the trial as facets of a *single* claim to determine prejudice. Rather, they suggest that multiple facets of ineffective assistance of counsel *in a discrete phase of the trial* may constitute a *separate* claim of ineffective assistance of counsel from allegations of error in a different phase.

Moreover, claims of ineffective assistance of counsel relating to different phases of a capital trial are not just analytically distinct, as to the formulation of the question to determine prejudice for each phase, they are practically distinct in the remedy that flows from each such claim: Deficient performance in the merits phase that is sufficiently prejudicial—*i.e.*, that creates a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt, *Strickland*, 466 U.S. at 695—requires relief from the conviction and, consequently, from the penalty as well, but deficient performance of counsel in the mitigation phase that is sufficiently prejudicial—*i.e.*, that creates a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death, *see id.*—requires relief only from the death sentence, not from the conviction. The issues, standards, and sometimes the factfinder in these two phases of the trial will also be

different.[29]  Thus, I conclude that, at a minimum, a claim or claims of ineffective assistance of counsel in the mitigation phase, a discrete phase of a capital trial, are separate from a claim or claims of ineffective assistance of counsel in the merits phase of the trial. The appeal is, likewise, a discrete phase of a case, involving different issues and kinds of error, as well as somewhat different standards for ineffective assistance of counsel, as set out in Section III.B.2., even if the prisoner was represented on appeal by the same counsel.

That conclusion leaves open the question of whether allegations of errors by counsel of *one kind* in one phase of the trial constitute a separate claim of ineffective assistance of counsel from allegations of errors by counsel of *a different kind* in the same phase. Here, Johnson contends that my reorganization of the various facets (what she called "areas") of her claim of ineffective assistance of counsel *in the mitigation phase* under various subtopical headings should not disguise the fact that all of the subtopics comprise one claim of ineffective assistance in the mitigation phase.[30]  As indicated in the chart summarizing claims to be considered on the merits in Section II.C., I have, indeed, reorganized Johnson's allegations of errors by counsel in the mitigation phase into the following four subtopics:  failure to confront aggravating evidence; presentation of ineffective mitigation evidence; failure to investigate, prepare, and present additional mitigation evidence; and failure to object to the mitigation phase determination and juror confusion.  The question

---

[29]I suggest that errors in the merits and sentencing phases of any non-capital federal felony case likewise present distinct claims of ineffective assistance of counsel, at a minimum, for each such phase, because the issues, standards, and factfinder in each phase are different.

[30]Thus, Johnson seems to argue that, even if all of her allegations of errors of counsel in the trial and appeal of her case do not constitute a single claim of ineffective assistance of counsel, all of the allegations of error *in the mitigation phase* constitute a single claim of ineffective assistance of counsel.

is whether these are subtopics of a single claim of ineffective assistance of counsel in the mitigation phase or separate claims of ineffective assistance of counsel in the mitigation phase.

The Supreme Court decisions on which Johnson has focused do not clearly indicate whether each of these subtopics relates to a *separate* claim of ineffective assistance of counsel in the mitigation phase or if all of these subtopics relate to a *single* claim of ineffective assistance of counsel in the mitigation phase. This is so, because those cases each involved only *one* of these subtopics, failure to investigate and present additional mitigation evidence. *See Strickland*, 466 U.S. at 699 (considering two facets of the claim of ineffective assistance of counsel in the mitigation phase, failure to seek more character evidence and failure to seek more psychological evidence); *Williams*, 529 U.S. at 396 (considering a claim of ineffective assistance of counsel in the mitigation phase involving failure to investigate and present available mitigation evidence); *Wiggins*, 439 U.S. at 514 (considering a claim of ineffective assistance of counsel in the mitigation phase involving "failure to investigate [the petitioner's] background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings"); *Porter*, ___ U.S. at ___, 130 S. Ct. at 449 (considering a claim of ineffective assistance of counsel in the mitigation phase involving failure to investigate and present mitigation evidence concerning the petitioner's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity").

Nevertheless, I believe that consideration of each of the subtopics concerning Johnson's counsel's errors in the mitigation phase as a *separate* (albeit multifaceted) claim of ineffective assistance of counsel is justified. Such separate consideration is justified, because the subtopics distinguish *different kinds of error by counsel*, sometimes involving

different kinds of conduct, roles, or skills. For example, allegations of failure to confront aggravating evidence involve counsel's faulty response to evidence presented by the prosecution; allegations of presentation of ineffective mitigation evidence involve counsel's presentation of faulty (or prejudicial) mitigation evidence. Allegations of failure to investigate, prepare, and present additional mitigation evidence involve counsel's failure to develop additional mitigation evidence. Allegations of failure to object to the mitigation phase determination and juror confusion have nothing to do with the mitigation phase evidence at all, but with counsel's failure to address alleged problems with the mitigation phase jury instructions and the verdict form and alleged problems with the jurors' mitigation phase verdict. Even though three of the subtopics involve evidence that was or could have been presented in the mitigation phase, there are, at least to my mind, fundamental differences among the skills or conduct involved in confronting evidence presented by an opponent, effectively presenting what evidence one has, and generating additional useful evidence. While the distinctions among kinds of error by counsel that are sufficient to state separate claims of ineffective assistance of counsel may, like plain meaning, fraud, and beauty, be in the eye of the beholder,[31] it seems to me that, like the distinction between what is and what is not obscenity, I know it when I see it. *See, e.g., Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) (stating that, while "perhaps I could never succeed in intelligibly [defining obscenity] . . . I know it when I see it").

I do not believe that the decision of the Eighth Circuit Court of Appeals in *Middleton* is contrary (1) to my conclusion that allegations of errors by counsel in a

---

[31] *See, e.g., Vis v. American Family Life Assur. Co. of Columbus*, 778 F. Supp. 2d 971, 972 n.2 (N.D. Iowa 2011) (examining the sources and applications of the phrase "eye of the beholder").

particular phase of the trial may present a single, multifaceted claim of ineffective assistance, rather than multiple claims of ineffective assistance, or (2) to my further conclusion that a multifaceted claim involving allegations of *errors of the same kind in the same phase* is distinguishable from a multifaceted claim involving allegations of *errors of a different kind in the same phase*. In *Middleton*, the court treated three different kinds of allegations of errors in the mitigation phase as separate from the claim of ineffective assistance in the mitigation phase. Those three kinds of allegations of errors were (1) "failing to contact four former employers and two family members or call them as witnesses during the penalty phase," *see Middleton*, 455 F.3d at 846; (2) "failing to elicit additional mitigating evidence during the penalty phase from Middleton's mother," *id*. at 847; and (3) "failing to object during penalty phase closing arguments following the prosecution's reference to society's drug problems," *id*. at 849. The court also treated a separate allegation of ineffective assistance in the merits phase—"failing to present expert testimony during the guilt phase that Middleton was not guilty by reason of mental disease or defect or suffered from diminished capacity," *id*. at 848—as a separate claim. In *Middleton*, the Eighth Circuit Court of Appeals simply considered these allegations of error as separate claims in the same way that the state courts and the federal district court had. *See id*. at 845 ("The district court denied habeas relief, but granted a certificate of appealability on the following eight claims," four of which were identified as errors by trial counsel); *and compare id*. at 845 ("Middleton raises several claims of ineffective assistance of counsel, which involve mixed questions of law and fact."); *see also Middleton v. State*, 80 S.W.3d 799, 806-17 (Mo. 2002) (analyzing numerous allegations of errors by counsel as separate claims of ineffective assistance of counsel). The Eighth Circuit Court of Appeals was never called upon to decide whether or not any of these allegations of error properly constituted multiple facets of a single claim of ineffective

assistance of counsel and did not purport to address that question.[32]  Moreover, the court concluded that none of the petitioner's allegations of error by counsel involved deficient performance, *see id.* at 846-50, so that there was no reason to consider whether the aggregate prejudice from multiple deficiencies warranted relief.  Thus, *Middleton* stands as no bar to consideration of related allegations of error by counsel as a single, multifaceted claim of ineffective assistance of counsel.

In short, I believe that it is proper to consider as a single, multifaceted claim of ineffective assistance of counsel multiple, related allegations of errors.  Sufficient "relatedness" is demonstrated by factors including the following:  whether the errors are relevant to the same issue; whether the errors involve the same kind of conduct; whether the errors involve counsel acting in the same role; whether the errors involve the same skill of counsel; and whether the errors are in the same phase of the trial.  Here, for example, the four subtopics that I have used to identify Johnson's mitigation phase "claims" actually constitute four separate, multifaceted claims of ineffective assistance of counsel in the mitigation phase, not a single claim of ineffective assistance of counsel in the mitigation phase or various "areas" of error all related to a single claim of ineffective assistance of

---

[32]I suggest, however, that, for the same reasons that the court in *Middleton* characterized *Williams* and *Wiggins* as each "involv[ing] only a *single claim* of ineffective assistance of counsel—namely, trial counsel's failure to investigate and present mitigating evidence during the trial's penalty phase," *id.* at 851 (emphasis in the original), the court in *Middleton* could also have characterized at least the two allegations of counsel's failure to investigate and present evidence during the mitigation phase in the case before it as a single, multifaceted claim, even if it could have properly characterized the third mitigation phase allegation, concerning failure to object to the prosecution's improper mitigation phase closing argument, and the merits phase error, concerning failure to present expert testimony of a mental disease or defect, as separate claims.

counsel in the trial. In other words, my subtopical headings are more than just "groupings" of allegations for analysis, they are separate claims.

### 3. *Cumulative effect of other errors*

Johnson contends that, not only should I consider a claim of cumulative error of counsel, I should consider the cumulative prejudice arising from all of the errors alleged in her Second Amended § 2255 Motion in assessing whether she was denied her right to a fair trial under the Fifth, Sixth, and Eighth Amendments. It is interesting to note that the Eighth Circuit Court of Appeals has not consistently rejected consideration of the cumulative effect of other errors as the basis for *habeas* relief.

First, I must acknowledge that the Eighth Circuit Court of Appeals has supposedly categorically foreclosed consideration of the cumulative effect of violations of a petitioner's constitutional rights as the basis for *habeas* relief. *See, e.g., Cole v. Roper*, 623 F.3d 1183, 1187, 1196 (8th Cir. 2010) (stating, in a state prisoner's *habeas* action, "In Cole's final claim, he alleges that his constitutional rights were violated by the cumulative effect of the errors asserted in his petition [consisting of (1) a *Batson* claim regarding black veniremember Vernard Chambers, who was struck by the prosecution (Claim 4); (2) claims for ineffective assistance of counsel based on counsel's failure to investigate Cole's social and medical history, specifically on the days leading up to the crime (Claims 10 and 11); (3) a claim for ineffective assistance of counsel based upon counsel's failure to present evidence during the mitigation phase about Cole's exemplary prison conduct while awaiting trial (Claim 12); (4) due process claims based upon Cole's allegedly visible leg restraint during the guilt and mitigation phase trials (Claims 7 and 16); and (5) claims for prosecutorial misconduct during closing arguments in both the guilt and mitigation phases (Claims 2 and 13)]. Our precedent forecloses this argument, *Hall v. Luebbers*, 296 F.3d 685, 692-93 (8th Cir. 2002), as Cole concedes."); *Harris v. Bowersox*, 184 F.3d 744, 755

(8th Cir. 1999) (stating, in a state prisoner's *habeas* action, "To the extent Harris's arguments invite us to assess the cumulative effects of any perceived evidentiary errors (see Appellant's Br. at 11), we decline the invitation. We have held that each due process claim must stand or fall individually. *See Griffin v. Delo*, 33 F.3d 895, 905 (8th Cir. 1994), *cert. denied*, 514 U.S. 1119, 115 S. Ct. 1981, 131 L. Ed. 2d 869 (1995); *Byrd v. Armontrout*, 880 F.2d 1, 11 (8th Cir. 1989), *cert. denied*, 494 U.S. 1019, 110 S. Ct. 1326, 108 L. Ed. 2d 501 (1990). *But see Hobbs v. Lockhart*, 791 F.2d 125, 128 (8th Cir. 1986) (addressing and then rejecting a section 2254 petitioner's argument that the cumulative effect of admitting other crimes evidence tainted the fundamental fairness of the entire trial)."); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (stating, in a state prisoner's *habeas* action, "Henderson's final contention is that all of his other allegations of error [involving a due process claim of improperly admitted evidence, ineffective assistance of counsel, and violation of the Constitution by admitting the petitioner's police statement into evidence] combine to constitute cumulative error warranting section 2254 relief. As Henderson himself acknowledges, 'cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own.' *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990). The district court correctly withheld habeas relief on this issue."); *McDonald v. Bowersox*, 101 F.3d 588, 598 & n.8 (8th Cir. 1996) (stating, in a state prisoner's *habeas* action, "McDonald also argues that he should be granted the writ because of the cumulative effect of this misconduct [by the trial judge, consisting of (1) warning a witness not to breach his duty of confidentiality; (2) leaving the bench to investigate a courtroom disturbance; (3) asking defense counsel not to place an exhibit so as to obstruct the defendant's view of the witnesses; (4) introducing the victim's relatives to the jury; (5) allowing the testimony of the victim's widow; (6) allowing the victim's widow to display grief in front of the jury; and (7) allowing certain questions

about prior consistent statements of McDonald's girlfriend]. However, we may not grant a writ of habeas corpus based on a claim of cumulative effect. *Byrd v. Armontrout*, 880 F.2d 1, 11 (8th Cir. 1989), *cert. denied*, 494 U.S. 1019, 110 S. Ct. 1326, 108 L. Ed. 2d 501 (1990) ('Because each claim of constitutional deprivation must stand on its own, we reject this [cumulative effect] claim as well.' (internal citations and quotations omitted))."); *see also Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief.").

Notwithstanding such supposedly categorical foreclosure, the Eighth Circuit Court of Appeals has expressly *required* consideration of the cumulative effect of prosecutorial misconduct in *habeas* actions. *See, e.g., Graves v. Ault*, 614 F.3d 501, 507-08 (8th Cir. 2010) (stating, in state prisoner's *habeas* action, "We have looked to three factors to determine whether prosecutorial misconduct deprived the defendant of a fair trial. *United States v. Beeks*, 224 F.3d 741, 745 (8th Cir. 2000). 'First, *we consider the cumulative effect of the misconduct*. Second, we examine the strength of the properly admitted evidence of the defendant's guilt. Last, we review the curative actions taken by the district court.' *Id.*" (emphasis added)); *Louisell v. Director of Iowa Dep't of Corrections*, 178 F.3d 1019, 1024 (8th Cir. 1999) (stating, in a state prisoner's *habeas* action, "Finally, Louisell contends that the prosecuting attorney deliberately pursued information previously suppressed by the trial court during the examination of several witnesses. Trial errors warrant habeas relief when the prosecutor's actions are improper and have 'prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.' *United States v. Thomas*, 93 F.3d 479, 487 (8th Cir. 1996). 'In evaluating whether a trial error resulted in prejudice to the defendant, *we consider the cumulative effect of such*

*misconduct*, the strength of the properly admitted evidence of the defendant's guilt, and the curative actions taken by the [trial] court.' *Id.*" (emphasis added)).

The Eighth Circuit Court of Appeals has also recognized that, when a *habeas* petitioner presents a claim of actual innocence based on newly discovered evidence, the court must consider the cumulative effect of the new evidence:

> A petitioner's showing of innocence is not insufficient just because the trial record may contain sufficient evidence to support the jury verdict. [*Schlup v. Delo*, 513 U.S. 298,] 330–32, 115 S. Ct. [851,] 869 [(1995)]. *When determining the impact of evidence unavailable at trial, a court must make its final decision based on the likely cumulative effect of the new evidence had it been presented at trial. Battle [v. Delo]*, 64 F.3d [347,] 353 n. 11 [(8th Cir. 1995)] (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). The court is called upon to consider all the evidence, including any new evidence, and make a probabilistic determination of what a reasonable, properly instructed juror would do. *Schlup*, at 328–30, 115 S. Ct. at 868. The appropriate inquiry is whether it is more likely than not that in light of the new evidence no reasonable juror, "conscientiously following the judge's instruction requiring proof beyond a reasonable doubt, would vote to convict." *Id.* at 331, 115 S. Ct. at 869.

*Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997) (emphasis added). Johnson does not make a claim of actual innocence based on newly discovered evidence, however.

In light of these Eighth Circuit precedents, a district court entertaining a § 2255 motion has little choice but to reject cumulative error review except where expressly permitted by the Eighth Circuit Court of Appeals.

166

#### 4.     *Cumulative error and unfairness of the trial*

Johnson's last arguments for cumulative error review are, first, that *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993), requires cumulative error review of all trial errors, so that Eighth Circuit law cannot be construed to the contrary.  She also argues that cumulative error analysis is required, because the fundamental question is whether the petitioner received a fundamentally unfair trial.  She argues that there should not be any difference between direct appeal and *habeas* proceedings in the way the court determines whether the trial was fundamentally unfair.  I will consider these arguments in turn.

As to *Brecht*, Johnson argues that that decision teaches that collateral relief is proper if the proven constitutional errors in a case had a "'substantial and injurious effect or influence in determining the jury's verdict,'" Petitioner's Brief On Cumulative Error In The Eighth Circuit (Civ. docket no. 345) at 24 (quoting *Brecht*, 507 U.S. 623), and, more specifically still, that the Court was "'not foreclos[ing] the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not "substantially influence" the jury's verdict.'"  *Id.* at 13 (quoting *Brecht*, 507 U.S. at 638 n.9).  Like the other Supreme Court cases on which Johnson relies, *Brecht* does not expressly discuss "cumulative error" or the "cumulative effect" of errors.  I also find that Johnson reads *Brecht* too broadly.

In *Brecht*, only a single error was at issue, a "*Doyle* error" that the prosecution made references to the defendant's post-*Miranda* silence in violation of the defendant's due process rights.  *See Brecht*, 507 U.S. at 622-23 (citing *Doyle v. Ohio*, 426 U.S. 610 (1976)).  More specifically, the Court determined that the appropriate harmless-error standard for *habeas* relief for a "*Doyle* error" is "whether the *Doyle* error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* at 623 (quoting

167

*Kotteakos v. United States*, 328 U.S. 750, 776 (1946), thus rejecting the "harmless beyond a reasonable doubt" standard in *Chapman v. California*, 386 U.S. 18, 24 (1967)).

In *Brecht*, the Court explained the difference between "trial errors" and "structural errors," as follows:

> [W]e think *Doyle* error fits squarely into the category of constitutional violations which we have characterized as "'trial error.'" *See Arizona v. Fulminante*, 499 U.S. 279, 307, 111 S. Ct. 1246, 1263, 113 L. Ed. 2d 302 (1991). Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Id.*, at 307-308, 111 S. Ct., at 1264. At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.*, at 309, 111 S. Ct., at 1265. The existence of such defects—deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process. *See id.*, at 309-310, 111 S. Ct., at 1265.

*Brecht*, 507 U.S. at 629-30 (footnote omitted). The Court noted, "Since our landmark decision in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), we have applied the harmless-beyond-a-reasonable-doubt standard in reviewing claims of constitutional error of the trial type." *Id.* The Court rejected application of that harmless-error standard, however, replacing it with the *Kotteakos* standard, which "requires reversal only if it 'had substantial and injurious effect or influence in determining the jury verdict.'" *Brecht*, 507 U.S. at 631 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Court reasoned that the *Kotteakos* standard was supported by the following: the federal harmless-error statute, 28 U.S.C. § 2111; the reservation of *habeas* relief as

an "extraordinary" remedy; the distinction between direct and collateral review; and the interest in finality of convictions. *Id.* at 632-37.

The Court also observed,

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. *Cf. Greer v. Miller*, 483 U.S. 756, 769, 107 S. Ct. 3102, 3110, 97 L. Ed. 2d 618 (1987) (STEVENS, J., concurring in judgment). We, of course, are not presented with such a situation here.

*Brecht*, 507 U.S. at 638 n.9. It is this language on which Johnson hangs her argument that *Brecht* permits cumulative error review of errors other than ineffective assistance of counsel.

I find that *Brecht* cannot be read to require cumulative error review of *all* errors in the case. First, it addressed only errors of the "trial type," that is, errors that occur during the presentation of the case to the jury. *See id.* at 629-30. Second, it did not suggest cumulative review of *all* errors of the "trial type." Rather, to the extent that *Brecht* authorizes cumulative consideration of a pattern of errors, it is a pattern of *prosecutorial misconduct*, of which *Doyle* error is just one kind. *See id.* at 638 n.9. As explained in the preceding subsection, the Eighth Circuit Court of Appeals also requires consideration of the cumulative effect of instances of prosecutorial misconduct. *See, e.g., Graves*, 614 F.3d at 507-08. Thus, Eighth Circuit law is not inconsistent with *Brecht*, and neither *Brecht* nor Eighth Circuit law requires cumulative review of *all* errors.

Johnson also contends that, in *United States v. Hardy*, 224 F.3d 752, 757 (8th Cir. 2000), the court recognized that, on direct appeal, a court may reverse where the case as

a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal. She contends that the Eighth Circuit Court of Appeals purports to reject that standard on *habeas* review, even though nothing justifies such different treatment between direct review and *habeas* review. She also points out that the inquiry in *Strickland* is designed to determine the ultimate fairness of the proceedings in light of counsel's errors, which is like the standard for direct appeals. Johnson is correct that, in *United States v. Hardy*, 224 F.3d 752 (8th Cir. 2000), a decision on direct appeal, the Eighth Circuit Court of Appeals observed,

> Where a defendant asserts that the cumulative effect of certain alleged errors has rendered his trial unfair and violated his constitutional rights, "we may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United States v. Riddle*, 193 F.3d 995, 998 (8th Cir. 1999).

*Hardy*, 224 F.3d at 257. This language does stand in stark contrast to the rejection of cumulative error review in *habeas* cases in the Eighth Circuit. Nevertheless, as the Supreme Court recognized in *Brecht*, there are reasons why the standards for relief on direct appeal may be different from those for *habeas* relief. *See Brecht*, 507 U.S. at 633 ("The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence."). Johnson contends that the primary reasons for the distinction advanced in *Brecht* were federalism and comity between state criminal proceedings and federal *habeas* proceedings, which have no applicability to a § 2255 motion by a *federal* prisoner. However, the Court in *Brecht* also recognized that, whether the criminal proceedings are state or federal, "[d]irect review is the principle avenue for challenging

a conviction," federal *habeas* review "is secondary and limited," the *habeas* remedy is "extraordinary," and the same interest in "finality" of a criminal conviction that has survived direct review applies, whether the conviction is in state or federal court. *Id.* at 633-35.

Thus, even if there are differences between the standards applied to the same error on direct review and collateral review, those differences do not necessarily justify across-the-board consideration of the cumulative effect of all errors in the trial for purposes of *habeas* review.

### 5.      *The appropriate aggregations of alleged errors*

I observed, above, on page 162, that several factors demonstrated sufficient "relatedness" of allegations of error to demonstrate that they properly constituted a single, albeit multifaceted claim of ineffective assistance of counsel.  Those factors included the phase of the trial in which the errors occurred; whether the errors are relevant to the same issue; whether the errors involve the same kind of conduct; whether the errors involve counsel acting in the same role; whether the errors involve the same skill of counsel; and whether the errors are in the same phase of the trial.  I believe that the same factors are relevant to distinguish distinct claims for § 2255 relief more generally.  For that reason, I reorganized Johnson's various allegations into the following phases:  Pretrial phase, jury selection, merits phase, mitigation phase, and post-trial and appeal.[33]  Similarly, I believe that claims involving different actors (counsel, the trial judge, the prosecutor, or a juror or jurors, for example) are also distinct from each other.

---

[33] Again, it appears to me that even Johnson's "cumulative error" claims do not encompass her general Eighth Amendment attacks on her death sentence, her Claims Eight through Eleven in her Second Amended § 2255 Motion.  Those claims do not rely on errors in the proceedings leading to her conviction and sentence.

Application of these factors leads me to the conclusion that the following are separate claims, sometimes consisting of multiple facets:[34]

- In the pretrial phase, the following are *separate* claims, even though all are ineffective assistance of counsel claims, because they involve distinct issues:

  - Claim **1**

  - Claim 2

  - Claim 3

- In the jury selection phase, the following are *separate* claims, because they involve distinct issues or a different actor:

  - Claim 4 (ineffective assistance of counsel)

  - Claim 5 (misconduct by Juror No. 55)

  - Claim 6 (ineffective assistance of counsel)

  - Claim 7 (ineffective assistance of counsel)

- In the merits phase, the following are *separate* claims:

  - A multifaceted claim of ineffective assistance of counsel in relation to Johnson's demeanor and competence, comprising Claims **8** and 9

  - Claim 10, a stand-alone constitutional "demeanor and competence" claim that Johnson was tried while incompetent

  - A multifaceted claim of ineffective assistance of counsel in the investigation and presentation of Johnson's defense on the merits, comprising Claims *11, 12, 13, 14*, 15, and *16*

- In the mitigation phase, the following are *separate* claims:

---

[34]Again, claim numbers in **bold** were briefed, and claim numbers in *italics* will not be considered on the merits, because they do not "relate back."

- A multifaceted claim of ineffective assistance of counsel in the confrontation of aggravating evidence, comprising Claims **18, 19, 20, 21, 22, *23, 24,*** and ***25***

- A multifaceted claim of prosecutorial misconduct, comprising Claims **26, 27,** and **28**, where the Eighth Circuit Court of Appeals directs that allegations of prosecutorial misconduct should be considered for their cumulative effect

- A multifaceted claim of ineffective assistance of counsel in the mitigation evidence that was presented, comprising Claims **29, 30, 31, 32,** and ***33***

- A multifaceted claim of ineffective assistance of counsel in failing to prepare additional mitigation, comprising Claims **34, 35, *36*, 37, 38, *39*, *40*, 41, *42, 43*,** and 44

- Claim 45, involving ineffective assistance of counsel in failing to object to the mitigation phase determination and evident juror confusion

- Claim *64*, the "weighing instruction" claim, involving application of an improper burden of proof for the weighing of aggravating and mitigating factors

- In the post-trial and appeal phase, the following are *separate* claims:

  - A multifaceted claim of ineffective assistance of trial counsel in post-trial motions, comprising Claims 47 and 48

  - A multifaceted claim of ineffective assistance of appellate counsel, comprising Claims 49, 50, *51*, and 52

- The following are separate Eighth Amendment claims, involving different issues:
  - Claim 54
  - Claim 55
  - Claim **56**
  - Claim 60
  - Claim 63
  - A multifaceted claim of violation of *Baze v. Rees*, 553 U.S. 35 (2008), comprising Claims 57, 58, 59, 61, and 62

I find that "cumulative error" claims, Claims 17, 46, and 53, are barred by Eighth Circuit precedent. Therefore, they are not included in the chart that follows.

The conceptualization of Johnson's claims is perhaps also usefully presented in the following chart, which also adds a brief summary of each allegation of error:

**JOHNSON'S SEPARATE CLAIMS**

| Phase | Claims | Type | Facet(s) (Court Claim Number(s)) |
|-------|--------|------|----------------------------------|
| *Pretrial* | ☐ | IAC | **1. Failure to resolve for less than death** |
| | ☐ | IAC | 2. Failure to preclude timely death notice |
| | ☐ | IAC | 3. Failure to make meritorious arguments |
| *Jury Selection* | ☐ | IAC | 4. Ineffective *voir dire* of Juror No. 55 |
| | ☐ | Juror Misconduct | 5. Misconduct by Juror No. 55 |
| | ☐ | IAC | 6. Ineffective *voir dire* regarding views on Pentecostal religion and women |
| | ☐ | IAC | 7. Failure (a) to reurge a change of venue and (b) to object to allocation of peremptory challenges |

175

**JOHNSON'S SEPARATE CLAIMS**

| Phase | Claims | Type | Facet(s) (Court Claim Number(s)) |
|---|---|---|---|

**Merits Phase**

| | | IAC | Failure to address demeanor and competence<br>**8. Failure to address medication and its effects on (a) demeanor and (b) ability to assist in her defense**<br>9. Failure to seek a competency hearing |
|---|---|---|---|
| | | 5th, 6th, 8th Amendments | 10. Trial while incompetent |
| | | IAC | Investigation and presentation of a merits defense<br>*11. Regarding Robert McNeese*<br>*12. Regarding Christie Gaubatz*<br>*13. Regarding Wendy Jensen*<br>*14. Regarding Terry DeGeus's involvement in the killings*<br>15. Regarding other evidence (forensic expert, Proscovec, gun shop owner, after-acquired evidence, alibi)<br>*16. Regarding "mere presence" defense* |

176

## JOHNSON'S SEPARATE CLAIMS

| Phase | Claims | Type | Facet(s) (Court Claim Number(s)) |
|-------|--------|------|----------------------------------|
| Mitigation Phase | | IAC | Confrontation of aggravating evidence<br>**18. Regarding rebuttal of the prosecution's theory for DeGeus's murder with battered woman's syndrome evidence**<br>**19. Regarding rebuttal of the prosecution's argument that Johnson was "worse" than Honken**<br>**20. Regarding rebuttal of the prosecution's argument that Johnson was "worse" than Honken with admissions in the Honken trial**<br>**21. Regarding Honken's plans to kill a prosecutor and membership in a white supremacist prison gang**<br>**22. Regarding other aggravating evidence**<br>***23. Regarding limitations on future dangerousness evidence***<br>***24. Regarding Kathy Rick's triple hearsay***<br>***25. Regarding Kyla Davis's testimony*** |
| | | Prosecutorial misconduct | Prosecutorial misconduct<br>**26. Failure to correct false testimony**<br>**27. *Brady* violation regarding Honken's planned attacks and association with a prison gang**<br>**28. Presentation of inconsistent arguments in the two trials** |

| Phase | Claims | Type | Facet(s) (Court Claim Number(s)) |
|---|---|---|---|

IAC — Ineffective presentation of mitigation evidence used
**29. Regarding Holly Dirksen**
**30. Regarding Douglas Book**
**31. Regarding Susan Marsolek**
**32. Regarding psychiatric pharmocologist Evans**
*33. Regarding overly-complicated mitigating factors in the jury instructions*

IAC — Failure to prepare additional mitigation evidence
**34. Regarding mental state at the time of the offense**
**35. Regarding the timely hiring of Dr. Gelbort, instructions to him, not replacing him, failing to conduct other testing that he suggested, and failing to use his evidence through other experts**
*36. Regarding the 1996 diagnosis with depression and dependent personality features*
**37. Regarding expert and lay testimony of Honken's influence over Johnson**
**38. Regarding statements of Phyllis Proscovec for residual doubt**
*39. Regarding Honken's letters to impeach Steven Vest for residual doubt*
*40. Regarding Honken's lies to impeach Steven Vest for residual doubt*
**41. Regarding the offer to plead guilty**
*42. Regarding evidence of remorse through experts*
*43. Regarding evidence of the effect of Johnson's execution on her family members*
44. Regarding other evidence from lay witnesses

Mitigation Phase (Continued)

## JOHNSON'S SEPARATE CLAIMS

| Phase | Claims | Type | Facet(s) (Court Claim Number(s)) |
|---|---|---|---|
| Mitigation Phase (Continued Post-Trial) | | IAC | 45. Failure to object to the mitigation phase determination and evident juror confusion |
| | | Court's Error | *64. "Weighing instruction" claim concerning failure to require weighing of aggravating and mitigating factors beyond a reasonable doubt* |
| | | IAC | Ineffective assistance in post-trial motions<br>47. Failure to make meritorious arguments<br>48. Failure to raise Juror No. 55's dishonesty |
| Appeal | | IAC | Ineffective assistance of appellate counsel<br>49. Failure to raise all of Juror No. 55's misconduct<br>50. Failure to litigate the prosecution's inconsistent theories in the two trials<br>*51. Failure to raise the skewing effect of multiplicitous counts*<br>52. Failure to raise meritorious arguments |
| Execution | | 8th Amendment | 54. Requirement of a heightened standard of proof to impose the death penalty |
| | | 8th Amendment | 55. Execution while suffering from a severe mental illness |

**JOHNSON'S SEPARATE CLAIMS**

| Phase | Claims | Type | Facet(s) (Court Claim Number(s)) |
|---|---|---|---|
| Execution (Continued) | | 8th Amendment | **56. The Bureau of Prisons' method of execution violates the 8th Amendment, the APA, and the Controlled Substances Act** |
| | | 8th Amendment | *Baze* claims<br>57. Executioner incompetence<br>58. Drug administration deficiencies<br>59. Lack of safeguards<br>61. Discovery is required to determine if the BOP's protocol is constitutional under *Baze*<br>62. *Baze* does not impact the APA and Controlled Substances Act claims |
| | | 8th Amendment | 60. Readily available alternatives would reduce the risk of maladministration and inhumane execution |
| | | 8th Amendment | 63. The death penalty violates the 8th Amendment |

At long last, I turn next to the merits of the claims that I have concluded can be considered on the merits. Where claims have not been briefed on the merits in Johnson's Post-Hearing Brief (Civ. docket no. 349) (*i.e.*, those claims appearing in plain text) I will base my understanding of her arguments on her Second Amended § 2255 Motion (docket no. 263). Similarly, the respondent's responses to such claims are drawn from its Amended Resistance To Plaintiff's Corrected, Amended Motion Under 28 U.S.C. § 2255

(docket no. 27), instead from the respondent's response to Johnson's Second Amended § 2255 Motion, which focused on what claims or allegations were time-barred rather than the merits of all of the claims asserted.

## IV.  ERRORS IN THE PRETRIAL PHASE

I concluded, above, that Claims **1**, 2, and 3 from the pretrial phase are *separate* ineffective assistance of counsel claims, in light of the distinct issues involved in each claim.  Therefore, I will consider them separately.

### A.  Claim 1:  Failure To Pursue A Disposition
### For A Sentence Less Than Death

The "ineffective assistance" claim to which Johnson has devoted the most energy and attention is Claim 1 (Johnson's Claim One, § A), a claim that trial counsel was ineffective in failing to negotiate a resolution to her case for something less than death. In a pair of cases handed down just yesterday, the Supreme Court reiterated the importance of effective assistance of counsel in plea negotiations.  In *Lafler v. Cooper*, the Supreme Court stated,

> Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process. *[Missouri v.] Frye, ante*, at 8 [2012 WL 932020 (March 21, 2012)]; see also *Padilla v. Kentucky*, 559 U. S. ___, ___ (2010) (slip op., at 16); *Hill [v. Lockhart]*, 474, U.S. 52,] 57 [(1985)].  During plea negotiations defendants are "entitled to the effective assistance of competent counsel." *McMann v. Richardson*, 397 U. S. 759, 771 (1970).

566 U.S. ___, ___, 2012 WL 932019 (March 21, 2012).  In *Missouri v. Frye*, 566 U.S. ___, 2012 WL 932020 (March 21, 2012), the Supreme Court plainly recognized that plea

negotiations are a "critical point" in the course of a criminal proceeding in which effective assistance of counsel is required:

> Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas. See Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics Online, Table 5.22.2009, http:// www.albany.edu/sourcebook/pdf/t5222009.pdf (all Internet materials as visited Mar. 1, 2012, and available in Clerk of Court's case file); Dept. of Justice, Bureau of Justice Statistics, S. Rosenmerkel, M. Durose, & D. Farole, Felony Sentences in State Courts, 2006–Statistical Tables, p. 1 (NCJ226846, rev.Nov.2010), http://bjs.ojp.usdoj.gov/content/ pub/pdf/ fssc06st.pdf; *Padilla [v. Kentucky*, 559 U.S. ___], *supra*, at ---- (slip op., at 15) (recognizing pleas account for nearly 95% of all criminal convictions). The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages. Because ours "is for the most part a system of pleas, not a system of trials," *Lafler*, post, at 11, it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process. "To a large extent . . . horse trading [between prosecutor and defense counsel] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it is the criminal justice system." Scott & Stuntz, Plea Bargaining as Contract, 101 Yale L. J.1909, 1912 (1992). See also Barkow, Separation of Powers and the Criminal Law, 58 Stan. L.Rev. 989, 1034 (2006) ("[Defendants] who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes. This often results in individuals who accept a plea bargain receiving shorter

sentences than other individuals who are less morally culpable but take a chance and go to trial" (footnote omitted)). In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.

To note the prevalence of plea bargaining is not to criticize it. The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties. In order that these benefits can be realized, however, criminal defendants require effective counsel during plea negotiations. "Anything less . . . might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'" *Massiah [v. United States]*, 377 U.S. [201,] 204 [(1964)] (quoting *Spano v. New York*, 360 U.S. 315, 326, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (Douglas, J., concurring)).

566 U.S. at ___, 2012 WL 932020, at *6-*7.[35]

---

[35]The circumstances in *Frye* and *Lafler* are factually distinguishable from the circumstances presented here, however. As the Court explained in *Lafler*,

> In *Frye*, defense counsel did not inform the defendant of the plea offer; and after the offer lapsed the defendant still pleaded guilty, but on more severe terms. Here, the favorable plea offer was reported to the client but, on advice of counsel, was rejected. In *Frye* there was a later guilty plea. Here, after the plea offer had been rejected, there was a full and fair trial before a jury. After a guilty verdict, the defendant received a sentence harsher than that offered in the rejected plea bargain.

*Lafler*, 566 U.S. at ___, 2012 WL 932019 (March 21, 2012); *see also Frye*, 566 U.S. at ___, 2012 WL 932020 at *8 ("Here the question is whether defense counsel has the duty to communicate the terms of a formal offer to accept a plea on terms and conditions that may result in a lesser sentence, a conviction on lesser charges, or both."). As explained, below, in Johnson's case, there was no plea offer from the prosecution.

Like other claims of ineffective assistance of counsel, "[c]laims of ineffective assistance of counsel arising from plea negotiations are reviewed under the two-part test laid out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *United States v. Regenos*, 405 F.3d 691, 693 (8th Cir. 2005) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)); *Wanatee v. Ault*, 259 F.3d 700, 703 (8th Cir. 2001). Therefore, I will consider whether Johnson's trial counsel performed deficiently in their attempts to negotiate a plea agreement and whether Johnson was prejudiced by any such deficiencies.

### 1.     *Deficient performance*

Johnson makes several complaints about the performance of her trial counsel in plea negotiations, including the following:

- Missing "golden opportunities" to plead the case, such as before the bodies were discovered, before the death penalty was authorized, while the admissibility of McNeese's evidence was being litigated and appealed, when Honken's team was seeking a joint resolution, and when she could still cooperate against Honken at Honken's trial;

- Continuing to pursue a plea agreement for a term of years, specifically 20 years or less, after the lead prosecutor at the time described a 20-year sentence as "unconscionable";

- Insisting upon a plea agreement before she would proffer;

- Failing to spend sufficient time with her to establish the rapport necessary to facilitate discussion of plea options;

- Failing to present her with a unified message that her only realistic course was to accept a plea agreement to life imprisonment;

- Failing to marshal and confront her with evidence suggesting that a plea to a life sentence was the only realistic option; and

- Failing to enlist the aid of family members and others to convince her to plead guilty to the charges and escape the death penalty.

Although I find trial counsel's conduct disappointing in nearly all of these respects, only a few raise an arguable question of constitutionally deficient performance.

While hindsight shows that there were "golden opportunities" to plead Johnson's case to something less than death, hindsight is not the proper perspective; the court "'must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."'" *King*, 595 F.3d at 852-53 (quoting *Ruff*, 77 F.3d at 268, in turn quoting *Strickland*, 466 U.S. at 690). Moreover, the Supreme Court has urged caution in reviewing the performance of counsel at the pretrial stage of the proceedings, when neither the prosecution nor the defense may know with much certainty what course the case may take. *See Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 742 (2011). Similarly, as the Supreme Court subsequently cautioned,

> The inquiry then becomes how to define the duty and responsibilities of defense counsel in the plea bargain process. This is a difficult question. "The art of negotiation is at least as nuanced as the art of trial advocacy and it presents questions farther removed from immediate judicial supervision." *Premo v. Moore*, 562 U.S. ----, ---- (2011) (slip op., at 8–9). Bargaining is, by its nature, defined to a substantial degree by personal style. The alternative courses and tactics in negotiation are so individual that it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process. *Cf. ibid.*

*Frye*, 566 U.S. at ___, 2012 WL 932020 at *8 (declining to define the duties of defense counsel in those respects in light of the circumstances of the case before the Court).

Such caution is particularly appropriate here as to the period before the bodies were discovered. During that period, it was not clear that the bodies ever would be found, nor was it certain, or even likely, that the death penalty would be sought. Also, prior to recovery of the bodies, the charges pending against Johnson were not even potentially capital offenses. Just as importantly, trial counsel could not reasonably have evaluated the mountain of evidence already in the discovery file, let alone have conducted any adequate independent investigation—or even, as in this case, a woefully inadequate investigation—during what turned out to be a very few short months between Johnson's arrest and the recovery of the bodies. Thus, before the bodies were found, counsel could not reasonably have been in a position to plead a defendant to charges of involvement in the murders of five people seven years earlier. Moreover, the record shows that post-authorization plea agreements had been made in other capital cases by both Attorney General Ashcroft and Attorney General Gonzalez, so that the door to a resolution of the case by a plea agreement did not necessarily close even after the bodies were found and the death penalty was authorized on new capital charges.

I also find some of Johnson's trial counsel's other choices in plea negotiations to be reasonable strategies that I decline to second guess, even if I do not now find them to be wise. *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (the potential for second-guessing trial counsel's decisions requires a presumption of reasonable conduct); *Rice*, 449 F.3d at 897 ("'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)). Choices that fall into this category are Johnson's trial attorneys' decisions to wait and see, rather than to push for a plea agreement, at various times in the course of the development

of Johnson's capital case, and their position with regard to when Johnson would make a proffer.

Somewhat more specifically, Learned Counsel plainly recognized that the period while the *Massiah* issues concerning the admissibility of McNeese's evidence were still being litigated and the period before Honken's trial were times during which both Johnson and the prosecution had incentives to reach a plea agreement in her case. Even so, Johnson's trial counsel chose to wait and see what would happen with the *Massiah* litigation and to wait and see what the result would be in Honken's case. Those are choices that, in hindsight, both Learned Counsel and I believe were mistakes. *See, e.g.,* Hearing Transcript, Vol. 11, 11:1-25 (acknowledgment by Learned Counsel that the time before Honken went to trial was a "critical juncture" for a plea agreement, because after that, the government's incentive would be gone); *id.* at 58:12-59:3 (Learned Counsel's discussion of the time before Honken went to trial as "the most optimal time" to attempt to resolve the case by plea, but trial counsel instead "waited to see what happened in Honken, and that turned out to be a disastrous mistake"); *id.* at 220:5-21 (Learned Counsel's discussion of a letter to the prosecution, Exhibit W, indicating that no plea agreement would be undertaken while Johnson was waiting for the outcome of the *Massiah* hearing).

Although I now question those decisions, caution is appropriate in reviewing the conduct of trial counsel at these times in light of uncertainties about the outcomes that they presented. *See Premo*, ___ U.S. at ___, 131 S. Ct. at 742. For example, Johnson's trial counsel not unreasonably (although clearly overly optimistically) believed that, if my ruling excluding McNeese's evidence was affirmed, then the prosecution's case would be sufficiently hampered that the prosecution would be more open to a favorable plea agreement. Similarly, Johnson's trial counsel not unreasonably (although, again, clearly

overly optimistically) believed that Honken's trial could end with verdicts for life imprisonment, and that, if it did, then the prosecution might withdraw, or the court might quash, the death notice on Johnson's motion. While I agree that, in hindsight, failure to press for a plea agreement at these times was a serious mistake, those mistakes do not necessarily demonstrate either deficient performance or prejudice. The fact that other, better strategies were reasonable is not the test of whether Johnson's trial counsel acted unreasonably. *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 ("The Court acknowledged [in *Strickland*] that '[t]here are countless ways to provide effective assistance in any given case,' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" (quoting *Strickland*, 466 U.S. at 689)).

As to another of Johnson's allegations of deficient performance in plea negotiations, I find that Johnson's trial counsel did, in fact, expressly reject the prosecution's "proffer first" position, that is, the prosecution's demands that she proffer before any plea agreement would be offered. *See* Hearing Transcript, Vol. 11, at 34:9-25 (Learned Counsel's description of what he understood the prosecution's "proffer first" position to be and his belief that such a position was "senseless"). However, I do not agree with Johnson's characterization of her trial counsel's position as a "plea agreement before proffer" position. Instead, based on testimony of Learned Counsel that I find credible, I find that trial counsel's position was a much more reasonable one: Johnson would not proffer without at least a commitment from the local United States Attorney's Office to recommend a plea agreement for a sentence less than death to the Department of Justice, if Johnson proffered truthfully and essentially as anticipated. *See, e.g.,* Hearing Transcript, Vol. 11, 38:9-39:13 (Learned Counsel's testimony expressing frustration that the prosecution could not commit to recommending a life sentence, if Johnson said the things expected from her in a proffer, and asserting that a plea could have been done if the

prosecution had made that commitment); *id.* at 51:16-52:8 (same). Trial counsel's position on this issue falls within the scope of the "nuanced" art of negotiation" that does not lend itself to "immediate judicial supervision." *Frye*, 566 U.S. at *8 (internal quotation marks and citations omitted).

Like Learned Counsel, I regret that Johnson's trial counsel did not consider further alternatives, such as proffering to a taint team with an agreement that limited the use that could be made of the proffer, much like the limited use agreement that Honken had obtained. *See id.* at 52:13-53:9. Nevertheless, I do not believe that it was unreasonable for Johnson's trial counsel to fail to think of those alternatives. For instance, I note that, although the prosecution had agreed to let Honken proffer to a taint team with generous limits on the use that could be made of the proffer, if a plea agreement was not forthcoming, the prosecution did not suggest such a course in Johnson's case, despite the prosecution's own incentives to obtain Johnson's cooperation against Honken.

I find it very troubling that trial counsel were unable to present Johnson with a unified message that her only realistic course was to accept a plea agreement to life imprisonment; that they did not spend more time with Johnson, and sooner, discussing plea options; that they did not do more, and sooner, to marshal and confront Johnson with evidence suggesting that a plea to a life sentence was the only realistic option; and that they did not do more, and sooner, to enlist the aid of family members and others to convince her to plead guilty to the charges in order to escape the death penalty. As a specific example, Johnson's trial counsel actually delegated the vast majority of the client contact not to an attorney on the team, or even to the mitigation specialist, but to a paralegal, Nancy Lanoue. Worse still, Lanoue commiserated with Johnson, believed in her innocence, and reinforced rather than dampened Johnson's belief that she could be acquitted, a position very much at odds with that of Learned Counsel and the mitigation

specialist. Thus, delegation of client contact to a paralegal undermined the capacity of trial counsel and other members of the defense team to present a unified message to Johnson that her best and only realistic hope was to plead guilty in exchange for a sentence to life imprisonment without parole. Being very troubled with these circumstances, however, is short of finding that her trial counsel's performance in these respects was professionally incompetent. *Richter*, ___ U.S. at ___, 131 S. Ct. at 791 ("*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" (quoting *Strickland*, 466 U.S. at 687 (internal quotation marks omitted)).

The performance of trial counsel in plea negotiations that I *do* find was deficient was their continued push for an agreement to a sentence for a term of years, once a plea to a term of years became both wholly unrealistic and wholly unreasonable as a bargaining position. The initial demand for an agreement to a term of years was not unreasonable, when Johnson appeared to be reluctant to agree to, or was inconsistent about agreeing to, any sentence for more than 20 years, *see, e.g.,* Hearing Transcript, Vol. 11, at 10:10-25 (Learned Counsel's explanation of a discussion of a 20 year sentence for Johnson with one of Honken's attorneys, noting that 20 years was his number, but "we were having a hard time [with Johnson] with 20 at that point, so I thought 30 was out of the question"); *id.* at 133:8-134:1 (Learned Counsel's explanation that, if Johnson offered a 20 year sentence, "my expectation was maybe the government will come back with 30 or we'll enter into some negotiation," but "[t]hat wasn't what happened"). Such a demand became wholly unreasonable, however, not later than the point at which Honken received death sentences. It appears that Learned Counsel recognized that fact, but Johnson's trial counsel never changed course. *See id.* at 56:15-57:1 (Learned Counsel's testimony that, to the extent they had been talking about 20 years for Johnson, the death verdict for Honken was "an eye opener" for Johnson and her attorneys, because "the prospect of a death sentence

became that much more real"); *and compare* Hearing Transcript, Vol. 6, 1764:20-1765:4 (testimony of Russell Stetler, Federal Death Penalty Projects national mitigation coordinator, opining that, once the prosecutor had described a 20-year sentence as "unconscionable" in 2002, continued assertion of 20 years "was extremely unrealistic"). After Honken's death sentences, I do not believe that any reasonably competent attorney, faced with the facts of this case, could have considered a guilty plea to anything less than a life sentence to be reasonable or even possible. *King*, 595 F.3d at 852-53 (conduct must be judged at the time it occurred, not with hindsight). I find that reasonable attorneys would have then pursued a life sentence with all the diligence at their command. Johnson's trial counsel did not do so, instead clinging to their demand for a sentence to a term of years until the very eve of trial, when the prosecution no longer had any incentive at all to accept any plea agreement, even one for a life sentence.

Having found that Johnson's trial counsel performed deficiently in at least one respect in the course of plea negotiations, I must still consider whether or not Johnson can prove that the deficient performance of her trial counsel prejudiced her ability to obtain a plea agreement. *Gianakos*, 560 F.3d at 821 ("'Unless a defendant makes both showings [of deficient performance and prejudice], it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.'") (quoting *Strickland*, 466 U.S. at 687).[36] Therefore, I turn next to whether Johnson can show the

---

[36]Neither cumulative error review of an ineffective assistance of counsel claim nor what I have called aggregate consideration of a multifaceted claim permits determination of prejudice based on any allegations of error that ultimately are not found to be deficient performance. *See Middleton*, 455 F.3d at 851 ("We repeatedly have recognized 'a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test.'" (quoting *Hall,* 296 F.3d at 692); *Becker*, 578 F.3d at

(continued...)

necessary prejudice.

## 2.    *Prejudice*

In the context of a claim of ineffective assistance of counsel in plea negotiations, the prejudice prong requires the petitioner to "'prove that the result of the plea negotiations would have been different had her counsel performed adequately.'" *Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1105 (8th Cir. 2011) (quoting *Regenos*, 405 F.3d at 693); *Wanatee*, 259 F.3d at 703 ("The prejudice inquiry in such cases 'focuses on whether counsel's constitutionally ineffective performance affected the outcome of the *plea process*.'" (quoting *Hill*, 474 F.3d at 59, with emphasis added)).  For reasons explained more fully below, in this context, analysis of the prejudice prong involves several inquiries:  (1) whether the petitioner would have accepted a plea agreement; (2) whether the petitioner could have made a supporting proffer that the prosecution (or, here, the Attorney General) would have found acceptable; (3) whether or not the Attorney General would have accepted a guilty plea for a sentence less than death; and (4) whether the prosecution ever formally offered a plea agreement that the petitioner could have accepted.

---

[36](...continued)
914 n.5 ("Even if we were to deem some aspect of counsel's performance deficient under *Strickland*, any prejudice analysis would have to be limited to consideration only of the consequences of the constitutionally defective aspects of representation, not an accumulated prejudice based on asserted but unproven errors as urged by Becker."); *see also supra* at page 155 (holding that it is permissible to aggregate related facets of ineffective assistance of counsel as a single, multifaceted claim, but that, "[o]f course, only facets of the claim that are actually found to involve unreasonable, and therefore deficient, performance must be considered to determine whether the 'prejudice' prong of the ineffective assistance of counsel claim has been met").

### a.      *Whether the petitioner was willing to plead guilty*

As to the first inquiry, some federal courts have expressly posited, and the Eighth Circuit Court of Appeals has suggested, that proof of prejudice in plea negotiations requires proof that the petitioner would have accepted a plea agreement. *See Arnold v. Thaler*, 630 F.3d 367, 370-71 (5th Cir. 2011) ("To establish prejudice under *Hill*, a petitioner must show a reasonable probability that, absent counsel's ineffectiveness, he would have changed his plea."); *Jenkins v. Greene*, 630 F.3d 298, 309 (2d Cir. 2010) ("With respect to the second prong, 'a defendant's statements that he would have accepted a plea offer in combination with some objective evidence, such as a significant sentencing disparity, is sufficient to support a prejudice finding.'" (quoting *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010), with citation and quotation marks omitted)); *cf. United States v. Stevens*, 149 F.3d 747, 748 (8th Cir.) (rejecting a claim that trial counsel was ineffective for failing to advise the defendant of the advantages of pleading guilty for failure to show prejudice, where the defendant maintained his innocence at a post-trial motion hearing and, thus, failed to demonstrate a reasonable probability that he would have pleaded guilty if properly advised), *cert. denied*, 525 U.S. 1009 (1998); *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995) (rejecting a claim that trial counsel was ineffective for failing to advise the defendant of the advantages of accepting an offered plea agreement where the defendant, *inter alia*, maintained his innocence at trial and continued to assert his innocence after trial).

Here, the respondent argues that Johnson's willingness to accept a plea agreement is undermined by her continued protestations of innocence.  The respondent points to Johnson's denials to her trial counsel of her involvement in the killings. *See* Hearing Transcript, Vol. 11, 166:18-182:10 (Learned Counsel's testimony regarding Exhibits B through K, concerning notes of jail visits with and correspondence from Johnson,

indicating that Johnson told trial counsel or members of her defense team that she was innocent, that she was frustrated that trial counsel thought she was guilty, that she had not given a factual basis for a plea, and that she claimed her knowledge of the killings came from Honken); *id.* at 204:2-3 (Learned Counsel's testimony that Johnson "consistently denied to everybody, to them anyway [meaning her lawyers], I'm innocent, I didn't do this. That was her story."). The respondent also points to Johnson's continued claims of innocence in her allocution at her sentencing hearing. *See id.* at 216:20-22 (Learned Counsel's acknowledgment that Johnson "exculpat[ed] herself" in her allocution); *id.* at 217:10-218:1 (testimony from Learned Counsel concerning his notes of Johnson's allocution, Exhibit TT, noting that Johnson maintained her innocence).[37] Such reiterations of innocence do undermine Johnson's claim that she was willing to accept a plea agreement. *See Stevens*, 149 F.3d at 748 (finding evidence that the defendant maintained his innocence after conviction undermined the probability that he would have pleaded guilty); *Engelen*, 68 F.3d at 241 (finding evidence that the defendant maintained his innocence at trial and continued to assert his innocence after trial undermined the probability that he would have pleaded guilty).

Also, while I find that Learned Counsel genuinely believed that he had obtained Johnson's agreement to the facts stated in her "attorney proffer," Exhibit 53, RS 9-516—9-518, *see also* Exhibit 48 at PLSP 128-29, I cannot find that Johnson did agree to those facts. This is so, because Learned Counsel's notes, Exhibit M, of the meeting in which he discussed the proffer reflect only that Johnson had two relatively trivial disagreements with the statement of facts in Honken's proffer, which became the basis for Learned

---

[37]Learned Counsel's perception of Johnson's allocution as a continued protestation of innocence comports with my own. *See* Sentencing Transcript (Crim. docket no. 702), 19:25-23:13.

Counsel's proffer on Johnson's behalf, but nowhere record Johnson's express agreement to the truth or accuracy of the statement of facts in Honken's proffer. Based on Learned Counsel's copious and detailed notes on other matters, I cannot believe that he would not have recorded Johnson's express agreement to the proffer, had it occurred. Similarly, while I find credible Learned Counsel's testimony that he believed that obtaining a factual basis for any guilty plea by Johnson ultimately would not have been a problem, I have considerable doubt that he actually could have done so. This is so, because Johnson admitted, *in May of 2011, six years after her trial*, that she had lied to the respondent's mental health expert in a recent interview about being present at the scene of the murders. *See* Final Report of Dr. Woods, p. 49, Exhibit 107, p. WOD000146. Her continued refusal to admit her involvement honestly to the government, even years after her conviction and death sentences, demonstrates the difficulty she would have had providing a factual basis for a guilty plea. *See Stevens*, 149 F.3d at 748.

On the other hand, as Johnson now contends, at various times, she indicated a desire to plead guilty and even to cooperate against Dustin Honken. *See, e.g.,* Hearing Transcript, Vol. 7, 2139:2-2141:10 (Learned Counsel's testimony about an October 24, 2002, letter, Exhibit 67, MCN 02-2749—02-2753, received from Johnson asking him to get a deal); Exhibit 67, MCN 03-2969—03-2970 (letter of May 10, 2003, from Johnson to Co-Counsel asking him to "get me the best deal you can and I <u>will</u> cooperate. At this point I will confess to killing the Pope." (emphasis in the original)). She also allegedly confessed to her involvement in the crimes to numerous informants, suggesting that she would ultimately have been willing to do so, in open court, pursuant to a plea agreement.

There also could be no greater sentencing disparity than the disparity between death, pursuant to a possible jury verdict, and life imprisonment, pursuant to a plea agreement. That disparity strongly suggests that a reasonable defendant would have accepted a plea

agreement for a life sentence, at least in a case like this one, where the evidence on the merits is insurmountable. *See Jenkins*, 630 F.3d at 309 ("With respect to the second prong, a defendant's statements that he would have accepted a plea offer in combination with some objective evidence, such as a significant sentencing disparity, is sufficient to support a prejudice finding.") (internal quotation marks and citations omitted).

Thus, the evidence of Johnson's willingness to plead guilty is equivocal.

Johnson contends that any reluctance that she may have had about pleading to a life sentence was, in fact, the result of failure of her trial counsel to advise her properly about whether or not to go to trial or plead guilty, so that her reluctance actually demonstrates her prejudice. In support of this contention, she cites my prior decisions in *United States v. Hernandez*, 450 F. Supp. 2d 950, 975 (N.D. Iowa 2006), and *Wanatee v. Ault*, 39 F. Supp. 2d 1164, 1171 (N.D. Iowa 1999) (*Wanatee I*). In both *Wanatee I* and *Hernandez*, I observed that whether or not a defendant appears to want to plead guilty is not an impediment to an "ineffective assistance" claim that the defendant was improperly advised about whether or not to go to trial or to plead guilty. *See Wanatee I*, 39 F. Supp. 2d at 1172; *see also Hernandez*, 450 F. Supp. 2d at 975 (quoting *Wanatee I*). However, those observations did not obviate the need for the defendant to show "prejudice" to succeed on such an "ineffective assistance" claim. *See id.* (noting that failure to advise a criminal defendant of the relevant law is "deficient performance," but then considering whether such deficient performance was "prejudicial"); *Hernandez*, 450 F. Supp. 2d at 975 (noting that the criminal defendant must still prove "prejudice" (citing the Eighth Circuit decision in *Wanatee v. Ault*, 259 F.3d 700, 703-04 (8th Cir. 2001)).

In *Hernandez*, for example, I noted that, while it was a simple matter to conclude that the defendant would have received a "lesser sentence," if he had been properly advised and pleaded guilty, "[t]he somewhat more complicated question is whether or not

[the defendant], subjectively, would have accepted the plea but for counsel's advice." *Hernandez*, 450 F. Supp. 2d at 977. To make that determination, I considered both Hernandez's testimony at the evidentiary hearing that he "probably" would have accepted a guilty plea, if properly advised of the possible two-level shift for obstruction of justice if he went to trial, and whether something more than his self-serving statements corroborated that he would have pleaded guilty. *Id.* I found such corroboration from Hernandez's admission of some involvement in various drug transactions—that is, a profession of innocence as to a particular level or kind of offense, but not a profession of innocence of any wrongdoing—and a significant sentencing disparity between pleading guilty and going to trial. *Id.* at 978. In Johnson's case, there is certainly a significant sentencing disparity, but comparable evidence of admissions to any level of guilt is doubtful, for all of the reasons explained above.

Likewise, in *Wanatee v. Ault*, 101 F. Supp. 2d 1189 (N.D. Iowa 2000) (*Wanatee II*), in which I considered whether or not the defendant had shown the required "prejudice" to sustain his claim of ineffective assistance of counsel in failing to advise him properly of a plea offer, I also considered whether the defendant would have accepted the plea offer, based on evidence of his conduct and circumstances. *Wanatee II*, 101 F. Supp. 2d at 1201-02. In addition, however, I also considered whether or not the prosecution ever made a plea offer, which I found depended upon evidence about the prosecutor's conduct, citing *Kingsberry v. United States*, 202 F.3d 1030, 1031 (8th Cir. 2000), and whether the defendant could have performed the agreement, which I found depended upon evidence of the terms of the plea agreement offered and evidence showing whether the defendant could (or could not) have provided the specific cooperation those terms required. *Wanatee II*, 101 F. Supp. 2d at 1201-02. Thus, my conclusion that Wanatee was, indeed, "prejudiced" was based on more than evidence that the defendant would have pleaded guilty if properly

advised, including evidence that a plea offer was actually made and evidence that Wanatee could have performed the plea agreement. *See id.* at 1202-14. Here, as explained in more detail in my analysis of the second inquiry, below, evidence that Johnson could have performed the plea agreement by making an adequate factual proffer is equivocal, and, as explained in more detail in my analysis of the fourth inquiry, below, there is no evidence that the prosecution ever actually made a plea offer to Johnson.

Thus, as in *Hernandez* and *Wanatee*, it is not enough for Johnson to point to evidence supporting a reasonable probability that she would have been willing to plead guilty, if properly advised, to demonstrate the necessary "prejudice." Instead, I must consider the additional inquiries postulated above, and discussed below, including whether she could have made a supporting factual proffer that the prosecution (or, here, the Attorney General) would have found acceptable; whether or not the Attorney General would have accepted a guilty plea for a sentence less than death; and whether the prosecution ever formally offered a plea agreement that Johnson could have accepted.

### b.     *Whether the prosecution would have accepted a factual proffer that the petitioner was willing to make*

The next inquiry, whether or not the prosecution (and here, specifically, the Attorney General) would have accepted a proffer that the petitioner was willing to make, is pertinent, because a plea agreement must necessarily have the agreement of both the defendant and the prosecution. *United States v. Yellow*, 627 F.3d 706, 708 (8th Cir. 2010) ("Plea agreements are contractual in nature and should be interpreted according to general contractual principles." (quoting *United States v. Thompson*, 403 F.3d 1037, 1039 (8th Cir. 2005)); *United States v. Segura*, 209 Fed.Appx. 128, 136 (3d Cir. 2006) ("Put more colloquially, to consummate a plea bargain, it takes two to tango, and there is no reason to believe that the Government wanted to dance." (citing *Kingsberry v. United States*, 202

F.3d 1030, 1032 (8th Cir. 2000)). It is also a corollary of the principle that an acceptable factual proffer is ultimately required for the prosecution to accept a plea agreement.[38]

Here, I find that there is no *certainty* that the Attorney General would have accepted any proffer that Johnson could have made. First, as I stated above, while I find that Learned Counsel believed, in good faith, that he had Johnson's agreement to the facts stated in her eleventh-hour "attorney proffer," *see* Exhibit 53, RS 9-516—9-518, I cannot find that Johnson did agree to those facts. Thus, I am not convinced that the "attorney proffer" demonstrates that Johnson would ultimately have made that proffer. Second, the "attorney proffer" was the nearest thing to an acceptable proffer of facts that Johnson made prior to her trial, but it was not made until after Honken had been tried and convicted, and by then, there was no incentive for the Attorney General to accept any proffer from her. Certainly, the Attorney General did not accept Johnson's eleventh hour "attorney proffer," or at least did not agree to a plea to life based on that proffer at that point. *See, e.g.,* Hearing Transcript, Vol. 11, 213:2-13 (Learned Counsel's testimony that the defense team had no assurance that the Attorney General would ever accept Johnson's proffer, when finally made, and noting that "[t]hey [sic] did not accept it eventually"). Johnson has not identified any specific factual proffer that she was willing to or did make at a time when the Attorney General had a greater incentive to accept such a proffer as the basis for a plea to a life sentence. Also as noted above, Johnson admitted, *in May of 2011, six years after her trial*, that she had lied to the respondent's mental health expert in a recent interview about being present at the scene of the murders. *See* Final Report of Dr. Woods, p. 49,

---

[38]An acceptable factual proffer is required to consummate a plea agreement, even if, as Johnson's trial counsel argued, the prosecution could have made a plea offer contingent on an adequate, subsequent factual proffer and final acceptance of the plea agreement by the Attorney General.

Exhibit 107, p. WOD000146. Her continued refusal to admit her involvement honestly to the government, even years after her conviction and death sentences, also demonstrates the difficulty that she would have had providing a factual basis for a guilty plea that the Attorney General would have found acceptable at the time that such a truthful proffer would have been required. *Cf. Stevens*, 149 F.3d at 748.

At the other extreme, I do not believe that Johnson absolutely could not have made a factual proffer that the Attorney General would have found acceptable. Johnson did allegedly confess to her involvement in the crimes to numerous informants in sufficient detail to satisfy the prosecution's requirements for a truthful proffer, suggesting that she would ultimately have been both capable of and willing to make such a factual proffer to the Attorney General, where she had an incentive to save her life. Thus, the evidence of her ability to make an acceptable proffer, like the evidence of her willingness to plead guilty, is equivocal. I also cannot say that the Attorney General had absolutely no incentive to accept *any* factual proffer that Johnson could have made. To the contrary, the Attorney General also had incentives to accept an adequate, truthful factual proffer, had it been made, particularly if coupled with an agreement to testify against Honken, but also to avoid the necessity of a second, long, expensive, and uncertain (at least as to penalties) capital trial against an aider and abettor, if the principal could be convicted of and receive the death penalty for all or most of the killings.

The question for determining "prejudice," however, is not whether the petitioner certainly could or certainly could not have made an acceptable proffer, but whether there is a *reasonable probability* that the Attorney General would have accepted a factual proffer that Johnson was willing to make as the basis for a plea to a life sentence. Considering the incentives that Johnson had to avoid a death sentence, and the evidence that Johnson did make truthful statements of the facts prior to trial, albeit not to her attorneys or mental

health experts, and evidence of her willingness to cooperate against Honken, I think that there is a reasonable probability that Johnson would have been willing to make a truthful proffer, prior to Honken's trial, with an agreement to testify against Honken. Also, considering the incentives that the prosecution had prior to Honken's trial to obtain Johnson's cooperation against Honken and to avoid a second capital trial against an aider and abettor rather than the principal, I think that there is a reasonable probability that the Attorney General would have been willing to accept such a factual proffer from Johnson.

Thus, this inquiry suggests that Johnson was prejudiced by her trial counsel's deficient performance in plea negotiations.

### c.  *Whether the Attorney General would have accepted a plea*

I also believe that logic dictates a third inquiry on the prejudice prong, at least in the context of a capital prosecution in which the Attorney General had authorized the death penalty and the local prosecutors no longer had the authority to accept a plea agreement after a change in Department of Justice policy in June 2001. *Cf. Kingsberry*, 202 F.3d at 1032 (stating that the requirement of an offer of a plea agreement from the prosecution was dictated by logic). That third inquiry is whether or not the Attorney General would have accepted a guilty plea for a sentence less than death in Johnson's case under any circumstances.

Again, the respondent represents that the Attorney General never authorized anyone to accept a plea of less than death from Angela Johnson, making it unlikely that he would have done so. This argument ignores the fact that Johnson did not offer an acceptable factual proffer, which the prosecutor insisted was a prerequisite to any plea offer from the prosecution. More telling is the fact that there are no representations in any correspondence from the local prosecutors to Johnson's trial counsel that a plea agreement was expressly authorized by the Department of Justice if certain terms were met; no other

evidence that the Attorney General would have accepted a guilty plea in Johnson's case, but was stopped only by a remediable problem, such as the timing and content of an adequate proffer and an agreement to cooperate; and no evidence that the Attorney General had accepted a guilty plea in a case that was arguably as egregious or more egregious than Johnson's (specifically, multiple killings involving child victims) for reasons that did not have to do with collateral concerns, such as the desire for cooperation against a defendant or other evidentiary problems.

Nevertheless, the record shows that plea agreements after the death penalty was authorized had been made in other capital cases by both Attorney General Ashcroft and Attorney General Gonzalez, some involving egregious facts, sometimes for reasons involving collateral concerns, like cooperation against a co-defendant or difficulties of proof. Johnson undoubtedly could have capitalized on the value of her testimony against Honken as the basis for a plea to a life sentence. Thus, I cannot say as categorically as the respondent does that resolution of this case by a plea agreement authorized by the Attorney General would not have occurred. To the contrary, I think that, there is a reasonable probability that the Attorney General would have accepted a plea to a life sentence for Johnson, if there had been a perfect alignment of a truthful proffer, at an advantageous time, with an agreement to testify against Honken. Such a perfect alignment of circumstances reasonably could have occurred in this case; it simply did not.

### d.    *Whether the prosecution ever offered a plea agreement*

Even though I believe that some of the other inquiries suggest that there is a reasonable probability that, if trial counsel had not performed deficiently, Johnson would have obtained a plea agreement to a life sentence, her claim must still pass the final inquiry concerning prejudice in plea negotiations mandated by the Eighth Circuit Court of Appeals, which is whether the prosecution ever formally offered a plea agreement that the petitioner

could have accepted.  *Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000).

I read the decision in *Kingsberry* to establish the requirement of a formal plea offer from the prosecution to be a bright line test of prejudice arising from counsel's deficient performance in plea negotiations.  Specifically, in *Kingsberry*, the Eighth Circuit Court of Appeals stated,

> We address the prejudice component, assuming *arguendo* that the performance of Kingsberry's trial counsel fell below an objective standard of reasonableness.  We begin by noting that prejudice is possible, notwithstanding a subsequent fair trial, where counsel failed to provide accurate advice regarding a plea agreement offer.  *See Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995) (citation omitted).  *See also United States v. Rodriguez*, 929 F.2d 747, 753 n. 1 (1st Cir. 1991); *United States v. Day*, 969 F.2d 39, 44 (3rd Cir. 1992).  *Logic dictates therefore, that to establish such prejudice, the petitioner must begin by proving that a plea agreement was formally offered by the government.*  Kingsberry argues that the contradictory affidavits submitted on this issue create a fact dispute, mandating an evidentiary hearing.  We disagree.
>
> The record before this Court is sufficient to show conclusively that a formal plea offer never materialized. The two parties necessarily privy to a plea offer and fundamental to resolution of this issue both deny the existence of a plea agreement offer. . . .  No facts casting genuine doubt upon the veracity of [trial counsel's] affidavit were presented.

*Kingsberry*, 202 F.3d at 1032-33 (emphasis added; footnotes omitted).  Because the court stated that the petitioner "must" prove that a plea agreement was formally offered by the government, the conclusion that this is a bright line test of prejudice is inescapable.

I find no evidence that the prosecution ever formally offered a plea agreement, let alone one that Johnson would have accepted.  *See id.*  At most, the putative plea offers

from the prosecution to Johnson's trial counsel, on which Johnson relies, are suggested frameworks for or outlines of possible plea terms, or speculation by local prosecutors as to what the Department of Justice *might* find constituted acceptable terms. None is a statement of possible terms prefaced with a statement that the Department of Justice had authorized the local prosecutor to offer such terms. Thus, they fall well short of "a plea agreement formally offered by the government." *Id.*

Indeed, as reflected in my Order (Civ. docket no. 283), filed June 23, 2011, in the course of the evidentiary hearing in this case, I asked the respondent to consider answering the ultimate question of whether the Attorney General, or any of his representatives, ever authorized anyone to accept a plea of less than death for Angela Johnson. In an e-mail dated June 21, 2011, to the court and opposing counsel, the respondent's counsel answered that, no, neither the Attorney General nor any of his representatives had ever authorized anyone to accept a plea of less than death for Angela Johnson. The respondent subsequently filed an affidavit of counsel expressly stating, "Neither the Attorney General, nor any of his representatives, ever authorized the United States Attorney's Office [for the Northern District of Iowa] to accept a guilty plea allowing for a penalty of less than death for Angela Johnson." *See* Affidavit (Civ. docket no. 308).

Where no formal offer of a plea agreement from the prosecution ever materialized, Johnson cannot make the bright line showing necessary to prove prejudice in plea negotiations. *Kingsberry*, 202 F.3d at 1032.

### 3.    *Summary*

I do not deny—indeed, I firmly believe—that a perfect alignment of circumstances leading to a plea agreement for life imprisonment was *clearly possible* in this case. For example, I believe that there is at least a reasonable possibility that, if Johnson had agreed to testify against Honken, supported by an adequate factual proffer, the Attorney General

would have accepted her guilty plea to a life sentence. Such a perfect alignment of Johnson's agreement to testify against Honken, supported by an adequate factual proffer, and her willingness to accept a life sentence, on the one hand, and a plea offer from or authorized by the Attorney General to plead to a life sentence in return for testifying against Honken, on the other hand, simply never occurred. Thus, Johnson has failed to prove by the greater weight of the evidence that there is a *reasonable probability* that "the result of the plea negotiations would have been different had her counsel performed adequately." *Tinajero-Ortiz*, 635 F.3d at 1105 (internal quotation marks and citations omitted); *see also Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (holding that, to prevail on an ineffective assistance of counsel claim, there must be "a 'substantial,' not just 'conceivable,' likelihood of a different result" (citing *Richter*, 562 U.S. at ___, 131 S. Ct. at 791)). Whether a capital petitioner can ever show prejudice from deficient performance of counsel in plea negotiations in the absence of a formal offer of a plea agreement from the prosecution, *see Kingsberry*, 202 F.3d at 1032—for example, where the petitioner has shown that there is a reasonable probability that she would have been willing to accept a plea agreement to life imprisonment, if properly advised, that she could have made a supporting factual proffer that the prosecution (or the Attorney General) would have found acceptable, and that the Attorney General would have accepted a guilty plea for a sentence less than death—is a question that must be left to the Eighth Circuit Court of Appeals. I am constrained by the bright line rule in *Kingsberry* to hold that Johnson cannot show the necessary prejudice, because the prosecution never formally offered her a plea agreement to a sentence less than death.

Johnson is not entitled to § 2255 relief on this claim.

## B. *Claim 2: Failure To Preclude A Timely Death Notice*

Claim 2 (Johnson's Claim One, § B) is that trial counsel were ineffective in not proceeding to trial at a time that would have precluded the government from filing a timely notice of intent to seek the death penalty.  Johnson's argument is that, had her trial team not sought a continuance of the May 6, 2002, trial date in January 2002, in the original case against Johnson, just before the two criminal cases were consolidated, the Notice of Intent (Crim. docket no. 49), filed on April 25, 2002, just eleven days before the scheduled May 6, 2002, trial date, would not have been timely.  She also argues that trial counsel, who had conducted no merits phase investigation, had no reasonable tactical or strategic reason for not proceeding to trial on May 6, 2002.  The respondent counters that, had the court not continued the May 6, 2002, trial date, the prosecution simply would have filed the Notice of Intent sooner, but once the trial was continued to November 4, 2002, there was no need for the prosecution to file the Notice of Intent any sooner than it did.  I believe that this part of Johnson's § 2255 Motion borders on, if it does not trespass well into, the frivolous.

First, as to deficient performance, in granting Johnson's request for a continuance, I found that the reasons that her trial counsel advanced for the continuance served the ends of justice and outweighed the interests of the public and her right to a speedy trial.  *See* Order (Crim. docket no. 39).  Those reasons were that the court had not yet ruled on her motion to dismiss; that no penalty notice had yet been filed; and that she had not been able to obtain discovery in an economical or efficient way.  Therefore, it cannot be convincingly argued that Johnson had no strategic reason for seeking a continuance.  *See* *Rice*, 449 F.3d at 897 ("'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).

Second, as to prejudice, Johnson cannot show that there is any reasonable probability that a timely death notice could not have been filed before her trial, had her trial counsel not moved for a continuance in January 2002. *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (holding that, to prevail on an ineffective assistance of counsel claim, there must be "a 'substantial,' not just 'conceivable,' likelihood of a different result" (citing *Richter*, 562 U.S. at ___, 131 S. Ct. at 791)). As the respondent points out, the date on which the actual Notice of Intent was filed was dictated by the November 2002 trial date, not by the May 2002 trial date, so that the Notice of Intent likely would have been filed earlier if the trial date had not been changed. Moreover, Johnson cannot assert a viable claim that the death notice was too late by the end of January 2002 for a trial set May 6, 2002. Because continuing the trial after the notice preserves the defendant's statutory right to reasonable notice of the government's intent to seek the death penalty, *see, e.g., United States v. Wilk*, 452 F.3d 1208, 1222-23 (11th Cir. 2006), had the death notice in this case been filed too close to an existing trial date, the trial would simply have been continued.

This claim involves not just hindsight, but wishful thinking. It is denied.

### C. *Claim 3: Failure To Raise Pre-Trial Meritorious Motions, Objections, And Arguments*

Claim 3 (Johnson's Claim One, § DD.a-c & f) is that trial and appellate counsel rendered prejudicially ineffective assistance of counsel by failing to timely and effectively make a number of meritorious motions, objections, and arguments. The facets of Johnson's Claim One, § DD that I find are pertinent to the claim of ineffective assistance of counsel in the pretrial phase are identified by Johnson in subdivisions (a) through (c) and (f) of that claim—in other words, these are the facets of this claim of ineffective

assistance of counsel in the pretrial phase. Those facets relate to the following circumstances: (a) a letter from me to Co-Counsel on August 1, 2002, Exhibit 67, MCN 02-2449, stating, "If you would spend as much time on the mediocre briefs that you have filed in this case as you have pestering our office about payment, your client's interest would be well served"; (b) a portion from the transcript of the November 17, 2004, motion for a change of venue in which I commented that I believed "the defense totally missed the mark," because the defense provided only a general brief, not one related to the facts of Johnson's case; (c) a portion of a pretrial ruling, *United States v. Johnson*, 377 F. Supp. 2d 686, 687 (N.D. Iowa 2005), in which I observed that Johnson had failed to raise a challenge to the indictment based on failure to plead the "substantive connection" element of a § 848 offense, despite notice of the element since at least a ruling in August 2002, so that she had waived the issue; and (f) a portion of my ruling on post-trial motions, *United States v. Johnson*, 403 F. Supp. 2d 721, 771 (N.D. Iowa 2005), finding that Johnson had waived her argument that the allegations in Counts 6 through 10 should be stricken where she had failed to object to a magistrate judge's November 26, 2002, ruling.

I find now—and I believed at the time—that the conduct of Johnson's trial counsel was deficient in all but the first of these circumstances. As to circumstance (a), "mediocre" briefs, by definition, are not professionally incompetent, even if they might be disappointing in the context of a death penalty case, and the allegation of deficient performance lacks sufficient specificity otherwise even to ascertain the nature of Johnson's claim. As to the other circumstances now at issue, (b), (c), and (f), I find deficient performance and no excuse for it.

Nevertheless, even considered as facets of a single claim of ineffective assistance of counsel, the circumstances that I find involved deficient performance, in the aggregate, did not result in unconstitutional prejudice. Circumstance (b) fails, even though I noted

at the time that Johnson's trial counsel had "missed the mark" with their briefing of the change-of-venue issue, because I subsequently ruled on the merits of that motion, including a detailed analysis of the factual circumstances of her case that I believed that Johnson's attorneys should have asserted. *United States v. Johnson*, 354 F. Supp. 2d 939, 978-89 (N.D. Iowa 2005). Similarly, I ruled at the time that Johnson's allegation of failure to plead the necessary "substantive connection" at issue in circumstance (c) was not only "untimely," but "unpersuasive," based upon a detailed analysis of the sufficiency of the pleading of the "substantive connection" in the indictment, *see Johnson*, 377 F. Supp. 2d at 687-88, so that even a timely objection would have failed, and no prejudice from the untimeliness resulted. Finally, as to circumstance (f), while I found that Johnson had waived her argument that the allegations in Counts 6 through 10 should be stricken, I once again concluded that, "even if the issue were reviewable, and even if it was error to submit the challenged violations, I would still conclude that Johnson was not entitled to either judgment of acquittal or a new trial on this ground," because the jury also found nine other violations had been committed as part of the series of violations and that four of those violations had been committed either before or both before and after the killings. *United States v. Johnson*, 403 F. Supp. 2d 721, 771-72 (N.D. Iowa 2005). Even in the aggregate, these circumstances caused no prejudice, because the sum of no prejudice at all from any of the errors alleged is still no prejudice at all in the aggregate, so this ineffective assistance of counsel claim fails. *Gianakos*, 560 F.3d at 821 ("'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" (quoting *Strickland*, 466 U.S. at

691)).[39]

Johnson is not entitled to § 2255 relief on this claim. Therefore, I pass on to consideration of her claims of errors in the jury selection phase of her trial.

## V. ERRORS IN THE JURY SELECTION PHASE

I concluded, above, that Claims 4, 5, 6, and 7 from the jury selection phase are *separate* claims, notwithstanding that three of them (Claims 4, 6, and 7) are ineffective assistance of counsel claims, and only Claim 5 involves a different actor, Juror No. 55, because the ineffective assistance claims involve distinct issues.[40] Because Johnson did not brief any of these claims in her Post-Hearing Brief, and I do not find that any of them raise a colorable claim for relief, I will address them only briefly.

---

[39]Similarly, if they are separate claims of ineffective assistance of counsel, not merely facets of a single claim of ineffective assistance of counsel, none of the deficient performance at issue caused the required prejudice. In other words, the aggregate prejudice is no prejudice at all.

[40]Claim 4, an ineffective assistance of counsel claim, and Claim 5, a juror misconduct claim, involve Juror No. 55. Johnson makes other claims related to Juror No. 55: Claim 48 (her Claim One, § FF.2), that trial counsel were ineffective in failing to raise in post-trial motions Juror No. 55's failure to answer *voir dire* questions honestly, and Claim 49 (her Claim One, § GG), that her appellate counsel failed to raise all components of the misconduct of Juror No. 55. Claims 48 and 49 are addressed in Section VIII, concerning errors post-trial, and Section IX, concerning errors appeal, respectively.

## A. *Claim 4: Counsel's Failure To Investigate And Voir Dire Juror No. 55 Adequately*

In Claim 4 (Johnson's Claim One, § C.1), Johnson argues that trial counsel's *voir dire* failed to follow up on information disclosed in Juror No. 55's questionnaire[41] and failed to probe the personal experiences with drugs that he had volunteered on his own after his *voir dire* concluded.[42] She argues that these failings caused her severe prejudice,

_____

[41]In a juror questionnaire completed by each prospective juror and distributed to counsel prior to jury selection, Juror No. 55 answered "no" to questions asking whether he had "ever been mentally, physically, or emotionally abused as a child," and whether he was "familiar with" various participants in the trial, including me. Juror No. 55 also revealed in his questionnaire that he had a son in prison because of drugs, that he had adopted his son's children because of his son's drug abuse, and that he visited his son in prison on occasion. In his juror questionnaire, Juror No. 55 also revealed that he was a veteran of the United States Navy and the United States Air Force and a former member of the Woodbury County Sheriff's Posse, who had assisted police investigations, including at least one murder investigation. Original § 2255 Motion (Civ. docket no. 1), Exhibit 26. Trial counsel did not investigate or question Juror No. 55 about these responses, either before or during *voir dire*, and asked him only general questions. When Juror No. 55 described methamphetamine as a "nasty" drug, Lead Counsel's follow up asked only whether Juror No. 55 could give Johnson a fair trial because of that "nasty" drug. Transcript of *Voir Dire* at 741.

[42]After his questioning was completed, on his own initiative, Juror No. 55 requested permission to return to court to provide further information. Specifically, he explained that his son was in prison on federal drug charges, that he had adopted his grandchildren, and that his grandson was brain damaged because of drug abuse by his son and his girlfriend. In follow-up questions, Learned Counsel explored the extent of the grandchild's brain damage, then asked if Juror No. 55 was concerned that what happened to his grandchild might "bleed into this case." Juror No. 55 answered, "A little bit." I then asked him, "How, if at all, do you think this situation that you've just described to us might affect your ability as a juror in this case or might influence your ability," to which he responded, "Well, I hope none honestly," adding, "But, if drugs were administered to the kids or something, which I don't know, it might affect me then because

(continued...)

because Juror No. 55 could not be fair, could not follow the court's instructions, and could not consider Johnson's personal abuse as a child as mitigation because of his own abuse as a child. She also argues that Juror No. 55 influenced the entire jury, because he was a leader for the death penalty, he provided extraneous and incorrect information about the appellate process, leading jurors to believe that responsibility for determining Johnson's sentence rested elsewhere, and sought out and shared extraneous information about the conditions of confinement for a prisoner doing a life sentence versus one sentenced to death.[43] She argues that it is reasonably probable that, had trial counsel

---

[42](…continued)
I have kind of a hatred for that kind of thing." Learned Counsel's follow up was, in essence, to ask the juror to separate his feelings about his son's and grandchild's situation from his consideration of this case and to ask for his promise that he would do that, to which the juror responded, "I'll do the best I can." Transcript of *Voir dire* at 768-70. Juror No. 55 was not removed for cause or by peremptory challenge.

[43]In a post-trial telephone interview on July 7, 2005, with an investigator for Johnson's trial counsel—in response to questioning, some of which clearly exceeded the bounds of anything that it is permissible to ask jurors post-trial—Juror No. 55 purportedly revealed that he was a leader for the death penalty and the only juror who would have voted for the death penalty for the killing of Greg Nicholson, but that he decided he would let that go, because the vote was 11 to 1 for life. Original § 2255 Motion (Civ. docket no. 1), Exhibit 13, p. 1. He also purportedly explained that, when other jurors expressed concern that voting for the death penalty would make them murderers, he had told them that was not true, because Johnson would go through automatic appeals, so that the jurors were not the final decision-makers, they just set the stage upon which she would have to act. *Id.* at 2. He also purportedly revealed that he had visited his son in federal prison during the recess between mitigation phase evidence and closing arguments and had asked a guard about the differences between death row and doing a life sentence, and the guard purportedly told him that on death row you are alone, like in solitary confinement, and with a life sentence you are in general population, like everyone else, and that Juror No. 55 had then communicated this information to other jurors. *Id.* at 3. The

(continued…)

performed adequately, Juror No. 55 would have been excused for cause and, if he had not been excused for cause, that trial counsel should have used a peremptory challenge to remove him.

The respondent counters that trial counsel did not perform deficiently with respect to Juror No. 55, because it was unrealistic to expect trial counsel to perform investigations of the hundreds of potential jurors to whom questionnaires were sent. Moreover, the

---

[43](...continued)
investigator's notes also reveal the following:

> **So it seems like you had all the information you needed to make the right decision about a sentence in the first part of the trial.**
> No, it was the whole trial. Because the mother [AJ's mother], there were things said by her that really pissed some of us off. All this about she [AJ] was such a battered person. There were a couple of us that have been through a hell of a lot worse than she had. She never was beaten so bad she couldn't sit down for a month. A couple of us, we had it rough, and we didn't turn out to do drugs and kill people.

Original § 2255 Motion (Civ. docket no. 1), Exhibit 13, p. 3.

On March 4, 2011, an agent with the Iowa Division of Narcotics Enforcement again interviewed Juror No. 55 in connection with these proceedings. During that interview, he described one incident of "abuse" as a child, in which he was working for his father at a construction site, and fell asleep on a stack of sheet rock; while he slept, his father stapled his clothing to the sheet rock, hung the sheet rock on the ceiling, and went to lunch; and his father did not let him down from the ceiling until he returned from lunch. Juror No. 55 also explained to the investigator that he did not think his father's form of discipline was "abuse" and that it was not until he started therapy, after the end of Johnson's trial, that he figured out that his father was abusive.

Investigation by Johnson's § 2255 counsel also revealed that, on April 2, 2002, I sentenced Juror No. 55's son to consecutive sentences of 40 months for conspiracy to distribute methamphetamine and 60 months for conspiracy to commit a violent crime, and that Juror No. 55's son was in federal prison pursuant to that sentence at the time that he was serving on Johnson's jury.

respondent contends that Juror No. 55 revealed most of the pertinent information during *voir dire* and that he demonstrated that he could keep an open mind. The respondent argues that Johnson has not shown that it was unreasonable for trial counsel to leave Juror No. 55 on the jury. In any event, the respondent argues that Johnson cannot show prejudice, because she relies on information improperly obtained in a post-trial interview, which is inadmissible pursuant to Rule 606 of the Federal Rules of Evidence.

In *White v. Helling*, 194 F.3d 937 (8th Cir. 1999), a murder case, a juror had explained in chambers that the juror had spoken to a spectator, because the juror had known the spectator years before, but that the juror did not know that the spectator was a sister of one of the murdered men. The juror also explained that the conversation was unrelated to the case and that the conversation would have no bearing on her decision as a juror. *White*, 194 F.3d at 940. The Eighth Circuit Court of Appeals considered a claim that the trial counsel had been ineffective in failing to go "more deeply into the matter" concerning the circumstances and content of a juror's conversation with the spectator. The court explained,

> Our initial inquiry is whether counsel's omission caused his representation of Mr. White to fall below acceptable professional standards. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We must resist the temptation to use hindsight to require that counsel's performance have been perfect. Only reasonable competence, the sort expected of the "ordinary fallible lawyer," *Nolan v. Armontrout*, 973 F.2d 615, 618 (8th Cir. 1992), is demanded by the Sixth Amendment. Having weighed the matter carefully, we believe the Iowa Court of Appeals was correct in stating as follows:
>
> > [W]hile petitioner's brief indicates certain aspects of this issue could have been handled more favorably for petitioner, we are unwilling to find that trial counsel's

conduct was outside the bounds of normal competency.
*White v. State*, 380 N.W.2d [1,] 5 [(Iowa Ct. App. 1985)].

*White*, 194 F.3d at 941.

Similarly, here, I cannot find that trial counsel's omissions, in response to Juror No. 55's questionnaire answers and *voir dire*, fell below acceptable professional standards. *Id.; Strickland*, 466 U.S. at 688 (holding that, to establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness"); *see also Richter*, ___ U.S. at ___, 131 S. Ct. at 791 ("*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" (quoting *Strickland*, 466 U.S. at 687 (internal quotation marks omitted)). It is only through hindsight that further probing of Juror No. 55's answers seems warranted. *Id.* ("We must resist the temptation to use hindsight to require that counsel's performance have been perfect."); *King*, 595 F.3d at 852-53 (observing that the court "'must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"'" (quoting *Ruff*, 77 F.3d at 268, in turn quoting *Strickland*, 466 U.S. at 690)). The prospective juror did disclose the impact that drugs had had on his son and grandchild, including that his son was in prison on drug charges, and he also assured trial counsel and the court that he would do the best that he could not to let those personal factors affect his judgment in the case. Like the petitioner in *White*, Johnson has now suggested that certain aspects of this issue could have been handled more favorably for her, but like the Iowa Court of Appeals and the Eighth Circuit Court of Appeals in *White*, I am unwilling to find that trial counsel's conduct was outside the bounds of normal competency. *Id.* (quoting *White v. State*, 380 N.W.2d at 5). Because I do not find deficient performance, I do not reach the question of prejudice on this claim. *Walker*, 324 F.3d at 1040 (if the movant fails to show deficient performance

by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim).  This claim is simply not a basis for § 2255 relief.

## B. *Claim 5: Juror No. 55's Misconduct*

In Claim 5 (Johnson's Claim Six), Johnson contends that her Sixth Amendment right to an impartial jury was violated when Juror No. 55 concealed his history of physical abuse as a child, his familiarity with me, as the sentencing judge in his son's criminal case, and when he obtained information about the differences between being on death row and doing a life sentence from a guard while visiting his son in prison on the recess between the mitigation phase and closing arguments in Johnson's case, and then conveyed the information he learned from the guard to other jurors.  The respondent contends that this claim is procedurally defaulted, at least as to alleged childhood abuse and familiarity with me, and that Johnson has failed to demonstrate that ineffective assistance of counsel constitutes "cause and prejudice" excusing the default.  Even assuming that no part of this claim is procedurally defaulted, the respondent argues that the claim fails, because Johnson cannot show that Juror No. 55 answered any questions dishonestly, that Juror No. 55 was motivated by bias, or that, even if all facts were known, Juror No. 55 would have been stricken for cause.  Assuming, without deciding, that the claim is not procedurally defaulted, I conclude that it is without merit.

More than a decade ago, the Eighth Circuit Court of Appeals recognized, in a direct appeal case, that "[t]o gain a new trial on the ground of juror misconduct, a movant must present evidence that is not barred by Federal Rule of Evidence 606(b) and that establishes grounds recognized as adequate to overturn a jury verdict." *United States v. Tucker*, 137 F.3d 1016, 1030 (8th Cir. 1998).  The court also recognized, however, that "'Rule 606(b) specifically allows a juror to testify 'on the question whether extraneous prejudicial

information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.'" *Id.* Thus, Rule 606(b) may bar Johnson's evidence of purported dishonesty by Juror No. 55, but it does not necessarily bar her evidence that Juror No. 55 shared extraneous information about death row versus life-in-prison inmates with other jurors. *Id.*; *see also Van Kahl v. United States*, 242 F.3d 783, 791 (8th Cir. 2001) (Rule 606(b) did not necessarily bar a § 2255 petitioner from using juror testimony to establish juror bias).

Even assuming that Rule 606(b) does not bar any of the evidence marshaled on Johnson's allegations of Juror No. 55's alleged dishonesty in failing to disclose his history of physical abuse as a child or his familiarity with me, as the sentencing judge in his son's criminal case, her juror dishonesty claim fails. On such a "concealed bias" claim, Johnson must show "that the challenged juror answered dishonestly, not just inaccurately; that the juror was motivated by partiality; and that the true facts, if known, would have supported striking that juror for cause." *Von Kahl*, 242 F.3d at 790 (quoting *Tucker*, 137 F.3d at 1026). As the respondent points out, Juror No. 55 did disclose that his son was in prison on drug charges. Johnson has produced no evidence suggesting that Juror No. 55 was actually being dishonest by failing to disclose that I had sentenced his son. It is just as plausible that he did not remember that I had been the sentencing judge, just as I did not remember sentencing his son. While Johnson makes much of Juror No. 55's statement that some of the jurors had had it worse than Johnson did, the statement does not necessarily indicate that Juror No. 55 had, in fact, been beaten or that he recognized his father's form of discipline as abuse. Indeed, the juror indicated that it was not until after the trial that he recognized that his father had been abusive. Furthermore, where Juror No. 55 asked to talk to the parties and the court again after his *voir dire* had actually been completed to attempt to clarify his circumstances, there is even less basis for a claim of dishonesty. The

217

inferences that Juror No. 55 was motivated by partiality are even weaker, where none of the juror's purportedly dishonest non-disclosures nor any of the other conduct alleged even hints at a bias *against Johnson*.  Finally, the record suggests that Juror No. 55 was willing to set aside his experiences to give Johnson a fair trial.  Thus, the evidence falls a long way from convincing me that the true facts, if known, would have supported striking Juror No. 55 for cause.

Similarly unavailing is Johnson's "extraneous information" allegation.  "'[A] juror's exposure to extraneous information is not structural error.'"  *United States v. Jones*, ___ U.S. ___, ___, 2011 WL 6015586, *7 (8th Cir. Dec. 5, 2011) (quoting *Helmig v. Kemna*, 461 F.3d 960, 963 (8th Cir. 2006)).  More specifically still, that means that, "[i]n federal prosecutions, such 'misconduct' gives rise to no presumption of prejudice that the government must rebut, or a new trial will be granted."  *Helmig*, 461 F.3d at 963.  As the Eighth Circuit Court of Appeals has explained,

> The question of prejudice depends on whether "there is any reasonable chance that the jury would have been deadlocked or would have reached a different verdict but for the fact that even one reasonable juror was exposed to prejudicial extraneous matter."  *United States v. Hall*, 116 F.3d 1253, 1255 (8th Cir. 1997) (emphasis added), *cert. denied*, 522 U.S. 1140, 118 S. Ct. 1106, 140 L. Ed. 2d 159 (1998). Therefore, prejudice is possible even if [one juror] was the only juror to be contaminated.

*Tucker*, 137 F.3d at 1031-32.  The court has also explained that, "In extraneous evidence cases, we have looked to the extent and timing of jury exposure to the extraneous facts."  *Id.* at 1032.  In the context of "a trial's worth of other facts," no prejudice was likely here.  *Id.*  I denied Johnson's post-trial motion for an investigation of Juror No. 55's alleged misconduct in obtaining extraneous information about the conditions of death row and life-

in-prison inmates. *See United States v. Johnson*, 403 F. Supp. 2d 721, 887-888 (N.D. Iowa 2005). The Eighth Circuit Court of Appeals affirmed, agreeing with me that there was no reasonable possibility that information pertaining to prison conditions for death row and life-in-prison inmates would have affected the jurors' deliberations or prejudiced Johnson's case, where Johnson herself introduced evidence pertaining to prison conditions. *United States v. Johnson*, 495 F.3d 951, 981 (8th Cir. 2007). I believe that this finding also forecloses Johnson's substantive *habeas* claim of juror misconduct, because Johnson has added nothing to the record suggesting that the information that Juror No. 55 obtained would have caused the jury to deadlock or reach a different verdict. *Tucker*, 137 F.3d at 1031.

This claim provides no basis for § 2255 relief. It is denied.

## C. *Claim 6: Errors Relating To Voir Dire On Pentecostal Religion And Women*

Returning to allegations of ineffective assistance of counsel in the "Jury Selection" phase, Johnson's next claim, Claim 6 (Johnson's Claim One, § C.2), is that trial counsel failed to structure *voir dire* to identify jurors with prejudicial views on Pentecostal religion and women. She argues that trial counsel knew that the evidence in mitigation would include evidence of what trial counsel deemed "bizarre" religious rituals, involving speaking in tongues and exorcisms, yet trial counsel failed to understand that some prospective jurors might not consider such religious practices "bizarre," so that attempts to use evidence that she was subjected to them as mitigating evidence might anger those jurors. Johnson points out that her jury consultant has testified that, if she had been aware of the intended use of such evidence, she would have wanted to address it in either jury selection or the juror questionnaire. Similarly, Johnson contends that trial counsel were ineffective in failing to probe prospective jurors' attitudes towards women in general and

women accused of crimes in particular. She asserts that her trial counsel knew they would offer evidence that she was a single mother of two children who used and sold methamphetamine, who had affairs with married men, who bore a child out of wedlock, whose language could be brash and profane, and whose outward appearance was strong and not feminine. She argues that trial counsel knew, or should have known, that many prospective jurors have negative attitudes towards women who do not adhere to widely held stereotypes of female behavior, but trial counsel failed to conduct *voir dire* to identify and strike such jurors. She argues that, as a result of these failings, she was prejudiced, because there is a reasonable probability that the verdicts in this case were harsher as a result of trial counsel's failure to perform adequate *voir dire* on these subjects.

The respondent asserts that this claim is wholly without factual support, is premised on nothing but conjecture, and fails to establish either deficient performance or prejudice. Somewhat more specifically, the respondent argues that there is no evidence that any members of the jury engaged in religious practices similar to the ones that Johnson has branded "bizarre," nor anything but speculation that any hypothetical juror would be angered by an attempt to use such evidence as mitigating. There is also no factual support, the respondent argues, for Johnson's contention that trial counsel could have discovered or removed such jurors if they had conducted proper *voir dire*. The respondent also rejects Johnson's postulate that there must have been jurors who reacted negatively to her non-traditional lifestyle to explain the "harshness" of the verdict, because the respondent asserts that there is simply no evidence of this. Thus, the respondent argues that there is no evidence of deficient performance or prejudice. Indeed, the respondent argues that there is no evidence at all that Johnson was tried by a biased jury.

Absent evidence that a biased juror was actually seated, a claim that counsel was ineffective during *voir dire* necessarily fails. *See Singleton v. Lockhart*, 871 F.2d 1395,

1400 (8th Cir. 1989) (citing *Strickland*, 466 U.S. at 694); *Sanders v. Norris*, 529 F.3d 787, 790-94 (8th Cir. 2008);[44] *accord Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) ("Ybarra has not made the required showing of prejudice under *Strickland*, because he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense."). Johnson has identified circumstances that would have made it wise for trial counsel to raise with prospective jurors during *voir dire* the issues of "bizarre" religious practices and the traditional and non-traditional roles of women. Nevertheless, I do not need to decide whether or not trial counsel's performance was deficient, because Johnson has failed to offer anything but speculation that trial counsel's failure to raise these issues in *voir dire* actually prejudiced her in this case. *See Boysiewick*, 179 F.3d at 620 (explaining that courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice"); *accord Gianakos*, 560 F.3d at 821 ("'We need not inquire into the effectiveness of counsel, however, if we determine that no prejudice resulted from counsel's alleged deficiencies.'" (quoting *Hoon*, 313 F.3d at 1061)). Johnson has pointed to absolutely nothing suggesting that any juror was biased, either actually or impliedly, on the basis of the juror's views on religious practices or the roles of women.

This claim is denied.

---

[44]In *Sanders v. Norris*, 529 F.3d 787, 790-94 (8th Cir. 2008), the Eighth Circuit Court of Appeals declined to decide whether a petitioner must show that a juror was actually biased, or whether proof of extreme circumstances in which the bias of the juror could be presumed would demonstrate the required prejudice. Johnson has shown neither actual bias of any juror nor any circumstances that would give rise to a presumption of bias in any juror.

### D. Claim 7: Failure To Raise Timely Motions And Objections

Johnson's last jury selection phase claim, Claim 7 (her Claim One, § DD.e and g), is also a claim of ineffective assistance of counsel, this time with two parts. She alleges deficient performance in and prejudice from trial counsel's failure (1) to reurge a motion for change of venue and (2) to object to the manner in which peremptory challenges were allocated. Johnson alleges, generally, that her trial counsel did not fulfill their basic duty to assert legal claims in a timely and effective manner, noting specifically that I (and later the Eighth Circuit Court of Appeals) concluded that she had waived, forfeited, or did not effectively present the two matters at issue in this claim, citing *Johnson*, 403 F. Supp. 2d at 769 and 778.

I think that competent trial counsel would have reurged Johnson's change of venue motion in a timely manner, and I was surprised that her trial counsel did not do so. I think that the failure to do so was likely simply carelessness, because the record then and now contains no hint that trial counsel made a strategic decision not to reassert the motion. On the other hand, I do not think that failure to assert a frivolous objection to the allocation of peremptory challenges, after trial counsel expressly agreed to that allocation, was deficient performance. Even assuming that Johnson can establish deficient performance as to failure to raise either matter, however, Johnson cannot establish the required prejudice to obtain relief, whether I consider the two facets of this ineffective assistance claim separately or in the aggregate. *See Boysiewick*, 179 F.3d at 620 (explaining that courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice"); *accord Gianakos*, 560 F.3d at 821 ("'We need not inquire into the effectiveness of counsel, however, if we determine that no prejudice resulted from counsel's alleged deficiencies.'" (quoting *Hoon*, 313 F.3d at 1061)). There are two reasons why this is so.

222

First, I did indeed find that Johnson's trial counsel had waived the issue of whether or not she was entitled to a change of venue by failing to renew or reurge her motion for a change of venue at the conclusion of jury selection. *See Johnson*, 403 F. Supp. 2d at 769. Nevertheless, I also found "that the extensive *voir dire* of jurors actually appearing for jury selection in no way revealed the kind of prejudice that Johnson asserted would result from pretrial publicity or the kind of prejudice that would require a change of venue." *Id.* at 768-69; *see also id.* at 770 ("In short, the issue of a change of venue for prejudice pursuant to Rule 21(a) was either waived, *the requirements for such a change of venue were never met in this case*, or both." (Emphasis added)). Thus, notwithstanding Johnson's trial counsel's waiver of the issue, I addressed it on the merits and found the evidence that the panel of prospective jurors was prejudiced by pretrial publicity to be wanting. Johnson has presented no new evidence suggesting that my finding that the requirements for a change of venue had not been met was wrong, so that she can show no prejudice from trial counsel's failure to reurge the issue at the conclusion of jury selection.

Similarly, I did indeed find that Johnson's trial counsel had waived an objection to the manner in which the available peremptory challenges were allocated (that is, fifteen peremptory challenges for each party to be used "on the fly" and five to be "reserved" to be used to reduce the panel of "qualified" potential jurors to the twelve trial jurors required), because her trial counsel had agreed to that procedure. *See id.* at 778. Nevertheless, Johnson cannot show the required prejudice to prevail on a claim that her trial counsel was ineffective in waiving that objection, because I also found that "because Johnson still had five 'reserved' peremptory challenges available to her at the time that she ran out of 'on the fly' peremptory challenges, she [could] not make a credible showing that she was unduly prejudiced by the lack of additional 'on the fly' challenges." *Id.* (adding, "To put it another way, the 'reserved' peremptory challenges provided her with sufficient

opportunity to protect her interest in a fair trial, even after she ran out of 'on the fly' peremptory challenges."). Thus, notwithstanding Johnson's trial counsel's waiver of the issue, I addressed it on the merits and found no prejudice from the allocation of peremptory challenges to which trial counsel had failed to object. Johnson has presented no new evidence suggesting that my finding that there was no prejudice resulting from the allocation of peremptory challenges was wrong, so that there is no evidence that trial counsel's failure to object to that allocation resulted in *Strickland* prejudice.

Of course, the aggregate prejudice from two parts of this ineffective assistance of counsel claim, each involving no prejudice, is no prejudice. Therefore, this claim is denied.

## VI. *ERRORS IN THE MERITS PHASE*

I concluded, above, that Johnson asserts three separate claims relating to the merits phase of the trial: The first claim (aggregating Claims **8** and 9) involves two facets of ineffective assistance of counsel in relation to Johnson's demeanor and competence; the second claim (Claim 10), although identified as another "demeanor and competence" claim when I reorganized Johnson's claims, is nevertheless a separate constitutional claim relating to trial while incompetent, not a claim of ineffective assistance of counsel; and the third claim (aggregating Claims *11, 12, 13, 14*, 15, and *16*), involves multiple facets of ineffective assistance of counsel in the investigation and presentation of Johnson's defense on the merits, although I have already determined that only one of those facets (Claim 15) will be considered on the merits, because the rest do not relate back to the filing of Johnson's § 2255 Motion. I will consider these claims in turn.

## A. Claims Relating To Demeanor And Competence

### 1. Factual background

There is no dispute that, on May 6, 2005, two days before the opening statements of the merits phase of Johnson's trial, a physician's assistant at the Woodbury County Jail increased Johnson's Zoloft prescription to 300 mg daily, with 200 mg of Seroquel. Exhibit 133, #26, p. 91. The increased Zoloft dosage was based on the physician's assistant's diagnosis of Johnson with a "major depressive disorder" and "generalized anxiety disorder," both of which had been "recently exacerbated by beginning [Johnson's] trial." *Id.*

What is disputed is whether or not the increase in Johnson's Zoloft prescription had a marked effect on Johnson's demeanor and competence. One of Johnson's § 2255 mental health experts, Dr. George W. Woods, Jr., testified that Zoloft at the dosage Johnson was taking can and did cause a change in her mental state, making her unduly sedated or "zoned out," and that side effects of an excessive Zoloft dosage include agitation, irritability, increased depression, and suicidal ideation. Hearing Transcript at 4481-83. Indeed, he testified that the amount of Zoloft that Johnson was prescribed was, in his view, a "toxic level." *Id.* at 4482. In response to my questions, however, Dr. Woods acknowledged that he had never personally studied the effect of a 300-mg dosage of Zoloft on individuals, but had "relied upon Goodman and Gilman's Textbook of Pharmacology," which he admitted also did not address any specific dosage of Zoloft. *Id.* at 4492-93.[45] He also testified that he looked at two studies in a book on drugs and psychomotor functioning, but he admitted that neither of those specifically addressed a dosage of 300

---

[45] *See* GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS (12th ed. 2011).

mg, because one study involved dosages of 200 mg and the other involved dosages of 400 mg. *Id.* at 4493. For his opinion that Johnson's ability to assist in her defense and present a beneficial demeanor were compromised, he relied on Johnson's self-reporting and information from her trial counsel and family members. *Id.* at 4494. He ultimately testified that it was not the increased Zoloft dosage alone that affected Johnson's competence and demeanor, but her "vulnerable brain" that made her potentially more susceptible to the effects of drugs and the impact of excessive levels of Zoloft and other medications on her vulnerable brain. *Id.* at 4504-05.

Turning to first hand observations of Johnson's demeanor, Johnson's jury consultant testified that, during jury selection, she had perceived Johnson's demeanor to be at times "girly or giddish" and at times "harsh" or "judgmental," *see id.* at 338, but that she also noted that Johnson was actively participating in the jury selection process. *Id.* at 339. On the other hand, Nancy Lanoue, the paralegal who had spent the most time with Johnson prior to trial, described Johnson's demeanor during the trial itself as "drugged" or "out of it," *see id.* at 430-41, and Johnson's daughter, Alyssa, described Johnson's expression during trial as "blank," very different from the happy or upbeat person she had been most of her life, and that Johnson strangely showed only minimal interest in the proceedings when they talked during breaks. *Id.* at 1657-58. Others who knew Johnson also noted that she seemed uninterested or out of touch during the proceedings, often apparently "doodling" rather than focusing on the proceedings. Her trial counsel also noted differences in her behavior during trial, which one attributed to a need to establish a psychological or mental separation from the evidence. *See id.* at 1558. Another of her trial counsel admitted that, during the trial, Johnson "mostly scribbled and drew pictures," that she "had some lucid moments and other times . . . didn't appear to be with it, so she was kind of in and out," *id.* at 3136-37, and ate lots of candy, although he "was at the time

226

thinking, well, you know, it's better if she's zoned out than if she's going to react." *Id.* at 1337-38.

The respondent notes that Johnson's trial counsel had been concerned about Johnson acting out and behaving inappropriately, *see id.* at 3136-37, 3139, and that Johnson reinforced those concerns during jury selection. Therefore, trial counsel instructed Johnson to maintain her composure, not to roll her eyes or make audible comments, and to maintain a poker face. *Id.* at 964. During trial, when jurors sent out a note complaining that they could not see Johnson, trial counsel instructed Johnson not to glare at witnesses and to "try to have a pen in your hand and a notepad and appear to be interested in what's going on." *Id.* at 1557. The respondent argues that what Johnson now asserts was "doodling" appeared to the jury to be appropriate note-taking. The respondent also asserts that there is evidence that, during the mitigation phase, Johnson's behavior in response to witnesses and evidence was appropriate. *Id.* at 1559, 966-67. The respondent also points out that Dr. Cunningham, one of Johnson's trial experts, interviewed her for five hours a few days after the change in her medication, but did not observe anything that made him believe that she was sedated, agitated, or otherwise over-medicated, *id.* at 3865, although Dr. Woods contends that two days after a medication change would be too soon to note any change. The respondent also notes that Johnson's trial counsel, who saw more of her than anyone else did during the trial, did not see any changes in her behavior in the course of the trial or any appearance of over-medication, *id.* at 966-67, and did not have any concerns about her competence or ability to understand and assist in the proceedings, *id.* at 964-67, 997, 1559, 3136-3139. Thus, the respondent asserts that changes in Johnson's demeanor were consistent with her trial counsel's instructions about maintaining a poker face.

## 2. Errors of counsel involving demeanor and competence

The first facet of Johnson's ineffective assistance claim relating to her demeanor and competence, Claim **8** (Johnson's Claim One, § D), is the only merits phase claim that Johnson has briefed. Johnson alleges that her trial counsel failed to reduce her medication or to address the effects of the medication on her demeanor at trial and her ability to participate in her own defense, in violation of her right to due process and a fair trial. The second facet of this claim, Claim 9 (Johnson's Claim One, § E), alleges that trial counsel failed to seek a competency hearing. I will consider these allegations of error separately, then in the aggregate, if there was any deficient performance, for purposes of determining whether or not Johnson has shown the necessary prejudice to obtain relief.

### a. Claim 8: Failure to address the effect of medication

***i. Arguments of the parties***. Johnson argues that capital jurors want and expect to see remorse, as is confirmed by answers that trial jurors gave in their questionnaires before jury selection and during *voir dire*, as well as the jurors' complaint to the court that they could not see Johnson during the trial. She contends that jurors were prevented from seeing remorse, because she was over-medicated and her trial counsel did nothing about it.

Somewhat more specifically, she argues that her trial counsel were oblivious to the dramatic alteration of her demeanor caused by the increase in her medication and the false picture that her demeanor was presenting to the jury, because the medication prevented her from showing her remorse, pain, and intense suffering. She points out that the prosecution made a point of arguing her apparent lack of remorse in the mitigation phase. She contends that trial counsel should have noted the changes in her demeanor and, at the very least, should have explained to the jury, for example, through experts, the impact of Johnson's medications on her demeanor, so that jurors would not have a false impression

of her. She argues that the effect of trial counsel's obliviousness and inaction was to make her "Government's Exhibit A" in aggravation. She argues that she was prejudiced by trial counsel's failings, because of the influence in capital proceedings of jurors' assessments of a defendant's behavior, manner, facial expressions, and emotional responses, or their absence. She argues that, had trial counsel discovered and properly addressed the over-medication issue, there is a reasonable probability that jurors would have seen a profoundly different person—profoundly disturbed and unable to control her behavior without large dosages of medication—so that they mistook a drugged person for a cold, uninterested, compassionless, and remorseless killer. If shown a proper picture, Johnson contends, at least one juror would have voted to spare her life.

The respondent counters that Johnson cannot prove either deficient performance or prejudice as to this allegation of ineffective assistance of counsel. First, the respondent argues that trial counsel's decision not to reveal to the jury the instructions that they had given Johnson about her demeanor was reasonable, because jurors likely would have been offended that Johnson had been instructed to conceal her real emotions, and, because Johnson did not testify, it was not proper for trial counsel to comment on her demeanor. The respondent contends that what medications and dosages Johnson was taking were likely beyond the scope of an attorney's general expertise, but the more important issue was the effect any change in medications might have had on her. The respondent points out that trial counsel did not note a change in Johnson's demeanor and unanimously testified that they had no concern that she was unable to understand the proceedings or to assist in her defense. The respondent also argues that Johnson cannot show prejudice, because she has not established that she actually took the medication or that her supposed demeanor change was consistent with side-effects of Zoloft over-medication or the timing of the change in her medication. Instead, the respondent argues that Johnson was

displaying a potentially damaging demeanor during jury selection and that trial counsel advised her to adopt a poker face, which she apparently did do. The respondent also argues that the record shows that Johnson showed appropriate responses to mitigation phase witnesses and evidence. Next, the respondent argues that there is no evidence of whether or not the jury believed that Johnson lacked remorse from her demeanor, and Johnson did not testify herself at the evidentiary hearing to demonstrate that she suffered any remorse, pain, or suffering as a result of her participation in the murders of five people, and there is no other evidence that Johnson's medications prevented her from showing emotion. The respondent contends that, contrary to Johnson's characterization, the prosecution never commented on her demeanor, but on the lack of evidence of remorse. In short, the respondent argues that the jurors did see the "real" Johnson.

In her reply, Johnson asserts that the respondent confuses "competency" with "demeanor," where the latter may have a huge impact on a jury. She contends that, while her trial counsel may not have had concerns about her competency, their hearing testimony does indicate that they had problems with her demeanor. She also argues that her trial counsel could have taken appropriate steps to monitor and control her demeanor, including checking on any changes or dosages of her medications, but did nothing. She also argues that, contrary to the respondent's contentions, her demeanor is a matter of legal significance and, also contrary to the respondent's contentions, that she is not suggesting that her trial counsel should have informed the jury that they had instructed her to conceal her true emotions. She also contends that, if her demeanor was an illegitimate factor for jurors to consider, she can, and does, offer evidence of jurors' observations of her demeanor, which she argues is permitted by Rule 606(b) of the Federal Rules of Evidence.

*ii.*    ***Analysis***.  I agree with Johnson that a defendant's "competence" and a defendant's "demeanor" are separate issues, although both are at issue in the facet of this ineffective assistance claim identified as Claim **8**.  Specifically, "'[a] defendant has a due process right not to be convicted while incompetent and to have his competence determined in an evidentiary hearing." *United States v. Mueller*, 661 F.3d 338, 352 (8th Cir. 2011) (quoting *United States v. Long Crow*, 37 F.3d 1319, 1325 (8th Cir. 1994), with internal citations omitted).  "'Under 18 U.S.C. § 4241(a), a district court is required to grant a motion requesting a competency hearing when "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."'" *Id.* at 353 (quoting *United States v. Whittington*, 586 F.3d 613, 618 (8th Cir. 2009), in turn quoting 18 U.S.C. § 4241).  Thus, "competence" raises a due process issue of the defendant's mental state and ability to understand and assist in the proceedings at the time of trial.

While a court considering a defendant's competence to stand trial should consider the defendant's demeanor, as well as his or her behavior and psychiatric history, *see United States v. Turner*, 644 F.3d 713, 721 (8th Cir. 2011), Johnson has not cited, and I have not found, any authority for a due process right to be tried only while displaying an appropriate demeanor.  Nevertheless, a defendant's demeanor, even if the defendant does not testify, can be a significant factor in how a jury or a sentencing judge views the defendant.  As Johnson points out, in a concurrence in *Riggins v. Nevada*, 504 U.S. 127 (1992), Justice Kennedy observed,

> It is a fundamental assumption of the adversary system
> that the trier of fact observes the accused throughout the trial,

> while the accused is either on the stand or sitting at the defense
> table. This assumption derives from the right to be present at
> trial, which in turn derives from the right to testify and rights
> under the Confrontation Clause. *Taylor v. United States*, 414
> U.S. 17, 19, 94 S. Ct. 194, 195, 38 L. Ed. 2d 174 (1973) (per
> curiam). At all stages of the proceedings, the defendant's
> behavior, manner, facial expressions, and emotional responses,
> or their absence, combine to make an overall impression on
> the trier of fact, an impression that can have a powerful
> influence on the outcome of the trial. If the defendant takes
> the stand, as Riggins did, his demeanor can have a great
> bearing on his credibility, persuasiveness, and on the degree
> to which he evokes sympathy. The defendant's demeanor may
> also be relevant to his confrontation rights. *See Coy v. Iowa*,
> 487 U.S. 1012, 1016-1020, 108 S. Ct. 2798, 2800-2802, 101
> L. Ed. 2d 857 (1988) (emphasizing the importance of the
> face-to-face encounter between the accused and the accuser).
>
> The side effects of antipsychotic drugs may alter
> demeanor in a way that will prejudice all facets of the defense.

*Riggins*, 504 U.S. at 142 (Kennedy, J., concurring); *see also Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (observing that the "demeanor [of mentally retarded defendants] may create an unwarranted impression of lack of remorse for their crimes"); *United States v. Winters*, 416 F.3d 856, 860 (8th Cir. 2005) (holding that the sentencing court properly rejected a reduction for acceptance of responsibility, where the sentencing court, "which had the opportunity to observe the [defendant's] demeanor at sentencing, was within its discretion to conclude that he had not accepted responsibility for his offense" (citing *United States v. Morris*, 139 F.3d 582, 584 (8th Cir. 1998)); *United States v. Shepherd*, 284 F.3d 965, 967 (8th Cir. 2002) (holding that the trial judge did not abuse his discretion by removing an uncooperative defendant from the courtroom during trial on the ground that the trial judge "thought that if [the defendant] remained in the courtroom his demeanor would harm his case in the eyes of the jury"); *United States v. Sanchez*, 659 F.3d 1252,

1258-59 (9th Cir. 2011) ("A defendant's demeanor in the courtroom is arguably relevant to determining his guilt or innocence, and in determining his credibility."). Thus, the failure to address a defendant's demeanor problems may have an impact on whether or not the defendant received a fair trial.

Even if a defendant's demeanor has an impact on the jury, the Fifth Circuit Court of Appeals has observed that there is a difference between jurors' inevitable observation of a non-testifying defendant's demeanor and a prosecutor's comment on such a defendant's demeanor:

> The precedents that we have discovered from other circuits agree that courtroom demeanor of a non-testifying criminal defendant is an improper subject for comment by a prosecuting attorney. Of course, it is inevitable that jurors will observe a defendant at counsel table during the course of a trial. Some jurors may form opinions from these observations regardless of instructions given them by the court. This is a natural consequence of a defendant's decision to exercise his right to be present at trial. *See Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). But the prosecutor may not elevate these opinions that may arise with "no help from the court" to the status of evidence which jurors should consider during their deliberations. *United States v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir. 1973).
>
> Mendoza did not testify. His courtroom demeanor was not "in any sense legally relevant to the question of his guilt or innocence of the crime charged." *Id.* The prosecutor's comments were error.

*United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (footnotes omitted).

Addressing this last issue first, I do not find that the prosecutor improperly commented on Johnson's *demeanor* during trial, when he argued the issue of lack of remorse. *See id.* Johnson has not pointed to arguments by the prosecutor in the merits

phase that Johnson lacked remorse, and in the mitigation phase, the prosecutor quite properly commented on the lack of any *evidence* of remorse. *See* Trial Transcript at 4031-32 (prosecution's mitigation phase closing argument noting, "And remorse, there's no evidence, not a shred of evidence, of remorse in this case.").

I turn, then, to that part of Claim **8** in which Johnson alleges that her trial counsel were ineffective in failing to reduce her medication or to address its effects on her demeanor at trial. It is clear that Johnson had a problem with her demeanor *before* the merits phase of the trial began and *before* her Zoloft dosage was increased. That problem was apparent to her trial counsel, *see* Hearing Transcript at 3136-37, 3139 (testimony that, prior to trial, trial counsel had been concerned about Johnson acting out and behaving inappropriately); her jury consultant, *see id.* at 338 (testimony that, during jury selection, she had perceived Johnson's demeanor to be at times "girly or giddish" and at times "harsh" or "judgmental"); to me; and to anyone who had seen a news video of Johnson being taken from the federal courthouse by the United States Marshal Service in the course of pretrial proceedings in which she appeared to be enjoying the attention and her notoriety.

It is equally clear that her demeanor changed at or shortly after the beginning of the merits phase, that is, at the time or shortly after her Zoloft dosage was increased. That change was also noted by her trial counsel, *see id.* at 1558, 3136-37; by the paralegal who had worked most closely with her during preparation of the case, *see id.* at 430-41; her family members, *see id.* at 1657-58; and even by me. However, that change in demeanor was consistent with trial counsel's instructions to try to counter Johnson's prior demeanor problems, *See id.* at 964, 1557, and with what one of her trial counsel reasonably thought was a need to establish some mental separation from the evidence, *see id.* at 1558.

In my view, in light of Johnson's prior problems with demeanor, her trial counsel

reasonably concluded that "it's better if she's zoned out than if she's going to react." *Id.* at 1337-38. There was also no convincing evidence that trial counsel should have or did perceive a problem with Johnson's ability to assist with her defense. Moreover, the record and my own observations at the time indicate that Johnson's demeanor was more animated and appropriately responsive to witnesses and evidence during the mitigation phase. That being the case, I do not see a "trigger" in what trial counsel knew or observed that should have prompted reasonable counsel to investigate the effects of Johnson's medication, to suggest offering evidence about her medication and its effect on her demeanor, or to request an instruction on the effect of her medications on her demeanor. To put it another way, under the circumstances presented here, I do not find that trial counsel's failure to discover and address the alleged effect of Johnson's medications on her demeanor constituted deficient performance. *See Strickland*, 466 U.S. at 688 (deficient performance is the first prong of an ineffective assistance claim).

Even if I were persuaded that trial counsel performed deficiently in failing to discover and address the effect of Johnson's increased Zoloft dosage upon her demeanor, I cannot find that Johnson was prejudiced by that deficiency. *Strickland*, 466 U.S. at 691-92 (an ineffective assistance of counsel claim also requires proof of prejudice, that is, a showing of a reasonable probability that the outcome of the proceeding would have been different, but for counsel's unprofessional errors); *Gianakos*, 560 F.3d at 821 ("'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" (quoting *Strickland*, 466 U.S. at 691)). For many of the same reasons that a non-testifying defendant's flat or disengaged demeanor may be significant in the eyes of a jury, a non-testifying defendant's inappropriate reactions to evidence, witnesses, and her circumstances may also be significant—and just as detrimental. *See, e.g., Riggins*, 504 U.S. at 142

(Kennedy, J., concurring). Johnson's assertions of prejudice ignore the two-edged sword that her demeanor problems presented: An overly-reactive demeanor posed just as much if not more of a threat to her defense as a flat demeanor. If anything, I find that Johnson's change in demeanor was to her *advantage*, not to her *detriment*. *Cf. Shepherd*, 284 F.3d at 967 (recognizing that a defendant's demeanor in the courtroom could harm his case in the eyes of the jury). Indeed, because I faced Johnson head on throughout the trial, while the jurors saw her in profile, sometimes partially obscured by her trial counsel, I was in a better position even than the jurors to observe her demeanor, and I did not see anything sufficiently inappropriate about it *once the merits phase began* to raise concerns that she was prejudiced by trial counsel's failure to address it. There is also simply no evidence that Johnson's increased Zoloft dosage made her incapable of showing remorse or any other appropriate demeanor, where Johnson did not testify at the § 2255 hearing and the record does not include any other evidence that I find shows that she was remorseful. *See, e.g.,* Trial Transcript at 3968-76 (my comments, during a conference on mitigation phase Jury Instructions, that I did not see any evidence of remorse).

Also, in light of the overwhelming evidence presented of Johnson's involvement in the murders of five people, including two young girls, I cannot say that there is any reasonable probability that the outcome of the merits phase (or for that matter, the mitigation phase) would have been any different had trial counsel offered evidence about Johnson's medication and its effect on her demeanor at the time of trial or had trial counsel requested and received an instruction on the effect of Johnson's medication on her demeanor at the time of trial. This is so, because such evidence would not have changed the evidence of Johnson's involvement in the killings nor would it have mitigated her culpability at the time of the killings. *Strickland*, 466 U.S. at 691-92 (proof of prejudice requires a showing of a reasonable probability that the outcome of the proceeding would

have been different, but for counsel's unprofessional errors).

Thus, this part of Claim **8** does not warrant any relief, standing alone.

The second part of Claim **8** is that Johnson's trial counsel failed to address the effect of her medication on her ability to participate in her own defense. I conclude that this part of Claim **8** also does not warrant any relief, standing alone. For essentially the same reasons that I do not see a "trigger" in what trial counsel knew or should have known that would have prompted reasonable counsel to investigate and address the effect of Johnson's medication on her demeanor, I do not see a "trigger" in what trial counsel knew or should have known that should have prompted reasonable counsel to investigate and address the effect of her medication on her ability to participate in her defense. *Cf. Crenshaw v. Wolff*, 504 F.2d 377, 380 (8th Cir. 1974) (affirming the district court's finding "that there was no evidence that the trial attorney knew or should have known about petitioner's possible incompetency, and therefore should not be charged with neglect in failing to raise the matter"). Although, as noted above, a defendant's demeanor may be indicative of his or her competence to stand trial, *see Turner*, 644 F.3d at 721, I have already rejected Johnson's contention that her demeanor was negatively affected by her medication, so it follows that her demeanor would not have suggested to reasonable counsel that her competence to stand trial was affected by her medication. Thus, Johnson has failed to show deficient performance of trial counsel in this respect. *See Strickland*, 466 U.S. at 688 (deficient performance is the first prong of an ineffective assistance claim).

Even if I were persuaded that Johnson's trial counsel performed deficiently in failing to address the effect of her medication on her ability to participate in her own defense, I am not persuaded that Johnson suffered any prejudice from that deficiency. *Strickland*, 466 U.S. at 691-92 (an ineffective assistance of counsel claim also requires proof of prejudice, that is, a showing that the outcome of the proceeding would have been

different, but for counsel's unprofessional errors); *Gianakos*, 560 F.3d at 821 ("'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" (quoting *Strickland*, 466 U.S. at 691)). To show prejudice in this context, Johnson must show that, had trial counsel raised the issue, there is a reasonable probability that I would have found her incompetent to stand trial. *See Paul v. United States*, 534 F.3d 832, 845 (8th Cir. 2008). Even now, Johnson has not presented any persuasive evidence that her increased Zoloft dosage made her incompetent to stand trial, notwithstanding Dr. Woods's *post hoc* opinions that Johnson was not competent. First, Dr. Woods did not attribute Johnson's incompetence *solely* to her elevated Zoloft dosage, but to the effect of her elevated Zoloft dosage on her "vulnerable brain." Second, Dr. Woods's testimony notwithstanding, there is simply no evidence that, because of her elevated Zoloft dosage (with or without a vulnerable brain), Johnson's ability "to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense" was impaired. 18 U.S.C. § 4241; *Mueller*, 661 F.3d at 352; *Long Crow*, 37 F.3d at 1325. Trial counsel believed from their observations and interactions with Johnson, and I believe from my observations of her throughout her criminal proceedings, that she was participating in her defense. Thus, there is no reasonable probability that, had trial counsel raised the issue of the effect of her medication on her competence, I would have found Johnson incompetent and, consequently, there is no prejudice from this alleged deficiency of counsel.

Therefore, neither of the parts of Johnson's ineffective assistance claim alleged in Claim **8** warrants any relief, standing alone, nor do they considered in the aggregate.

### b.    *Claim 9:  Failure to seek a competency hearing*

In Claim 9, another facet of Johnson's first claim of ineffective assistance of counsel in the merits phase, Johnson asserts that her trial counsel were ineffective in failing to seek a competency hearing.  As indicated in the Second Amended § 2255 Motion, this unbriefed claim incorporates the allegations set forth in Claim **8**.  *See* Second Amended § 2255 Motion, § I.E, at 29.  However, it also appears to be broader in scope than Claim **8**, because it involves trial counsel's failure to seek a competency hearing based on Johnson's alleged multiple mental impairments and her trial counsel's failure to consult with qualified mental health experts, as well as her elevated Zoloft dosage.  I conclude that this facet of Johnson's first merits phase ineffective assistance claim also does not warrant any relief, standing alone.

As to the deficient performance prong of this allegation of error, I have already rejected the contention that trial counsel were ineffective in failing to seek a competency hearing on the basis of the effect of Johnson's medication.  Additional considerations relating to Johnson's mental health also would not have suggested to reasonable counsel that they should raise Johnson's competence to stand trial.  *See Crenshaw*, 504 F.2d at 380 (affirming the district court's finding "that there was no evidence that the trial attorney knew or should have known about petitioner's possible incompetency, and therefore should not be charged with neglect in failing to raise the matter").  Here, none of Johnson's trial mental health experts had suggested that Johnson was incompetent to stand trial, nor had anyone else's observations of her behavior.  *See Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008) (holding that counsel did not perform deficiently in failing to argue adequately that the defendant was incompetent, where none of the trial mental health experts employed by counsel expressed any belief that the defendant was mentally unable to comprehend his legal situation or to communicate rationally with counsel); *Paul*, 534 F.3d at 845 (finding

no deficient performance where counsel had sought mental health evaluations before trial, but received no indication that the defendant was incompetent); *Vogt v. United States*, 88 F.3d 587, 592 (8th Cir. 1996) (finding no deficient performance in failing to raise a competency issue, where examinations by mental health professionals had not raised a concern of incompetence, and the trial judge and the prosecutor corroborated trial counsel's testimony that the petitioner's behavior and demeanor were unexceptional, raising no concerns of incompetence).

The fact that Johnson was later able to find a mental health expert, Dr. Woods, to opine that she was not competent to stand trial does not make trial counsel's conduct at the time of trial unreasonable. As the Eighth Circuit Court of Appeals explained in *Forsyth*,

> That Forsyth was able in 2001 [seven years after his conviction] to obtain a psychiatrist, Dr. Logan, who was willing to testify that Forsyth was unable to understand the nature of the proceedings against him or to rationally communicate with his counsel does not make trial counsel's conduct unreasonable. *See Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007). Trial counsel is not required by the Sixth Amendment to continue shopping for a psychiatrist until a favorable opinion is obtained. *Id.* Further, given the weight of psychiatric opinion on Forsyth's competence, Dr. Logan's testimony is unlikely to have swayed the trial court even if he had testified at the competency hearing. In light of trial counsel's own observations and the above-described expert opinions, trial counsel was not objectively unreasonable in choosing not to argue that Forsyth's initial delusions rendered him incompetent to stand trial. Accordingly, the district court did not err by finding that the Iowa courts' rulings were not unreasonable regarding either the facts or the applicable federal law.

*Forsyth*, 537 F.3d at 892. Similarly, here, the fact that, in 2010, five years after her trial, Johnson was able to obtain a psychiatrist, Dr. Woods, who was willing to testify that

Johnson was incompetent to stand trial does not make trial counsel's conduct in failing to seek a competency hearing unreasonable. *Id.* Here, as in *Forsyth*, trial counsel had not received indications from any of the mental health experts already employed that Johnson was incompetent to stand trial, and, in light of trial counsel's and my own observations of Johnson's demeanor and behavior, trial counsel was not unreasonable in choosing not to assert Johnson's incompetence to stand trial. *Id.*

Moreover, even if Johnson could show deficient performance on this allegation of error, she cannot show prejudice. Again, there is no reasonable probability that I would have found her incompetent to stand trial, even if trial counsel had raised the issue at the time. *See Paul*, 534 F.3d at 845 (defining prejudice in this context). Even now, Johnson has not presented any persuasive evidence that she was incompetent to stand trial, notwithstanding Dr. Woods's *post hoc* opinions that she was not competent. First, after careful consideration of the evidence presented by Dr. Woods in Johnson's § 2255 proceedings, I join other federal courts in finding that Dr. Woods's *post hoc* opinions that a petitioner was incompetent at the time of trial or suffered from a mitigating mental defect at the time of the offense, while based on his good faith beliefs, ultimately are not persuasive.[46] *See Forsyth*, 537 F.3d at 892 (concluding that, given the weight of the

---

[46]Several courts have expressly rejected Dr. Woods's *post hoc* opinions that a petitioner was incompetent to stand trial or mentally impaired at the time of the offense. *See, e.g., Cullen v. Pinholster*, ___ U.S. ___. ___, 131 S. Ct. 1388, 1410 (2011) (reversing federal court decisions granting *habeas* relief, and affirming the state court's conclusion that additional mitigating evidence from Dr. Woods, gathered years after the conviction, concerning the petitioner's mental illness, was of questionable mitigating value, where it would have opened the door to rebuttal by a state expert); *Crittenden v. Ayers*, 624 F.3d 943, 961-52, 964-66 (9th Cir. 2010) (rejecting Dr. Woods's opinion that the petitioner acted under extreme stress and was unable to form the requisite intent for

(continued...)

conviction at the time of the offense, where Dr. Woods did not examine the petitioner until after the trial, and his evidence was refuted by overwhelming evidence of deliberation and premeditation, and also rejecting Dr. Woods's *post hoc* opinion that evidence of an organic brain disorder should have been investigated as mitigating evidence in the mitigation phase, where none of the seven mental health professionals consulted by trial counsel before the mitigation phase diagnosed such a disorder, concluding that the petitioner's argument "turn[ed] on a latter-day battle of experts that is insufficient to warrant federal habeas relief," and "Dr. Woods' singular diagnosis of an organic mood disorder with bipolar features amounts to a difference in medical opinion, not a failure to investigate" (internal quotation marks and citations omitted)); *Boyde v. Brown*, 404 F.3d 1159, 1166-67 (9th Cir. 2005) (finding Dr. Woods's opinion about the petitioner's competence to stand trial unpersuasive, where it was based on interviews with the petitioner a full decade after the petitioner's murder trial, and all of the contemporaneous evidence suggested that the petitioner was competent); *Sims v. State*, 2011 WL 334295. *57 (Tenn. Crim. App. Jan. 28, 2011) (slip op.) (concluding that "mitigating evidence obtained from the neuropsychological evaluation [by Dr. Woods, long after the trial] was merely speculative"); *Hodges v. Bell*, 548 F. Supp. 2d 485, 495-96, 500-01 (M.D. Tenn. 2008) (rejecting Dr. Woods's opinion, rendered more than a decade after the petitioner's trial, that the petitioner was incapable of deliberating at the time of the murder and unable to conform his conduct to the law because of a severe emotional disturbance, as contrary to the facts of the murder and the opinions of other mental health experts who examined the petitioner throughout his life or shortly after the murder); *see also Massie v. Woodford*, 244 F.3d 1192, 1197 (9th Cir. 2001) (agreeing with the district court that the petitioner failed to present meaningful evidence of his current incompetency to be executed, where, among other evidence, the petitioner offered the opinion of Dr. Woods, who had never examined the petitioner and had based his opinion on records that were twelve years old).

At least one court has also rejected Dr. Woods's *post hoc* opinion as to the petitioner's mental state at the time of the offense on the ground that it contradicted the petitioner's merits phase defense. *See Sully v. Ayers*, 2008 WL 2128171, *7-*8, *10 (N.D. Cal. May 20, 2008) (denying relief on a claim of ineffective assistance of counsel in failing to assert at the mitigation phase that the petitioner suffered from mental impairments, supported by Dr. Woods's declaration as to the petitioner's mental state at the time of the offense made eleven years after the verdict, not because Dr. Woods's

(continued...)

evidence was speculative, but because his theory would have contradicted a merits phase "innocence" defense).

On the other hand, at least one court has been willing to rely on Dr. Woods's *inability* to opine on the petitioner's mental state at the time of the offense to reject a claim of incompetence at the time of trial. *Stanley v. Cullen*, 633 F.3d 852, 863 (9th Cir. 2011) (holding that there was insufficient evidence of the petitioner's incompetence during the merits phase of his trial to sustain an ineffective assistance of counsel claim based on failure to move for a competency hearing, where Dr. Woods testified that he could not conclude to a medical certainty that the petitioner was incompetent during the merits phase).

Courts that have found Dr. Woods's *post hoc* opinions about a petitioner's mental state at the time of the offense to be sufficient have done so in circumstances where there was no contemporaneous evidence of the petitioner's mental state, *see Hamilton v. Ayers*, 583 F.3d 1100, 1129 (9th Cir. 2009) (finding that evidence from experts retained for purposes of the petitioner's habeas petition, including Dr. Woods, about his mental health at the time of trial was sufficient to support a claim of ineffective assistance of counsel, where counsel had made no investigation to discover "the abundance of classic mitigating evidence that was available" and, instead, abandoned his investigation after acquiring only rudimentary knowledge of the petitioner's history from a narrow set of sources), or where the question was simply whether his evidence was sufficient to avoid dismissal or to raise a triable issue. *See United States v. Sampson*, ___ F. Supp. 2d ___, 2011 WL 5022651, *34 (D. Mass. Oct. 20, 2011) (finding that an affidavit by Dr. Woods opining that the petitioner was incompetent at the time of trial was "facially sufficient" to avoid dismissal of an ineffective assistance of counsel claim for failure to seek a competency hearing before trial); *Dennis v. Ayers*, 2008 WL 5411576, *4-*5 (N.D. Cal. Dec. 29, 2008) (finding that Dr. Woods's *post hoc* conclusion that the petitioner was delusional at the time of the offense was sufficient to raise a triable issue of fact on the petitioner's claim that trial counsel was ineffective in failing to investigate and enter a plea of not guilty by reason of insanity).

I have not found, and Johnson has not identified, any decision embracing Dr. Woods's *post hoc* opinion as to the petitioner's mental state at the time of the offense or the petitioner's competence to stand trial as sufficient proof on the merits of a *habeas* claim for relief based on mental state at the time of the offense or competence to stand trial

(continued...)

evidence of the petitioner's competence at the time of trial, a mental health expert's opinion several years later that the petitioner was incompetent was unlikely to have swayed the trial court, even if that expert had testified at the time of trial). There is simply no persuasive evidence that Johnson's ability "to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense" was impaired. 18 U.S.C. § 4241; *Mueller*, 661 F.3d at 352; *Long Crow*, 37 F.3d at 1325. Trial counsel believed from their observations and interactions with Johnson, and I believed from my observations of her throughout her criminal proceedings, that she was participating in her defense; trial counsel was not presented with any other contradictory evidence at the time; and Johnson has not produced any convincing evidence in these proceedings that she was incompetent at the time of trial. Thus, there is no reasonable probability that, had trial counsel raised the issue of Johnson's competence, I would have found Johnson incompetent and, consequently, there is no prejudice from this alleged deficiency of trial counsel. This claim, standing alone, does not warrant relief.

Moreover, where there is no showing of prejudice from any allegations of error at issue in Claims **8** and 9, the aggregate of no prejudice for all facets of this ineffective assistance of counsel claim is no prejudice, so that this claim warrants no relief.

### 3.    *Claim 10: Trial while incompetent*

Johnson has also raised, but not briefed, as Claim 10 (her Claim Five), a claim that she was tried while incompetent, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. This claim relies on essentially the same evidence offered in support of Claim **8** (Johnson's Claim One, § D) and Claim 9 (Johnson's Claim

---

[46](…continued)
or trial counsel's ineffective assistance in failing to raise those issues.

One, § E) and, indeed, expressly incorporates those claims. *See* Second Amended § 2255 Motion at 144. The difference between Claim 10 and Claims **8** and 9, however, is that this claim is not an ineffective assistance of counsel claim, but a stand-alone claim that Johnson was tried while incompetent, because she was not able to provide needed information to her trial counsel, communicate effectively with her trial counsel, or participate in her defense.

This claim also fails for some of the same reasons that Johnson's ineffective assistance claims concerning her competence to stand trial fail. There is simply no persuasive evidence that Johnson's ability "to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense" was impaired. 18 U.S.C. § 4241; *Mueller*, 661 F.3d at 352; *Long Crow*, 37 F.3d at 1325. Trial counsel believed from their observations and interactions with Johnson, and I believed from my observations of her throughout her criminal proceedings, that she was participating in her defense; I certainly was not presented with any other evidence at the time suggesting that Johnson was incompetent; and Johnson has not produced any convincing evidence in these proceedings that she was incompetent at the time of trial.

Johnson is not entitled to § 2255 relief on this claim.

### B. Claims 11 through 16: Counsel's Errors Relating To Investigation And Presentation Of A Merits Phase Defense

Johnson's last merits phase claim is a multifaceted claim of ineffective assistance of counsel in the investigation and presentation of a merits phase defense, comprising Claims *11*, *12*, *13*, *14*, 15, and *16* (Johnson's Claims One, §§ F and H.1, F and H.2, T, F and I, F, and G, respectively). However, only parts of that claim were timely asserted, those parts comprising Claim 15 (parts of Johnson's Claim One, § F), alleging that trial

counsel erred in failing to investigate and present evidence from three witnesses (a forensic expert; the Duncans' neighbor, Phyllis Proscovec; and a gun shop owner), or to investigate or present evidence in support of an after-acquired information theory or an alibi defense.[47]

Somewhat more specifically, Johnson alleges that her trial counsel made no attempt to retain or present any evidence from a forensic expert to challenge the prosecution's forensic evidence, or the lack of forensic evidence, tying Johnson to the murders. Similarly, she alleges that trial counsel made no timely investigation, that is, prior to the potential witness's death, of Phyllis Proscovec, a neighbor of the Duncans, whose account of the events on July 25, 1993, was inconsistent with the prosecution's theory. She alleges that trial counsel also made no investigation of the owner of the gun shop where she purportedly purchased the gun used in the killings, to determine whether he remembered selling the gun, whether Honken was present that day, and whether Honken chose the gun that she purchased. Johnson also alleges that trial counsel made no investigation of her assertion that she acquired *from Honken*, after the fact, the information shown in the maps and other materials that she gave to McNeese. Specifically, she asserts that she obtained

---

[47]I found, above, that Claims *11, 12, 13, 14*, 15, and *16*, in aggregate, present a single, multifaceted claim of ineffective assistance of counsel in the investigation and presentation of Johnson's defense on the merits. However, I also found, above, that only Claim 15 will be considered on the merits, because the rest of the pertinent allegations of error do not relate back to the filing of Johnson's § 2255 Motion. Also, as indicated, for example, in the Summary Of Claims To Be Considered On The Merits in Section II.C of this ruling, Johnson's Claim One, § F, is broader than Claim 15, because Johnson's Claim One, § F, also incorporates allegations of error reiterated in her Claim One, §§ H.1, H.2, I, and T (Claims *11, 12, 14*, and *13*, respectively), all of which are untimely. To put it another way, Claim 15 comprises only the portions of Johnson's Claim One, § F, that are both timely and not overlapping with other sections of Johnson's Claim One.

this information when she visited Honken while he was incarcerated in Florence, Colorado. She contends that trial counsel simply dismissed this after-acquired knowledge theory without any attempt to assess its credibility. Finally, Johnson alleges that trial counsel made no investigation of her own whereabouts on July 25, 1993, even though she told her trial counsel that she was either at home or at work on that evening, and that trial counsel, instead, wrote off this assertion as a fantasy defense. She asserts that it would have been relatively easy to subpoena her work records for July 25, 1993, but Learned Counsel did not do so, because he did not want to give Johnson the impression that he was even close to believing her purported alibi.

Johnson argues that trial counsel's failure to investigate or present any of this evidence violated trial counsel's obligation to conduct a thorough and independent investigation of guilt, despite trial counsel's belief that there was "overwhelming" evidence of guilt. She points out that funds were available to conduct an adequate merits phase investigation and that there was no strategic or tactical reason for failing to investigate her guilt. She also argues that she was prejudiced by trial counsel's failings in these respects, because adequate investigation might have facilitated an early plea, by assessing the strength of the prosecution's case, or would have shown that it was improper to abandon any defense on the merits without calling a single defense witness. She adds that, because of this lack of investigation, there was no evidence, in the mitigation phase, to support the non-statutory mitigating factor of residual doubt, but if trial counsel had done an adequate investigation on the merits, at least one juror would have voted to save her life on the basis of residual doubt.

As explained, above, "'strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after a less than complete investigation are reasonable precisely to the extent that

reasonable professional judgments support the limitations on investigation.'" *Orr*, 636 F.3d at 952 (quoting *Strickland*, 466 U.S. at 690–91). "On the other hand, strategic choices 'resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.'" *Armstrong*, 534 F.3d at 864-65; *see also Francis*, 557 F.3d at 901 ("In other words, the strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy of counsel's investigation.'" (quoting *White*, 416 F.3d at 732, in turn relying on *Strickland*, 466 U.S. at 690-91)).

I agree with Johnson that trial counsel's investigation of her case, in general, and in each of the specific areas that she raises in this claim, in particular, was woefully and shockingly inadequate, entitling trial counsel's choices not to offer the identified evidence or theories to no presumption of reasonableness. *Id.* Indeed, Gordon Gratias, the second investigator employed by Johnson's trial counsel, frankly admitted at the evidentiary hearing that "[i]t was the worst job I've ever done in 40 years." Hearing Transcript at 2353. He noted, for example, that his request for authorization to investigate witnesses that the prosecution had struck off its witness list a few months before Johnson's trial was ignored, *see id.* at 2334, that he was never asked to follow up on lists of potential witnesses from Johnson herself, *see id.* at 2336, and that his requests to do follow up investigations on other information obtained from Johnson were ignored, *see id.* at 2337. In the context of a capital case, trial counsel's failure to address these requests was unconscionable. I am so horrified at the shoddiness of trial counsel's investigation of this case, in general, that it would serve little purpose to parse the specific allegations of error to determine in which respects trial counsel failed to perform an adequate investigation of the merits or in which respects reasonable professional judgments supported limitations on

investigation.[48]  Thus, Johnson has satisfied the first prong of this claim of ineffective assistance of counsel, by demonstrating deficient performance.  *See Strickland*, 466 U.S. at 688 (deficient performance is the first prong of an ineffective assistance claim).

That conclusion does not mean that Johnson is entitled to any relief on this claim, however, because she must also show that she was prejudiced by counsel's deficient performance.  *See Strickland*, 466 U.S. at 691-92 (an ineffective assistance of counsel claim also requires proof of prejudice, that is, a showing that the outcome of the proceeding would have been different, but for counsel's unprofessional errors); *Gianakos*, 560 F.3d at 821 ("'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'"  (quoting *Strickland*, 466 U.S. at 691)).  Here, where Johnson is challenging her conviction, to determine whether she was prejudiced, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  She cannot make that showing here.  This is not a case in which the guilty verdicts were "only weakly supported by the record," and thus, "more likely to have been affected by errors," but verdicts "with overwhelming record support."  *Id.* at 696.  "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings," I cannot say that there is any probability, or anything more than a minute possibility, that

---

[48]Nevertheless, I will note that, in addition to the timely allegations of error in Claim 15, each of which involves what I believe was deficient performance, I can find no justification for trial counsel's failure to attack Robert McNeese's testimony with my findings regarding his credibility in the *Massiah* hearing, as alleged in untimely Claim *11*.

the decision reached *on the merits* would have been different absent the errors. *Id.*[49]

Johnson is not entitled to relief on this or any other merits phase claim. Thus, her convictions withstand *habeas corpus* review, even in light of the heightened *habeas* review in death cases that some courts have used. *See, e.g., Strickland*, 466 U.S. at 704 (Brennan, J., concurring in part and dissenting in part) (observing, in *habeas* proceedings pursuant to § 2254, that "we have consistently required that capital proceedings be policed

---

[49]There is also, at best, only a remote possibility, not a reasonable probability, that the decision in the mitigation phase would have been different, absent these errors. The only mitigating factor that Johnson asserts would have been enhanced, had trial counsel performed a better investigation of a merits phase defense, is "residual doubt," and I cannot find that that mitigating factor would have been enhanced sufficiently to outweigh the aggravating factors, even drawing all reasonable inferences from the evidence that Johnson asserts in Claim 15 should have been presented during the merits phase, but for trial counsel's errors. *See Strickland*, 466 U.S. at 695 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). For example, although trial counsel performed deficiently in failing to investigate Johnson's claim that she was not present at the Nicholson/Duncan killings, and only afterwards acquired information about those killings, there is overwhelming evidence that she was, indeed, present for and a participant in those killings. Johnson also has not pointed to *any* evidence to support a contention that she was not present or involved in the killing of Terry DeGeus, for which she also received the death penalty. Similarly, while trial counsel performed deficiently in failing to investigate whatever information Phyllis Proscovec might have provided before she died, based on what trial counsel knew at the time, it is now clear that there are so many incongruities in Proscovec's statement that her testimony, if it had been obtained, would ultimately have added nothing to a "residual doubt" mitigator. For example, Proscovec's assertion that she went to the Duncan residence to take the Duncan girls to school on the morning that the Duncans disappeared is implausible, because there is no evidence that the Duncan girls were in summer school in late July 1993.

*at all stages* by an especially vigilant concern for procedural fairness and for the accuracy of factfinding" (emphasis added)); *Stumpf*, 653 F.3d at 435 (observing, in capital *habeas* proceedings, "The principle is beyond dispute, both legally and logically, that there exists a 'heightened "need for reliability in the determination that death is the appropriate punishment in a specific case."'" (quoting *Caldwell*, 472 U.S. at 323, in turn quoting *Woodson*, 428 U.S. at 305 (plurality opinion)), *rehearing en banc granted and opinion vacated* (Oct. 26, 2011); *Stouffer*, 168 F.3d at 1173 (observing that the court's "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" (quoting *Burger*, 483 U.S. at 785)); *Smith*, 379 F.3d at 939 (observing that, on *habeas* review of a capital case, the court's duty of "heightened attention parallels the heightened demands on counsel in a capital case.").[50]

## VII.  ERRORS IN THE MITIGATION PHASE

I concluded, above, that Johnson asserts six separate claims of errors in the mitigation phase:  The first claim (aggregating Claims **18, 19, 20, 21, 22, *23, 24,*** and ***25***) involves multiple facets of ineffective assistance of counsel in the confrontation of aggravating evidence; the second claim (aggregating Claims **26, 27,** and **28**) involves multiple facets of prosecutorial misconduct, which the Eighth Circuit Court of Appeals directs should be considered for their cumulative effect; the third claim (aggregating Claims **29, 30, 31, 32,** and ***33***) involves multiple facets of ineffective assistance of counsel in the mitigation evidence that was presented; the fourth claim (aggregating Claims **34, 35, *36*, 37, 38, *39, 40,* 41, *42, 43*,** and 44) involves multiple facets of ineffective assistance

---

[50] I observed, above, that Claim 17 (Johnson's Claims One, § JJ, and Seven), a "cumulative error" claim, is barred by Eighth Circuit precedent.

of counsel in failing to investigate, prepare, and present mitigation evidence; the fifth claim (Claim 45) involves ineffective assistance of counsel in failing to object to the mitigation phase determination and evident juror confusion; and the sixth claim (Claim *64*) involves application of an improper burden of proof for the weighing of aggravating and mitigating factors. Because I denied leave to amend to add the sixth claim, I will consider only the first five.

### A. Counsel's Errors In Confronting Aggravating Evidence

Johnson's first mitigation phase claim (aggregating Claims **18, 19, 20, 21, 22, 23, 24,** and **25**) involves multiple facets of ineffective assistance of counsel in the confrontation of aggravating evidence. I will consider in turn trial counsel's failure to confront each category of aggravating evidence that was timely challenged. However, I will first explore the standards for relief on a claim of ineffective assistance of counsel in challenging aggravating evidence.

#### 1. Applicable standards

Because decisions about challenging witnesses and evidence generally fall into the category of "strategic choices," courts "'generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel.'" *United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (quoting *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001)). Nevertheless,

> we heed the Supreme Court's guidance that, "'[a]bsent competent counsel, ready and able to subject the prosecution's case to the "crucible of meaningful adversarial testing," there can be no guarantee that the adversarial system will function properly to produce just and reliable results.'" *Driscoll v. Delo*, 71 F.3d 701, 706 (8th Cir. 1995) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 377, 113 S. Ct. 838, 122 L. Ed. 2d

252

180 (1993) (Stevens, J., dissenting)).  In that vein, "[t]he Eighth Circuit has found constitutionally deficient performance of trial counsel based on ineffective cross-examination where counsel allowed inadmissible devastating evidence before the jury or when counsel failed to cross-examine a witness who made grossly inconsistent prior statements." *Whitfield v. Bowersox*, 324 F.3d 1009, 1017 (8th Cir. 2003), *vacated in part on other grounds by*, 343 F.3d 950, 950 (8th Cir. 2003) (citing *Hadley v. Groose*, 97 F.3d 1131, 1135–36 (8th Cir. 1996); *Driscoll*, 71 F.3d at 709–11).  Specifically, "[a] failure to impeach constitutes ineffective assistance when there is a reasonable probability that, absent counsel's failure, the jury would have had reasonable doubt of the petitioner's guilt." *Id.* at 1018 (citing *Driscoll*, 71 F.3d at 711).

*Orr*, 636 F.3d at 952.

Thus, as to challenges to the prosecution's witnesses, the "threshold of reasonable professional competence required by *Strickland*" may be violated, for example, by failure to impeach "especially critical" testimony, particularly where counsel cannot articulate a reasoned strategy for not doing so. *Id.* at 953 (citing *Steinkuehler v. Meschner*, 176 F.3d 441, 445 (8th Cir. 1999)).  On the other hand, counsel does not perform deficiently in cross-examining a particular witness if counsel does elicit testimony that calls the witness's credibility into question and points out the weaknesses of the witness's story. *Parker v. Bowersox*, 188 F.3d 923, 928 (8th Cir. 1999).  Even where unreasonable performance is shown, it may be difficult to show the requisite prejudice, because "it is very difficult to show the trial outcome would have been different had specific questions been asked on cross examination, particularly where other trial testimony repeatedly corroborated the [challenged] testimony." *Orr*, 636 F.3d at 952 (internal quotation marks and citations omitted).  Similarly, a petitioner cannot show prejudice from failure to impeach a witness where the inconsistencies in a witness's pretrial statements and trial testimony are "very

slight," because the likelihood of a different result must be considered in light of the evidence as a whole. *Johnson v. United States*, 278 F.3d 839, 843 (8th Cir. 2002).

I conclude that essentially the same standards concerning counsel's failure to impeach a witness would apply to counsel's failure to challenge or refute other evidence or the prosecution's theory of the case. For example, in *Showers v. Beard*, 635 F.3d 625 (3d Cir. 2011), the Third Circuit Court of Appeals considered a petitioner's claim that her counsel had been ineffective in failing to present expert evidence to try to refute the prosecution's theory that she administered liquid morphine to her husband to kill him and to support her theory that the victim committed suicide. *See Showers*, 635 F.3d at 631. The basis for the petitioner's theory was that a victim would not unknowingly drink liquid morphine without a substantial masking agent to cover its bitterness, but no such masking agent was found in the victim's stomach. *Id.* The court concluded that the petitioner's trial counsel had performed deficiently, because he failed to establish key facts that could have led a jury to find that the petitioner's husband voluntarily consumed the liquid morphine. *Id.* at 632. This was so, notwithstanding some attempts by trial counsel to use a less-qualified expert to elicit some of the points in support of a suicide theory, where counsel ignored a suggestion by one of his experts to employ one of three better-qualified experts on the specific issue of masking of liquid morphine. *Id.* As to the prejudice prong of the analysis, the court held that closing arguments could not sufficiently exploit the gaps in the prosecution's evidence, because closing arguments are not evidence, and testimony concerning the amount of masking agent necessary to disguise such a large dose of morphine, time of absorption, and autopsy reports, from a credible, objective expert would have cast such serious doubt on the prosecution's case as to raise a reasonable probability that the outcome would have been different. *Id.* at 633-34; *see also Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("Although it may not be necessary in every instance

to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance."); *id.* at 1240-46 (discussing, in detail, whether new blood evidence would have been likely to change the outcome on a statutory "special circumstance" for a death penalty). Thus, as with ineffective assistance claims related to flawed impeachment of witnesses, a claim of failure to confront aggravating evidence involves consideration of deficient performance in light of how critical the evidence was, what evidence was available to counsel to rebut the aggravating evidence, and what counsel did do in response to the aggravating evidence. *Cf. Orr*, 636 F.3d at 952-53; *Parker*, 188 F.3d at 928. It also involves consideration of prejudice in light of the probability that adequate efforts to rebut the evidence would have changed the outcome. *Id.*

### 2. Claim 18: Failure to challenge the prosecution's theory for DeGeus's murder

In Claim **18** (Johnson's Claim One, § J), Johnson asserts that her trial counsel were ineffective in failing to present evidence of battered woman's syndrome to explain her relationship with DeGeus, which she contends would have rebutted or refuted the prosecution's theory that her motive for killing DeGeus was revenge for the beatings that he had inflicted upon her. The respondent denies that this allegation of error warrants any relief.

#### a. Arguments of the parties

Johnson argues that her trial counsel failed to respond to the prosecution's "revenge" theory with readily-available evidence that she suffered from battered woman's syndrome, which made the "revenge" theory untenable. She argues that, without the framework of battered woman's syndrome, which would have explained to jurors why she

still loved DeGeus, despite the beatings that he had administered, the defense's argument that Johnson had not killed DeGeus on other occasions, when she might have been legally justified in doing so, and feared him, underscored, rather than rebutted, the prosecution's theory. Johnson argues that trial counsel had available both an expert, Dr. Hutchinson, who could have testified about battered woman's syndrome and its effects, and plenty of other evidence to demonstrate that Johnson suffered from that syndrome. What expert evidence trial counsel did elicit concerning Johnson's continued love for DeGeus, despite his brutal treatment of her, was rendered useless, Johnson contends, by trial counsel's concessions (and the court's instructions) that none of the evidence was offered to explain Johnson's state of mind at the time of the offenses. She also argues that trial counsel had no strategic reason not to present this evidence, and that Learned Counsel even recognized that Johnson had a romanticized view of DeGeus that he could not explain, where she had almost the opposite view of Honken. Johnson argues that evidence of battered woman's syndrome, in the context of a holistic mental health presentation, would not only have refuted the prosecution's theory that she participated in the killing of Terry DeGeus for revenge, but would have bolstered the entire mental health mitigation presentation. Failure to present this evidence, she argues, was thus deficient performance.

The respondent argues that there was, indeed, evidence that Johnson's motive for killing DeGeus was revenge, including evidence that she brought a bat to inflict injury on DeGeus before killing him and a note from Johnson to McNeese concerning the locations of the bodies of the murder victims, stating that DeGeus "was buried on his knees like he would make me be when I would beg for my life." Exhibit 312C. The respondent also argues that there was sufficient evidence that Johnson feared what would happen when DeGeus learned that she was pregnant with Honken's child to support a motive for killing DeGeus. The respondent also argues that trial counsel elicited sufficient evidence to

reasonably, if ultimately unpersuasively, respond to the prosecution's "revenge" theory, including testimony from Dr. Hutchinson about how Johnson responded to DeGeus's violence, which included express references to "battered woman's syndrome," and evidence from other witnesses that Johnson loved DeGeus despite his violence toward her. As to prejudice from any purportedly deficient performance of trial counsel, the respondent argues that its primary theory for Johnson's participation in DeGeus's murder was not revenge, but intent to further the drug enterprise, and that the jury found that Johnson aided and abetted DeGeus's murder in furtherance of the drug enterprise. The respondent contends that the prosecution relied on revenge only as a basis for imposing the death penalty against Johnson for DeGeus's murder, in response to defense counsel's argument that Johnson should not be sentenced to death for that murder when Honken received a life sentence for it. The respondent also argues that a secondary motive of revenge might actually have been a mitigating factor, because it would have suggested that the murder of DeGeus was not wholly for greedy and selfish reasons of furthering a drug operation and might have made the jury more sympathetic to Johnson, because of her suffering at the hands of her victim.

In reply, Johnson reiterates her contention that whatever evidence of battered woman's syndrome trial counsel may have presented was rendered useless by trial counsel's explicit and repeated assertions to the jury that none of the evidence related to Johnson's state of mind at the time of the offenses. Thus, nothing that Dr. Hutchinson or any other witness said about Johnson's battering by DeGeus could have been used by the jury to assess the prosecution's theory of her motive for killing him. Johnson also reiterates that she was prejudiced by trial counsel's deficiencies, because it is ludicrous to suppose that revenge as a secondary motive was mitigating, particularly where the prosecution used revenge as a basis for imposing the death penalty on Johnson for a

murder for which Honken only received a life sentence. Johnson argues that, had Dr. Hutchinson been able to explain that there is a well-recognized syndrome common to women who are battered, and that when women like Johnson who suffer from that syndrome commit acts of violence, it is out of fear, not revenge, that testimony would have been powerful mitigating evidence. Prejudice from trial counsel's failings, she argues, is apparent from her death sentence for a murder for which Honken got a life sentence.

### b. Analysis

I have no hesitation in concluding that trial counsel performed deficiently in the mitigation phase in failing to confront the prosecution's "revenge" theory for DeGeus's killing with evidence of battered woman's syndrome that specifically addressed Johnson's mental state at the time of the offense. That theory was "especially critical" or "pivotal" to the determination of the appropriate penalty for DeGeus's killing, *cf. Orr*, 636 F.3d at 953; *Showers*, 635 F.3d at 632; *Duncan*, 528 F.3d at 1235, because, as the respondent admits, the secondary "revenge" motive was used to establish a basis for giving Johnson the death penalty for aiding and abetting a killing for which the shooter, Honken, only received a life sentence. As will be explained in more detail below, there was no adequate strategic reason for avoiding this or any other evidence of Johnson's mental state at the time of the offenses. Thus, the failure to present readily available evidence, including expert evidence, concerning battered woman's syndrome, was deficient. *See Showers*, 635 F.3d at 632; *Duncan*, 528 F.3d at 1235. It was not enough that there were stray mentions of the violence to which Johnson was subjected by DeGeus and Johnson's continuing affection for DeGeus despite it, or even that there were stray mentions of battered woman's syndrome, because there was no attempt to tie together the evidence, the syndrome, and the extent to which the syndrome explained the evidence, Johnson's mental state, and her conduct. *Cf. Orr*, 636 F.3d at 952 (considering what evidence counsel did

present); *see also Showers*, 635 F.3d at 632; *Duncan*, 528 F.3d at 1235.

Even acknowledging that prejudice from such deficient performance may be "very difficult" to show, *see id.,* Johnson has made that showing.  Evidence from a credible defense expert about battered woman's syndrome and its impact on Johnson's conduct and mental state *at the time of DeGeus's murder* would have cast such serious doubt on the prosecution's "revenge" theory as a basis for differentiating between Honken and Johnson as to raise a reasonable probability that the outcome of the mitigation phase would have been different as to Johnson's death sentence for killing DeGeus.  *Cf. Showers*, 635 F.3d at 633-34; *Duncan*, 528 F.3d at 1240-46.  This is not an example of a slight or merely nuanced difference in the evidence that could have been and actually was presented, or an example of evidence that would have been swallowed by other overwhelming evidence of death-worthy conduct, but an example of a difference of substantial magnitude.

The conclusion that the outcome probably would have been different as to the sentence for DeGeus's killing, had trial counsel properly challenged the prosecution's "revenge" theory with evidence of battered woman's syndrome, has no effect on the death sentences for other killings.  Whether those death sentences are also undermined is a separate question.

Thus, Johnson is entitled to § 2255 relief from the death sentence for the killing of DeGeus on this allegation of an error of trial counsel, standing alone.

### 3.      Claims 19, 20, and 21: Failure to confront the prosecution's arguments that Johnson was "worse" than Honken

Johnson makes three allegations of errors by trial counsel in failing to confront the prosecution's arguments that she was "worse" than Honken.  In Claim **19** (Johnson's Claim One, § M), Johnson asserts that her trial counsel were ineffective for failing to present readily-available evidence about Honken to refute the prosecution's argument that

Johnson was "worse" than Honken; in Claim **20** (Johnson's Claim One, § N), she asserts that her trial counsel were ineffective for failing to use the prosecution's arguments at Honken's trial as party admissions to rebut the prosecution's evidence that she was "worse" than Honken; and in Claim **21** (Johnson's Claim One, § P), Johnson asserts that her trial counsel were ineffective for failing to discover and present information regarding Honken's plans to kill a prosecutor and his family and Honken's membership in a white supremacist prison organization. I concluded, above, that these allegations of error, with Claim **18**, are part of a single, multifaceted claim of ineffective assistance of counsel. I conclude that, even if it is not proper to consider these allegations of error in the aggregate as multiple facets of a single ineffective assistance claim, they are so related or interrelated that they can be discussed as a group.

### a. Arguments of the parties

All three of these allegations of error arise from Johnson's contention that, at the penalty phase in her trial, the prosecution elicited testimony that Honken was a studious young man who had no proclivity for violence until he met Johnson and, from this premise, argued that Johnson had manipulated and encouraged Honken, or used him as a pawn under her sway, to commit the charged crimes, so that she was "worse" or more culpable than Honken. Johnson contends that there was readily available evidence, catalogued in each of these claims, to refute this characterization of Honken as non-violent and of her as the moving force behind the murders. Johnson argues that trial counsel had access to all of this information, either from the discovery file or the transcript in Honken's trial, which had been made available to them, or that such information could have been readily discovered, had trial counsel pursued an adequate investigation from the leads in discovery material and available transcripts. She argues that trial counsel had no strategic reason for failing to pursue and present such evidence, but have admitted that they

simply failed to follow up on the available information and were then simply surprised by the extent to which the prosecution portrayed Honken as Johnson's mild-mannered pawn in Johnson's trial. Johnson contends, for example, that testimony from the prosecutor toward whom Honken had made threats would have vividly portrayed Honken as a violent schemer far more effectively than any evidence that defense counsel did present. She argues that some of the witnesses called by the defense actually reinforced the false image of Honken. She also argues trial counsel made matters worse by calling one of Honken's defense attorneys to testify that Honken was sentenced to death for the murders of the children, which trial counsel mistakenly thought would make death sentences for Johnson impossible, but then trial counsel failed to support that argument with evidence that Johnson really was less culpable than Honken and was actually dominated by him. She argues that she was prejudiced by all of these failings, because, had a more realistic picture of Honken been painted by the defense, the evidence, taken as a whole, would have made it reasonably probable that the jurors would have found her less culpable than Honken and, therefore, not deserving of death sentences for any of the crimes.

The respondent argues that Johnson's claims about how the prosecution portrayed Honken are inaccurate, because the prosecution did not argue that Honken had no proclivity to violence before he met Johnson, but that Honken had not engaged in acts of violence until he met Johnson. The respondent disputes Johnson's contention that any portrayal of Honken by the prosecution in either trial was false or even inconsistent. The respondent also points out that many of Honken's plans for violent retribution against cooperators and law enforcement officers occurred *after* he met Johnson, so that they do not show that Honken was a violent schemer before he met Johnson.

The respondent also argues that there is no demonstration of deficient performance, because there was, and is, no evidence to show that Honken ever engaged in any violent

acts prior to meeting Johnson, and Johnson produced none at the evidentiary hearing. The respondent also argues that trial counsel offered reasonable strategic reasons for calling one of Honken's trial attorneys to testify about the verdicts against Honken, because Johnson's trial counsel reasonably believed that Johnson, who was charged only with aiding and abetting Honken, was consequently more likely to be sentenced only to life imprisonment, where Honken received the death sentence, but only for two of the five killings. The respondent also argues that it is not necessarily true that Johnson's trial counsel would have succeeded in using the cited portions of the prosecution's closing argument in Honken's trial as admissions in Johnson's trial, because the statements are not statements of fact, but conclusions that the prosecution believed that jurors could draw from the evidence. The respondent argues that, in any event, there is nothing inconsistent between the prosecution's statements in the two trials, because none of the cited statements was an assertion that Honken was more culpable than Johnson. The respondent also argues that Johnson is relying on a hindsight view of what the prosecution argued in Johnson's trial, not what trial counsel knew at the time. Moreover, the respondent argues that Johnson now concedes that trial counsel was aware of all of the evidence that she now asserts should have been presented, including the *substance* of the prosecutor's report concerning threats to his safety, so that trial counsel was not deficient in failing to discover any of it.

The respondent also argues that Johnson has failed to show prejudice from these claims of error, because nothing in the record at the time or that Johnson has produced since would have precluded the prosecution from arguing that Honken never committed a violent act and would not have killed anyone until he met Johnson, and the prosecution never explicitly described Johnson as the "driving force" behind the murders. The respondent also argues that Johnson is not relying on undiscovered evidence, but evidence that her trial counsel were aware of and reasonably concluded would not have assisted their

arguments about relative culpability, because it would only have corroborated the prosecution's argument that Honken was not violent absent someone like Johnson to give him the courage to engage in violent acts.

In reply, Johnson explains that the gravamen of these claims is not that any witness lied, but that her trial counsel failed to rebut the prosecution's fallacious portrait of Honken with readily available evidence that would have enabled the defense to counter the prosecution's argument that Johnson was the catalyst for these crimes because Honken had never committed a violent act until he met her. Johnson also argues that the respondent's distinction between Honken planning violent acts and committing violent acts is much too fine, not least because the jurors were never required to make such a distinction, where they were not exposed to evidence of Honken's pre-1993 plans for and acts of violence. She also argues that the prosecution's closing arguments in Honken's case would have been admissible as admissions of an opponent and that they are contrary to statements in her case, because of the change in the prosecution's characterization of who was the planner, organizer, and motive force for the murders in the two cases. She points out that the evidence of prejudice from trial counsel's failings is clear, because not one juror found the mitigating factor that her participation in the murders was relatively minor compared to Honken's.

### b.    *Analysis*

*i.    **Admissions by the prosecutor***. I begin my analysis with what I believe is the weakest—although perhaps the most complex—of these allegations of error, Claim **20** (Johnson's Claim One, § N), Johnson's contention that her trial counsel should have used statements of the prosecution about Honken in Honken's trial as admissions in her trial to undermine the prosecution's portrait of her as "worse" than Honken. I have set out those

"admissions" in the following footnote with identifying numbers that I have given them.[51]

[51]Johnson identified the following as "admissions" by the prosecution in Honken's trial:

> [1]  Dustin Honken was the chemist.  He was the one with the knowledge that was necessary to building a meth lab and not just some country bumpkin meth lab but a meth lab such as DEA Agent Mizell described, a super lab that produces methamphetamine of a high quality, better than 90% methamphetamine.

Honken Trial Transcript at 3220 (merits phase closing argument by Mr. Miller).

> [2]  I would submit to you that among [Dustin Honken, Tim Cutkomp, and Jeff Honken], clearly Dustin Honken was the organizer of this criminal activity.  It is he who was the chemist.  It is he who had the know-how.  It is he who actually put together the method of manufacturing methamphetamine.  It is he who invited Tim Cutkomp to Arizona.  It is he who distributed drugs through Terry DeGeus and through Greg Nicholson.

Honken Trial Transcript at 3292 (merits phase closing argument by Mr. Miller).

> [3] Suggested to you [by the defense] that Dustin Honken is merely a chemistry nerd.  He's a smart guy.  He understands chemistry.  He understands organic chemistry.  Not a lot of people do.  But that doesn't mean he isn't also a criminal schemer and manipulator.

Honken Trial Transcript at 3392 (merits phase rebuttal closing argument by Mr. Miller).

> [4] However, no one in that partnership did more to organize that operation than Dustin Honken.  He was the man with the

(continued...)

(…continued)

       know-how.   He was the chemist.   He was the one who recruited the other participants.  He was the one who told Greg Nicholson about the plans for the future growth of the drug business.

Honken Trial Transcript at 3404 (merits phase rebuttal closing argument by Mr. Miller).

       [5] What kind of man after doing that [killing Greg Nicholson and the Duncan family] and having his own son born three months later can lure Terry DeGeus out to a site knowing what he's done, knowing what the consequences are, and murder another human being and a month later—you saw the video—have a happy Christmas with his family?

Honken Trial Transcript at 3903 (mitigation phase closing argument by Mr. Williams).

       [6a] This is somebody who can think long and hard and rationally about how he's going to slaughter people and think about what he did in this case.  We know that he literally hunted down Greg Nicholson, that he developed a plan for gaining entry into the house, that they intentionally borrowed Christie Gaubatz's car because they didn't want to be found. That's thinking long in advance about how he's going to do this crime.

       [6b] We know that he purchased a handgun through his girlfriend Angela Johnson.  Now, think about the purchase of that handgun.  Angela Johnson was actually the person who bought the gun.  But who do you think went in there?  Who's the person who gets into guns, who has gun magazines in his locker at work?  Who do you think walked into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there?  Do you think Angela Johnson

(continued…)

(…continued)
            picked it out?  Defendant picked it out.

Honken Trial Transcript at 3905-06 (mitigation phase closing argument by Mr. Williams).

            [7a] We also know that he thought this out long and hard.
            You remember the Poor Man's James Bond Book, at 1991,
            that was seized from the defendant's house in 1996?
            Remember this page from it?  Remember the language on this
            suggesting that if you really want to do a good job in making
            sure that you have a more effective gag you stuff a piece of
            cloth in their mouth and use duct tape across it?  You don't
            think this defendant was thinking this out far in advance on
            exactly how he was going to do this?

            [7b] We know that he buried Greg Nicholson and the Duncan
            family in a remote site.  This is somebody who thinks these
            things out in advance.  Do you think after abducting these
            people that he started driving around looking for a possible
            spot, or do you think this defendant knew exactly where he
            was going to bury these people, had it cased out, had found a
            place that he knew was secluded, some woods that nobody
            would go to?

Honken Trial Transcript at 3906-07 (mitigation phase closing argument by Mr. Williams).

            [8] The defendant plans, schemes, thinks out these things long
            in advance.

Honken Trial Transcript at 3908 (mitigation phase closing argument by Mr. Williams).

            [9a] Now, think back about the way this defendant thinks, the
            way he plans, the way he schemes.  [Lori Duncan's] name was
            in that ring.  Do you think it was accidental, do you think it

                                                        (continued…)

                                    266

            was accidental that her ring was found downstairs [sic] from a dam miles away from the burial site, or do you think this defendant's thinking this out, thinking, I've got to divert the police from any chance of finding this body, so I'm going to throw her ring so that the police can find with her name in it, and I'm going to throw it in this river?

            [9b] And when did he take that ring off her finger? We know there was spiral fracture of the finger, her ring finger on her hand as testified to by Dr. Steadman. Did he rip it off her hand while she was still alive? Did he rip it off her hand when she was dead?

Honken Trial Transcript at 3910 (mitigation phase closing argument by Mr. Williams) (incorrectly cited by Johnson as Honken Trial Transcript at 3912 as part of a single quotation including the statements identified here as 10a and 10b).

            [10a] Incarceration, we know, doesn't deter this defendant. He was incarcerated in the Woodbury County Jail and was still plotting to kill. He's not deterred by law enforcement. He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families. And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

            [10b] The defendant will plan an escape. You know how this defendant thinks now, don't you? You know what he's capable of. You know how intelligent he is. You know how he schemes and plans and thinks.

Honken Trial Transcript at 3912 (mitigation phase closing argument by Mr. Williams).

(continued...)

The parties dispute the legal standards applicable to the question of the admissibility of a prosecutor's statements in closing arguments in a prior, related trial. The respondent relies on *United States v. DeLoach*, 34 F.3d 1001 (11th Cir. 1994), and *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), as stating the applicable standards. In reply, Johnson argues that the *McKeon* test is inapplicable to arguments of the prosecution, citing *United States v. Salerno*, 937 F.2d 797 (2d Cir. 1991), and *United States v. Bakshinian*, 65 F. Supp. 2d 1104 (C.D. Cal. 1999). I must first resolve the issue of the applicable standards.

In *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), the Second Circuit Court of Appeals started with the proposition that "[t]he general admissibility of an attorney's statement, as well as the binding effect of an opening statement within the four corners of a single trial, are . . . well established." *McKeon*, 738 F.2d at 30. The court noted, however, that a different issue is presented as to "the evidentiary use against a criminal defendant of an attorney's seemingly inconsistent statement at an earlier trial to prove that fundamental portions of the defendant's present case are fabricated." *Id.* The court observed, "Authority on this specific issue is scant, although in at least one civil action it has been suggested that while a previous opening statement is not binding on a litigant, the statement can, under certain circumstances be considered by the trier of fact." *Id.* (citing *Beyer Co. v. Fleischmann Co.*, 15 F.2d 465, 466 (6th Cir. 1926)).

---

[51](...continued)
>
> [11] Defendant thinks more of his dog . . . than he does of people, and he has no conscience.

Honken Trial Transcript at 3917 (mitigation phase closing argument by Mr. Williams).

The court foreshadowed its conclusion on the question before it, as follows:

> We believe that prior opening statements are not *per se* inadmissible in criminal cases. To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact.

*McKeon*, 738 F.3d at 31. The court then concluded "that there is no absolute rule preventing use of an earlier opening statement by counsel as an admission against a criminal defendant in a subsequent trial," but the court was "not willing . . . to subject such statements to the more expansive practices sometimes permitted under the rule allowing use of admissions by a party-opponent." *Id.* The court explained "that the evidentiary use of prior jury argument must be circumscribed in order to avoid trenching upon other important policies," for the following reasons: (1) "the free use of prior jury argument might consume substantial time to pursue marginal matters"; (2) "inferences drawn from an inconsistency in arguments to a jury may be unfair"; (3) "the free use of prior jury argument may deter counsel from vigorous and legitimate advocacy"; (4) "where an innocent factual explanation of a seeming inconsistency created by the prior opening statement exists, the offer of that explanation may seriously affect other rights of the defense"; and (5) "the admissibility of a prior opening statement may lead to the disqualification of counsel chosen by the defendant, a most serious consequence." *Id.* at 32-33.

The court in *McKeon* then established the following standards:

> For these reasons, we circumscribe the evidentiary use of prior jury argument. [1] Before permitting such use, the

district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted. The inconsistency, moreover, should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial. [2] The court must further determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant. The formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to act on their behalf, considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements. Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant.

Finally, [3] the district court should, in a Fed.R.Evid. 104(a) hearing outside the presence of the jury, determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist. Where the evidence is in equipoise or the preponderance favors an innocent explanation, the prior opening statement should be excluded. We impose this requirement so as to allow leeway for advocacy and to lessen the burden of choice between the defendant's not explaining the inconsistency to the jury or sacrificing other valuable rights. Moreover, where the attorney-client privilege, the privilege against self-incrimination, the fear of impeachment by a prior conviction, apprehension over having to change attorneys, the revelation of work product, trial tactics, or legal theories of defense counsel may be involved in explaining the changes in the defendant's version of events, the court should

offer an opportunity to the defense to present those reasons *in camera*, outside the presence of the jury and of the prosecution. *In camera* hearings are permitted where the government seeks to use grand jury testimony to overcome the attorney-client privilege or work product immunity, *In re John Doe Corp.*, 675 F.2d 482, 489–91 (2d Cir.1982), and similar considerations apply in the present circumstances.

*McKeon*, 738 F.2d at 33.

Applying these principles, the court in *McKeon* held that the prior opening statement of the defendant's attorney was properly admitted against the defendant under Rule 801(d)(2)(B) and (C) of the Federal Rules of Evidence. *Id.* This was so, because the statements in the two proceedings were "facially and irreconcilably at odds"; "[t]his inconsistency was not the result of differences in the evidence at the trials over which the defendant had no control or even of the behavior of a neutral witness"; because the truth of the matter was known to the defendant, "[a]bsent some explanation to the trial judge, there was every reason to believe that [the defendant] participated in the development of trial strategy regarding this issue at both trials"; and "[t]he offer of the expert testimony was a calculated act factually inconsistent with the version of events offered at the third trial." *Id.* at 33-34. The court explained,

We thus conclude that the circumstances described above amply support an inference that the offer of expert testimony on the use of the bank's xerox machine may be regarded as the equivalent of a testimonial statement by McKeon that he did not ask his wife to copy the documents. They further support an inference that, knowing the expert's testimony was weak because it was untrue and would now be challenged by the expert's instructor, McKeon fabricated a new version of events. Absent an explanation for the radically different version of the facts offered at the third trial, we believe that Judge Platt had little choice but to admit the prior

opening statement as evidence of fabrication demonstrating consciousness of guilt. No such explanation was proffered even though Judge Platt offered an in camera hearing on the reasons for the new version of events. If an innocent explanation for the inconsistency existed, but McKeon's counsel was unwilling to reveal it in open court for reasons explained above, this offer gave him ample opportunity to apprise the trial judge of that explanation without risk of a waiver of McKeon's rights or exposure of work product, trial tactics or legal theories.

*McKeon*, 738 F.3d at 34.

Johnson asserts that, subsequently, in *United States v. Salerno*, 937 F.2d 797 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 317 (1992), the Second Circuit Court of Appeals rejected the application of *McKeon*, which involved allegedly inconsistent statements by the defense in two trials, to inconsistent statements of a prosecutor in two trials. In *Salerno*, defendant Auletta argued "that the district court abused its discretion by precluding him from establishing that the government had prosecuted the [prior] commission case under the theory that Auletta—like many other contractors—was a victim of extortion by the members of the commission, a theory that was inconsistent with the government's position in this case [that Auletta was guilty of fraudulent bid-rigging] [and] that he should have been able to introduce the indictment, as well as the government's opening and closing statements from the commission case as admissions of a party-opponent under Fed.R.Evid. 801(d)(2)." *Salerno*, 937 F.2d at 810-11. The Second Circuit Court of Appeals acknowledged that it did not have to reach this issue, because it had reversed the convictions of all of the defendants on other grounds, but discussed it to provide "guidance," because "a retrial [wa]s likely." *Id.* at 811.

The court in *Salerno* looked to its prior decision in *McKeon*, noting that it had recognized in that case "that serious collateral consequences could result from the

272

unbridled use of [an attorney's prior inconsistent] statements," so that it had "circumscribed the evidentiary use of prior jury arguments," as follows:

> First, "the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial." [*McKeon*, 738 F.2d] at 33. Second, the court must determine "that the statements of counsel were such as to be the equivalent of testimonial statements" made by the client. *Id.* Last, the district court must determine by a preponderance of the evidence that the inference that the proponent of the statements wishes to draw "is a fair one and that an innocent explanation for the inconsistency does not exist." *Id.*

*Salerno*, 937 F.2d at 811. The court in *Salerno* applied *McKeon*, rather than rejecting it, even though the case before it involved statements of a prosecutor, and *McKeon* involved statements of defense counsel. Specifically, the Second Circuit Court of Appeals held in *Salerno* that the district court had abused its discretion in refusing to admit evidence that might have disproved that the defendant had the purpose of rigging bids in mind when he made certain mailings, because the mail fraud statute required proof of specific intent to execute a fraud. *Id.* Specifically, "[h]ad the jury [in Auletta's mail fraud trial] viewed Auletta the way the government did in the commission case, they might have concluded that his purpose was other than bid-rigging when he deposited the bids in the mail," and that Auletta, thus, lacked the specific intent to execute a fraud. *Id.* at 811-12.

After surveying demonstrably inconsistent statements about the defendant in the commission case, the court observed,

> Apparently, the government has taken the same evidentiary clay that they used in the commission case and, for purposes of this trial, resculpted Auletta from a "puppet on a string" to a bid-rigger. The government was free to choose, for tactical or other reasons, not to join Auletta in the commission case,

and to postpone his prosecution until they brought the club case. Even so,

> [t]he jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.
>
> *United States v. GAF Corp.*, 928 F.2d [1253,] 1260 [(2d Cir. 1991)].

*Salerno*, 937 F.2d at 812. The court then concluded,

> In summary, this is a telling example of one of the problems the government creates by framing such huge indictments. A prosecution of this magnitude is necessarily generalized and even vague in some respects, and the "differences" between the commission case and the club case illustrate just how malleable such a prosecution can become. Perhaps Auletta was a culpable bid-rigger; perhaps he was a puppet on a string. The government, at different times, has urged both—and the jury was entitled to know that, because the jury, and not the government, must ultimately decide which he was.

*Salerno*, 937 F.2d at 812.

In *United States v. DeLoach*, 34 F.3d 1001 (11th Cir. 1994), the Eleventh Circuit Court of Appeals read *McKeon* and *Salerno* to be consistent with each other and to lay out the standards applicable to a defendant's claims that the court had erred when it refused to admit portions of the prosecutor's closing arguments in a prior prosecution of a co-defendant (joined with a different co-defendant), which the defendant claimed contained assertions of fact that were inconsistent with the allegations made by the prosecutor against him. *DeLoach*, 34 F.3d at 1005. The court's analysis of the issue was as follows:

Only the Second Circuit has squarely addressed this issue. In *McKeon*, the court said that opening statements of a defendant's attorney in a criminal case are admissible under Rule 801(d)(2) where they are: 1) "assertions of fact" that are the "equivalent of a testimonial statement by the [client];" and 2) "inconsistent with similar assertions in a subsequent trial." *McKeon*, 738 F.2d at 33; *see Salerno*, 937 F.2d at 811 (citing *McKeon* in dicta, indicating that statements meeting these requirements made by prosecutor during summation in prior, related case are admissible). The *McKeon* court also said that, "[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to the weaknesses in the prosecution's case or *invitations to a jury to draw certain inferences should not be admitted.*" *McKeon*, 738 F.2d at 33 (emphasis added). Thus, in the Second Circuit an attorney's arguments may be admissible, but admissibility is tightly circumscribed.

The Government contends that a review of the prosecutor's comments that DeLoach sought to admit establishes that they failed to meet the requirements set out in *McKeon* and *Salerno* because the comments were neither statements of fact nor inconsistent with the Government's position in the present case. We agree.

The prosecutor's comments from *Brown I* [the prior prosecution of a co-defendant] at issue in this case are: 1) "[A] reasonable inference could be drawn from that particular incident back at Biscayne Federal is DeLoach told them if you tell the bank it is okay;" and 2) "Mr. Brown himself admitted, Guy DeLoach did not advise him not to tell the bank." We note incidentally that these statements were made by the prosecutor during closing argument, not during opening statements in which lawyers are, in a sense, prohibited from arguing. In addition, the *Brown I* prosecutor was engaged in "advocacy as to the credibility of witnesses" and inviting the "jury to draw certain inferences," two circumstances under which *McKeon* expressly stated a lawyer's comments would not be admissible. *McKeon*, 738 F.2d at 33. Also, the prosecutor's comments in *Brown I* were

not clearly inconsistent with the evidence presented at DeLoach's trial. To say that DeLoach did not affirmatively advise Brown to lie to the savings and loans, does not mean that both DeLoach and Brown did not, in fact, conspire to lie and, later, lie to the savings and loans.

The comments of the prosecutor were neither statements of fact equivalent to a testimonial statement by the client nor clearly inconsistent with the Government's position in this case. *See Salerno*, 937 F.2d at 811; *McKeon*, 738 F.2d at 33. We conclude that the comments by the prosecutor in *Brown I* would be inadmissible as admissions of a party opponent even under the cases relied upon by DeLoach. So, we also conclude that the district court did not abuse its discretion in prohibiting the admission of the prosecutor's comments from *Brown I*.

*DeLoach*, 34 F.3d at 1005-06. Thus, *DeLoach* again applied the *McKeon* standards to prior inconsistent statements of a prosecutor.

As both parties acknowledge, the United States District Court for the Central District of California *did* expressly reject application of *McKeon*—and by extension, *DeLoach*—to prior inconsistent statements of a prosecutor, on the ground that many of the restrictions on use of prior inconsistent statements in *McKeon* related exclusively to concerns about protecting a defendant's rights. *See United States v. Bakshinian*, 65 F. Supp. 2d 1104, 1107-09 (C.D. Cal. 1999). That court explained,

For example, while the possibility of wasting time would apply to the defendant and the government alike, the possibility that the jury will be misled as to the government's burden applies only to the defendant. *McKeon* noted that because the government bears the burden of proving every element of the offense, the defense need not attack each element in each proceeding and can instead focus only on certain weaknesses. [*McKeon*, 738 F.2d] at 32. This may mislead the jury. *Id.* The government, however, cannot rely

276

on this argument: it bears the burden of proving every element in every proceeding. Therefore, if the government's prior statement weakens its present case as to a certain element, the government cannot complain that the jury may misunderstand the government's burden.

*McKeon* also noted that the admission of prior arguments may deter "vigorous and legitimate advocacy." *Id.* Again, this argument applies only to the defendant. Because the burden of proof is on the government, the defendant need only argue that the government has not met that burden and that something other than the government's theory might have actually occurred.

*Bakshinian*, 65 F. Supp. 2d at 1108. The court in *Bakshinian* also rejected a theory that prior statements of opinions rather than assertions of fact are not evidence. *Id.* at 1109. Instead, the court relied on Rule 801(d)(2) standards to determine the facial admissibility of a prosecutor's prior statements, including opinions, as admissions of a party-opponent. *Id.*

Specifically, the court concluded, as follows:

The government's statement in the *Nabaie* trial falls within the "generous treatment" of party-opponent statements. While the government claims that the statement should be excluded because it was not "evidence," opinions are freely admissible when made by a party-opponent. *See, e.g., Washington Public Power Supply Sys. v. Pittsburgh–Des Moines Corp.*, 876 F.2d 690, 696–97 (9th Cir. 1989); *Owens v. Atchison, T. & S. F. Ry. Co.*, 393 F.2d 77, 79 (5th Cir. 1968) ("[I]t is well settled that the opinion rule does not apply to a party's admissions.").

To the extent the government asserts that the statements were merely invitations to the jury to draw certain inferences, such statements could be admissible to show how the government construed the evidence. This goes to the credibility of the government's case. For example, in the

> *Nabaie* trial, the government asserted that the evidence
> supported the conclusion that Nabaie was the leader of the
> conspiracy. Though this statement is not "evidence" it is a
> statement about the evidence and it reflects on the evidence in
> Bakshinian's case. The government cannot exclude it based on
> arguments that it is not "evidence" or not "testimonial."
> Because the government is a party-opponent, the statement
> falls within the scope of Rule 801(d)(2).

*Bakshinian*, 65 F. Supp. 2d at 1110.

The court in *Bakshinian* cautioned, however, that even if evidence falls within the scope of Rule 801(d)(2) as an admission of a party-opponent, its admissibility was still subject to Rules 401 and 403 of the Federal Rules of Evidence, that is relevance and the weight of its probative value balanced against potential prejudice. *Id.* at 1110. The court found, however, that it could not conclusively determine admissibility of the prosecutor's prior statements at issue in that case under those rules. *Id.* Nevertheless, the court suggested, *inter alia*, that the extent to which the prior statement was inconsistent with a statement at trial would go to its relevance and the weight of its probative value balanced against its potential prejudice. *Id.* The court also recognized "that the admission of a statement by the government in a prior case would raise substantial dangers of confusing the jury and wasting time." *Id.*[52]

I believe that the rejection of the *McKeon-Salerno-DeLoach* standard in the *Bakshinian* decision perhaps throws out the baby with the bath water. While I agree with

---

[52]The only other federal appellate court decision that I can find in which a defendant sought to admit a prosecutor's statements in prior proceedings as an admission pursuant to Rule 801(d)(2) did not ultimately reach that issue, because the appellate court concluded that, "even under the most searching review, the district court's ruling [excluding the prosecutor's prior statement] would amount to harmless error." *See United States v. Nubuor*, 274 F.3d 435, 443-44 (7th Cir. 2001).

the *Bakshinian* court's assessment of *McKeon* to the extent that I find that *some* of the reasons offered in *McKeon* for circumscribing use of an attorney's statements in a prior trial apply *most readily* to defense statements, rather than to prosecution statements, *cf. Bakshinian*, 65 F. Supp. 2d at 1107-08 ("[I]t is clear that *much* of [the *McKeon* court's] analysis is restricted to the use of a defendant's prior statements and is thus inapplicable to prior statements of the government." (emphasis added)), I find that more of the reasons given for circumscribing the use of an attorney's prior statements in *McKeon* apply to statements of a prosecutor, as well as to statements of a defense attorney, than the *Bakshinian* court did. The *Bakshinian* court would only admit that "the possibility of wasting time would apply to the defendant and the government alike," *Id.* at 1108, but I find that preventing undue deterrence of counsel from vigorous and legitimate advocacy, *see McKeon*, 738 F.2d at 32, is also a concern as to arguments of a prosecutor. This is so, because a prosecutor may also legitimately emphasize "inferences or factual conclusions possible in a particular case, . . . except when the truth-seeking purpose clearly demands otherwise." *Id.* To put it another way, a prosecutor may legitimately focus on the conduct and motives of one co-defendant in a separate trial of that co-defendant, then focus on the conduct and motives of another co-defendant in that co-defendant's separate trial, as long as the arguments are reconcilable and both consistent with the same version of the facts. Certainly, in *DeLoach*, the Eleventh Circuit Court of Appeals recognized that a prosecutor may also properly engage in "advocacy as to the credibility of witnesses" and invite the "jury to draw certain inferences," so long as the prosecutor's comments were not clearly inconsistent with the evidence presented in the second case. *DeLoach*, 34 F.3d at 1105-06.

I will consider Johnson's allegation of error by trial counsel in failing to offer statements of the prosecution in Honken's case as admissions in her case under both the

*McKeon-Salerno-DeLoach* standard and the *Bakshinian* standard.

The issue of whether the prosecutor here made inconsistent statements about Honken in Honken's trial and Johnson's trial is raised here in the context of a claim of ineffective assistance of counsel—a different context from the one in which the issue of prior inconsistent arguments arose in *McKeon*, *Salerno*, *DeLoach*, and *Bakshinian*. Thus, I must apply the two-prong *Strickland* test of deficient performance and prejudice. *See Strickland*, 466 U.S. at 688 (deficient performance is the first prong of an ineffective assistance claim); *id.* at 691-92 (an ineffective assistance of counsel claim also requires proof of prejudice, that is, a showing that the outcome of the proceeding would have been different, but for counsel's unprofessional errors). Where the claim is that counsel failed to address the prosecution's theories or evidence, I must consider deficient performance in light of how critical the evidence was, what evidence was available to counsel to rebut the aggravating evidence, and what counsel did do in response to the aggravating evidence. *Cf. Orr*, 636 F.3d at 952-53; *Parker*, 188 F.3d at 928. I must also consider prejudice in light of the probability that adequate efforts to rebut the evidence would have changed the outcome. *Id.*

As to deficient performance, Johnson has demonstrated that her trial counsel never really considered offering the prosecution's prior statements about Honken in the Honken trial in her trial, for any purpose, let alone to show that the prosecution had ostensibly painted an inconsistent picture of Honken in the prior trial, or if her trial counsel did consider doing so, they never made any diligent effort to identify inconsistent statements nor did they make a reasoned decision not to look for them or not to offer them. Thus, their decision not to offer the prosecution's prior statements is not entitled to any presumption of reasonableness. *See Armstrong*, 534 F.3d at 864-65 ("On the other hand, strategic choices 'resulting from lack of diligence in preparation and investigation [are] not

protected by the presumption in favor of counsel.'"); *see also Francis*, 557 F.3d at 901 ("In other words, the strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy of counsel's investigation.'" (quoting *White*, 416 F.3d at 732, in turn relying on *Strickland*, 466 U.S. at 690-91)).

That said, I turn to the merits of trial counsel's failure to offer such evidence bereft of any presumption that the decision was reasonable. In the context of an ineffective assistance of counsel claim, I think that it behooves reasonably diligent counsel to examine any statements of the prosecutor in a prior closely-related case (either a prior prosecution of the defendant or a co-defendant or an otherwise closely-related prosecution arising from the same core of operative facts, even if it involved different defendants and different charges) to look for factual admissions or inconsistent statements. Such factual admissions or inconsistencies, if any, would be readily-available, powerful evidence of how the prosecution viewed the case and, in the case of factual admissions, would potentially bind the prosecution or, at the very least, undermine the prosecution's purportedly different view of the facts in a subsequent trial. *See McKeon*, 738 F.2d at 31 ("That function [of the trial as a truth-seeking proceeding] cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact."); *Salerno*, 937 F.2d at 812 (observing, "'[t]he jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.'" (quoting *GAF Corp.*, 928 F.2d at 1260). To put it another way, such admissions are potentially critical under any circumstances, and the more so when the

question is the relative culpability of co-defendants for capital offenses. *Orr*, 636 F.3d at 952-53 (considering deficient performance, *inter alia*, in light of how critical the evidence in question was); *Parker*, 188 F.3d at 928. Johnson's trial counsel had been provided with transcripts of Honken's trial, presumably for this very purpose, but there is no evidence that they actually reviewed the transcripts for this purpose. Thus, even judging the reasonableness of trial counsel's conduct as of the time of that conduct, *see King*, 595 F.3d at 852-53, trial counsel's failure to make a diligent review of the prosecution's prior statements in the Honken trial was deficient.

I think it is also plain that trial counsel would have performed deficiently in failing to offer a prosecutor's *inconsistent* factual assertions in a prior related prosecution as admissions of an opponent, under a *McKeon-Salerno-DeLoach* standard, and *inconsistent* factual assertions or *inconsistent* opinions under a *Bakshinian* standard. On the other hand, failure to offer statements that were not inconsistent factual assertions or inconsistent opinions would not constitute deficient performance under either standard. As explained above, admissibility under the *McKeon-Salerno-DeLoach* standard expressly turns on whether or not the prior statements were inconsistent factual assertions. *See McKeon*, 738 F.2d at 33 ("Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial."); *Salerno*, 937 F.2d at 811 (same); *DeLoach*, 34 F.3d at 1005 (same). While *Bakshinian* and Rule 801(d)(2) do not require inconsistency of either statements or opinions to establish the facial admissibility of the statements as admissions of a party opponent, *Bakshinian* nevertheless recognizes that the likelihood that a prior statement will be admissible under Rules 401 and 403 turns on whether or not they are inconsistent with trial statements. *Bakshinian*, 65 F. Supp. 2d at 1110. Indeed, in the absence of an inconsistency, it is not clear what strategic purpose would be served by offering a prior

statement of the prosecution, nor is it clear that the prior statement would ultimately be admissible as probative of anything.

I will apply the *McKeon-Salerno-DeLoach* standards, first, then the *Bakshinian* standards, to the "admissions" that Johnson has identified. Again, those "admissions" are set out in footnote 51 with identifying numbers that I have given them.

Only Statement 1 and arguably Statement 8 are straightforward "assertions of fact." *See McKeon*, 738 F.2d at 33; *see Salerno*, 937 F.2d at 811; *DeLoach*, 34 F.3d at 1005. Although there is a factual component to the other statements, each invited the "jury to draw certain inferences" from the facts, which is a circumstance under which *McKeon* and *DeLoach* hold that a lawyer's comments would not be admissible. *McKeon*, 738 F.2d at 33; *DeLoach*, 34 F.3d at 1005-06. Specifically, based on facts identified, Statement 2 invited the jurors to conclude that Honken was an organizer of the criminal drug activity; Statement 3 invited the jurors to reject the notion that Honken was "merely a chemistry nerd" and to conclude, instead, that he was "a criminal schemer and manipulator"; Statement 4 invited the jurors to conclude that nobody did more to organize the drug operation than Honken; Statement 6a invited the jurors to conclude that Honken planned the murders of the victims; Statement 6b invited the jurors to conclude that Honken was the decisionmaker in the purchase of the handgun by Johnson; Statement 7a invited the jurors to conclude that Honken planned how he would gag his victims; Statement 7b invited the jurors to conclude that Honken had pre-selected the burial site for Nicholson and the Duncans; Statement 9a invited the jurors to conclude that Honken schemed and planned to dispose of Lori Duncan's ring in a way that would misdirect the police; Statement 9b invited the jurors to conclude that Honken ripped Lori Duncan's ring off her finger and to consider whether he did it while she was alive or dead; Statement 10a invited the jurors to conclude that incarceration and law enforcement officers do not deter Honken

from criminal conduct; Statement 10b invited the jurors to conclude that Honken would plan to escape; and Statement 11 invited the jurors to conclude that Honken thinks more of his dog than of people. Although lacking the same framing as an invitation to draw a specific inference from certain evidence, Statement 5 nevertheless invites the jurors to draw a negative inference about what kind of man Honken is, from evidence that he celebrated the birth of his son before killing DeGeus and celebrated a happy Christmas with his family after doing so. Thus, none of the identified statements, other than Statements 1 and 8, were admissible under the "factual assertion" requirement of the *McKeon-Salerno-DeLoach* standard.

Furthermore, Johnson has failed to point to any statements by the prosecution in her case that were inconsistent with Statement 1 (that Honken was the chemist of the drug operation) or Statement 8 (that Honken plans, schemes, and thinks things out in advance), or, indeed, any of the other purported admissions that she has identified, so that she also has not shown that these purported admissions are admissible under the "inconsistency" requirement of the *McKeon-Salerno-DeLoach* standard. *See DeLoach*, 34 F.3d at 1006. Johnson's attempt to establish inconsistency is the following:

> At Honken's trial, the prosecution argued that he was intelligent, an organizer and a schemer, and did a lot of planning. [Doc. 325 at 44.] However, at Petitioner's trial, it was Ms. Johnson who was the schemer and planner (*See, e.g.,* Tr. T. 4011) (Petitioner, "through her efforts, through her manipulation, got herself to the top of this organization, partnered with Dustin Honken. . . .") (*Id.*); ("[t]his was a plan from the beginning that [Petitioner] made with Dustin Honken to go kill Greg Nicholson and, towards that end, they plotted."); (regarding the DeGeus homicide, "[Petitioner] has time to think. She has time to contemplate. She has time to reflect upon the conduct that she engaged in . . . [and] she decides to act again.") (*Id.* at 4014); (Petitioner "had the

> power to manipulate" "a tough man [like Terry DeGeus]," "to
> bring him to his own death") (*Id.* at 4015); and ("it was not
> the defendant [who was] entitled to determine what punishment
> Terry DeGeus was to receive for [his abuse of her]. It was not
> the defendant [who was] entitled to make the decision that he
> should receive the death penalty for his past abuse of her") (*id.*
> at 4030). Clearly, the prosecution's argument that "[i]n
> Petitioner's trial, the government did not deviate from the
> assertion Honken was the planner and schemer" [Doc. 325 at
> 45], is belied by the transcript.

Petitioner's Reply To Government's Post-Hearing Brief (Civ. docket no. 340) at 56-57. Although Johnson has not attempted to tie the purported inconsistencies to any of the prosecution's statements expressly identified in Claim **20**, Johnson's assertion of inconsistency appears to be based, for example, on Statement 8 in Honken's trial, that Honken "plans, schemes, thinks out these things long in advance."

The problem is, statements in Honken's trial that Honken planned, schemed, organized, manipulated, or was intelligent simply are not inconsistent with the cited statements in Johnson's trial that she was *also* a planner, schemer, and manipulator. *Cf. DeLoach*, 34 F.3d at 1006 (finding no inconsistency, because "[t]o say that DeLoach did not affirmatively advise Brown to lie to the savings and loans, does not mean that both DeLoach and Brown did not, in fact, conspire to lie and, later, lie to the savings and loans."). Johnson has cited no statements in Honken's case that Honken manipulated Johnson into involvement in the killings or that he was the sole organizer, planner, or schemer in the killings, nor any statements in Johnson's case that Johnson manipulated Honken into the killings or that she was the sole organizer, planner, or schemer in the killings, to demonstrate an inconsistency as to the same factual matter. Rather, the cited statements in each case are reconcilable, not irreconcilable, descriptions of each co-defendant. Where Johnson cannot demonstrate that any of the cited statements would have

met the "inconsistency" requirement for admissibility under the *McKeon-Salerno-DeLoach* standards, counsel did not perform deficiently in failing to offer them. *See Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) ("Counsel's failure to proffer evidence that was both inadmissible and cumulative does not constitute ineffective assistance.").

Indeed, the same is true, even under the *Bakshinian* standard, because that standard also recognizes that the likelihood that a prior statement will ultimately be admissible under Rules 401 and 403 turns on whether or not the prior statement is inconsistent with trial statements. *Bakshinian*, 65 F. Supp. 2d at 1110. In addition, the court in *Bakshinian* recognized "that the admission of a statement by the government in a prior case would raise substantial dangers of confusing the jury and wasting time." *Id*. That potential for confusion simply is not outweighed by the probative value of statements that are *not* inconsistent. Thus, Johnson has not shown that the cited statements would have met the requirements for admissibility under the *Bakshinian* standard, either, so that trial counsel's failure to offer those inadmissible statements was not deficient performance, even under that standard. *See Henderson*, 118 F.3d at 1288.

Having found that Johnson's trial counsel performed deficiently in failing to make a diligent review of the prosecution's prior statements in the Honken trial, and assuming, for the sake of argument, that trial counsel performed deficiently in failing to offer the purported admissions that Johnson has identified under either the *McKeon-Salerno-DeLoach* standards or the *Bakshinian* standards, I will consider whether Johnson can also show the necessary prejudice. *See Strickland*, 466 U.S. at 691-92 (an ineffective assistance of counsel claim also requires proof of prejudice, that is, a showing that the outcome of the proceeding would have been different, but for counsel's unprofessional errors); *Gianakos*, 560 F.3d at 821 ("'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the

error had no effect on the judgment.'" (quoting *Strickland*, 466 U.S. at 691)).

I conclude that both standards require proof of inconsistency to show prejudice for purposes of an ineffective assistance of counsel claim. This is so, again, because admissibility under the *McKeon-Salerno-DeLoach* standard expressly turns on whether or not the prior statements were inconsistent factual assertions. *See McKeon*, 738 F.2d at 33 ("Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial."); *Salerno*, 937 F.2d at 811 (same); *DeLoach*, 34 F.3d at 1005 (same). Also, while *Bakshinian* and Rule 801(d)(2) do not require inconsistency of either statements or opinions to establish the facial admissibility of the statements as admissions of a party opponent, *Bakshinian* nevertheless recognizes that the likelihood that a prior statement will ultimately be admissible under Rules 401 and 403 turns on whether or not they are inconsistent with trial statements. *Bakshinian*, 65 F. Supp. 2d at 1110. Thus, just as it is not clear what strategic purpose would be served by offering a prior statement of the prosecution in the absence of an inconsistency, it is not clear what prejudice could flow from failing to offer a prior statement of the prosecution that was *not* inconsistent.

Here, Johnson cannot show that, in the absence of any inconsistency, there is any reasonable probability that adequate efforts to present the purported admissions that she identifies would have changed the outcome. *See Orr*, 636 F.3d at 952-53. Specifically, where there is no inconsistency, there is nothing to show the jurors that "'the government at one time believed, and stated, that its proof established something different from what it currently claims,'" or that would undermine "'[c]onfidence in the justice system,'" because the prosecution did not "'make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.'" *Salerno*, 937 F.2d at 812 (quoting *GAF Corp.*, 928 F.2d at 1260). This is simply not a case in

which Johnson has demonstrated that she was prejudiced by her trial counsel's failure to offer purported admissions, because those purported admissions do not show that "the government ha[d] taken the same evidentiary clay that they used in the [Honken] case and, for purposes of [Johnson's] trial, resculpted" either Honken from a killer mastermind to a "puppet on a string" or Johnson from a "puppet on a string" to a killer mastermind. *Cf. id*. To the extent that the prosecution's arguments painted different pictures of Honken (or Johnson) in the two trials, even absent outright inconsistency, the differences are reconcilable descriptions based on the same facts. *See McKeon*, 738 F.2d at 33 (asking whether the two versions are "facially and irreconcilably at odds"). Indeed, even in the statements purportedly demonstrating inconsistency that Johnson cited, quoted above, the prosecution did not paint different pictures of the same defendant in different trials, but emphasized the conduct of the defendant on trial in each case in a way that was entirely reconcilable with the description of the conduct of the other defendant in that defendant's trial.

Johnson is not entitled to relief on Claim **20**, standing alone.

***ii.   Other evidence that Honken was "worse" than Johnson***.  Johnson may stand on better ground when she asserts, in Claim **19** (Johnson's Claim One, § M), that her trial counsel were ineffective in failing to present readily-available evidence about Honken to refute the prosecution's argument that Johnson was "worse" than Honken, and in Claim **21** (Johnson's Claim One, § P), that her trial counsel were ineffective for failing to discover and present information regarding Honken's plans to kill a prosecutor and his family and Honken's membership in a white supremacist prison organization.

More specifically, in Claim **19**, Johnson asserts that evidence to refute the prosecution's arguments that she was "worse" than Honken that was not presented by her trial counsel included the following:

- Honken's planning of and attempts to recruit others to participate in a robbery of the bank where his mother worked, years before he met Johnson, involving stealing his mother's key and making a copy, gaining entry with the key, shoving a teller into a restroom and locking her in, and later killing accomplices at an isolated location;

- Honken's ability to manipulate others into doing his dirty work;

- evidence that Honken and his high school friends talked of going to Minneapolis to beat up and rob homosexuals;

- Honken hitting a friend with a bull whip;

- Honken's various plans to kill law enforcement officers and prosecutors involved in his case and to blow up a crime laboratory where evidence against him was stored;

- Honken's involvement with a white supremacist prison gang that pursued violent activities inside and outside of prison; and

- Honken's threats to kill and attempts to hire others to kill witnesses and cooperators against him.

In Claim **21**, Johnson argues that evidence to refute the prosecution's argument that she was "worse" than Honken that was not presented by her trial counsel also included the following:

- the prosecution's arguments in Honken's trial that Honken would continue to pose a danger to the community and other inmates if sentenced to life in prison without possibility of parole;

- evidence that Honken had a specific and elaborate plan to kill one of the prosecutors initially assigned to his case and his family, detailed in a report by that prosecutor to the district security manager, and steps taken in

response to that report; and

- evidence of Honken's participation in a violent prison gang.

I conclude that the prosecution's evidence that Johnson was "worse" than Honken would ordinarily be critical in the mitigation phase of a capital case in which key issues ordinarily include the relative culpability and future dangerousness of co-defendants. *See Orr*, 636 F.3d at 952-53 (considering deficient performance, *inter alia*, in light of how critical the evidence in question was); *Parker*, 188 F.3d at 928. Thus, to the extent that Johnson's counsel failed to rebut or refute that evidence, counsel performed deficiently.

I also conclude that the some of the evidence cited in these two allegations of error was not presented, even though it was readily-available, but contrary to Johnson's contentions, some of it was presented. Specifically, her trial counsel *did* present evidence, through the cross-examination of Steve Vest, that Honken had a specific and elaborate plan to kill prosecutors and other law enforcement officers and evidence about Honken's participation in a violent white supremacist prison gang, the Odinists, that operated in and out of prison. Thus, trial counsel was not deficient to the extent that counsel did present some of the cited evidence to challenge the prosecution's case in the mitigation phase.

I also am not convinced that the cited evidence was probative of Honken's relative culpability, because it did not relate to Honken's conduct in the killings, and was not inconsistent with the prosecution's argument that, prior to meeting Johnson, Honken only planned but did not carry out acts of violence. At most, the evidence that trial counsel did not present is additional evidence that Honken planned violent acts, both before and after he met Johnson, but it is not evidence that, without Johnson's influence, he would

have engaged in violent acts at the time of the killings at issue.[53]  Furthermore, it is not evidence that demonstrates, or even raises a reasonable inference, that Johnson did not participate in the planning and execution of the killings, and there was considerable other evidence that she did both.  While I find that some of the cited evidence certainly was probative of Honken's relative future dangerousness, Johnson's trial counsel did present the evidence that was most probative on that point, evidence that, even after his convictions, Honken had a specific and elaborate plan to kill prosecutors and law enforcement officers and was involved in a violent prison gang that also operated outside of prison.

Despite this narrowing of the evidence supporting Johnson's claims that trial counsel failed to confront evidence that she was "worse" than Honken, trial counsel did not discover, develop, or present some of the cited evidence, that evidence was probative of Honken's relative future dangerousness, and trial counsel offered no strategic or tactical reason for failing to do so, trial counsel performed deficiently.  *See Armstrong*, 534 F.3d at 864-65 (while "strategic choices" generally are entitled to a presumption of reasonableness, "strategic choices 'resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.'"); *see also Francis*, 557 F.3d at 901 ("In other words, the strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy of counsel's investigation.'" (quoting *White*, 416 F.3d at 732, in turn relying on *Strickland*, 466 U.S. at 690-91)).  Thus, trial counsel's performance was, to some extent, deficient.

Where this claim ultimately falters, however, is on Johnson's inability to prove that

---

[53]The evidence of the bullwhip incident was too equivocal to determine whether Honken intentionally or accidentally struck his friend.

she was prejudiced by trial counsel's deficiencies. *See Strickland*, 466 U.S. at 691-92 (the second prong of an ineffective assistance of counsel claim is prejudice from counsel's deficient performance). As noted, above, contrary to Johnson's contentions, the cited evidence does very little, in light of all of the unaffected evidence, to show that some jurors (rather than none) would have found that Johnson's participation was relatively minor compared to Honken's role in the murders or to show that more than three jurors would have found that Honken, who was equally or more culpable than Johnson for the murders, would not be punished with death for the murders of two of the adults, *see* Mitigation Phase Verdict Form (Crim. docket no. 593) (Step Two, mitigation factors (1) and (4)), because it is not evidence about Honken's and Johnson's conduct during the killings. Even though some of the cited evidence that trial counsel did not present would have demonstrated Honken's future dangerousness in and out of prison, giving stronger support to a relative dangerousness argument, the record demonstrates that it was the balance of aggravating factors and mitigating factors *other than relative future dangerousness* that tipped the balance in favor of death sentences for Johnson for the killings of two of the adults, DeGeus and Lori Duncan, as well as the killings of the two children, the only killings for which Honken received the death penalty. Specifically, the jury did not unanimously find that Johnson posed a future danger, as an aggravating factor, *see* Mitigation Phase Verdict Form (Crim. docket no. 593) (Step One), and six jurors found her lack of future dangerousness was a mitigating factor as to all of the killings, *id.* (Step Two). Thus, there was nothing about Johnson's future dangerousness that needed to be counterbalanced by additional evidence of Honken's future dangerousness. Moreover, the jurors found that the balance of aggravating and mitigating factors *still* warranted death sentences for Johnson for four of the killings, notwithstanding their finding that Johnson's future dangerousness was not aggravating. I do not believe that

there is a reasonable probability that, had the jurors heard more evidence about *Honken's* future dangerousness, more jurors would have found *Johnson's* lack of "future dangerousness" mitigating, or that any one juror's balancing of aggravating and mitigating factors would have been different. *Orr*, 636 F.3d at 952-53.

Therefore, Johnson is not entitled to § 2255 relief from the death sentences for the killings of the Duncans and DeGeus on the allegation of errors of counsel in Claims **19** and **21**, each standing alone.

### 4. Claim 22: Failure to confront evidence of Johnson's threatening manner

Claim **22** (Johnson's Claim One, § Q) is another facet of Johnson's mitigation phase claim of ineffective assistance of counsel in failing to confront aggravating evidence. The evidence in question here is evidence presented in both the merits and mitigation phases that Johnson behaved in a "bizarre" and threatening manner before and after the time of the offenses. Johnson identifies the evidence that trial counsel failed to confront as the following:

- audiotapes and transcripts, played during the testimony of Agent Michael Mittan, of Johnson issuing grandiose, profanity-laden plans to recover a drug debt;

- testimony from Jeffrey Honken that he received a telephone call from Johnson in which she threatened that he was not going to see his children again, if Dustin Honken was not going to;

- testimony from Dan Cobeen that Johnson made a shooting gesture at him while passing him in a car;

- testimony from Kathy Rick that Johnson confronted her when she was driving with her children and screamed and yelled at her, which Rick took to be a threat, and that she had engaged in other threatening behavior;

293

- evidence from Police Chief Doug Book about Johnson screaming, irate, and out of control in voice messages that she left after Book executed a search warrant on Rick Summers and served a subpoena on Holly Dirksen; and

- testimony from Alyssa Nelson, Honken's sister, that Honken told her that Johnson was angry and flies into rages, that Honken told her that he once woke up with Johnson pressing a gun to his head, which scared him, and that Johnson behaved bizarrely at Honken's 1998 sentencing when she called a female law enforcement officer a "chick with a dick."

She contends that this evidence should have been confronted with expert testimony to explain the connection between her "bizarre" behavior and her malfunctioning brain.

### a.    Arguments of the parties

Johnson argues that trial counsel performed deficiently in failing to confront the evidence at issue in this allegation of error, because her trial mental health experts could have addressed and explained this seemingly bizarre behavior as manifestations of her malfunctioning brain, not as evidence that Johnson was a violent woman who inspired and encouraged violence by Honken, as the prosecution suggested. She argues that there is a reasonable probability that, but for trial counsel's failure to address this evidence of aggravation, the balance of aggravating and mitigating factors would have tipped in her favor, and she would have been sentenced to life imprisonment, not death.

The respondent counters that the behavior Johnson identifies was not "bizarre," but consistent with her pattern of threatening others. The respondent contends that Johnson's argument that her trial counsel performed deficiently in failing to elicit testimony from her trial experts to explain her behavior as the result of an abusive childhood and mental impairments is simply wrong, because trial counsel did elicit testimony from Johnson's trial experts that Johnson believed that it was better to be feared than loved as a defense

294

mechanism developed in her abusive childhood; that Johnson's methamphetamine use promoted extreme mood lability, resulting in fluctuations of mood and explosions of irritability; that Johnson's abusive childhood predisposed her to being mentally ill and to having a lot of anger, resentment, and depression; and that Johnson made threats to guards, but did not carry out any threats and did not get put in lockdown. The respondent also argues that Johnson has failed to explain *how* she was prejudiced, other than to suggest that her *habeas* mental health expert, Dr. Woods, had he been available at the time of her trial, would have provided or caused to be elicited from her other experts materially different evidence. The respondent counters that Johnson's *habeas* mental health expert did not provide materially different evidence from what Johnson's trial experts did present.

In her Reply Brief (docket no. 340), Johnson belatedly presents a much more developed argument concerning this claim than she presented initially, in either her Second Amended § 2255 Motion (docket no. 263) or her Post-Hearing Brief (docket no. 314). She clarifies that, had her trial mental health experts and mitigation specialist been properly instructed and consulted, they would have discovered that she suffered lifelong neurological impairments that affected her functioning and caused her to act in the manner described by witnesses. She contends that a complete battery of neuropsychological testing would have included the tests subsequently done by her *habeas* mental health experts, Dr. Young, Dr. Woods, and Dr. Merikangas, and that the data from such tests would have been incorporated into a comprehensive neuropsychiatric evaluation. She argues that the result would have been an organic explanation for behavior that the prosecution presented as aggravating. She asserts that the failure to obtain and present such evidence was neither tactical nor strategic.

In reply to the respondent's arguments, Johnson contends that the evidence actually elicited from her trial mental health experts fell well short of an adequate rebuttal. She

argues that those experts were not asked, and did not try, to explain the aggravating circumstances that the prosecution introduced. Specifically, she argues that there was no effort by those experts to tie her bizarre behavior to her mental impairments or to explain how her mental impairments affected her behavior in custody. She also argues that her trial counsel failed to tie any of her conduct to her mental impairments to undermine the prosecution's future dangerousness argument.

Johnson also argues that she was prejudiced by trial counsel's failings, because there would have been material differences between the evidence presented by her trial experts and an adequate presentation, as demonstrated by Dr. Woods's hearing testimony. Even if the trial testimony would have been the same in substance, the trial experts' opinions were never tied to the facts of the case. Thus, she argues that there is a reasonable probability that, if presented with adequate evidence and argument concerning her future dangerousness, at least one juror would have voted for life imprisonment rather than death.

**b.    *Analysis***

I conclude that this allegation of error also presents another example of deficient performance by Johnson's trial counsel in the mitigation phase of her trial. The prosecution's evidence of Johnson's frequent violent threats or threatening behavior toward various individuals over many years and in a variety of circumstances was at least potentially critical evidence of her future dangerousness as an aggravating factor supporting a death sentence. *Cf. Orr*, 636 F.3d at 952-53 (deficient performance in the context of failure to confront aggravating evidence requires consideration of how critical the evidence was, what evidence was available to counsel to rebut the aggravating evidence, and what counsel did do in response to the aggravating evidence); *Parker*, 188 F.3d at 928. Moreover, trial counsel did little or nothing to respond to that evidence, and certainly did not make effective use of any trial mental health expert to demonstrate that

the behavior was tied to specific mental impairments or developmental influences.  *Id.* While there might have been isolated bits of evidence and argument, even numerous isolated bits of evidence and argument, at trial that *would have* addressed this future dangerousness evidence, there was no effective attempt to tie the conduct to mental impairments, then argue why those impairments undermined future dangerousness—there was no connecting the dots.  *Id.*  Johnson has demonstrated, through the evidence of *habeas* experts Drs. Woods, Young, and Merikangas, that this future dangerousness evidence would have been substantially different, in substance and amount, and in its effectiveness in demonstrating the relationship between Johnson's conduct, her mental impairments, and her future dangerousness.

A closer question is presented as to whether these deficiencies prejudiced Johnson, that is, whether there is a reasonable probability that adequate efforts to rebut this future dangerousness evidence would have changed the outcome in the mitigation phase.  *Orr*, 636 F.3d at 952-53 (noting that "it is very difficult to show the trial outcome would have been different had specific questions been asked on cross examination, particularly where other trial testimony repeatedly corroborated the [challenged] testimony.").  Johnson asserts that a study by the Capital Jury Project found that 32% of jurors believed that the law required them to impose the death penalty if they believed that the defendant would be dangerous in the future.  Johnson's Reply Brief at 66 (citing John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the Capital Jury Project*, Chapter 5 in BEYOND REPAIR?  AMERICA'S DEATH PENALTY 144-77 (Duke Univ. Press 2003)).  She also points out that, although the jury did not unanimously find that she posed a future danger, six jurors rejected lack of future dangerousness as a mitigating factor.

The jurors in this case did *not* find that Johnson would be a danger in the future to the lives and safety of other persons as a "non-statutory aggravating factor" for any of the

killings, notwithstanding trial counsel's failure to confront the evidence of Johnson's "bizarre" and threatening behavior, but nevertheless sentenced her to death for four of the killings. *See* Mitigation Phase Verdict Form (Crim. docket no. 593) (Step One). Similarly, six jurors did find that mitigating factor (8), "if Angela Johnson is incarcerated in a federal penitentiary for life, she would not be a danger to the lives and safety of others," applied to all five killings, *id.* (Step Two), notwithstanding trial counsel's failure to confront the evidence of Johnson's "bizarre" and threatening behavior. Even the jurors who found this mitigating factor did not find that the balance of aggravating factors and mitigating factors tipped in favor of a life sentence for Johnson for four of the killings. Thus, it is reasonable to conclude that it was the balance of *other* aggravating factors and mitigating factors that tipped the balance in favor of death for four of the killings. Under these circumstances, I cannot find that there is a reasonable probability that, even if more jurors had found that Johnson's lack of future dangerousness was mitigating, at least one juror would have found that the balance of aggravating and mitigating factors tipped in favor of a life sentence for any or all four of the killings for which Johnson received a death sentence. Thus, I cannot find that Johnson was prejudiced by trial counsel's failure to confront the evidence of her "bizarre" and threatening behavior as evidence of future dangerousness.

Therefore, while this allegation of error certainly involves deficient performance, it does not involve sufficient prejudice to entitle Johnson to any relief, standing alone.

### 5. *Untimely allegations of error*

Johnson makes three other allegations of error (Claims *23, 24,* and *25*), which I have characterized as facets of her claim of ineffective assistance of counsel in the confrontation of aggravating evidence, but which I also found were untimely and would not be considered on the merits. Those claims are that trial counsel was ineffective in

failing to limit future dangerousness evidence to future dangerousness in prison (Claim *23*); in failing to object to Kathy Rick's triple hearsay testimony about Johnson's alleged possession of a gun (Claim *24*); and in failing to object to Kyla Davis's testimony that Johnson tried to find out where she lived and what car she drove (Claim *25*). Nevertheless, I will observe that, in my opinion, the conduct at issue in each of these claims involved deficient performance of trial counsel, which was part of a consistent trend of poor preparation for and litigation of the mitigation phase of Johnson's trial. Whether or not any of them would also have met the *Strickland* standard of prejudice is a much closer question that I need not and will not decide.

### 6.    *Aggregate prejudice*

I have concluded that, of the various facets of Johnson's claim of ineffective assistance of counsel in confronting aggravating evidence, only the allegations of error in Claim **18** (failure to challenge the prosecution's theory for DeGeus's murder) warrant granting Johnson § 2255 relief, standing alone, and then only from her death sentence for the killing of Terry DeGeus. Although I found that various other allegations of error involved deficient performance, I did not find that any of them, standing alone, also involved *Strickland* prejudice.

Nevertheless, because I believe that other allegations of error in this claim involved deficient performance, that is, Claims **19**, **20**, **21,** and **22**, I will also consider whether, aggregated together, these errors caused sufficient prejudice to warrant relief, even if individually they did not. *See Strickland*, 466 U.S. at 695 (considering, in a capital case, whether "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death"); *see also id.* at 675-78 (characterizing the petitioner's collateral attack as involving a single claim of ineffective assistance of counsel in the sentencing proceeding

299

in several "respects," resting on several "bases," and consisting of several "errors"). I do not believe that it is appropriate to aggregate the prejudice from Claim **18**, an error that involves sufficient prejudice, standing alone, to warrant relief, with the prejudice from errors that involved deficient performance, but not sufficient prejudice to warrant relief. Consideration of aggregate prejudice is only relevant to the extent that it leads to a *different* disposition of any claim of ineffective assistance of counsel than separate consideration of prejudice. I also do not believe that it is appropriate to use the "coattails" of an allegation of error involving sufficient prejudice to warrant relief to reassess the prejudice from allegations of error that do not involve sufficient prejudice, standing alone. Certainly, here, it is not appropriate to do so, where the prejudice arising from Claim **18** relates only to the sentence for the killing of DeGeus, and has no logical or factual relationship to the sentences for the Nicholson/Duncan killings.

I found that Claim **20** (failure to offer statements of the prosecution about Honken in Honken's trial as admissions in Johnson's trial) did not involve any inconsistent statements that could provide the essential basis for a showing of prejudice. Thus, it adds nothing to an "aggregate prejudice" analysis for the ineffective assistance claim based on failure to confront aggravating evidence. Claim **19** (failure to present readily-available evidence about Honken to refute the argument that Johnson was "worse" than Honken) and Claim **21** (failure to discover and present information regarding Honken's plans to kill a prosecutor and his family and Honken's membership in a white supremacist prison organization), likewise, add little or nothing to the aggregate prejudice analysis, because reassessment of the mitigating factors to which the missing evidence related would likely have had little effect on the outcome of the penalty phase. That leaves only Claim **20** (failure to confront evidence of Johnson's threatening manner), which I found presented a closer question on prejudice, but that I ultimately concluded did not involve sufficient

prejudice, standing alone, to warrant relief. There is no other prejudice with which the prejudice from Claim **20** could be aggregated to reach a different result. Consequently, consideration of aggregate prejudice here ultimately does nothing to change the disposition of the claim of ineffective assistance of counsel for failure to confront aggravating evidence.

Therefore, Johnson is entitled to § 2255 relief from her death sentence for the killing of Terry DeGeus on the basis of the ineffective assistance of counsel alleged in Claim **18**. On the other hand, she is not entitled to any relief based on the errors alleged in timely Claims **18, 19, 20, 21,** and **22**, concerning trial counsel's failure to confront aggravating evidence.[54]

### B. Prosecutorial Misconduct

The second multifaceted claim of error in the mitigation phase of Johnson's trial, aggregating Claims **26, 27,** and **28**, is different in kind, because it involves multiple facets of alleged prosecutorial misconduct, not ineffective assistance of Johnson's own counsel. As noted above, the Eighth Circuit Court of Appeals has expressly *required* consideration of the cumulative effect of prosecutorial misconduct in *habeas* actions. *See, e.g., Graves*, 614 F.3d at 507-08; *Louisell*, 178 F.3d at 1024. Although I must consider the cumulative effect of prosecutorial misconduct, I must first determine whether any of Johnson's allegations actually involve prosecutorial misconduct. Therefore, I will first examine the allegations of prosecutorial misconduct separately.

---

[54] As will appear below, Claim **18** is not the only basis on which I find that Johnson is entitled to relief from one or more of her death sentences.

## 1. Claim 26: Failure to correct false testimony about Honken

In Claim **26**, Johnson alleges that the prosecution failed to correct false testimony at her trial in violation of her Fifth and Eighth Amendment rights. This claim is based on Johnson's contention that testimony repeatedly elicited by the prosecution regarding Dustin Honken's nonviolent nature prior to his acquaintance with Angela Johnson, in support of the prosecution's theory that Honken was manipulated and encouraged to commit the charged crimes by Johnson, was false and known to the prosecution to be false. She identifies the false testimony as the following:

- Testimony from Honken's brother, Jeffrey, that Honken was "not at all" short tempered and was not violent, that Jeffrey had never seen him engage in violence "whatsoever" toward anyone, and that he was not physical with people and never roughed up or slapped anyone, citing Johnson Trial Transcript at 323.

- Testimony from Honken's longtime friend and co-conspirator, Timothy Cutkomp, that from the time he met Honken until the early 1990s, he was not aware of Honken using violence against other people, that Honken was not a physical person who would get into fights during or after high school, and that he was not aware of Honken hurting anyone up to the point when he became involved with Johnson, citing Johnson Trial Transcript at 830-31.

- Testimony from a co-worker, Rick Held, that, in his experience, Honken was not an aggressive or violent person, citing Johnson Trial Transcript at 1038.

- Testimony from Honken's ex-girlfriend, Kathy Rick, that Honken told her that he was not strong enough to leave Johnson, because he knew what she was capable of, and her opinion that Honken was afraid of Johnson, citing

Johnson Trial Transcript at 2641-42, and further testimony that Rick never saw Honken use violence or force toward anyone from 1989 until 1993, citing Johnson Trial Transcript at 2669.

- Testimony from Honken's sister, Alyssa Nelson, that she never knew her brother to engage in violence or use force before 1993, and that Honken told her that he once woke up to find Johnson pressing a gun to his head and that it scared him, citing Johnson Trial Transcript at 2679.

The respondent denies that the prosecution presented any false testimony, but argues that, if it did, the prosecution did not know any of the testimony to be false.

### a. Arguments of the parties

Johnson argues that the testimony identified above was false and known by the prosecution to be false, as is shown by the contradictory evidence that the prosecution proffered at the mitigation phase of Honken's separate trial. Specifically, she argues that, in Honken's trial, the government sought to rebut the testimony of Alyssa Nelson that Honken was coerced by his father into acquiring a bank key from his mother so that his father could rob the bank with a proffer of the following testimony:

- a proffer of testimony by Kenneth Hansen to the effect that Honken approached Hansen with a very detailed plan about robbing a bank, which included shoving an old lady into a bathroom, securing the door, and wearing surgical gloves and masks, citing Honken Trial Transcript at 3678;

- a proffer of testimony from Alan Johnson (no relation to Angela) that he had detailed discussions with Honken about the same bank robbery, citing Honken Trial Transcript at 3678, and proffer of further testimony from Alan Johnson that Honken asked him to kill Kenneth Hansen, who was to participate in the bank robbery, so that they could split Hansen's share of the

money between them, citing Honken Trial Transcript at 3678-79; and

- a proffer of even more graphic testimony from Mark Johnson, Alan Johnson's brother, that Honken recruited him to participate in the bank robbery, then kill Hansen and dispose of his body by throwing it into a manure lagoon, where chemicals would eat away the remains, citing Honken Trial Transcript at 3679.

Johnson argues that the prosecution's knowing elicitation of false testimony in her trial runs afoul of the long-established principle that the prosecution has an affirmative duty to correct false testimony.

The respondent argues, first, that this claim is procedurally defaulted, because Johnson never raised it at trial or on appeal. The respondent also argues that Johnson has not argued that failure to raise the issue is the result of ineffective assistance of counsel or that it involves newly-discovered evidence, nor could she, where the testimony in the two trials was known to her at the time of her trial, so that she cannot evade the procedural bar.

The respondent argues that, even if I reach this claim on the merits, it fails, because Johnson has not presented a shred of evidence that anything the witnesses in question said about Honken in Johnson's trial was false, let alone that the prosecution knew that it was false. Furthermore, the respondent argues that Johnson's proffer of the prosecution's evidence of Honken's involvement in planning a bank robbery does not show that the testimony of Jeff Honken, Cutkomp, Held, Rick, or Alyssa Nelson was false. The respondent reiterates that there is nothing about Honken's involvement in planning and plotting a bank robbery that established that he ever actually engaged in an act of violence before he met Johnson. In other words, the respondent argues that all of the evidence about the plan to rob a bank is typical of Honken's behavior as an evil planner and

schemer, but a coward unable to act on his plans without someone like Johnson to push him along. Thus, the respondent argues that the bank robbery evidence corroborates the prosecution's assertion that, before Johnson entered the picture, Honken was a planner and schemer, but a coward, not a violent actor.

In her Reply, Johnson argues that any procedural default of this claim is excused by the ineffective assistance of her trial and appellate counsel in missing the issue. She asserts that Claims **19** and **20** also raise the ineffective assistance of counsel in failing to correct the prosecution's false image of Honken. Furthermore, she argues that she did present newly-discovered evidence relating to this claim at the evidentiary hearing, in the testimony of Theodore Hovda, Kenny Hansen, Alan Johnson, Mark Johnson, Daniel Cobeen, and Timothy Cutkomp.

As to the merits, Johnson argues that she is not required to show that the identified witnesses perjured themselves at trial, because the prosecution's duty to disclose and correct false testimony is not limited to situations in which a witness is guilty of perjury. She argues that it is enough that there was abundant evidence, known to the prosecution, that Honken was not a peaceable, nonviolent person, as portrayed by his brother, friend, co-worker, girlfriend, and sister, and that the prosecution's selective presentation of evidence from these witnesses on the issue knowingly presented a fundamentally inaccurate picture of Honken. Again, she argues that the prosecution relies on a false dichotomy between Honken planning violent acts and Honken committing violent acts. She cites as evidence of a different picture of Honken Statements 5, 6a, 6b, 7a, 7b, 8, 9a, 9b, 10a, 10b, and 11 in footnote 51, from Honken's trial, the alleged "admissions" at issue in Claim **20**. Citing *Giglio v. United States*, 405 U.S. 150, 154 (1972), Johnson asserts that reversal of a conviction is required if the judgment of the jury could in any reasonable likelihood have been affected by the false image of Honken presented by the prosecution.

She also argues that she was prejudiced by the prosecution's misconduct, because, despite the fact that Honken personally killed all five victims, not a single juror found the mitigating factor that Johnson's participation was relatively minor compared to Honken's, and only three found the mitigating factor that Honken, who was equally or more culpable than Johnson in the murders, would not be punished with death for all of them. She argues that there is at least a reasonable likelihood that the prosecution's failure to correct its false portrayal of Honken at her trial affected the jury's penalty decision.

### b.    Analysis

As I noted, above, in my recitation of general standards for § 2255 relief, a "procedurally defaulted" claim cannot be the basis for § 2255 relief, unless the petitioner shows "cause and prejudice" or "actual innocence" to overcome the procedural default, *see Bousley*, 523 U.S. at 622 (1998), and that ineffective assistance of counsel may establish the required "cause and prejudice," *see Theus*, 611 F.3d at 449. Because Johnson has asserted ineffective assistance of counsel relating to essentially the same issues in Claims **19** and **20** as she asserts in Claim **26**, and I have found that Claim **19** is valid (at least as a facet of a multifaceted claim on which relief is appropriate), I will assume, without deciding, that Claim **26** is not procedurally defaulted, so that I may consider it on the merits.

Turning to the merits, the Eighth Circuit Court of Appeals and the Supreme Court have both made clear "that the government may not deliberately present false evidence at trial or allow it to go uncorrected." *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007) (citing *Giglio v. United States*, 405 U.S. 150, 153 (1972)). The Eighth Circuit Court of Appeals has explained,

> To establish a due process violation based on the prosecutorial
> use of false testimony, a defendant must show that "(1) the

prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *See United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005), *cert. denied*, 546 U.S. 1223, 126 S. Ct. 1452, 164 L. Ed. 2d 148 (2006); *United States v. Peterson*, 223 F.3d 756, 763 (8th Cir. 2000).

*Bass*, 478 F.3d at 951 (describing these as the "*Funchess* requirements"); *see also United States v. Boone*, 437 F.3d 829, 840 (8th Cir. 2006); *United States v. Goodson*, 165 F.3d 610, 615 (8th Cir. 1998); *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995). Thus, at least in the first instance, the duty not to present "false" testimony involves only "perjured" testimony. Here, as the respondent argues, Johnson has offered no evidence whatsoever that any of the identified witnesses presented perjured testimony or that the prosecution knew or should have known that their testimony was perjured. *See id.* Johnson has not identified any evidence that Jeffrey Honken, Cutkomp, Rick, Held, or Nelson was actually aware of violent acts by Honken prior to the 1990s and his association with Johnson or any evidence that the prosecution knew that any of those witnesses was actually aware of violent acts by Honken prior to the 1990s and his association with Johnson. Thus, a due process claim based on the prosecution's presentation of "perjured" testimony fails.

The lack of any perjured testimony means that Johnson must rely on her contention that, although the witnesses testified truthfully, the prosecution was required to present *other* evidence, known to the prosecution, that purportedly showed that Honken was engaged in violent acts prior to the 1990s, or was required not to present the truthful testimony of the witnesses, to avoid misleading the jury. This contention also fails.

Although the *Bass/Funchess* requirements for a due process violation are cast in

terms of whether or not a prosecutor knowingly used "perjured" testimony, there is also some Eighth Circuit authority for the proposition that a prosecutor's duty to correct false testimony "also encompasses situations in which the government allows materially misleading statements to go uncorrected," even if the statements are not perjured. *United States v. McClintic*, 570 F.2d 685, 692 (8th Cir. 1978) (citing *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir.), *cert. denied*, 419 U.S. 1069 (1974)). The decision of the Third Circuit Court of Appeals in *Harris*, on which *McClintic* relied and Johnson now relies, admittedly used broad language about the prosecution's duty to disclose false testimony of a witness not being limited to situations where the prosecution knows that the witness has committed perjury. *Harris*, 498 F.2d at 1168-69. Nevertheless, *McClintic*, *Harris*, and all of the other cases cited by Johnson or the *Harris* court involved a witness's failure to disclose accurately *the terms of a plea agreement* with the prosecution. *See McClintic*, 570 F.2d at 692 (addressing the "narrow issue" of whether "the defendant is entitled to a new trial on the ground that the lenient term of the plea agreement, relating to dismissal of the charges, was placed before neither the court nor jury," and noting that the doctrine that "the terms of a plea bargain reached with a material prosecution witness [must] be disclosed to the judge and jury so that the trier of fact may weigh the witness' credibility . . . arose from a series of cases in which witnesses were allowed to perjure themselves as to agreements made, either through inadvertence or design, [but] it also encompasses situations in which the government allows materially misleading statements to go uncorrected"); *Harris*, 498 F.2d at 1168 ("It is apparent in this case that the Assistant United States Attorney sat silently by while Ms. Johnson gave testimony on cross-examination which at least gave the court and jury an impression directly contrary to what he ultimately stated was the truth concerning his agreement with

Ms. Johnson.").[55] None of the allegedly false or misleading testimony at issue in this prosecutorial misconduct claim involves failure of the prosecution to disclose and correct false or misleading testimony by the witnesses about the terms of their plea agreements (indeed, most of these witnesses had no plea agreements). Nor has Johnson shown that the allegedly misleading testimony of any witness involved some other fact that, like the terms of a plea agreement, was *known to both the witness and the prosecution*. Thus, these cases do not stand for the sweeping proposition that Johnson asserts.

Johnson seems to argue that the prosecution nevertheless has a duty to impeach its own witnesses' version of the facts, if the prosecution, but not the witness, knows of evidence that would support a different version. I can find no authority for that

---

[55] *See also Giglio v. United States*, 405 U.S. 150, 153-54 (1972) (holding that, where "[t]he heart of the matter is that one Assistant United States Attorney—the first one who dealt with Taliento [a key witness]—now states that he promised Taliento that he would not be prosecuted if he cooperated with the Government," but that fact was not disclosed in the witness's testimony, the defendant was entitled to a new trial); *Napue v. Illinois*, 360 U.S. 264, 268-69 (1959) (reversing the defendant's conviction, because the prosecution's key witness testified that he had received no promise of consideration for his testimony, and the prosecutor only disclosed after the conviction that the witness had been promised a recommendation for a reduction of his sentence if he testified against the defendant); *United States v. Foster*, 874 F.2d 491, 494-95 (8th Cir. 1988) (holding that the prosecution breached its duty to correct falsehoods, in a case involving the defendant's claim that the prosecutor failed to correct false and misleading testimony of two witnesses about their agreements with the prosecution); *United States v. Bigeleisen*, 625 F.2d 203, 205-08 (8th Cir. 1980) (holding that, where a key witness denied that he was to receive anything in return for his cooperation, and the prosecution did nothing to correct that false testimony and "made no effort to set the record straight," a due process violation occurred); *United States v. Sanfilippo*, 564 F.2d 176-78 (5th Cir. 1977) (holding that the prosecution was not relieved of its duty to correct false testimony where a key witness disclosed only part of a plea agreement, and the prosecution did nothing to correct the false testimony, even though defense counsel could have impeached the witness concerning the terms of the agreement).

proposition, and Johnson offers none. Johnson also makes no allegation that the prosecution failed to disclose or hid from her trial counsel the evidence of Honken's plan for a bank robbery and the killing of at least one of his accomplices, which Johnson's counsel could have presented to undermine the picture of Honken as a nonviolent person prior to his association with Johnson. In other words, she does not assert a *Brady* violation with respect to the bank robbery information. Indeed, that information was in the transcripts of the Honken trial, which were provided to Johnson's trial counsel.

Moreover, even if the prosecution has some duty to disclose and correct, in front of the jury, testimony that, while truthful, is contrary to or misleading in the face of other evidence known to the prosecution, Johnson cannot show that the prosecution breached that duty here. Evidence that, prior to meeting Johnson, Honken *planned* a bank robbery, including a plan to murder one or more accomplices in that bank robbery to increase his share of the take, does not make testimony that Honken never *engaged* in violent acts until he met Johnson false or misleading. Rather, evidence that Honken *planned*, but never carried out, violent acts is entirely reconcilable with evidence that Honken never *engaged* in violent acts, to a particular witness's knowledge, until he met Johnson.

Finally, even if the prosecution had and breached a duty to disclose and present evidence that, before Honken met Johnson, he had developed a plan to commit a bank robbery and kill his accomplices, Johnson has failed to show that there is any reasonable likelihood that, had that evidence been presented, the judgment of the jury could have been affected. *See Giglio*, 405 U.S. at 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .'" (quoting *Napue*, 360 U.S. at 271)). The "contrary" evidence is evidence about Honken, not Johnson. At most, it is evidence that Honken planned violent acts before he met Johnson, but it is not evidence that, without Johnson's influence, he would not have

engaged in violent acts at the time of the killings at issue. Furthermore, it is not evidence that demonstrates, or even raises a reasonable inference, that Johnson did not participate in the planning and execution of the killings, and there was considerable other evidence that she did both. Contrary to Johnson's contentions, this evidence does very little, in light of all of the unaffected evidence, to show that some jurors (rather than none) would have found a mitigating factor to be that Johnson's participation was relatively minor compared to Honken's role in the murders, or to show that more than three jurors would have found a mitigating factor to be that Honken, who was equally or more culpable than Johnson for the murders, would not be punished with death for the murders of the adults, because it is not evidence about Honken's and Johnson's conduct during the killings. *See* Mitigation Phase Verdict Form (Crim. docket no. 593) (Step Two, mitigation factors (1) and (4)).

Johnson is not entitled to any relief on this allegation of prosecutorial misconduct, standing alone.

### 2. *Claim 27:* **Brady** *violation*

In Claim **27**, Johnson alleges that the prosecution committed a *Brady* violation by failing to disclose Honken's planned violent attack on one of the prosecutors as well as Honken's association with a white supremacist prison organization. The respondent argues that Johnson is not entitled to any relief on this claim.

#### a. *The undisclosed evidence*

This claim arises from the prosecution's failure to disclose the existence of three memoranda written by Assistant United States Attorney (AUSA) Patrick Reinert to law enforcement agents concerning threats that Dustin Honken made toward AUSA Reinert and others. I will summarize these three memoranda, in turn.

The first memorandum, dated March 8, 2001, was to Steve Badger, District Security Manager. Petitioner's Ex. 48 at PSLP-000005. The subject line of this

memorandum is, "Renewed Threat on AUSA and Agents." *Id.* In the memorandum, Reinert reviewed Honken's involvement in the murders of the Duncans, Gregory Nicholson, and Terry DeGeus. Reinert also touched upon Honken's 1996 drug case and his threats while that case was pending to "kill the DEA chemist, this AUSA, drug agents, and other cooperating individuals." *Id.* Reinert noted that a threat assessment was conducted and the Department of Justice took steps to "ensure the safety of the AUSAs involved in the case." *Id.*

Reinert went on to outline the following information received from an inmate housed with Honken:

> Once Honken became convinced that he would be charged for his involvement in the murders, he approached other inmates at USP Florence and developed a plan to have those inmates travel back with him as potential witnesses at his trial. Honken's plan was for those prisoners to escape from the county facility where Honken anticipated they would be housed, by killing the guards. Honken developed an elaborate plan, which included robbing a bank to obtain money and fleeing to Canada where he would obtain false identification to allow him to re-enter the country at will. Honken told inmates that when he re-entered the country after his escape, or if he is ever released from prison, one of the first things he plans to do is murder this AUSA along with others, including former AUSA Steve Colloton, a state narcotics agent, and a state homicide agent. Honken, during his 1996 case, claimed to know where this AUSA lived. Since that time, I have moved. However, Honken has taken steps from prison to locate addresses for agents and others using the internet. Honken indicated he intends, upon entering this AUSA's home, to kill the children immediately and then tie up this AUSA so the AUSA could be forced to watch while Honken tortures and murders this AUSA's wife. After torturing and killing this AUSA's wife, Honken plans to kill and decapitate this AUSA

> and take the head back to Canada. Honken stated his reason
> for removing the head from the body was to ensure that the
> AUSA's family never had closure and would be forever
> emotionally distraught due to the murder. Honken told
> inmates that he plans on making a bowl out of the skull of this
> AUSA.

*Id.* at PSLP-000005-06. Reinert also reports that "[w]hile incarcerated, Honken has become involved in the Odinists movement, a network of white supremacists with ties in and out of prison. Honken is one of the leaders in the Odinists group at USP Florence." *Id.* at PSLP-000006.

In the second memorandum at issue, dated April 9, 2001, Reinert writes to Badger and Cindy Lee regarding an upcoming meeting he has scheduled with the United States Marshal Service to discuss security for his home and family. *See* Petitioner's Ex. 48 at PSLP-000018. Reinert also described the security measures he had taken for his home as well as security measures the Department of Justice provided to him following Honken's last threat to him. *Id.*

The third memorandum, dated July 21, 2001, was to FBI Agent Scott Jennings. The subject line of this memorandum is, "Investigation of Possible Group Involved in Conspiracy to Murder Witnesses and Other Individuals Involved in the Investigation/Prosecution of Dustin Honken and Angela Johnson." *See* Petitioner's Ex. 48 at PSLP-000031. This memorandum reviewed Honken's involvement in an Odinist group in prison as well as information received from inmates regarding Honken's plans to escape from custody and "kill law enforcement officers and witnesses in retaliation for their investigation and prosecution of him." *Id.* Reinert explained, further,

> Since we anticipate Mr. Honken will be indicted and brought
> back to the district soon, we feel this is a matter which needs
> to be investigated to determine whether a conspiracy exists to

escape and murder various officials and the nature and extent that a conspiracy may have individuals already in the district participating and planning to participate in that venture.

*Id.*

### b.    *Arguments of the parties*

Johnson argues that these three memoranda were exculpatory at the mitigation phase, because they "contravened and undermined the prosecution's penalty phase arguments that Ms. Johnson manipulated and pushed Honken into committing violent crimes," contradicted the prosecution's theory that she was more culpable than Honken, "and spoke volumes about the government's view of Honken's propensity for violence." Johnson's Post-Hearing Brief at 109.  She argues that the evidence from the memoranda would have significantly enhanced her impeachment of the prosecution's theory that she was more culpable than Honken, because she could have used a prosecutor's own statements about how seriously he took Honken's threats, what steps he took to protect his family, and what further investigation he asked the FBI to conduct, rather than "tepid" cross-examination of a jailhouse informant, Steve Vest, to describe Honken's involvement with a white supremacist group and his plans to kill the prosecutor and other law enforcement officers.  She contends that the evidence suppressed by the prosecution was also material, because a true picture of Honken as painted by a prosecutor in the suppressed memoranda would have created a reasonable probability that the outcome of the mitigation phase would have been different.

The respondent argues, first, that the information in the memoranda was not exculpatory, because none of the information in the memoranda addressed whether Johnson manipulated and pushed anyone or whether Honken was susceptible to being manipulated.  Instead, the information referenced planning, not conduct, by Honken years

*after* the murders, so that the information would have reinforced the prosecution's evidence that Honken often planned violent conduct, but only committed violent crimes when he was with Johnson. Moreover, the respondent argues that a prosecutor's beliefs and opinions about the danger that Honken posed to the prosecutor and others and the prosecutor's belief that further steps were necessary to respond to Honken's threats are mental impressions and opinions that do not, themselves, constitute *Brady* material. The respondent also argues that the facts mentioned in the memoranda concerning the danger that Honken posed were provided in discovery, so that the memoranda were cumulative as to that evidence and, therefore, not material to Johnson's case. The respondent points out that failure to disclose one source of evidence, where that evidence is available from another source, is not a *Brady* violation, because the information from the undisclosed source is cumulative. The respondent points out that Johnson was also aware of similar evidence. Finally, the respondent argues that the evidence was not suppressed, because all of the facts in the memoranda were in the prosecution's discovery file and Johnson's trial counsel were aware of those facts.

In reply, Johnson argues that the memoranda contain more than the opinions and beliefs of the author, including facts that were not in the discovery file, such as the security measures taken in response to Honken's threats. She argues that, if the prosecution believed that Honken was just a schemer, his threats would not have resulted in a significant response to a perceived security threat. She acknowledges that a prosecutor's opinions ordinarily do not have to be disclosed, but that the exception is when they contain underlying exculpatory facts, which the opinions in these memoranda do. Johnson also argues that the information in the memoranda was not merely cumulative, because she had no other source of information about the security measures taken in 1996 and 2001 as a result of threats by Honken against AUSA Reinert and his family or the FBI's investigation

of his threats.  She argues that the memoranda undeniably were suppressed.  She also argues that she was prejudiced by the prosecution's suppression of this material, because not one juror found as a mitigating factor that Johnson's participation was relatively minor compared to Honken's role in the murders, and only three found as a mitigating factor that, although Honken was equally or more culpable than Johnson for the murders of the adults, he was not punished with death for those murders.

> ### c.    *Analysis*

The Fifth Amendment to the United States Constitution provides that no person shall be deprived of liberty without due process.  U.S. CONST. amend. V.  In *Brady v. Maryland,* 373 U.S. 83 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see also Smith v. Cain*, ___ U.S. ___, 2012 WL 43512, *2 (Jan. 10, 2012); *Cone v. Bell*, 556 U.S. 449, ___, 129 S. Ct. 1769, 1772 (2009); *United States v. Bagley*, 473 U.S. 667, 669 (1985); *United States v. Agurs*, 427 U.S. 97, 111 n.17 (1976).  Following *Brady*, the Supreme Court has held that the duty to disclose evidence favorable to the defendant applies even though there has been no request, *Agurs,* 427 U.S. at 107, and that the duty includes impeachment evidence as well as exculpatory evidence.  *Bagley,* 473 U.S. at 676.

Most recently, the Supreme Court stated that, "[u]nder *Brady*, the [prosecution] violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith*, ___U.S. at ___, 2012 WL 43512 at *2.  Thus, "'[t]o establish a *Brady* violation, a defendant is required to show that:  (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material.'" *United States v. Tate*, 633 F.3d 624, 630

(8th Cir. 2011) (quoting *United States v. Keltner*, 147 F.3d 662, 637 (8th Cir. 1998); *United States v. Payton*, 636 F.3d 1027, 1040 (8th Cir. 2011) (also quoting *Keltner*, 147 F.3d at 673); *and compare United States Ellefsen*, 655 F.3d 769, 778 (8th Cir. 2011) ("To prove a violation of his right to due process [under *Brady*], the defendant must show that the evidence was [1] favorable and [2] material and [3] that the government suppressed the evidence." (citing *United States v. Santisteban*, 501 F.3d 873, 877 (8th Cir. 2007))); *United States v. Jeanpierre,* 636 F.3d 416, 422 (8th Cir. 2011) ("'To show a *Brady* violation, the defendant must establish that (1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed evidence.'" (quoting *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009))).[56]

Considering the "suppression" element first, *see Tate*, 633 F.3d at 630, I note that the respondent admits that the prosecution did not disclose AUSA Reinert's three memoranda to Johnson's defense team, but nevertheless argues that the material in the memoranda was not suppressed by the prosecution, because it was in the prosecution's discovery file. "'The government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels.'" *United States v. Coplen,* 565 F.3d 1094, 1097 (8th Cir. 2009) (quoting *United States v. Zuazo,* 243 F .3d 428, 431 (8th Cir. 2001)); *United States v. Jones,* 160 F.3d 473, 479 (8th Cir. 1998) (no *Brady* violation occurs if the defendant could have obtained the information using reasonable diligence). Indeed, "[w]hen information is readily available

---

[56]I do not mean to suggest that there is any intracircuit split on the elements of a *Brady* violation, only to note that various panels of the Eighth Circuit Court of Appeals have cast the elements in a different order, some stating suppression of the evidence by the prosecution as the first element and some as the last element. I believe that it is more logical to consider, first, whether the prosecution suppressed the evidence at all, then to consider whether any evidence suppressed by the prosecution was favorable and material.

to the defendant, it is not *Brady* material, and the prosecution does not violate *Brady* by not discovering and disclosing the information." *United States v. Jones,* 34 F.3d 596, 600 (8th Cir. 1994) (citations omitted).

Johnson concedes in her brief that her trial counsel, through discovery, was aware of Honken's threats against Reinert in 1996. Petitioner's Post-Hearing Brief at 89. She further concedes that her trial counsel learned through discovery that Honken had threatened to kill AUSA Reinert and AUSA Steve Colloton, as well as their families. *Id.* In addition, Johnson concedes that her trial counsel knew, again through discovery, of Honken's participation in the Odinists. *Id.*[57] Thus, because Johnson was aware of information disclosing Honken's escape plans, his threat to kill Reinert and his family, and his participation in the Odinists, she cannot show that the prosecution suppressed this evidence. *See Agurs,* 427 U.S. at 103 (*Brady* only applies when evidence is "known to the prosecution but unknown to the defense"); *Jeanpierre*, 636 F.3d at 431 ("'[A] defendant's *Brady* rights are violated if he discovers information after trial which had been known to the prosecution but unknown to the defense. . . .'" (quoting *United States v. Almendares,* 397 F.3d 653, 664 (8th Cir. 2005))); *see also Abdur'Rahman v. Colson*, 649

---

[57]The respondent also points out that Honken's membership in the Odinists as well as Honken's plans and threats to kill witnesses, law enforcement officers, and prosecutors involved in the prosecution of this case were discussed in two of my published decisions. *See United States v. Honken*, 378 F. Supp. 2d 880, 887-88 (N.D. Iowa 2004); *United States v. Honken*, 378 F. Supp. 2d 970, 1008-09 (N.D. Iowa 2004). Thus, the respondent argues that this information was discussed in publicly available information. "Publicly available information which the defendant could have discovered through reasonable diligence cannot be the basis for a *Brady* violation." *United States v. Willis,* 277 F.3d 1026, 1034 (8th Cir. 2002). My decisions discussing the evidence that Johnson now argues was suppressed in violation of *Brady*, however, were initially sealed. They were not unsealed until June 23, 2005, after Johnson's trial had concluded. Thus, the information was not available from publicly available rulings until after Johnson's trial.

F.3d 468, 474 (6th Cir. 2011) ("The *Brady* rule 'only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial.'" (quoting *Apanovitch v. Houk,* 466 F.3d 460, 474 (6th Cir. 2006)); *United States v. Zagari,* 111 F.3d 307, 320 (2d Cir. 1997) ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information . . .").

Johnson argues that the memoranda also included the prosecutor's opinions that were not available from any other source. She acknowledges that a prosecutor's opinions ordinarily do not have to disclosed, *unless* they contain underlying exculpatory facts, which she argues the opinions in these memoranda do. This argument, which is based on *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011), does nothing to further her claim, however.

In *Kohring*, the Ninth Circuit Court of Appeals did state that, "'[i]n general, a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady[/Giglio] unless* they contain underlying exculpatory facts.'" *Kohring*, 637 F.3d at 907 (quoting *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006), with emphasis in the original). This statement does not mean that the memoranda themselves should have been disclosed, even though they disclosed the prosecutor's opinions and mental impressions of the case, as Johnson seems to argue. In *Kohring*, the court concluded that it was the *underlying exculpatory facts* from information that also contained the prosecutor's opinions and mental impressions, not those opinions and mental impressions, that had to be disclosed. *See id.* at 908. As the Ninth Circuit Court of Appeals explained,

> Here, some of the newly-disclosed information is opinion work product, otherwise inadmissible, or not capable of being used for impeachment (e.g., some of the undated, unidentified handwritten notes). Other information, such as the FBI 302 reports would, on the other hand, likely be either

admissible or capable of being used for impeachment. And even some of the facts contained in the opinion work product should have been disclosed. Consider, for instance, the October 3, 2007, e-mail. Certain statements in the e-mail reveal the prosecutor's "impressions of the evidence." *Morris*, 447 F.3d at 742. With regard to Smith's recollection of how much money Allen gave Kohring in Suite 604, the e-mail reads "RS has somewhat better recall on the issue." This is, arguably, the prosecutor's impression of Smith's memory (admittedly, it could also be a fact). However, the statement that "[Smith] believes that when BA asked him for money, he only gave BA $100" is clearly an "underlying exculpatory fact" that should have been disclosed to Kohring if it was not merely cumulative. *See id*. *Thus, while the prosecution did not have a duty to disclose the e-mail itself or the opinion work product in the e-mail, it did have a duty to disclose the non-cumulative "underlying exculpatory facts" in the e-mail. See id*. The same can be said with respect to other newly-disclosed information that is arguably opinion work product (e.g., the attorneys' handwritten notes).

*Kohring*, 637 F.3d at 908. Thus, to the extent that the memoranda contained the prosecutor's opinions and mental impressions about the case, the memoranda themselves did not have to be disclosed; only the "underlying exculpatory facts" in the memoranda had to be disclosed. *Id.* As explained above, where Johnson already had the purportedly exculpatory or impeaching underlying facts about Honken at issue here from other sources, not even the "underlying exculpatory facts" had to be disclosed from the memoranda. *See Jones,* 34 F.3d at 600; *accord Kohring*, 637 F.3d at 908 (the prosecution had a duty to disclose only "the non-cumulative 'underlying exculpatory fact' in the e-mail").

Johnson argues, further, that the prosecution did suppress information about the security response to and investigation of Honken's threats, because such information also was not available in the discovery file. The problem with this contention is that "[t]here

is no *Brady* violation if 'the defendant[s], using reasonable diligence, could have obtained the information' themselves." *Jones*, 160 F.3d at 479-80 (quoting *Westley v. Johnson*, 83 F.3d 714, 716 (5th Cir. 1996), *cert. denied*, 519 U.S. 1094 (1997), and citing *United States v. Willis*, 997 F.2d 407, 412-13 (8th Cir. 1993)). Here, Johnson could have obtained information about the security response to and investigation of Honken's threats, using reasonable diligence.

For example, in *Jones*, the defendant asserted a *Brady* violation on the basis of the prosecution's failure to disclose transcripts of a cooperating witness's plea and sentencing hearing, but the Eighth Circuit Court of Appeals rejected that claim, because the transcripts were readily available to the defense in the exercise of reasonable diligence. *Jones*, 160 F.3d at 479; *see also Ladoucer*, 573 F.3d at 636 ("[B]ecause Ladoucer could have obtained a copy of the transcript himself, he cannot show that the Government suppressed the evidence."). A better fit here is *United States v. Deavault*, 190 F.3d 926 (8th Cir. 1999). In *Deavault*, the defendant asserted that the prosecution violated *Brady* by suppressing surveillance videotape of a mall's food court that did not show any group of African-American males at a certain restaurant between 2:00 and 4:00 p.m. on the day of a carjacking. *Deavault*, 190 F.3d at 928-29. The prosecution had offered testimony of a restaurant employee in the food court that a group of African-American males, including the defendant, had approached the restaurant counter between 3:00 and 3:30 p.m. that day and that some of them had asked for and filled out job applications, to rebut the testimony of defense witnesses that the defendant was at home the entire afternoon and evening of the carjacking. *Id*. The court rejected the defendant's *Brady* claim, as follows:

> We conclude the government did not violate *Brady* because the videotape evidence was not suppressed. During pretrial discovery, the government provided police reports revealing the existence of Mall surveillance tapes from the day

in question. The defense subpoenaed tapes of the outside area where the carjacking occurred but not tapes of areas inside the Mall, even though the defense investigator interviewed Farwell and learned the substance of her later testimony. "Evidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence." *United States v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998).

*Deavault*, 190 F.3d at 929.

Here, reasonably diligent counsel, provided with discovery materials revealing Honken's threats against Reinert in 1996, Honken's later threats to AUSA Reinert and AUSA Steve Colloton, as well as their families, and Honken's participation in the Odinists, would have sought information about the government's response to those security threats. *Cf. id.* (holding there was no *Brady* violation when counsel failed to exercise reasonable diligence to seek a videotape that counsel knew or should have known existed). The fact that Johnson's trial counsel failed to do so, and the likelihood that Johnson's trial counsel would have had to litigate the discovery request to obtain internal security memoranda, do not mean that the *prosecution* suppressed the security information. Johnson cannot turn ineffective assistance of counsel in failing to pursue with reasonable diligence discovery of information that obviously existed from information disclosed by the prosecution in discovery into a *Brady* violation by the prosecution. *See, e.g., United States v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998) (observing, in a case in which defense counsel failed to seek a transcript of witness's grand jury testimony to which the prosecutor had specifically referred, "When defendants fail to recognize the exculpatory nature of documents to which they have access, *Brady* cannot be invoked to resuscitate their defense after conviction.").

Even assuming that the prosecution "suppressed" the memoranda—or more properly the information in the memoranda—I will assume that the information was, at least to some extent, favorable to Johnson. *See Tate*, 633 F.3d at 630 (the second element of a *Brady*

claim is that the evidence suppressed was favorable to the defendant). That does not end the matter, because even assuming that the prosecution "suppressed" the memoranda, and that the information in the memoranda was "favorable" to Johnson, Johnson cannot establish that the suppressed information was "material." *Id.* (the third element of a *Brady* claim is that the suppressed evidence was "material").

As the Supreme Court most recently explained,

> "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–470, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted).

*Smith*, ___ U.S. ___, 2012 WL 43512 at *2; *see also Bagley*, 473 U.S. at 682; *Tate*, 633 F.3d at 630 ("To establish materiality in the context of *Brady,* 'the accused must show there is a reasonable probability that if the allegedly suppressed evidence had been disclosed at trial the result of the proceeding would have been different.'" (quoting *United States v. Keltner,* 147 F.3d 662, 673 (8th Cir. 1998), in turn quoting *Drew v. United States,* 46 F.3d 823, 827–28 (8th Cir. 1995), with internal quotation marks omitted)). Because federal law requires a unanimous jury verdict to recommend the death sentence, *see United States v. Montgomery*, 635 F.3d 1074, 1099 (8th Cir. 2011), the relevant inquiry in a case such as this one is "whether there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment of the appropriate penalty for [Johnson's] crimes." *Cone,* 556 U.S. at ___, 129 S. Ct. at 1773.

Here, the information in the memoranda was not "material," because it was merely cumulative of other evidence available to the defendant; thus, there is no *Brady* violation. *See Burton v. Dormire*, 295 F.3d 839, 847 (8th Cir. 2002) (finding that evidence was not "material" for purposes of a *Brady* claim, where it was "purely cumulative"); *United States v. Zuazo,* 243 F.3d 428, 431 (8th Cir. 2001) (noting that "when the government does not disclose a potential source of evidence but the evidence available from that source is cumulative of evidence already available to the defendant, it has committed no *Brady* violation."); *United States v. Quintanilla,* 25 F.3d 694, 699 (8th Cir. 1994) (holding no *Brady* violation where undisclosed evidence was merely cumulative).[58] In *Burton*, the petitioner asserted that the prosecution committed a *Brady* violation by disclosing only one "plea deal" with a cooperating witness, but not a second "plea deal." 295 F.3d at 847. The court rejected the petitioner's contention that the second "plea deal" was "material," because "whether a witness' testimony is compelled by one, or by two, plea agreements does not seem material to us." *Id.* The court explained, "Evidence of a second plea

---

[58]Other federal Circuit Courts of Appeals agree that there is no *Brady* violation, if the evidence at issue is merely cumulative. *See Montgomery v. Bobby*, 654 F.3d 668, 679 (6th Cir. 2011) (noting "this circuit has repeatedly acknowledged that '[e]vidence that is merely cumulative to evidence presented at trial is not material for purposes of *Brady* analysis.'" (quoting *Brooks v. Tenn.,* 626 F.3d 878, 892 (6th Cir. 2010))); *Lopez v. Ryan,* 630 F.3d 1198, 1210 (9th Cir. 2011) ("'Evidence that is merely cumulative is not material.'") (quoting *United States v. Strifler,* 851 F.2d 1197, 1202 (9th Cir. 1988)); *United States v. Turner*, 501 F.3d 59, 73 (1st Cir. 2007)(holding "[s]uppressed evidence that is merely cumulative of evidence already in the defendant's possession does not justify a new trial."); *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003) (finding no *Brady* violation because the "evidence was merely cumulative . . . and therefore was not material"); *Spence v. Johnson,* 80 F.3d 989, 995 (5th Cir. 1996) (holding that "when the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs."); *United States v. Page,* 808 F.2d 723, 730 (10th Cir. 1987) (holding no *Brady* violation warranting a new trial where suppressed evidence was merely cumulative)

agreement is purely cumulative for impeachment purposes, and 'when the [state] does not disclose a potential source of evidence but the evidence available from that source is cumulative of evidence already available to the defendant, it has committed no *Brady* violation.'" *Id.* (quoting *Zuazo*, 243 F.3d at 431). The court concluded that the jury was "sufficiently apprised" of the potential taint on the witness's credibility to ensure a fair trial, whether the jury knew of one or both plea agreements. *Id.*

Here, not only was Johnson's trial counsel aware of the purportedly suppressed information from discovery, but trial counsel used that information in the mitigation phase, when trial counsel questioned Steve Vest. Trial counsel questioned Vest about the Odinists and Honken's participation in that group, *see* Johnson Trial Transcript at 2583-84;[59] about

---

[59]The pertinent part of the transcript is the following:

> Q.    Odinists. Tell the jury what is the odinists.
> A.    It's a religious group.
> Q.    Religious group.
> A.    Uh-huh.
> Q.    What kind of religion to [sic] the odinists practice?
> A.    It's an old-style religion like a pagan religion.
> Q.    Isn't it a white supremacy group posing as a religious group?
> A.    Well, that's what they say.
> Q.    Well, there aren't any African Americans in there, are there?
> A.    No.
> Q.    And they have some really strong views about African Americans, don't they?
> A.    Yes.
> Q.    Would it be unfair to characterize the odinists as a white supremacy group? Would that be unfair of me?
> A.    No.
> Q.    But they claim they're a religious group?

(continued...)

Honken's escape plans when he was brought back for trial, *see id.* at 2615-16;[60] and,

---

[59](...continued)

    A.     Yeah, something like the pagans.

    Q.     Do they have odinist priests or spiritual leaders?

    A.     Somebody does the ceremony, but he's just a regular—

    Q.     Just a regular old white supremacist?

    A.     He's a regular inmate, whatever, nobody off the street.

    Q.     And you were in this group with Mr. Honken?

    A.     I was.

Johnson Trial Transcript at 2583-84.

[60] The pertinent part of the transcript is the following:

    Q.     [T]his was the breakout Mr. Honken planned at the Woodbury County Jail. That's supposed to be during his trial here in Sioux City; right?

    A.     Yes.

    Q.     And I wonder if you could elaborate on the plan a little bit, tell us specifically what it is that Mr. Honken claimed he was going to do.

    A.     He was going to take a shower. He figured that everybody would be locked in the hole, in a special section of the jail, and he would get out of the cell to take a shower, and then he would overpower and kill the guard, take his keys, and let everybody out.

    Q.     And then once everybody got out, presumably there might be some people killed in the process?

    A.     Yes.

    Q.     And there were going to be guns involved, weren't there?

    A.     Yeah, he said that they had some place there that he knew where they kept the guns, so he was going to go down to get the guns.

    Q.     And once you got out, wasn't the plan to go rob a bank, get some money?

    A.     Yeah, we was going to go to a grocery store and pick

(continued...)

finally, about Honken's threats against law enforcement following the planned escape from jail, *see id.* at 2617-18.[61]  Thus, it seems no more material to me whether the jury learned

---

[60] (...continued)

> > up a woman hostage, switch cars, and then go to a bank and rob a bank.
>
> Q.  Okay.  And then with the money—and I don't know.  What was supposed to happen to the woman hostage?
>
> A.  He was going to kill her.
>
> Q.  Kill her.  And then the plan was to go to Canada.
>
> A.  Yes.
>
> Q.  And you were going to hide out.  This group of people were going to hide out for a year and train.
>
> A.  Yeah.
>
> Q.  What does that mean?
>
> A.  Artie and Dustin were going to train.
>
> Q.  Train.  This kind of white supremacist odinists group in Canada?
>
> A.  I wouldn't say that, but it's just a—I don't know, just they were into that stuff.

Johnson Trial Transcript at 2615-16.

[61] The pertinent part of the trial transcript is the following:

> Q.  So after the training, then the group is coming back to wreak more havoc on the criminal justice system; isn't that right?
>
> A.  I wouldn't say the group.  It was just Dustin as far as I know.
>
> Q.  Okay, Dustin, what was he supposed to be doing after—
>
> A.  He was going to come back and kill everyone that testified against him.
>
> Q.  Didn't he—it was more than that.  He was going to come back and torture people and torture their families; right?
>
> A.  Yes.

(continued...)

of Honken's involvement with the Odinists and his plots against prosecutors through Vest or through information culled from the undisclosed memoranda. *Cf. Burton*, 295 F.3d at 847.

Johnson argues, however, that there is such a significant qualitative difference between presenting this information to the jury through the "tepid" cross-examination of Vest actually undertaken by her trial counsel and the "vigorous examination" of the prosecutor that should have been done, using the prosecutor's own statements about how seriously he took Honken's threats, what steps he took to protect his family, and what further investigation he asked the FBI to conduct, as to establish "materiality" on this *Brady* claim. Johnson relies on a statement in *United States v. Cooper*, 654 F.3d 1104 (10th Cir. 2011), that "suppressed evidence that 'significantly enhanc[es] the quality of the

---

[61](...continued)

| | |
|---|---|
| Q. | He was going to cut people's heads off and keep them in bags. |
| A. | That's what he said. |
| Q. | Didn't he talk about taking the skulls and making bowls out of these people? |
| A. | Uh-huh. |
| Q. | And the people we're talking about were prosecutors? |
| A. | Prosecutors and FBI agents. |
| Q. | FBI agents? |
| A. | Yeah. |
| Q. | He went on at some length about this too, didn't he? |
| A. | Yes. |
| Q. | And this was very credible story, Mr. Vest? Pretty wild stuff, isn't it? |
| A. | Yeah, but I do not know. |
| Q. | Who knows? |
| A. | Yeah. |

Johnson Trial Transcript at 2617-18.

impeachment evidence usually will' satisfy the [*Brady*] materiality standard." 654 F.3d at 1120 (quoting *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009)). Johnson reads this statement in isolation.

In *Cooper*, the example that the court gave of evidence that "significantly enhanc[es] the quality of the impeachment evidence," such that it would satisfy the *Brady* "materiality" requirement, was "'[e]vidence that provides a new basis for impeachment,'" as opposed to evidence that "'insignificantly impact[s] the degree of impeachment,'" such as additional impeachment evidence, where the witness's credibility "'has already been substantially called into question in the same respect by other evidence.'" *Cooper*, 654 F.3d at 1120 (quoting *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009)). Thus, *Cooper* does not stand for the proposition that, if *better* use of the information could have been made, had it been presented from a different source, the information from the different source was "material" for purposes of a *Brady* claim. In *Cooper*, the court held that the suppressed evidence did not provide "an entirely new basis for impeachment," because the evidence available to the defendant at trial and the suppressed evidence both impeached the same witness's credibility in the same way, by suggesting that he was a dishonest person, on the basis of lies and tax fraud, so that it would only insignificantly have impacted the degree of impeachment and would have provided only marginal additional support for the defense. *Id.* at 1120-21.

Moreover, *Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997), on which Johnson also relies, actually demonstrates the difference between material and non-material evidence. In *Clemmons*, three witnesses testified that Bagby committed the murder with which Clemmons was charged, but each of those witnesses was impeached on the ground that Bagby was "conveniently dead" at the time that they accused him, along with other grounds, while the suppressed statement, from a different witness, identifying Bagby as

329

the murderer was made while Bagby was still alive and, indeed, less than an hour after the murder. 124 F.3d at 950. Thus, the suppressed evidence in *Clemmons* provided an entirely new basis for challenging the prosecution's theory that Clemmons committed the murder and supporting the defense theory that Bagby actually committed it that was not subject to impeachment on the basis that the witnesses only accused Bagby after he was dead, effectively "eliminat[ing] one of the State's key arguments for disbelieving the story that Bagby killed [the victim]." *Id.* at 950-51.

Here, even supposing that Johnson could have elicited the evidence in the memoranda from testimony by the prosecutor, including the prosecutor's opinions about how seriously he took Honken's threats, what steps he took to protect his family, and what further investigation he asked the FBI to conduct, that evidence did not "provide[] a new basis" for demonstrating the threat that Honken posed, but only provided "additional" evidence on the same issues presented through the cross-examination of Vest. *Cf. Cooper*, 654 F.3d at 1120-21 (additional evidence impeaching a witness's credibility is not enough to be "material" under *Brady*). It certainly would not have effectively eliminated the prosecution's theory that Honken did not actually engage in violent acts until he was associated with Johnson, any more than Vest's cross-examination did, because it was not new evidence of Honken actually committing violent acts prior to his association with Johnson. *Cf. Clemmons*, 124 F.3d at 950-51 (additional evidence providing an entirely new basis to challenge the credibility of a witness or the prosecution's theory and effectively eliminate a key argument of the prosecution is "material" under *Brady*). Thus, the likelihood of a different result, based on the *manner* in which the same information would have been presented to the jury, simply is not great enough to "'undermine[ ] confidence in the outcome of the trial.'" *Smith*, ___ U.S. ___, 2012 WL 43512 at *2 (quoting *Kyles*, 514 U.S. at 434, with internal quotation marks omitted).

The final fallacy in Johnson's argument concerning this allegation of prosecutorial misconduct is much the same as one of the fallacies in her prior allegation of prosecutorial misconduct: At most, the supposedly suppressed evidence is additional evidence that Honken planned violent acts *after* he met Johnson, but it is not evidence that, without Johnson's influence, he would not have engaged in violent acts at the time of the killings at issue. Furthermore, it is not evidence that demonstrates, or even raises a reasonable inference, that Johnson did not participate in the planning and execution of the killings, and there was considerable other evidence that she did both. Contrary to Johnson's contentions, the supposedly suppressed evidence does very little, in light of all of the unaffected evidence, to show that some jurors (rather than none) would have found as a mitigating factor that Johnson's participation was relatively minor compared to Honken's role in the murders or to show that more than three jurors would have found as a mitigating factor that Honken, who was equally or more culpable than Johnson for the murders, would not be punished with death for the murders of the adults, *see* Mitigation Phase (Crim. docket no. 593) (Step Two, mitigation factors (1) and (4)), because it is not evidence about Honken's and Johnson's conduct during the killings. For this further reason, Johnson has failed to show that the likelihood of a different result, had this supposedly suppressed evidence been presented to the jury, is sufficiently high to "'undermine[ ] confidence in the outcome of the trial.'" *Id.* at *2 (quoting *Kyles*, 514 U.S. at 434, with internal quotation marks omitted).

Therefore, this prosecutorial misconduct claim also fails on its merits.[62]

---

[62]Although I have concluded that there was no *Brady* violation by the prosecution concerning disclosure of the prosecutor's memoranda, which Johnson alleges resulted in "tepid" cross-examination of Vest, rather than "vigorous" examination of the prosecutor

(continued...)

### 3. Claim 28: Inconsistent argument violation

Johnson's last allegation of prosecutorial misconduct, Claim **28**, is that the prosecution violated her Sixth Amendment, Eighth Amendment, and due process rights by presenting inconsistent arguments at her trial and Honken's trial. This allegation of misconduct is, again, based on the prosecution's characterization of Honken in Johnson's trial as a bookish, peaceable young man who had never been violent or even short-tempered until he met her, in contrast with the prosecution's argument in Honken's trial that Honken was the master manipulator and organizer and that Johnson was his compliant dupe. As examples of the pertinent arguments in Honken's trial, Johnson cites Statements 5, 6a, 6b, 10b, and 11 in footnote 51, which she identified in support of Claim **20**. As the contradictory testimony offered at her trial, Johnson cites the testimony by Honken's brother, friend, co-worker, girlfriend, and sister that she identified as "false" in Claim **26**.

In an Order (docket no. 291), filed July 12, 2011, following my initial comparison of claims in Johnson's Second Amended § 2255 Motion and her previous Corrected

---

[62](…continued)

himself about the dangers that Honken posed, the analysis of an ineffective assistance claim arising from trial counsel's failure to investigate threats against the prosecutor and failure to call and examine the prosecutor might not have been so easily rejected. As I noted above, Johnson's trial counsel knew from the discovery file and their investigation about Honken's threats against AUSA Reinert in 1996 and Honken's later threats to AUSA Reinert and AUSA Steve Colloton, as well as their families. Therefore, had Johnson asserted a claim of ineffective assistance of counsel for failing to investigate those issues further and in failing to try to call Reinert to testify, I very likely would have found trial counsel's performance was deficient. While Johnson might not have been able to prove *Strickland* prejudice on an ineffective assistance claim, for essentially the same reasons that she could not demonstrate the "materiality" of the evidence for purposes of a *Brady* claim, that question is not presented here, because neither Johnson's original *habeas* team nor her current *habeas* team asserted such an ineffective assistance of counsel claim.

Amended § 2255 Motion, I invited the parties to brief, in their briefs on the merits, the effect of what appeared to be Johnson's disclaimer of Claim No. 28 in the earlier version of her § 2255 Motion. The respondent asserts that this claim was not only disclaimed, but procedurally defaulted, as well as without merit.

The parties have briefed the disclaimer, procedural default, and merits of the claim.

### a.    *Disclaimer and procedural default*

*i.    **Arguments of the parties**.*  In response to my invitation to brief whether or not she had disclaimed this claim, Johnson states that she cannot read prior *habeas* counsel's mind, but suspects that the purported disclaimer was based on trial counsel's attempt to raise the issue of inconsistent theories in a motion in limine, but failure to re-raise that issue on direct appeal, *i.e.*, a decision to disclaim a procedurally defaulted claim. She argues, however, that trial, appellate, and prior *habeas* counsel were all ineffective in failing to raise the inconsistent theories argument as a substantive claim and that the claim relies on facts that were set forth in the Corrected Amended § 2255 Motion and involve the same time (trial) and type (inconsistent arguments), so that this claim does not significantly alter the nature of this proceeding by injecting a new and unanticipated claim, but simply expands upon facts previously alleged, so that it relates back to the Corrected Amended § 2255 Motion. This argument, of course, does not address whether or not prior *habeas* counsel expressly disclaimed the claim that Johnson's present *habeas* counsel have now asserted, it simply asserts that prior counsel's disclaimer should be ignored.

The respondent argues that Johnson expressly disavowed this claim in her Corrected Amended § 2255 Motion. The respondent argues that the claim cannot "relate back," if it was expressly disavowed. Moreover, the respondent argues that it does not relate back simply because it arose out of the same trial, and the claim that the prosecution made inconsistent arguments is not of the same type as claims that the prosecution offered false

testimony or that Johnson's trial counsel were ineffective in failing to object to that testimony. The respondent also points out that a *habeas* petitioner cannot rely on the ineffective assistance of *habeas* counsel. The respondent also adds that the claim is procedurally barred, because Johnson did not raise it before the district and appellate courts, and only if trial and appellate counsel were ineffective in failing to raise it does it evade the procedural bar.

In reply, as to procedural default, Johnson argues that trial counsel did raise the claim in a motion in limine, but then were ineffective in failing to renew it when the prosecution actually presented testimony from the same witnesses that was inconsistent with their testimony in the Honken trial. She also argues that prior *habeas* counsel were ineffective in disavowing the claim and that § 2255 does not contain a prohibition on claims by federal prisoners of ineffective assistance of post-conviction relief counsel, although § 2254 does contain such a bar for state prisoners seeking federal *habeas* relief.

*ii.* ***Analysis.*** In the Order (docket no. 291), filed July 12, 2011, in which I invited the parties to brief whether Johnson had disclaimed this claim in her previous Corrected Amended § 2255 Motion, I pointed out, first, that, in her Corrected Amended § 2255 Motion, Johnson stated, "Petitioner is not arguing that the Government improperly argued inconsistent theories of their case during the two trials." Order (docket no. 291) at 1-2 (citing Corrected Amended § 2255 Motion at 90 n.30). I also pointed out that, in her Second Amended § 2255 Motion, in her Claim Four (which I renumbered as Claim **28**), Johnson argued that "'[t]he Government Violated Petitioner's Rights Under the Sixth and Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments At Her Trial and That of Her Co-Defendant.'" *Id.* at 1 (quoting Second Amended § 2255 Motion, Claim Four). The language of Johnson's disclaimer of this claim in her Corrected Amended § 2255 Motion is clear, so there is no reasonable basis to argue that Johnson's

334

prior counsel did not expressly and specifically disclaim the claim of prosecutorial misconduct that Johnson attempts to resurrect in Claim **28** of her Second Amended § 2255 Motion.

Johnson's only arguments to avoid the disclaimer are that her prior *habeas* counsel was ineffective and that the claim comes as no surprise. Even though Johnson is now represented by different *habeas* counsel, who disagree with what I must assume was prior *habeas* counsel's strategic decision to disclaim the present prosecutorial misconduct claim, that does not mean that everything prior *habeas* counsel did was a nullity. Moreover, Johnson's "relation back" argument—offered as another ground to ignore prior *habeas* counsel's disclaimer—is unpersuasive, because where prior *habeas* counsel expressly disclaimed this claim, it simply would not be possible for the prior pleading to put the respondent on notice that the claim would be asserted. *Cf. Hernandez*, 436 F.3d at 858 (finding no relation back where the facts alleged in the original claim were not such that would put the opposition on notice of the issue in the "new" claim). Indeed, the notice expressly given to the respondent was that the claim *was not being asserted*, even if the factual basis for the claim was set out in the prior pleading.

Even if this claim was not effectively disclaimed, the respondent argues that it is procedurally defaulted. Johnson concedes that this claim was not raised on direct appeal, and her failure to do so constitutes procedural default of the claim in § 2255 proceedings. *Ramey*, 8 F.3d at 1314. Johnson attempts to save the claim from procedural default on the basis of ineffective assistance of counsel, as set out in Claim **20**, as demonstrating "cause and prejudice." As noted above, ineffective assistance of counsel may establish the "cause and prejudice" necessary to overcome procedural default. *See Theus*, 611 F.3d at 449. Also, Claim **20** alleges that trial counsel were ineffective in failing to address the prosecution's inconsistent admissions about Honken in the Honken trial, so that it does

address comparable, though not necessarily identical issues.  While I did not grant relief on the allegations of ineffective assistance of counsel in Claim **20**, standing alone, I did find that the claim involved deficient performance.  Therefore, assuming for the sake of argument and contrary to my conclusion that Claim **28** was not disclaimed, I will assume that there is a colorable claim that it was not procedurally defaulted, and consider it on the merits.

### b.  *The merits*

*i.*  *Arguments of the parties*.  As to the merits of this claim, Johnson argues that the prosecution's use of inconsistent, factually contradictory theories about her role and Honken's role at their separate trials violated her Fifth Amendment right to due process, her Sixth Amendment right to a fair trial, and her Eighth Amdnment right to reliable, non-arbitrary fact finding.  She contends that *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), forbids the use of inconsistent, irreconcilable theories to secure convictions of two or more defendants arising from the same event.  She argues that, in her case, the prosecution "stacked the decks in [its] favor," and, in violation of due process, pursued a death sentence for her without regard to fairness and the search for truth, in light of inconsistent arguments in Honken's trial.

The respondent denies that the prosecution presented inconsistent evidence or arguments at the two trials.  The respondent points out that Johnson has not shown that the prosecution offered inconsistent theories about who was the shooter or about whether or not Honken engaged in violence prior to 1993.  The respondent also argues that Johnson has not shown any inconsistency between the prosecution's mitigation phase closing arguments in Honken's trial and arguments in her trial, because the prosecution never argued that Honken engaged in violence prior to 1993, that Johnson was not violent or impulsive, or that Honken manipulated Johnson into participating in the crimes.  The

336

respondent points out that the prosecution did argue in both trials that Johnson participated in the murders and in luring DeGeus to his death and that Honken and Johnson used DeGeus's affection for Johnson as a method to lure him to his death. The respondent argues that, in Johnson's trial, the prosecution permissibly emphasized Johnson's conduct, but did not present an argument inconsistent with any argument in Honken's case. The respondent argues that this is not a case like *Smith v. Groose*, in which the prosecution argued factually inconsistent or contradictory theories about who committed the murders and when they occurred, both of which could not be correct.

In reply, Johnson concedes that the prosecution did not present evidence in her trial from Honken's brother, friend, co-worker, girlfriend, and sister about Honken not being violent that contradicted evidence from those witnesses in Honken's trial, the prosecution simply did not present any of that evidence in Honken's trial at all. She argues that the prosecution then made inconsistent arguments in her trial based on evidence that it did not elicit at Honken's trial. She argues that, by abandoning its depiction of Honken in his trial and portraying her as the catalyst for the crimes in her trial, the prosecution violated her rights. Thus, she contends that, as in *Smith v. Groose*, there was an inconsistency at the core of the prosecution's case against co-defendants for the same crime. She argues that she was prejudiced by the inconsistency, because not a single juror found the mitigating factor that her participation was relatively minor as compared to Honken's role in the murders and only three jurors found the mitigating factor that Honken, who was equally or more culpable than Johnson for the murders of the adults, would not be punished with death for those killings. She argues that there is a reasonable probability that, but for the prosecution's use of inconsistent theories, the result in her trial would have been different.

*ii.* ***Analysis***. As the Eighth Circuit Court of Appeals succinctly explained, "'To violate due process, an inconsistency must exist at the core of the prosecutor's cases

337

against defendants for the same crime,' and the [prosecution's] error must have 'rendered unreliable' the habeas petitioner's conviction." *Clay v. Bowersox*, 367 F.3d 993, 1004 (8th Cir. 2004) (quoting *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.), *cert. denied*, 531 U.S. 985 (2000)). In *Smith*, the Eighth Circuit Court of Appeals did not "hold that prosecutors must present precisely the same evidence and theories in trials for different defendants," *Smith*, 205 F.3d at 1052, which seems to be precisely what Johnson reads that case to hold. Rather, the court held "only that the use of inherently factually contradictory theories violates the principles of due process." *Id.* The factual contradictions must be more than "minor variations in testimony or defects in memory" that might arise, for example, from the lapse of time between trials. *Id.* On the other hand, due process is violated, and the convictions are infirm, when, in its "zeal to obtain multiple convictions," the prosecution relies on "diametrically opposed testimony" from the same witnesses. *Id.* (granting relief pursuant to § 2254, because the state offered inherently factually contradictory theories).

The decisions of the Eighth Circuit Court of Appeals in *Clay* and *Paul* demonstrate that there is no violation of the defendant's rights, when the prosecution relies on reconcilable theories that are not *factually* contradictory. In *Clay*, the court held that, where there was no showing that inconsistent evidence was presented to the two juries, a prosecutor's acknowledgment to one jury that the evidence presented to both juries left open the possibility that either murderer could have pulled the trigger, this acknowledgment did not render the second defendant's conviction unreliable. *Clay*, 367 F.3d at 1004. Similarly, in *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000), the Eighth Circuit Court of Appeals found that the prosecutor had not violated the defendant's due process rights by asserting the theory that either Paul or a separately-tried co-defendant, Ingle, or both, shot the murder victim, because that theory "was not factually

irreconcilable and was supported by the evidence." *Paul*, 217 F.3d at 998. As the court explained,

> Paul stated to both Chris Rogers and Cindy Wallace that he shot Williams. In addition, Paul told Rogers that Ingle also shot Williams after Paul did. The defense admitted the evidence was in conflict during closing argument at the guilt phase, stating: "I think throughout the testimony we heard three things; that Jeffrey shot Mr. Williams, that Trinity shot Mr. Williams, that Jeff and Trinity shot Mr. Williams. It is never a consistent story as to who shot Mr. Williams." More importantly, Paul could have been convicted of aiding and abetting in the murder of Sherman Williams under either theory. *See United States v. Clark*, 980 F.2d 1143, 1146 (8th Cir. 1992) ("To convict under the aiding and abetting statute, 18 U.S.C. § 2, the government need only prove that [each] defendant associated himself with the unlawful venture, participated in it as something he wished to bring about, and by his action sought to make the activity succeed.").

> Finally, Paul only argues that the prosecutor made inconsistent *arguments* at the two trials, but cannot point to the use of evidence at the different trials which was factually inconsistent and irreconcilable. At the guilt-phase closing argument in Paul's trial, the prosecutor also conceded there were three possible scenarios with regard to the shooting. *When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. See Nichols v. Scott*, 69 F.3d 1255, 1268–69 (5th Cir. 1995) (regarding the analogous felony murder situation). Thus, because there was evidence that supported both theories, and since Paul could have been convicted of aiding and abetting under either theory, we find no error.

*Paul*, 217 F.3d at 998-99 (first emphasis in the original, second emphasis added; footnote

omitted).

Johnson has come nowhere close to establishing that the prosecution violated her due process rights by asserting inconsistent arguments or theories. First, she concedes that the prosecution did not present evidence in her trial from Honken's brother, friend, co-worker, girlfriend, and sister about Honken not being violent that contradicted evidence from those same witnesses in Honken's trial. Rather, her argument is that the prosecution simply did not present any of the evidence from those witnesses in Honken's trial at all. She argues that the prosecution then made inconsistent arguments based on evidence that it did not elicit at Honken's trial. It is not enough to establish a due process violation that the prosecution did not present exactly the same testimony of the same witnesses in the two trials. *See Smith*, 205 F.3d at 1052 (making clear that the court was not "hold[ing] that prosecutors must present precisely the same evidence and theories in trials for different defendants," and instead considering whether there was "diametrically opposed" testimony from the same witness in both trials).

Moreover, Johnson has failed to establish that, even though the prosecution used witnesses who did not contradict themselves, the prosecution presented "inherently factually contradictory theories." *See id.* Like the defendant in *Paul*, she "cannot point to the use of evidence at the different trials that was factually inconsistent and irreconcilable." *See Paul*, 217 F.3d at 998. As I explained, above, in my analysis of Claim **20**, Johnson has not identified any factually irreconcilable arguments in the two trials: She has cited no statements in Honken's case that Honken manipulated her into involvement in the killings or that he was the sole organizer, planner, or schemer in the killings, nor any statements in her trial that she manipulated Honken into the killings or that she was the sole organizer, planner, or schemer in the killings. Rather, the cited statements in each case are reconcilable, not irreconcilable, descriptions of each co-

340

defendant. Also, consistent with my analysis of Claim **26**, arguments and evidence that, prior to meeting Johnson, Honken *planned* violent acts is not inherently inconsistent with arguments and evidence that Honken never *engaged* in violent acts until he met Johnson. Rather, evidence and argument that Honken *planned*, but never carried out, violent acts is entirely reconcilable with evidence that Honken never *engaged* in violent acts until he met Johnson. Not only was the evidence in the two trials not irreconcilable, it left open the possibility for the prosecution, consistent with the evidence, to emphasize each particular defendant's involvement in the killings. *Cf. Clay*, 367 F.3d at 1004; *Paul*, 217 F.3d at 998-99.

Nor can I find that the prosecutor's error, if any, in the framing of the arguments in the two trials "'rendered unreliable' the habeas petitioner's conviction." *Clay*, 367 F.3d at 1004 (stating the requirements as proof of an inconsistent argument and that the error rendered the conviction unreliable). Johnson asserts, yet again, that this alleged error had such an effect on the mitigating factors concerning relative role of the co-defendants that, had it not occurred, there is a reasonable probability that the result in her trial would have been different. I am no more convinced by this argument here than I was in its previous permutations. Again, contrary to Johnson's contentions, the supposedly contradictory arguments did very little, in light of all of the unaffected evidence, to show that some jurors (rather than none) would have found that Johnson's participation was relatively minor compared to Honken's role in the murders or to show that more than three jurors would have found that Honken, who was equally or more culpable than Johnson for the murders, would not be punished with death for the murders of the adults, *see* Mitigation Phase (Crim. docket no. 593) (Step Two, mitigation factors (1) and (4)), because those arguments are not *factually* inconsistent arguments about Honken's and Johnson's conduct during the killings.

Johnson is not entitled to any relief on this prosecutorial misconduct claim, either.

### 4.    Cumulative prejudice from the prosecutor's misconduct

The Eighth Circuit Court of Appeals has expressly *required* consideration of the cumulative effect of prosecutorial misconduct in *habeas* actions. *See, e.g., Graves*, 614 F.3d at 507-08; *Louisell*, 178 F.3d at 1024. However, where I have found no errors or none that had any effect on Johnson's mitigation phase verdict, there is simply nothing to cumulate. Therefore, Johnson is not entitled to any relief based on the cumulative effect of alleged errors or misconduct by the prosecution in her trial.

### C.  Counsel's Errors Involving The Mitigation Evidence Presented

Although Johnson makes no other claims of prosecutorial misconduct, she has alleged that her trial counsel made a myriad of other errors in the mitigation phase of her trial. Thus, I turn to Johnson's third multifaceted claim of ineffective assistance of counsel in the mitigation phase, aggregating Claims **29, 30, 31, 32,** and *33*, all of which involve alleged failures of trial counsel relating to the mitigation evidence that trial counsel actually did present.

### 1.    Claims 29, 30, and 31:  Poorly chosen mitigation witnesses

#### a.    The witnesses at issue

Somewhat more specifically, Claims **29**, **30**, and **31** (Johnson's Claim One, §§ BB.1, BB.2, and BB.3, respectively) allege ineffective assistance of counsel in calling three mitigation witnesses—Holly Dirksen, Johnson's younger sister; Douglas Book, the Chief of Police for Forest City, Iowa; and Susan Marsolek, a halfway house resident who had worked with Johnson at the Waterfront Restaurant and Lounge in Clear Lake, Iowa, and had later been housed with Johnson in M Block of the Linn County Jail—because trial counsel's failure to prepare adequately before calling these witnesses allowed the

prosecution to elicit aggravating evidence from them. Not only have I concluded that these allegations of error are facets of a single multifaceted claim of ineffective assistance of counsel relating to the mitigation evidence actually presented, but I find that these three allegations of error are so similar that they can be discussed as a group.

The problem with Dirksen's testimony, Johnson contends, is that, unlike her other siblings to testify, James Johnson, Jr., and Wendy Jacobson, Dirksen could not remember or confirm much of the "horrific" upbringing that Johnson suffered and, instead, depicted a rather normal childhood. Worse yet, on cross-examination, the prosecution was able to elicit damaging testimony that Dirksen was a drug addict, that Johnson was her supplier, and that Johnson knew that DeGeus was missing and information about how he was buried before his body was found. The problem with Chief Book's testimony, Johnson contends, was that, although he was called to testify about beatings that she suffered at DeGeus's hands and her reluctance to allow law enforcement to intervene, the prosecution was then able to question Chief Book about threatening messages that she left for Book on his home answering machine when he conducted an investigation of alleged drug activity involving her and Rick Summers. The problem with Marsolek's testimony, Johnson contends, was that, although her trial counsel elicited testimony that Marsolek had worked with her and had been in jail with her, that she was compassionate and trustworthy and had taken Marsolek under her wing when they were both in jail, and that Marsolek had never seen her in a fight in the jail, the prosecution was then able to turn Marsolek into an aggravating witness, by showing that Marsolek had lied to law enforcement after Marsolek's arrest, that Marsolek had denied obtaining drugs from her and owing her money, and that Marsolek had made a contradictory statement about her involvement in a fight at the Linn County Jail in an investigation of that incident.

### b.    *Arguments of the parties*

As to each of these witnesses, Johnson argues that, had her trial counsel been familiar with the discovery, trial counsel would have known about the facts elicited from these witnesses by the prosecution on cross-examination and would have realized that the testimony of these witnesses would be, at best, cumulative, and most likely aggravating. She argues that calling these witnesses without discovering their unhelpful testimony was deficient performance. She also argues that she was prejudiced by these deficiencies, because, if the harmful evidence is removed from the aggravating side of the balance, and the helpful evidence remains on the mitigating side, the different balance might have influenced the jurors' view of her culpability, with the likelihood of a different result.

The respondent argues that the testimony of each of these witnesses supported multiple mitigating factors. The respondent also argues that the record shows that Johnson's trial counsel did spend time reviewing the discovery file relating to each of these witnesses. The negative aspects of their eventual testimony, the respondent argues, was certainly known to Johnson, but she did nothing to warn her trial counsel about it. Thus, the respondent argues that it is only hindsight that allows Johnson to criticize her trial counsel for not foreseeing the damaging aspects of the potential testimony of these witnesses with her present clarity and to make a different assessment of the value that these witnesses added to her mitigation case. The respondent also challenges Johnson's ability to demonstrate the necessary prejudice relating to these witnesses, because Johnson simply recites that, had different evidence been presented, the result might have been different. The respondent argues that Johnson overemphasizes the effectiveness of the prosecution's cross-examination and the ineffectiveness of her trial counsel's rehabilitation of the witnesses on redirect. As to Chief Book's testimony, in particular, the respondent points out that there was copious other evidence about Johnson threatening others, so that the

aggravating aspect of his testimony was too cumulative to be prejudicial.

In reply, Johnson reiterates that Dirksen's mitigating testimony was, at best, cumulative of other mitigating testimony, and that her trial counsel should have recognized that her testimony would potentially (and did in fact) do more harm than good. Similarly, she argues that Chief Book's mitigating testimony was cumulative of other evidence that Johnson was abused by DeGeus and that trial counsel's failure to ask if Book had anything bad to say was not only clearly deficient, but devastatingly prejudicial, because a witness that counsel anticipated would be very positive strongly supported the prosecution's portrait of her. Johnson also argues that Marsolek's testimony is another example of trial counsel's failure to prepare adequately and to assess the potential benefit of the witness's testimony against its potential to open the door to aggravating evidence. Johnson argues that the prejudice that she suffered from calling these witnesses was sufficient to undermine confidence in the penalty decision.

### c.    *Analysis*

As the Eighth Circuit Court of Appeals has explained, "The decision whether to call witnesses is normally a judgment by counsel which the courts do not second-guess." *Williams v. Carter*, 76 F.3d 199, 200 (8th Cir. 1996) (citing *Sherrill v. Wyrick*, 524 F.2d 186, 188, 190 (8th Cir. 1975), *cert. denied*, 424 U.S. 923 (1976)). A *habeas* court should consider whether the record demonstrates that counsel's decision to call a witness who ultimately made damaging statements was strategic in nature, whether it was made after adequate investigation, and what effect the damaging aspects of the witness's testimony had in relation to the witness's helpful testimony. *See Fairbanks v. Ayers*, 650 F.3d 1243, 1254 (9th Cir. 2011) (although the petitioner asserted that defense counsel was ineffective in presenting defense witnesses who made damaging statements about the petitioner, the record showed that defense counsel had knowingly offered the witnesses and their

damaging statements as a strategic choice to attempt to gain credibility); *Morales v. Mitchell*, 507 F.3d 916, 938 (6th Cir. 2007) (noting that, in a prior case, *Combs v. Coyle*, 205 F.3d 269, 287-88 (6th Cir.), *cert. denied*, 531 U.S. 1035 (2000), the court had held that defense counsel was objectively unreasonable in presenting an expert witness without conducting a pretrial investigation adequate to reveal his damaging opinion on an issue critical to proof of the crime, but that defense counsel had not been ineffective in the case before it, where the petitioner's trial counsel had "fully ascertained his expert witness's opinion before trial," and the bulk of the expert's testimony was helpful to the defense).

It is a relatively simple matter, with the benefit of hindsight, to conclude that calling Dirksen, Book, and Marsolek opened the door to damaging testimony and to conclude, further, that even the beneficial testimony from these witnesses was largely cumulative of other mitigating evidence on similar issues. Nevertheless, hindsight is not the proper perspective. *See King*, 595 F.3d at 852-53 (observing that the court "'must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"'" (quoting *Ruff*, 77 F.3d at 268, in turn quoting *Strickland*, 466 U.S. at 690)). There were *discernible* strategic bases for trial counsel's decision to call each of these witnesses, and each witness did, in fact, present some mitigating evidence. *Cf. Morales*, 507 F.3d at 938. I am also sympathetic to Learned Counsel's complaints that Book sandbagged the defense during a pretrial interview by not disclosing potentially harmful testimony that he could offer, and to the respondent's argument that Johnson herself certainly knew about the potentially damaging testimony that Book could offer, as well as his potentially mitigating testimony, but did nothing to warn trial counsel. I conclude that Johnson has not shown that her trial counsel did an inadequate job of investigating these witnesses to make a fully informed, strategic decision about whether their potentially mitigating testimony would outweigh any potentially

aggravating testimony that the prosecution might elicit on cross-examination. *Cf. Combs*, 205 F.3d at 287-88. Indeed, I think that, even had trial counsel somehow learned the negative information that these witnesses would ultimately present, trial counsel still might reasonably have believed that, based on what trial counsel knew at the time of the mitigation phase, their testimony would be more helpful than harmful and that any harmful aspects could be neutralized. *Cf. Fairbanks*, 650 F.3d at 1254 (there was no deficient performance where counsel knowingly elicited potentially damaging testimony from a witness for the strategic reason of attempting to gain credibility).

Even if trial counsel performed deficiently in investigating and calling these witnesses, those errors are not enough to demonstrate the requisite prejudice. *See Strickland*, 466 U.S. at 691-92 (the second prong of an ineffective assistance of counsel claim is prejudice from counsel's deficient performance). First, I am not convinced that the negative aspects of each witness's testimony outweighed the mitigating aspects. Each did offer evidence supporting multiple mitigating factors, and the aggravating aspects of their testimony were also largely cumulative of other aggravating evidence, as the prosecution argues, so that the prejudicial effect of the aggravating testimony was limited. Moreover, I cannot say that, had these witnesses not testified at all, or if they had testified, but trial counsel had been more effective in neutralizing or blocking the aggravating aspects of their testimony, there is any reasonable probability that the outcome of the mitigation phase would have been any different. *Id.* The purportedly aggravating aspects of the testimony of these witnesses were neither so central to nor so strongly supportive of the prosecution's aggravation case, where it was limited and largely cumulative of other aggravating evidence, on the one hand, nor so damaging to Johnson's own mitigation case, on the other, as to make it reasonably likely that a different presentation would have made any difference. *Compare Combs*, 205 F.3d at 287-88 (counsel's deficient performance

allowed damaging testimony on a critical issue in the case).

Johnson is not entitled to relief on any of these allegations, standing alone, nor do any of them involve any prejudice that can be aggregated to determine whether Johnson was ultimately prejudiced by all of the errors of counsel in presenting her mitigation case.

## 2. *Claim 32: Flawed use of the psychiatric pharmacologist*

In Claim **32** (Johnson's Claim One, § CC), Johnson asserts another error by trial counsel in the mitigation case actually presented. That alleged error is failing to provide psychiatric pharmacologist Roswell Lee Evans with data regarding Johnson's drug history, which rendered his expert testimony essentially irrelevant. Johnson called Dr. Evans to testify "about methamphetamines, their actions, what do they do, and pretty much from an informational perspective." Johnson Trial Transcript at 3580. However, at the outset of his testimony, Dr. Evans acknowledged that he did not know Johnson, had never seen her before, had not been provided with any material concerning her case, and was not going to testify about her state of mind at the time of the offenses; he was simply there "to talk about methamphetamine." *Id*. The prosecution was then able to elicit admissions from Dr. Evans that some people involved in the drug trade are not users and that methamphetamine can have different effects on different people, including how addictive it is for them, and that he had no idea whether Johnson had been diagnosed as drug dependent.

### a. *Arguments of the parties*

Johnson argues that Learned Counsel could offer no reason why her defense team had not provided Dr. Evans with Johnson's drug history so that he could be in a position to explain the effects of methamphetamine use on her, given her history. She argues that the result of trial counsel's omission was that Dr. Evans could not and did not provide any connection between his information about the effects of methamphetamine and her conduct

in the charged offenses, notwithstanding her statements to other mental health experts about how frequently she used methamphetamine, and he could not diagnose her as drug dependent. She argues that, not only was Dr. Evans's testimony effectively neutralized by his lack of knowledge of her drug history, it likely led at least some jurors to view her drug history as aggravating, that is, as merely recreational, not as causing devastating effects on her, which it would have shown, particularly if evidence of methamphetamine use had been coupled with evidence of organic brain impairments and her psychiatric history that trial counsel could and should have presented. She also points out that none of her other mental health experts, who knew her drug history, was asked to testify about the extent of her addiction or its impact on her behavior at any time, including when the charged offenses occurred. Johnson contends that, had trial counsel put on expert opinions that she suffered from drug dependency, the defense would have undermined the prosecution's arguments that she was not addicted, but was involved in the drug trade for profit. She also contends that, because four jurors found her methamphetamine use to be mitigating, even in the absence of adequate testimony from Dr. Evans, there is a reasonable probability that, had Dr. Evans been able to present evidence about the extent and impact of her methamphetamine use, at least one juror would have voted for a life sentence, because the mitigating evidence that was not presented might have influenced the jurors' appraisal of her culpability.

The respondent argues that trial counsel's performance was not deficient, because Dr. Evans testified about the damaging effects of methamphetamine use and, although no other mental health expert had testified that Johnson was drug dependent, there was copious other evidence of her regular drug use for years. The respondent also argues that allowing Dr. Evans to testify about Johnson's actual methamphetamine use would have opened the door to evidence of her continued methamphetamine use seven years after the

murders. The respondent also asserts that, because Dr. Evans was a pharmacologist, not a psychiatrist, he was not qualified to examine Johnson and diagnose her as drug dependent. The respondent also points out that Johnson claimed that she was not using methamphetamine in 1993 while she was pregnant, which encompasses the time of both the Nicholson/Duncan murders and the DeGeus murder, that she had only been using methamphetamine a relatively short time before the murders, and that there is no evidence that her methamphetamine use up to the time of the murders caused any brain damage.

The respondent also argues that trial counsel's performance, if deficient, was not prejudicial, where Johnson has failed to show what Dr. Evans's testimony would have been, if he had received information about her methamphetamine use, because Dr. Evans did not testify in her evidentiary hearing. Thus, the respondent contends, Johnson is really only speculating about what Dr. Evans could have said. Similarly, the respondent contends that Johnson is only speculating about how the jurors interpreted Dr. Evans's testimony or its impact on whether her methamphetamine use was the result of dependence or merely recreational. As to prejudice, the respondent argues that, because Johnson was not using methamphetamine at the time of the murders, evidence about her methamphetamine use would not have mitigated her behavior at the time of the offenses, and she has no evidence that prior methamphetamine use had already caused her brain damage. Finally, the respondent argues that Johnson is simply speculating that any juror would have found that different evidence from Dr. Evans would have changed the result of the mitigation phase.

In her reply, Johnson points out that, while the prosecution asserts that there were reasons not to give Dr. Evans her drug history or to have him testify about it, her trial counsel gave *no* reason for failing to do so. She also argues that the respondent's attempt to downplay the significance of her methamphetamine use is contrary to evidence of the

severe and long-lasting effects that methamphetamine use had on her life, even before the murders. She also argues that, with proper information, Dr. Evans could have tied her prior methamphetamine use to her behavior in 1993, even if she had stopped using methamphetamine during her pregnancy. She also argues that she was prejudiced, because the failure with Dr. Evans is another example of a squandered opportunity to provide a cohesive mitigation defense about how and why she ended up involved with Honken in five killings. However, she argues that his testimony was, instead, neutralized, for example, because studies have shown that jurors dismiss expert testimony that is not tied to the case. Furthermore, she argues that the prosecution did exploit the limitations on Dr. Evans's testimony, managing to leave the impression that she was involved in the drug trade for profit, not because of addiction, and that the effects of methamphetamine on her were trivial, not devastating. She reiterates that, had jurors been given a proper understanding of the effect of methamphetamine on her life and behavior, it is reasonably probable that at least one juror would have voted for life.

### b.    Analysis

This allegation of error is somewhat different from the allegations in Claims **29**, **30**, and **31**, in that Johnson does not allege that poor preparation allowed an ostensibly mitigating witness to give aggravating testimony, but that poor preparation did not allow an ostensibly mitigating witness to live up to his full potential.[63]  Even so, it is another example of poor—indeed, professionally unreasonable and, thus, deficient—preparation for and presentation of evidence in the mitigation phase of Johnson's trial.

---

[63]It also differs from subsequent allegations of error concerning other defense experts, because Johnson alleges that trial counsel had all of the information that Dr. Evans needed to present fully effective mitigation testimony, not that defense counsel prevented experts from obtaining that information.

The Eighth Circuit Court of Appeals has explained, "'Reasonable performance of counsel includes adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.'" *Cagle v. Norris*, 474 F.3d 1090, 1097 (8th Cir. 2007) (quoting *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005)). I find that the performance of trial counsel did not meet all of these requirements as to Dr. Evans's testimony. Assuming, at least for the sake of argument, that trial counsel had adequately investigated the facts of Johnson's drug use history—where there appears to be no dispute that Johnson's drug use history was known to trial counsel—it does not appear that trial counsel ever adequately considered (if trial counsel considered at all) viable theories about how Johnson's drug use history could be used to explain her conduct at the time of the charged offenses or how Dr. Evans could be used to offer that explanation. Clearly, trial counsel did not develop evidence to support any theory that Johnson's conduct at the time of the offenses was influenced by her drug use history, where there was no attempt to connect Dr. Evans's testimony about the effects of methamphetamine to Johnson's actual use of methamphetamine, either through Dr. Evans himself or through another expert.

A series of recent cases from the Sixth Circuit Court of Appeals is also instructive. In *Otte v. Houk*, 654 F.3d 594 (6th Cir. 2011), the petitioner asserted "that his counsel were ineffective for failing to retain a substance abuse expert who could testify as to Otte's alcohol, cannabis, and cocaine dependence." *Otte*, 654 F.3d at 602. The Sixth Circuit Court of Appeals stated that, "As a general matter, counsel's failure to make a reasonable investigation of a defendant's history and present this evidence at mitigation can constitute ineffective assistance." *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003)); *accord Cagle*, 474 F.3d at 1097. However, the court noted that the petitioner had cited no case in which the failure to retain a substance abuse expert had been grounds for

granting *habeas* relief. *Id.* The court noted, further, that the petitioner could not show that he was prejudiced by counsel's failure to present a substance abuse expert, because evidence of his long history of drug abuse was introduced by another expert. *Id.*

More specifically, the court in *Otte* explained,

> We have rejected many claims of this type before. In *Clark v. Mitchell*, 425 F.3d 270 (6th Cir. 2005), the petitioner's counsel called an expert at mitigation who testified that Clark was a drug addict and his "need for drug money had a contributing effect to Clark's crimes." 425 F.3d at 275. Before this court, Clark argued that his counsel should have retained a pharmacologist who could have testified in greater detail as to the effects of his drug addiction. We refused to find the state court's decision unreasonable because the expert actually called at mitigation "addressed Clark's drug addiction and its effect on his criminal conduct." *Id.* at 285. In *White v. Mitchell*, 431 F.3d 517, 530 (6th Cir. 2005), we rejected an ineffective assistance claim de novo that was premised on counsel's failure to retain "experts to explain the effect of intoxication on White at the time of the crime." In that case, we held that the evidence would have been cumulative because the jury was aware that White had been drinking and another expert testified about the effects of alcohol on White's mood and behavior. Most recently, in *Tibbetts [v. Bradshaw]*, 633 F.3d [436,] 443 [(6th Cir. 2011)], we rejected the petitioner's argument of ineffective assistance for failure to present a pharmacologist because the expert who actually testified mentioned that "Tibbetts' use of drugs and alcohol was an explosion waiting to happen, and that Tibbetts was unable to control his rage response while intoxicated."
>
> Otte's case is not meaningfully distinguishable from these. During the penalty phase, Dr. McPherson testified as to Otte's drug and alcohol dependence from a young age, as well as the effects that drug and alcohol use might have had on him. She stated that Otte's life was "primarily related around the use of drugs and alcohol. . . . Periodically people support

themselves in this kind of situation, not only by acts of theft or anti-social behavior, but they also sell drugs to get money." She also testified that Otte "had a pretty heavy crack cocaine habit, which are [sic] not only expensive, but also extremely damaging as to how they [a]ffect psychological functioning." She testified that "the first thing that the alcohol drugs [sic] knock out is the control system." She also gave her opinion that the drugs and alcohol made Otte more likely to commit crimes. ("If he is clean, sober, he is not likely to do this."). It was very well established that Otte had been drinking and consuming drugs around the time of the murders. Considering the entirety of Dr. McPherson's testimony, then, we do not see how a substance abuse expert could have affected the panel's decision to impose a death sentence. Because such testimony would have been largely cumulative, Otte cannot establish that he was prejudiced, and this claim fails.

*Otte*, 654 F.3d at 602-03.

Here, Johnson's case *is* meaningfully distinguishable from each of the cases described in *Otte* and *Otte* itself. Although Johnson *had* the appropriate expert, Dr. Evans, a pharmacologist, and none of the petitioners in *Otte*, *Clark*, *White*, or *Tibbetts* did, her trial counsel did not elicit from Dr. Evans the appropriate, available testimony that Johnson was a methamphetamine addict or the effect that her drug addiction would have had on her, even if she was not using methamphetamine at the time of the offenses. The still more critical failing here is that neither did her trial counsel elicit testimony from any other expert that addressed the effect of Johnson's prior methamphetamine use on her conduct at the time of the offenses, as had occurred in each of the Sixth Circuit cases. *See id.* While there might have been evidence presented to the jury about Johnson's methamphetamine use prior to the offenses, there was no testimony about its effects on Johnson's behavior at the time of the offenses, *compare Clark*, 425 F.3d at 285; *White*, 431 F.3d at 530, or even its potential effects on her behavior at the time of the offenses,

*compare Tibbetts*, 633 F.3d at 443. Although it was well-established that Johnson had been a methamphetamine user prior to the offenses, the evidence also showed that she claimed not to have been using methamphetamine during her pregnancy in 1993—*i.e.*, at the time of the offenses—and there was no attempt to use Dr. Evans, or any other expert, to explain the effects that *prior* methamphetamine use might have had on her conduct at the time of the offenses. *Compare Otte*, 654 F.3d at 603.

The performance of trial counsel in this respect was not only deficient, in failing to elicit evidence to support a theory that Johnson's methamphetamine use affected her behavior at the time of the offenses, either through Dr. Evans or through Dr. Evans's testimony in conjunction with other expert evidence, but that deficiency was prejudicial. Although Dr. Evans's testimony may have put information about the effects of methamphetamine use "in the air," the defense did not connect that information in any way to Johnson. Notwithstanding that failing, four jurors found that Johnson's methamphetamine addiction for most of her adult life was mitigating. *See* Mitigation Phase Verdict Form (Crim. docket no. 593) (Step Two, mitigating factor (16)). Because the additional evidence connecting the effects of methamphetamine to Johnson's drug history that Dr. Evans could have provided was not merely cumulative, there is a reasonable probability that, had that evidence been presented, more jurors would have found Johnson's methamphetamine use was mitigating and that at least one juror would have voted for life sentences on all of her convictions. *Compare Otte*, 654 F.3d at 603 ("Considering the entirety of Dr. McPherson's testimony, then, we do not see how a substance abuse expert could have affected the panel's decision to impose a death sentence. Because such testimony would have been largely cumulative, Otte cannot establish that he was prejudiced, and this claim fails."). Contrary to the respondent's contentions, Johnson's assertions about what Dr. Evans could and should have testified to, if provided

with her drug use history, is not based on mere speculation, even though Dr. Evans did not testify at the evidentiary hearing on Johnson's § 2255 Motion about what his testimony would have been, if he had been properly prepared with Johnson's drug use history. It is not speculation to find that, had Dr. Evans been provided with Johnson's drug use history, he would have been able to cast his testimony about the effects of methamphetamine use in terms of the effects of methamphetamine *on Johnson* in light of her drug use history, rather than simply in terms of the effects of methamphetamine *on people* who use some amounts of methamphetamine in certain ways.

Therefore, I conclude that Johnson is entitled to relief from the mitigation phase verdicts on all charges, owing to trial counsel's ineffective assistance in the presentation of Dr. Evans's testimony.

### 3. *Claim 33: Untimely allegation of error regarding formulation of mitigating factors*

The last facet of Johnson's claim of ineffective assistance of counsel relating to the mitigation evidence that counsel actually did present, Claim *33* (Johnson's Claim One, § EE), is that counsel used multifaceted, overly-complicated yet incomplete mitigating factors for the jury to weigh, rather than simple, straightforward facts that encompassed all of the mitigation. Although I concluded that this claim is untimely and does not "relate back" to the filing of Johnson's Corrected Amended § 2255 Motion, so that it cannot be the basis for relief, I nevertheless believe that it is important to discuss this allegation of error as a cautionary tale. This is true, not least because the mitigating factors were remarkably poorly drafted, considering how important they are in a capital case, but also because I ignored my own significant misgivings at the time, and submitted Johnson's trial counsel's mitigating factors essentially as proposed, a mistake I now deeply regret.

Johnson points out that her mitigation specialist had drafted a list of forty-four

straightforward mitigating factors, but trial counsel ignored her suggestions. The result, she argues, was that the jurors were prevented from considering and giving effect to all of the mitigating evidence presented. The respondent argues that this claim is not only time-barred, but without merit, because different attorneys might well have different views on the most effective way to draft mitigating factors. Here, the respondent argues, the mitigating factors, as drafted by trial counsel, "told a story," demonstrating both the pertinent facts and why they were mitigating, and Johnson cannot know why jurors did or did not find certain factors were mitigating, even if the underlying facts stated were true. Thus, the respondent argues that Johnson offers nothing but speculation that the outcome of the trial would have been different, if trial counsel had drafted the mitigating factors in a different manner.

In discussing this allegation of error, for illustrative purposes only, I will restrict my comments to an example of a mitigating factor actually submitted, without addressing Johnson's other untimely contentions that trial counsel were also ineffective in failing to submit mitigating factors on certain topics, in withdrawing certain factors, or in failing to notice that one proposed mitigating factor had been inadvertently omitted.

As Johnson contends, the United States Supreme Court has recognized that "[a] careful review of our jurisprudence in this area makes clear that well before our decision in [*Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*)], our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 33, 246 (2007). As the Court also explained in *Abdul-Kabir*, "[T]he jury must be permitted to 'consider fully' such mitigating evidence and . . . such consideration 'would be meaningless' unless

the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." 550 U.S. at 260 (quoting *Penry I*, 492 U.S. at 321).

The respondent is correct that *Abdul-Kabir* did not involve a claim of ineffective assistance of counsel in the drafting or formulation of mitigating factors, but the question of whether a Texas statute, and jury instructions consistent with that statute, prevented jurors from giving meaningful consideration to constitutionally relevant mitigating evidence. *See id.* at 237. Nevertheless, the respondent too blithely ignores the impact of the principles stated in *Abdul-Kabir* upon trial counsel's duty to provide effective assistance in a capital case. If capital sentencing juries "must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual," *see id.* at 246, it follows that counsel in a capital case performs deficiently, even if counsel presents mitigating evidence, if counsel fails to formulate mitigating factors in a way that allows jurors to give meaningful consideration and effect to that mitigating evidence (or fails to object to mitigating factors formulated by the court that do not do so), and that a petitioner may be prejudiced by that deficiency, if there is a reasonable probability that, had counsel properly formulated mitigating factors, jurors would have been able to give meaningful consideration and effect to all mitigating evidence. *See Strickland*, 466 U.S. at 688 (deficient performance is the first prong of an ineffective assistance claim); *id.* at 691-92 (prejudice, that is, a showing that the outcome of the proceeding would have been different, but for counsel's unprofessional errors, is the second prong of an ineffective assistance of counsel claim); *cf.* ABA Death Penalty Guidelines (2003), Guideline 10.11 K (The Defense Case Concerning Penalty) ("Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all

relevant mitigating evidence.  Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions.  Post-conviction counsel should pursue these issues through factual investigation and legal argument.").

Johnson offers the following as an example of a deficiently and prejudicially drafted mitigating factor:

> (9) Angela Johnson was raised in a single-parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem.

"Penalty Phase" Verdict Form (docket no. 593) (Step Two, mitigating factor (9)); *see also* Exhibit 1, MG002248 (First Amended List of Mitigating Circumstances, 11).  Five jurors found this mitigating factor, *id.*, that is, that it stated "an aspect of [Johnson's] character or background, any circumstance of the offense in question, or any other relevant fact or circumstance that might indicate that [she] should receive a sentence of life imprisonment without possibility of parole instead of a death sentence."  *See* Final "Penalty Phase" Instructions (Crim. docket no. 589) (Instruction No. 3 - Step Two - "Mitigating" Factors).

Johnson argues—and I agree—that, instead of allowing jurors to give meaningful consideration and effect to the mitigating effect of separate facts, *see Abdul-Kabir*, 550 U.S. at 260, this single mitigating factor included many facts (at least eight) that jurors were asked to consider as a group:  (1) that Johnson was raised in a single-parent household; (2) that her mother was emotionally unstable; (3) that her mother subjected her

to unusual fasting practices; (4) that she suffered long periods of abandonment and physical detachment; (5) that she suffered occasional physical abuse; (6) that she was susceptible to escape through illicit drug use; (7) that she had a series of unhealthy relationships with men; and (8) that she had chronic feelings of abandonment and low self-esteem. Furthermore, it required the jurors to reach the specific conclusion that the first five of these facts actually caused (that is, "result[ed] in") the remaining three, thereby restricting the jurors' ability to give each fact its full mitigating effect. At a minimum, this mitigating factor, as formulated by Johnson's trial counsel, would have confused jurors as to their ability to consider the potential mitigating effect of any particular fact, standing alone, or in conjunction with all of the other facts with which it appeared. For example, was a juror required to find all of the first five factors, rather than just one of them, had all three of the specified results, rather than any one of them, to find that factor (9) was mitigating? This problem was not isolated to this specific example, as nearly all of the other mitigating factors were also multifaceted, convoluted, and/or required the jurors to find that one or more preconditions or a series of conditions had specific results.

Johnson asserts that the responsibility for deficient drafting of the mitigating factors must be laid at the feet of trial counsel, because I did not insist on limiting the number of factors or on combining multiple facts into a single factor, but sought to simplify trial counsel's proposed mitigating factors by removing confusing language. I will not so easily exonerate myself from responsibility for allowing such multifaceted, complex, convoluted, and confusing mitigating factors to go to the jury to guide their death penalty determination. I clearly had misgivings about the way that trial counsel had formulated proposed mitigating factors, both when I conferred with the parties about "Penalty Phase" Instructions at the conclusion of evidence in the merits phase, *see* Johnson's Trial Transcript at 2148-2152, as well as at the time of the conference on the Final "Penalty

Phase" Instructions, *see id.* at 3966-3997. Nevertheless, I continued to adhere to my statement in the earlier conference on the Preliminary "Penalty Phase" Instructions that "I think [Johnson's defense team] [is] for the most part entitled to [its] language unless I have a serious objection to it," Johnson's Trial Transcript at 2152, even after I *did* have "serious objection" to trial counsel's formulation of the mitigating factors. Certainly, if presented with the same requested mitigating factors, I would now be wise enough to reject them and, instead, reformulate mitigating factors in a manner that would have allowed the jurors, at a minimum, to find and consider separately the effect of key mitigating facts.

Not only was the formulation of the mitigating factor used as an example deficient, it was also prejudicial. There can be little doubt of the extreme importance of the mitigating factors to the jurors' ultimate mitigation phase determination in this case, as demonstrated by the statute under which Johnson was convicted and sentenced to death. *See* 21 U.S.C. § 848(k) (2004) (superseded) (stating, in pertinent part, "the jury, or if there is no jury, the court, shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence."). Thus, the potential for prejudice from deficiently formulated mitigating factors was especially high.

That potential for prejudice was realized here. Again using mitigating factor (9) as an example, the grouping of five separate facts as "resulting in" three other specified characteristics or circumstances precluded the jurors from giving "meaningful consideration and effect" to any one of those five facts. *See Abdul-Kabir*, 550 U.S. at

246. As a still more specific example, mitigating factor (9) precluded jurors from finding that the occasional physical abuse suffered by Johnson was mitigating, standing alone, because it resulted in Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem, or resulted in any one of those things, *or* had some other result not listed, such as inuring her to physical violence against others, even children, which reasonable jurors might find mitigating. *Cf. id.* at 256-57 ("Under the framework set forth in *Penry I*, the testimony of Cole's mother and aunt, as well as the portions of the expert testimony suggesting that his dangerous character may have been the result of his rough childhood and possible neurological damage, were not relevant to either of the special verdict questions, except, possibly, as evidence supporting the State's argument that Cole would be dangerous in the future. This would not satisfy the requirement of *Penry I*, however, that the evidence be permitted its mitigating force beyond the scope of the special issues. Therefore, it would have followed that those questions failed to provide the jury with a vehicle for expressing its 'reasoned moral response' to that evidence."). Where, as here, the mitigating factors, as formulated, precluded jurors from giving meaningful consideration and effect to all mitigating evidence, there is a reasonable probability that, had the jurors been presented with coherent and effective mitigating factors, they would have reached a different mitigation phase verdict. *Cf. id.* ("Our cases following *Lockett [v. Ohio*, 438 U.S. 586 (1978),] have made clear that when the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed.").

Therefore, had this allegation of error been timely asserted, I would likely have granted relief on it. Because it was not timely asserted, it cannot be the basis for any

relief.

### 4.    *Aggregate prejudice*

I turn, briefly, to consideration of the aggregate prejudice from all of the alleged errors of trial counsel relating to the mitigation evidence that trial counsel actually did present. I have found that Claims **29**, **30**, and **31** (Johnson's Claim One, §§ BB.1, BB.2, and BB.3, respectively), alleging ineffective assistance of counsel in calling three mitigation witnesses, did involve deficient performance, because trial counsel did an inadequate job of investigating these witnesses to make a fully informed, strategic decision about whether their potentially mitigating testimony would outweigh any potentially aggravating testimony that the prosecution might elicit on cross-examination. Nevertheless, I concluded that Johnson is not entitled to relief on any of these allegations, standing alone, nor do any of them involve any prejudice that can be aggregated to determine whether Johnson was ultimately prejudiced by all of the errors of trial counsel in the mitigation case actually presented. In contrast, I concluded that Claim **32** (Johnson's Claim One, § CC), alleging failure to provide psychiatric pharmacologist Roswell Lee Evans with data regarding Johnson's drug history, which rendered his expert testimony essentially irrelevant, involved both deficient performance and sufficient prejudice, standing alone, to entitle Johnson to relief from the mitigation phase verdicts on all charges. While I also concluded that, had Claim *33* (Johnson's Claim One, § EE), alleging trial counsel's errors in the formulation of mitigating factors, been timely, I likely would have found both deficient performance and prejudice, that claim was not timely and, consequently, does not figure in the aggregate prejudice analysis.

Thus, as to this multifaceted ineffective assistance of counsel claim involving errors relating to the mitigation evidence that trial counsel actually did present, there is nothing to aggregate with the prejudice from the error alleged in Claim **32**. Nevertheless, that

363

allegation of error, standing alone, is sufficient to warrant relief on this claim of ineffective assistance of counsel; thus, aggregating any other prejudice would not lead to a different result nor afford any additional relief.

### D.  Counsel's Errors In Investigating, Preparing, And Presenting Mitigation Evidence

Johnson's fourth multifaceted claim of ineffective assistance of counsel in the mitigation phase of her case (aggregating Claims **34, 35,** *36,* **37, 38,** *39, 40,* **41,** *42, 43,* and 44) involves multiple allegations of error in failing to investigate, prepare, and present mitigation evidence.  I find that this is the most substantial of Johnson's many claims of ineffective assistance of counsel, even limiting it to the timely allegations of error in Claims **34, 35, 37, 38**, and **41**, which are the only allegations that I will discuss in detail. The first three of these allegations of error all involve alleged failure to present testimony, primarily from experts, but also from some lay witnesses, about Johnson's mental state at the time of the offenses.  The last two are somewhat different, as they involve failure to introduce statements from a deceased witness to create residual doubt and failure to introduce Johnson's offer to plead guilty as mitigation evidence.

### 1.  Errors relating to Johnson's mental state at the time of the offenses

The allegations of error in Claims **34, 35,** and **37** all arise from trial counsel's alleged failure to investigate, prepare, and present mitigating evidence concerning Johnson's mental state at the time of the offenses.  I will consider these allegations of error separately, but I will first summarize the standards applicable to all three.

### a.  Applicable standards

The Eighth Circuit Court of Appeals has explained that, as a general matter, counsel has a "duty to 'conduct a thorough investigation of [a capital defendant's] background.' "

*Ortiz v. United States*, 664 F.3d 1151, 1169 (8th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). This duty extends to expert evidence about the defendant's mental state. *See id.* at 1169-70 (rejecting claims of ineffective assistance of counsel, where counsel made a reasonable investigation into the defendant's background and the decision not to pursue a mental health defense was a reasonable professional judgment under the circumstances); *Worthington v. Roper*, 631 F.3d 487, 500-02 (8th Cir. 2011) (stating that "'counsel has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary,'" in the context of a claim of ineffective assistance with regard to mental health experts (quoting *Link v. Luebbers*, 469 F.3d 1197, 1203 (8th Cir. 2006)). The court's "focus is on whether the investigation was reasonable, [which] is an objective review, measured against the prevailing professional norms at the time of the investigation, [and] [i]t is 'a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time' without 'the distorting effects of hindsight.'" *Id.* at 1169 (quoting *Wiggins v. Smith*, 539 U.S. 510, 423 (2003)).

In the specific context of a claim of ineffective assistance of counsel relating to failure to investigate, prepare, and present expert testimony concerning mental health issues, the Eighth Circuit Court of Appeals has explained that the *Strickland* inquiry involves asking whether counsel conducted an adequate investigation and whether counsel's decision to refrain from further investigation and presentation of mental health mitigation evidence was reasonable. *Worthington*, 631 F.3d at 500 (casting these questions in terms of whether the state court reasonably decided these inquiries, on a state prisoner's § 2254 petition); *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) (observing, in a federal prisoner's § 2255 case, that "counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in

determining the mitigation evidence to present during the penalty phase of [the petitioner's] trial.").

The extent of trial counsel's preparation for the mitigation phase does not have to be "ideal," and the court's inquiry must not disregard what trial counsel *did* do. *Id.* at 501. Deficient performance is established only "'where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence.'" *Id.* (quoting *Link*, 469 F.3d at 1203). Moreover, counsel does not perform deficiently by failing to obtain and present testimony of additional mental health experts, if their testimony would have been merely cumulative, not more favorable. *See Elam v. Denney*, 662 F.3d 1059, 1066 (8th Cir. 2011). Similarly, counsel does not necessarily perform deficiently by declining to present all of the documentation that might have supported a testifying expert's opinions, at least where counsel performed an adequate investigation, elicited sufficient testimony from the expert to support and explain the expert's opinion, and made a reasonable strategic choice not to ask the jurors to "sift through all of the supporting documentation." *See Williams v. Norris*, 612 F.3d 941, 956 (8th Cir. 2010).

More specifically, as to deficient performance, the Eighth Circuit Court of Appeals explained in *Worthington*,

> [W]e have repeatedly observed that "[w]here counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion." *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) (citing *Sidebottom [v. Delo]*, 46 F.3d [744,] 753 [(8th Cir. 1995)]); *see also Winfield [v. Roper]*, 460 F.3d [1026,] 1041 [(8th Cir. 2006)]. Cases in which the Supreme Court has held counsel's failure to investigate to be constitutionally ineffective involved a level of deficiency absent from the

present case. Counsel in *Williams* neglected to prepare for the penalty phase until one week before the hearing and erroneously believed that state law barred access to their client's records. 529 U.S. at 395, 120 S. Ct. 1495. Counsel in *Wiggins* based their decision not to present any mitigating evidence solely on one page in a presentence investigation report and a collection of social service records that documented their client's placement history in the foster care system. 539 U.S. at 524–25, 123 S. Ct. 2527. And counsel in *Rompilla* failed to examine a readily available court file that they knew the prosecution planned to introduce as evidence of aggravating factors. 545 U.S. at 389–90, 125 S. Ct. 2456.

*Worthington*, 631 F.3d at 501-02.

With this guidance, the court in *Worthington* concluded that the state court had not unreasonably determined that trial counsel did not perform deficiently. *Id.* The court explained,

> Counsel based the decision not to pursue a psychological mitigation strategy on the opinions of two mental-health professionals—Drs. Givon and Miller—each of whom had interviewed Worthington twice. Dr. Givon had reviewed a substantial collection of records pertaining to Worthington's social and medical history. Likewise, Dr. Miller demonstrated significant familiarity with many of the records documenting Worthington's background. *See* State App. 494 (noting Dr. Kessler's report); *id.* (noting Dr. Legan's report); *id.* (noting reports from the Illinois Department of Correction, Youth Division); *id.* 494–95 (noting records of Dr. Ryall's sessions). Further, Dr. Miller was aware of the physical and sexual abuse that Worthington suffered as a child. *See id.* 493. He also knew that Worthington's grandmother was chronically hospitalized for schizophrenia and that both of Worthington's parents had been in psychiatric hospitals and rehabilitation programs. *See id.* 496. We cannot conclude, therefore, that the opinions of Drs. Givon and Miller were so

> lacking in factual basis that the state court unreasonably concluded that counsel had conducted an adequate investigation.

*Worthington*, 631 F.3d at 502; *see also Forsyth v. Ault*, 537 F.3d 887, 893 (8th Cir. 2008) (holding that trial counsel's investigation of a mental health defense was not deficient when the experts employed by trial counsel did not provide counsel with any basis for further investigation of mental health defenses).

Because the court in *Worthington* concluded that trial counsel had reasonably investigated a mental health defense, the court turned to the question of whether trial counsel had reasonably decided not to proceed further with a psychological mitigation strategy, noting that the reasonable investigation clothed that decision with a presumption of reasonableness. *Id.* The court concluded that trial counsel had made a reasonable decision, because trial counsel had consulted carefully with the defense mental health experts about the strengths, weaknesses, and potential dangers of a mental health mitigation strategy. The court also found that trial counsel had presented a "meaningful mitigation case that focused on [the petitioner's] abusive background," and had succeeded in persuading the sentencing court to find as mitigating factors "his dysfunctional family life, his abuse and neglect as a child, and his history of drug abuse." *Id.* at 503. Thus, the court concluded that the petitioner had not overcome the presumption that his counsel performed reasonably. *Id.*

Turning to the question of *Strickland* prejudice in this context—a question that the court did not reach in *Worthington*—the Eighth Circuit Court of Appeals has explained that the petitioner "must establish a 'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability

that it would have returned with a different sentence.'" *Sinisterra*, 600 F.3d at 906 (quoting *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386, in turn quoting *Wiggins*, 539 U.S. at 535, 536, with internal quotations and alterations omitted). The court has also explained, "A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish *Strickland* prejudice." *Rodela-Aquilar v. United States*, 596 F.3d 457, 462 (8th Cir. 2010) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009), and also citing *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998)). Even if counsel performed deficiently in failing to present more favorable expert testimony, a petitioner may not be able to prove prejudice, if the prosecution already had in its hands strong contrary expert testimony. *See Cole v. Roper*, 623 F.3d 1183, 1190 (8th Cir. 2010). Similarly, a petitioner cannot show prejudice merely by showing that more documentation could have been offered to support a testifying expert's opinion; the petitioner must show that there is a reasonable probability that the jurors' decision would have been different, had all of the supporting documentation been introduced. *Williams*, 612 F.3d at 956. On the other hand, a petitioner may be able to prove prejudice, if counsel failed to present credible evidence that would have supported "'the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability.'" *Sinisterra*, 600 F.3d at 907 (quoting *Wiggins*, 539 U.S. at 535) (remanding for an evidentiary hearing).

The duty to investigate mitigating evidence extends beyond experts, to include lay witnesses with pertinent information. The Eighth Circuit Court of Appeals has recognized that, in this context, the ABA Guidelines can be useful as "guides" to what reasonableness of an investigation entails. *See Ortiz*, 664 F.3d at 1170 (citing *Bobby v. Van Hook*, ___ U.S. ___, ___, 130 S. Ct. 13, 16-17 (2009)). More specifically,

The ABA standards in effect during Ortiz's trial, which we

369

find are a useful guide in this case, provide "[c]ounsel should conduct independent investigations relating to the . . . penalty phase of a capital trial . . . regardless of any initial assertion by the client that mitigation is not to be offered . . . [and] this investigation should comprise efforts to discover all reasonably available mitigating evidence." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(A) and (C) (1989) (emphasis added). *The standards also state "[c]ounsel should consider interviewing potential witnesses . . . familiar with aspects of the client's life history that might affect . . . mitigating evidence to show why the client should not be sentenced to death[,]"* as well as "members of the victim's family opposed to having the client killed." *Id.* at 11.4.1(D)3.B and C (emphasis added). And the commentary to Rule 11.4.1 notes, "[c]ounsel's duty to investigate is not negated by the expressed desires of a client[,][n]or may counsel 'sit idly by, thinking that investigation would be futile.'"

*Ortiz*, 664 F.3d at 1170 (emphasis added).[64] In *Ortiz*, the court concluded that counsel had performed adequately by contacting numerous family members of the defendant to try to obtain mitigating evidence, notwithstanding the defendant's specific direction not to do so, in addition to attempting to persuade the defendant to undergo a mental health examination, notwithstanding his repeated refusals to do so. *Id.* at 1170-71. A defendant may have been prejudiced by counsel's failure to call lay witnesses to support a mental health defense, but only if that failure makes it more likely that the outcome would have been different. *See Cole*, 623 F.3d at 1190 ("And with the strong expert testimony already in the hands of the state at the time of trial, it is unlikely that Cole suffered any prejudice

---

[64] The ABA Guidelines in effect at the time of Johnson's trial were a later version, but did not differ significantly in substance from those in effect at the time of the trial in *Ortiz* and, in fact, Johnson's *habeas* team relied on both the 1989 and 2003 versions of the ABA Guidelines.

from the failure to call more favorable expert or lay witnesses, even if performance was lacking.").

### b.     Claim 34:  Failure to investigate and present evidence of Johnson's mental state at the time of the offenses

Claim **34**, which alleges that trial counsel were ineffective in failing to investigate and present evidence regarding Johnson's mental state at the time of the offenses, is the broadest of Johnson's allegations of error relating to failure to investigate and present mental health evidence in the mitigation phase of the trial.  Indeed, to a large extent, it encompasses the allegations of error presented in Claims **35** and **37**.  Not surprisingly, then, it is one of the most extensively briefed portions of Johnson's claims for § 2255 relief.

### i.     Arguments of the parties.  Johnson contends that her trial counsel chose to present a "mental state at the time of the offense" defense at the merits phase—that she was present at the killings of Nicholson and the Duncans, but did not have the requisite intent, and that she was not present at the killing of DeGeus and did not have the intent to kill him when she lured him to a meeting with Honken.  She argues that, having done so, there was no tactical or strategic reason for trial counsel not to introduce evidence of her mental state at the time of the killings in the mitigation phase.  Indeed, she contends that, prior to trial, Federal Death Penalty Resource Counsel Richard Burr had given trial counsel a "road map" on how to present mental health evidence to explain Johnson's participation in the crimes, but trial counsel unreasonably rejected that guidance and, instead, presented an "overly restrictive" and "flaccid" mitigation case that was "doomed from the outset to failure."

More specifically, Johnson acknowledges that, while Learned Counsel initially hired a mental health expert, Dr. Logan, and directed him to explore her mental state at the time

of the offenses (and at the time that she made incriminating statements to jailhouse informant McNeese), Learned Counsel shortly thereafter apparently changed his mind, and, before Dr. Logan's second interview with her, directed him not to interview her about, or to address in any way, her mental state at the time of the offenses, citing Exhibit 1, MG 004292. Johnson argues that, even after Dr. Logan identified a number of "red flags" suggesting that she suffered from brain impairments, possibly inherited, counsel did nothing to follow up on that lead as support for a mental health mitigation case. Indeed, Johnson argues that trial counsel made no effort to keep Dr. Logan working or to initiate investigations by her other mental health experts, Drs. Gelbort, Hutchinson, and Cunningham, for almost four years, until shortly before trial in 2005. In the mean time, Johnson asserts that her trial counsel "bungled" their way through the requirements of Rule 12.2 of the Federal Rules of Criminal Procedure. She also points out that every mental health expert to testify at trial was required to admit, on both direct examination and cross-examination, that he or she was not opining on Johnson's mental state at the time of the charged offenses, limitations on which the prosecution capitalized at every opportunity.

Johnson argues that the decision to preclude mental health evidence relating to her mental state at the time of the offenses lacks any reasonable tactical or strategic rationale, and was not the result of consultation with either the mitigation specialist or any of the experts. She also points out that Learned Counsel now recognizes that decision was "a horrible mistake," particularly once guilt was determined, because there was little reason to continue to try to avoid anyone asking Johnson about the murders. The result, she argues, was that her trial counsel completely eviscerated the mental health evidence presented, for example, by undermining the value of any opinions that her mental health experts could give. Indeed, Johnson points out that, because Learned Counsel had

represented that she would not address mental state at the time of the offenses, I ruled that she was foreclosed from asserting any offense-specific mental condition mitigating factor in the penalty phase, *see Johnson*, 383 F. Supp. 2d at 1167, and gave Final "Penalty Phase" Instruction No. 5, which specifically prohibited the jurors from considering Johnson's mental health testimony for the purpose of determining her mental state at the time of the charged killings, and even then, Learned Counsel did not rethink his position.

Turning to prejudice, Johnson asserts that she has presented copious evidence, from both trial experts and additional *habeas* mental health experts, about what an adequate mental health mitigation case, specifically addressing her mental state at the time of the offenses, would have looked like. She argues that she was severely prejudiced by trial counsel's deficient performance, because the limitations imposed on her trial experts undermined and diminished the credibility and persuasiveness of their testimony. She argues that any mitigating factor based on mental state at the time of the offenses was expressly precluded, and trial counsel failed to develop any evidence to support a proposed mitigating factor that she was under the "substantial influence" of Honken at the time of the offenses. She argues that this prejudice was compounded when, at the last minute, Learned Counsel admitted in the closing arguments in the mitigation phase that she "could have saved" the children, but that "she was weak." Johnson's Trial Transcript at 4040. She argues that this is a case in which undiscovered mitigating evidence, taken as a whole, might well have influenced the jurors' appraisal of her culpability, raising sufficient likelihood that the outcome of the mitigation phase would have been different.

The respondent asserts that Johnson's trial counsel did not perform deficiently in the preparation and presentation of mental health mitigation evidence, nor was Johnson prejudiced by any such deficiency. The respondent argues that trial counsel not only did investigate and present a mental health mitigation case, but that Johnson's allegation of

error consists of no more than criticisms of the nature of the investigation and the manner of presentation, which are not sufficient to show that trial counsel's conduct was objectively unreasonable.

More specifically, the respondent argues that the mitigation case presented was consistent with ABA Guideline 10.10.1, because it was consistent with the merits phase theory, not contrary to it. The respondent characterizes Johnson's merits phase defense as mere presence (or lack of presence) and lack of knowing assistance, so that mental health issues affecting her decision-making ability would not have been relevant to whether she knew of Honken's murder plans and inconsistent with her claim that she did not know. The respondent argues that, by presenting evidence showing that Johnson suffered mental health problems, without attempting to excuse her participation in the crimes, trial counsel avoided presenting an inconsistent argument while still allowing the jury to take into account Johnson's mental illnesses in arriving at a just punishment. The respondent also argues that Learned Counsel did make a strategic decision to bar experts from questioning Johnson about her state of mind at the time of the offenses. The respondent points out that even *habeas* counsel admits that trial counsel's decision to instruct Johnson's trial experts not to question her about the crimes—to avoid drawing attention to the crimes, and instead to focus the mitigation phase on Johnson—was a strategic decision. The respondent asserts that *habeas* counsel just now disagrees with that decision. The respondent also points out that trial counsel's choices were hamstrung by Johnson's refusal to admit that she was even present at the murders, and one of Johnson's *habeas* experts admitted that a mental health defense in mitigation, concerning state of mind at the time of the offenses, would have been inconsistent with a merits phase defense that she was not present during the offenses. The respondent also argues that Rule 12.2 was relatively new at the time of Johnson's trial and that my decision in her case relating to the workings of Rule 12.2 was only the second

reported decision at the time, so that trial counsel's confusion or concern about how that rule worked was understandable.

The respondent also argues that Johnson has failed to show prejudice, because trial counsel did present three experts who examined Johnson and testified to her various mental health impairments, childhood abuse, abuse by DeGeus, her methamphetamine use, her mental impairments from depression, anxiety, and post-traumatic stress disorder, and the effects of those impairments on her relationships with men, her decision-making ability, her judgment, her impulsiveness and temper, her ability to make choices, and her perception of consequences of her conduct. The respondent argues that this and other allegedly missing mitigation evidence must also be considered against the aggravating evidence presented to determine whether additional or different mental health testimony would have changed the outcome of the trial, and the respondent asserts that it would not have. The respondent points out that trial counsel's instruction to trial experts not to question Johnson about the killings was no bar to opinions about Johnson's mental state at the time of the offenses, because *habeas* expert Dr. Woods opined about Johnson's state of mind at the time of the offenses, even though, until very recently, Johnson denied involvement in the crimes. The respondent also argues that any *post hoc* evidence about Johnson's brain impairments was subject to impeachment on the basis of her heavy methamphetamine use and potential brain damage from her suicide attempt, so that it would have been impossible for any expert to opine as to her mental health impairments in 1993. The respondent also argues that *post hoc* opinions about Johnson's mental state at the time of the offenses offered by her *habeas* experts are subject to impeachment, because they are not consistent with evidence of Johnson's behavior during her childhood or prior to the offenses. While Johnson presented extensive evidence from trial and *habeas* experts about what a mental health mitigation case would have looked like, the

respondent presented extensive explanations for how those opinions would have been impeached.

In a reply nearly as long as her original argument, Johnson disputes nearly every argument by the respondent. One difference in emphasis in her reply is that she argues much more extensively that the reason that trial counsel never developed a reasonable mitigation strategy based on her mental health was that trial counsel failed to establish the required relationship of trust with her, so that she could and would talk honestly to the defense experts about the crimes. She argues that trial counsel's decision not to discuss the crimes with her or to let experts do so was outdated under the then-prevailing standard of performance, was unreasonable, and does not deserve any presumption of reasonableness. She also argues that trial counsel's concerns about Rule 12.2 were not reasonable, because the mitigation case could not have been less persuasive than it was where it failed to explain how her mental and emotional impairments led her to become involved with Honken in the crimes. She also argues that an adequate mental health mitigation case would have led even the prosecution's experts to temper their opinions to recognize the impact of her impairments on her behavior.

Johnson also reiterates that she was prejudiced by trial counsel's failings, because she was deprived of *any* mitigating testimony, lay or expert, demonstrating impaired capacity, duress, and severe mental disturbance, all statutory mitigating factors; any expert testimony tying her mental and emotional impairments to the offenses; any narrative from her of what occurred, which would have strengthened the ties between her impairments and the offenses; and any consideration by the jury of the impact of her brain impairments on her mental capacity, emotional capacity, and mental state at the time of the offenses. Finally, she argues that the aggravating nature of the crimes here does not suffice to tip the balance against a finding of prejudice from the mitigating evidence not presented. She

argues that the missing mitigation evidence is sufficiently compelling to undermine confidence in the outcome of her mitigation phase.

*ii.* *Analysis*. I find that the performance of Johnson's trial counsel failed both inquiries concerning reasonable performance on a claim of failure to investigate, prepare, and present expert mental health testimony in the mitigation phase, that is, (1) whether trial counsel conducted an adequate investigation, and (2) whether trial counsel's decision to refrain from further investigation and presentation of mental health mitigation evidence was reasonable. *Worthington*, 631 F.3d at 500; *Sinisterra*, 600 F.3d at 906. Here, trial counsel's preparation for the mitigation phase not only was not "ideal," the record is clear that no reasonable attorney would have failed to pursue further evidence. *Id.*

Even recognizing what trial counsel *did* do, trial counsel's performance here is distinguishable in nearly every significant respect from the performance of counsel in *Worthington*, in which the state court had reasonably concluded that counsel did not perform deficiently. *Id.* at 501. It is true that Johnson's trial counsel initially hired Dr. Logan and directed him to explore Johnson's mental state at the time of the offenses (and at the time that she made incriminating statements to jailhouse informant Robert McNeese), but counsel then "pulled the plug" on that investigation, *see* Exhibit 1, MG 004292 (Dr. Logan's Psychiatric Evaluation of Johnson, reiterating the direction from Learned Counsel not to interview Johnson about her mental state at the time of the offenses), and that decision was not based on any advice of the experts, but contrary to it. *Compare Worthington*, 631 F.3d at 502; *Forsyth* 537 F.3d at 893. Dr. Logan eventually identified a number of "red flags" suggesting that Johnson suffered from brain impairments, possibly inherited, but trial counsel did nothing to follow up on that lead to develop support for a mental health mitigation case. Similarly, when Dr. Gelbort later asserted that Johnson's brain had holes in it, "like . . . Swiss cheese," and suggested

further testing to determine the extent of her brain impairments, trial counsel did nothing to develop further evidence of Johnson's brain impairments. Thus, the hired experts' own advice called for further development of mental health evidence to support their opinions, suggesting that the limited bases for and scope of their opinions developed so far rendered those opinions inadequate. *Compare id.* ("'[W]here counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion.'" (quoting *Marcum*, 509 F.3d at 511)). While Johnson's trial counsel may have done somewhat more somewhat sooner to develop a mental health mitigation case than trial counsel had done in *Williams*, 529 U.S. at 395, or *Wiggins*, 539 U.S. at 524-25, Johnson's trial counsel still ignored rather than relied on her trial experts' suggestions about available avenues to develop an appropriate and effective mental health mitigation case.

The lack of a reasonable investigation of mental health mitigation evidence here deprives the decision not to pursue a mitigation case based on mental state at the time of the offenses of any presumption of reasonableness. *Compare id.* (noting that the reasonable investigation of mental health evidence clothed the decision not to mount a mental health mitigation case with a presumption of reasonableness). Moreover, the decision not to develop such evidence was not based on a careful consultation with defense mental health experts about the strengths, weaknesses, and potential dangers of a mental health mitigation strategy. *Compare id.* (holding that, where a reasonable investigation was done, trial counsel had reasonably decided not to proceed further with a psychological mitigation strategy, where trial counsel had consulted carefully with the defense mental health experts about the strengths, weaknesses, and potential dangers of a mental health mitigation strategy). Learned Counsel made the decision not to have mental health experts

testify about Johnson's mental state at the time of the murders, Hearing Transcript at 2075, without consulting with his mitigation specialist, *id*. at 232, or the testifying experts, and, instead simply instructed the experts not to address that issue, *see id*. at 3525 (Logan); *id*. at 3609 (Hutchinson); *id*. at 3956 (Cunningham). Moreover, having chosen to concede Johnson's presence at the Nicholson/Duncan killings, and having chosen to argue that she was not present at the DeGeus killing and had no intent to kill him when she lured him to a meeting with Honken, and recognizing the possibility of losing on the merits, any reasonable counsel would have sought to explain and mitigate Johnson's presence and/or participation with evidence of her mental health and mental state *at the time of the offenses*. *Worthington*, 631 F.3d at 500 (stating that deficient performance is established only "'where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence.'" (quoting *Link*, 469 F.3d at 1203)).

Even to the extent that Learned Counsel's decision was based on a bad experience that he had had with disclosure of mental health evidence in a capital case many years earlier, *see, e.g.*, Hearing Transcript at 2075-2077, a "once burnt, twice shy" excuse simply is not good enough in the context of this case. In this case, Johnson's only real hope for mitigation, where her trial counsel conceded her presence at the Nicholson/Duncan murders and the jurors might reasonably conclude that she participated in all of the murders, was to tie mental health evidence to her state of mind at the time of the offenses. Even so, Learned Counsel did not do any real independent analysis—and certainly no consultation with either Johnson's trial experts or the other members of the trial team—of the issues presented by this case before rejecting that line of mitigation. If Learned Counsel's decision to reject such a mitigation defense was in some sense strategic, it was the worst strategic decision by any defense counsel that I have ever seen in my entire career: It effectively doomed Johnson's mitigation case from the start.

The other rationales offered for the decision also do not stand up to scrutiny, even from an objective perspective, using what trial counsel knew at the time, not the "distorting effects of hindsight." *See Ortiz*, 664 F.3d at 1169 (internal quotation marks and citations omitted). The mitigation specialist testified that she understood that Learned Counsel's rationale was to preclude another mental examination of Johnson. Hearing Transcript at 235. The record also suggests that trial counsel relied on concerns about Rule 12.2 disclosures, *see* Hearing Transcript at 3117-19; *Johnson*, 383 F. Supp. 1145; *Johnson*, 362 F. Supp. 2d 1043, and on trying to prevent the jurors from refocusing attention on the crimes. *See* Exhibit 121 at 984 (telephonic hearing on March 7, 2005, prior to trial in the criminal case).

My rulings on Rule 12.2 issues should have clarified for trial counsel what risks were involved in preparing a mental health mitigation case—particularly as to when, if ever, the prosecution would have access to certain information gathered by defense mental health experts—so that concerns about further mental examinations and disclosures pursuant to Rule 12.2 can hardly justify complete abandonment of a mental health mitigation case addressing Johnson's mental state *at the time of the offenses*. Instead, as Johnson asserts, because Learned Counsel had represented that the defense would not address Johnson's mental state at the time of the offenses, I ruled that Johnson was foreclosed from asserting any offense-specific mental condition mitigating factor in the penalty phase, *see Johnson*, 383 F. Supp. 2d at 1167, and gave Final "Penalty Phase" Instruction No. 5, which specifically prohibited the jurors from considering Johnson's mental health testimony for the purpose of determining her mental state at the time of the charged killings. Thus, this rationale is as deficient as the rationale of trial counsel in *Williams*, who erroneously believed that state law barred access to their client's records. 529 U.S. at 395.

The rationale of preventing jurors from refocusing attention on the crimes was, likewise, untenable. Any reasonable trial counsel had to recognize the possibility that Johnson's "mere presence" defense to the Nicholson/Duncan killings and her "not present and no intent to kill" defense to the DeGeus killing would be rejected, that she would be convicted, and that, in those circumstances, a reasonable, perhaps the best, avenue of mitigation would be to try to show how Johnson's mental impairments and mental state *at the time of the offenses* affected and explained her participation in the killings. While trial counsel may have laid a trail of bread crumbs for the jurors to follow concerning Johnson's mental state up to and shortly after the offenses, the trail disappeared at the critical junction, the time of the offenses, and it was wishful thinking to imagine that the jurors would necessarily make the desired connections without specific guidance.

Contrary to the respondent's contentions, this is not a case in which Johnson maintained that she was not present at a murder, so that trial counsel was not ineffective for making the strategic decision not to present a mental health defense in conflict with a claim of innocence. *See Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (holding trial counsel was not ineffective for not presenting a duress mental health defense when the defendant claimed he was not present at the murder scene). The defense offered here was that Johnson *was* present at the killings of Nicholson and the Duncans, but did not have the requisite intent, and that she was not present at the killing of DeGeus and did not have the intent to kill him, even though she lured DeGeus to the fatal meeting with Honken. The defense on the merits, to either the Nicholson/Duncan killings or the DeGeus killing, plainly warranted preparation of a mental health mitigation defense to explain Johnson's participation, in the event that the merits defense failed and Johnson was found guilty of the killings. This is so, not least because the prior killings of Nicholson and Lori Duncan made Johnson's failure to recognize that the two Duncan girls would also

be killed incomprehensible, and the prior killings of Nicholson and the Duncans made Johnson's failure to recognize the consequences of luring DeGeus to the meeting with Honken incomprehensible, in the absence of evidence that her ability to recognize those consequences or to act to avoid them was very substantially impaired.

Nor was the decision to forego presentation of what would have been copious mental health mitigation evidence offset by the presentation of a "meaningful mitigation case" that focused, instead, on family dysfunction, abuse, and a history of drug use. *Cf. Worthington*, 631 F.3d at 502. While the mitigation case that trial counsel presented did address Johnson's dysfunctional family and history of abuse, and did touch on her history of drug use, as I explained, above, in my analysis of Johnson's allegation of error relating to the testimony of Dr. Evans, the pharmacologist, it failed to make the specific connection between Johnson's drug history and her conduct at the time of the offense, and I now conclude that it also failed to make that same connection between Johnson's dysfunctional family life and abuse and any mental impairments and her conduct at the time of the offenses. Here, trial counsel specifically barred the trial experts from making those connections, not just by forbidding the experts to *ask* Johnson pertinent questions, but by forbidding the experts to *opine* that there was any connection between Johnson's mental health and her conduct at the time of the offenses, an omission on which the prosecution repeatedly capitalized to suggest—persuasively—that the experts' opinions had nothing to do with Johnson's conduct at the time of the offenses and, thus, provided no insight into her culpability or the appropriateness of a death penalty.

In short, trial counsel unreasonably decided that, in the mitigation phase, the defense would not even try to answer with mental health evidence the key question of how and why Johnson participated in the charged crimes, if she was convicted on the merits—a question made all the more "burning" by Johnson's "mere presence" defense in the merits

phase to the Nicholson/Duncan killings and her "not present and no intent to kill" defense in the merits phase to the DeGeus killing. Trial counsel's reliance, instead, on a mitigation case showing that Johnson suffered from impairments, drug use, and abuse as a child and an adult simply did not adequately address the issue, and no reasonable attorney would have believed that it did. *Worthington*, 631 F.3d at 500 (stating that deficient performance is established only "'where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence.'" (quoting *Link*, 469 F.3d at 1203)).

I have no hesitation concluding that this allegation of error involves deficient performance of counsel.

Turning to the prejudice prong of the *Strickland* inquiry, Johnson has presented copious evidence of what her trial experts would have said, in addition to their trial testimony, if unmuzzled and adequately prepared, and what additional experts would have said, if called at trial, about Johnson's mental state at the time of the offenses. *See Rodela-Aquilar*, 596 F.3d at 462 ("A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish *Strickland* prejudice." (quoting *Day*, 566 F.3d at 538)).

For example, Johnson argues, and I find, that trial experts could have presented the following testimony, based on what they already knew in 2005:

- Dr. Hutchinson testified at the evidentiary hearing about what she could have said, based on her own evaluation and the evaluations of Drs. Gelbort and Logan, even without asking Johnson about the crimes themselves, about Johnson's impaired capacity to conform her conduct, Hearing Transcript at 3610-11, 3645; appreciate the wrongfulness of her conduct, *id*. at 4067-71; duress, *see id*. at 3611-3625, 4072-78; and severe mental or emotional disturbance, *see id*. at 3625-36, 3650, 4076-77.

- Dr. Logan testified that, even without discussing the facts with Johnson, he could have testified about several impairments and the impact of each of them on her behavior at the time of the offenses, including a possible diagnosis of borderline personality disorder from symptoms in Johnson's history, *see id.* at 3530; that her symptoms were also consistent with affective spectrum disorder, including bipolar disorder, *id.* at 3545; that she was unable to see bad consequences, *see id.* at 3547; and that she suffered symptoms of PTSD, *see id.* at 3547.

- Dr. Cunningham testified that he could have discussed Johnson's conduct at the time of the crimes without interviewing her about the crimes, *see id.* at 3956-57; the effect of mental capacity in terms of moral culpability, *see id.* at 3903; Johnson's ability to appreciate the wrongfulness of her conduct, *see id.* at 3962-3967; and other mitigating factors, *see id.* at 3960-61. Dr. Cunningham also testified as to what defense counsel removed from the PowerPoint presentation that he had prepared for Johnson's case, which tied the risk factors to specific events and people to demonstrate how she was at risk, *see id.* at 3904-34, 3937-51, 3955, and how these life circumstances impacted her behavior at the time of the crimes, *see id.* at 3956.

Similarly, Johnson argues, and I find, that considerable additional expert testimony could have been presented, if trial counsel had adequately pursued a mental health mitigation case based on Johnson's mental state at the time of the offenses, including the following:

- Neuropsychologist Myla Young, Ph.D., who performed neuropsychological testing of Johnson in early 2010, would have testified that, in the course of that testing, she found evidence of brain dysfunction, including impairments

384

affecting Johnson's ability to assess situations, problem solve, act according to plan, and change actions when the plan was not working, have poor judgment, be labile, and be unable to develop insight into her actions. *See* Exhibit 112, YNG000035. She would also have testified that the likely etiologies for these impairments were circumstances in Johnson's youth, that is, well before the charged offenses occurred, so that they affected her at the time of the offenses. *See id.* at YNG000036-YNG000037. She testified at the evidentiary hearing about how she could recognize impairments that existed prior to the charged offenses. *See* Hearing Transcript at 4537-51. She also opined that most of the testing that she did in 2010 was available in 2005, *see* Exhibit 112, YNG000035, and that information about Johnson known in 2005 should have alerted trial counsel to the possibility of brain dysfunction and the need for comprehensive neuropsychological testing, *see id.* at YNG000037.

- Dr. Merikangas, a neurologist and psychiatrist, who reviewed a battery of tests given to Johnson in February 2011, testified that he had identified on the MRI images evidence of brain damage or injury and the possible etiologies of those impairments, including circumstances in Johnson's life well before 1993, and the possible effects of those impairments on Johnson's executive functioning and other consequences. *See* Hearing Transcript at 4016-32. He offered similar testimony about the results of Johnson's PET/CT scan, *see id.* at 4036-38, and EEG, *see id.* at 4043-45. While Dr. Merikangas candidly admitted that he could not opine that the damage he saw necessarily existed in 1993 or was not caused by subsequent drug abuse and other trauma, neither could he rule that out.

- Dr. George Woods, a neuropsychiatrist, testified as to the results of a comprehensive neuropsychiatric evaluation of Johnson in 2009 and 2011, based on the work of Drs. Young and Merikangas, on which he had produced two reports, *see* Exhibit 107, WOD000058-WOD0000081 (October 5, 2009, report), WOD000098-WOD000188 (May 26, 2011, supplemental report). Dr. Woods's testimony was extensive and appears to be the centerpiece of Johnson's contentions about the mental health mitigation case that could have been presented.

  - Dr. Woods opined that Johnson currently suffers from temporal lobe disease, with demonstrated cognitive deficits impairing her ability to adequately weigh and deliberate, sequence her thinking and actions, and understand and respond to social cues, making her vulnerable to dissociative periods. *See id.*, WOD000100.

  - He opined that, at the time of *trial*, Johnson suffered from Complex Post Traumatic Stress Disorder, resulting in destructive coping mechanisms. *See id.*

  - With the added benefit of Johnson's belated statements about her participation in the crimes, Dr. Woods opined that, at the time of the *offenses*, Johnson suffered from Axis I disorders, including bipolar mood disorder, secondary to a general mental condition of temporal lobe dysfunction; cognitive disorder NOS; PTSD complex, severe, and chronic; and chronic methamphetamine abuse, *see id.* at WOD000142, as well as an Axis II disorder of dependent personality disorder, several Axis III disorders, including dysexecutive syndrome secondary to frontal lobe impairment and parietal lobe dysfunction,

and an Axis IV disorder of extreme intimidation interpersonal relationships, *see id.* at WOD000143. He also opined that these clinical formulations could have been presented at trial. He opined, further, that these conditions impaired Johnson's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law, *see id.*, and made her incapable of understanding and predicting outcomes of situations in a normal way, although she may have understood the potential consequences of aiding Honken after the deaths of Nicholson and the Duncans, *see id.* at WOD000149, and that she suffered from severe mental and emotional disturbances and was under unusual and substantial duress when she aided and abetted Honken, *see id.* at WOD000149-WOD000162.

- He opined that the exploration of Johnson's traumatic history at the time of trial failed to address adequately the reasons why she suffered trauma and the impact of that trauma, for example, on her decision-making. *See id.* He opined that, while the trial team presented some evidence of Johnson's brain impairments, some beginning in childhood, much more could and should have been done. He also opined that, because he built a rapport with Johnson over several hours of contact, which trial counsel had failed to do, he was able to observe her expressions of remorse and could have offered expert testimony on remorse as a mitigating factor.

Johnson argues that, even if rebutted to some extent by the prosecution's experts, all of this evidence would nevertheless have provided persuasive explanations to the jurors

of why she participated in the charged crimes. I agree. I have already indicated how dubious I think Dr. Woods's *post hoc* diagnoses of mental conditions can be, when based only on latter day observations that conflict with contemporaneous evidence. *See supra*, page 241*ff*. As to mental state at the time of the offenses, however, there is substantial evidence from Johnson's test results and the opinions of other experts about the extent to which impairments now recognized existed at the time of the offenses to give some credibility to Dr. Woods's *post hoc* diagnoses. Moreover, even if the specific opinions and *post hoc* diagnoses of Drs. Young, Merikangas, and Woods are subject to significant impeachment, the *evidence* of brain dysfunctions and impairments, *through the time of the offenses*, that they developed—nearly all of which could have been developed by competent counsel at the time of Johnson's trial—paints a dramatically different picture of Johnson at the time of the offenses than trial counsel presented and offers a connection between her mental state and her conduct at the time of the offenses that was completely or almost completely missing from the trial presentation.

In addition, had trial counsel developed and presented this evidence, and not made a foolish concession that it would not be offered, I would not have ruled that Johnson was foreclosed from asserting any offense-specific mental health mitigating factor in the penalty phase, *see Johnson*, 383 F. Supp. 2d at 1167, nor would I have given Final "Penalty Phase" Instruction No. 5, which specifically prohibited the jurors from considering Johnson's mental health testimony for the purpose of determining her mental state at the time of the charged killings. Thus, the doors would have been open for the jurors to give full consideration and effect to this mitigating evidence. *Cf. Abdul-Kabir*, 550 U.S. at 246 (recognizing that capital sentencing juries "must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual"). On the other hand, because of those foolish

concessions, even to the extent that trial experts offered evidence from which jurors could have gained insight into Johnson's mental state at the time of the offenses, the jurors were precluded from giving mitigating effect to that evidence.

This is not just a case of failure to present additional mental health evidence that was merely cumulative, *see Elam*, 662 F.3d at 1066, or a case in which counsel reasonably declined to provide further documentation to support and explain trial experts' opinions, *see Williams*, 612 F.3d at 956, it is a case of substantial failure to present a viable mental health mitigation case that was different in scope, content, and *connection* to the offenses. Johnson has shown that the kind of mental health mitigation case that *could* and *should* have been presented involved credible evidence that would have supported "'the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability.'" *Sinisterra*, 600 F.3d at 907 (quoting *Wiggins*, 539 U.S. at 535). Thus, I conclude that there is a "'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" *Id.* at 906 (quoting *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386, in turn quoting *Wiggins*, 539 U.S. at 535, 536). In short, Johnson has proved prejudice as well as deficient performance.

I conclude that Johnson is entitled to relief from the mitigation phase verdicts on the basis of this allegation of error, standing alone.

c.      ***Claim 35:  Errors relating to Dr. Gelbort***

Johnson makes related allegations of errors by trial counsel in Claim **35** (her Claim One, § Y), alleging that trial counsel improperly delayed hiring neuropsychologist Dr. Gelbort, then failed to follow-up on his recommendations, to instruct him to conduct a more thorough battery of neuropsychological tests, to retain another neuropsychologist

when Dr. Gelbort refused to testify, to incorporate Dr. Gelbort's helpful findings and diagnoses into the testimony of the experts who did testify, and to conduct additional neuropsychological and neuroimaging testing. The respondent contends that these allegations of error do not warrant any relief.

  *i.*   *Arguments of the parties*. Johnson argues trial counsel were prompted from the start by Dr. Logan and the mitigation specialist to perform a battery of neuropsychological testing and that Learned Counsel did recognize that doing so is ordinarily a first step in preparation of the defense in a capital case. Although Learned Counsel first contacted Dr. Gelbort, a neuropsychologist, about working on Johnson's case, in October 2002, he did not actually try to hire Dr. Gelbort until September 2004, and Dr. Gelbort did not even see Johnson until January 2005, just months before her trial. Johnson points out that Learned Counsel explains that the delay was because of his hope, which he admits was naive, that Honken would only get life sentences and that he would then be able plead Johnson to life or a shorter sentence.

  Johnson argues that the mitigation specialist's notes reflect that, after performing testing in January 2005, Dr. Gelbort told the mitigation specialist that there were likely significant impairments, including that her brain was like "Swiss cheese," and that more testing was appropriate. Johnson asserts that the mitigation specialist understood, however, that Dr. Gelbort eventually did not want to testify, because he thought "there's nothing huge or useful, nothing useful, too much crap" in his original test results, but that this position simply indicated a need for more testing. She points out that Learned Counsel has offered no explanation or rationale for failing to pursue the more thorough neuropsychological testing that Dr. Gelbort suggested, that Learned Counsel made no attempt to follow-up with Dr. Gelbort when he declined to testify, and that Learned Counsel does not know whether Dr. Gelbort's test results were given to other experts or

why the defense would not have done so, if they were not. Indeed, she argues that Learned Counsel testified at the evidentiary hearing that there was no tactical reason for not administering a full battery of neuropsychological tests or for not presenting the results of such tests in this case. She argues that the results of subsequent testing by Dr. Young show the extent of trial counsel's error in not following up on Dr. Gelbort's leads. Thus, she argues that there is a reasonable probability that, absent trial counsel's failure to pursue neuropsychological and neuroimaging testing, at least one juror would have voted for a life sentence for her on all five murders.

The respondent argues that this allegation of error did not involve either deficient performance or prejudice. The respondent argues that indications from Dr. Gelbort about the results of the initial neuropsychological testing were that there was nothing much helpful to be discovered in that area. Thus, the respondent argues that trial counsel reasonably decided not to pursue that avenue of inquiry. The respondent asserts that trial counsel was not required to keep searching for a different expert with a more favorable opinion. The respondent also argues that there was a fair risk that further testing would indicate only "normal" results. The respondent points out that the first doctors to review the EEG and PET scans eventually performed by *habeas* counsel did, in fact, pronounce the result to be "normal," and only Dr. Woods was dissatisfied with those results, so that he sought out a colleague, Dr. Merikangas, to obtain a more favorable interpretation. The respondent argues that trial counsel's decision not to pursue unproductive mental health testing was a virtually unchallengeable strategic one. The respondent also argues that Johnson cannot show prejudice, because there is no evidence that, had Dr. Gelbort been hired sooner and had he performed his testing sooner that the outcome would have been different. Not only does the respondent argue that further testing eventually conducted has not proved significant impairments, but that any testimony about those latter day results

was subject to impeachment by the respondent's own expert, to the effect that the test results did not show significant impairments or deficits.

In a reply even longer than her original argument, Johnson asserts that trial counsel's performance was deficient, because there was no tactical decision not to call Dr. Gelbort, when he was not asked to perform adequate testing to investigate what his testimony would be, even though both Dr. Gelbort and Dr. Logan had suggested that further testing was necessary. She does not argue that trial counsel should have "shopped" for a helpful expert; what she argues is that trial counsel should have followed up on the information that Dr. Gelbort and other experts provided to discover what Dr. Gelbort's ultimate opinions would be. She argues that trial counsel's decision was based on inattention, not strategy. She also argues that she was prejudiced by trial counsel's deficiencies, because Dr. Young eventually found the same impairments that Dr. Gelbort identified and suggested should be investigated more thoroughly. She also argues that Dr. Merikangas's interpretation of MRI results is consistent with Dr. Gelbort's suggestion that Johnson's brain was like "Swiss cheese." She also argues that the respondent's expert's criticisms may go to the weight of the evidence, but that they do not disprove prejudice, because the experts disagreed about the appropriate "norms" to apply to Johnson's testing, the respondent's expert confirms that Dr. Gelbort needed to do more testing to support any opinion, and the respondent's expert was unable to offer as much criticism of and in fact agreed with many of Dr. Young's later test results and interpretations. Johnson argues that courts have recognized that failure to present evidence of brain abnormalities, cognitive deficits, organic brain damage, and severe mental disturbances significantly impairing several of a defendant's cognitive functions may be prejudicial.

*ii.*     ***Analysis***.   I believe that my analysis of this claim can be somewhat

392

abbreviated, because, as I suggested above, this claim is encompassed, to a large extent, by the allegations of error in Claim **34** and it is subject to the same standards as Claim **34**. Indeed, I find that this allegation of error is simply a more specific example of the unreasonable deficiencies in trial counsel's investigation of a mental health or mental state mitigation defense, and the resulting prejudice, described in my analysis of Claim **34**.

Somewhat more specifically, the decision not to pursue further testing by Dr. Gelbort was not based on any advice of the experts, but contrary to it. *Compare Worthington*, 631 F.3d at 502; *Forsyth* 537 F.3d at 893. As I noted above, when Dr. Gelbort asserted that Johnson's brain had holes in it, "like . . . Swiss cheese," and suggested further testing to determine the extent of her brain impairments, trial counsel did nothing to develop further evidence of Johnson's brain impairments. Thus, this expert's own advice called for further development of mental health evidence to support any opinions, suggesting that the limited bases for and scope of his opinions developed so far rendered those opinions inadequate. *Compare id.* ("'[W]here counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion.'" (quoting *Marcum*, 509 F.3d at 511)). It is little wonder, then, that Dr. Gelbort declined to testify, because his initial testing showed "nothing huge or useful, nothing useful, too much crap," but he *had* suggested that the "crap" indicated further testing was required to develop an adequate opinion, and trial counsel failed to follow up.

I also disagree with the respondent's argument that this is a case in which trial counsel's decision not to pursue unproductive mental health testing was a virtually unchallengeable strategic one. The lack of a reasonable investigation of whether further neuropsychological testing and evidence from Dr. Gelbort should be pursued deprives the

decision not to pursue that evidence of any presumption of reasonableness. *Compare id.* (noting that the reasonable investigation of mental health evidence clothed the decision not to mount a mental health mitigation case with a presumption of reasonableness). Moreover, Learned Counsel did not offer any reasonable rationale for not following up on Dr. Gelbort's (or Dr. Logan's) suggestions that more neuropsychological testing be done and did not actually consult with Dr. Gelbort before making that decision. *Compare id.* (holding that, where a reasonable investigation was done, trial counsel had reasonably decided not to proceed further with a psychological mitigation strategy, where trial counsel had consulted carefully with the defense mental health experts about the strengths, weaknesses, and potential dangers of a mental health mitigation strategy). As Johnson suggests, the record shows that the real reason for the decision not to pursue further testing by and opinions from Dr. Gelbort was simply neglect.

Moreover, I conclude that Johnson was prejudiced by this deficient performance. Johnson has shown, through the testing and testimony by Dr. Young, what additional testimony a neuropsychologist would have provided, if armed with results from an adequate battery of neuropsychological and neuroimaging testing, including, for example, testimony about Johnson's mental state at the time of the offenses, based on demonstrable, organic impairments. *See Rodela-Aquilar*, 596 F.3d at 462 ("A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish *Strickland* prejudice." (quoting *Day*, 566 F.3d at 538)). I do not doubt that the prosecution could have responded to such evidence with some effective testimony from its own expert or experts. Nevertheless, Johnson has shown that the kind of mental health mitigation case that *could* and *should* have been presented—if Dr. Gelbort or another neuropsychologist had performed the testing that he suggested, but trial counsel failed to seek—involved credible

evidence that would have supported "'the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability,'" particularly as it would have related to demonstrable, organic impairments. *Sinisterra*, 600 F.3d at 907 (quoting *Wiggins*, 539 U.S. at 535). Thus, I conclude that there is a "'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" *Id.* at 906 (quoting *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386, in turn quoting *Wiggins*, 539 U.S. at 535, 536).

I conclude that Johnson is entitled to relief from the mitigation phase verdicts on the basis of this allegation of error, standing alone.

> **d.** **Claim 37: Errors in failing to offer expert and lay testimony about Honken's influence over Johnson**

Johnson's next timely allegation of error by trial counsel involving failure to prepare mitigation is Claim **37** (Johnson's Claim One, § O), which alleges failure to offer expert and lay testimony that Johnson was under the substantial influence of Honken. The respondent argues that Johnson is not entitled to any relief on this allegation of error.

> **i.** **Arguments of the parties**. Johnson argues that trial counsel could have given

mitigating effect to evidence of Honken's substantial influence over her in two statutory mitigating factors, duress and minor participation, 21 U.S.C. § 848(m)(2) and (3), respectively,[65] and a non-statutory mitigating factor, expressly based on Honken's

---

[65]Johnson now cites 8 U.S.C. § 3592(a)(2) and (3) as the sources for these statutory mitigating factors, but at the time of her indictment and trial, these and other statutory mitigating factors for a capital offense in violation of 21 U.S.C. § 848(e) were codified in 21 U.S.C. § 848(m) (2001).

(continued…)

"substantial influence" over her at the time of the offenses. She contends that trial counsel missed the opportunity to give the jurors a chance to do so, by failing to present evidence of her mental state at the time of the offenses that would have supported those mitigating factors, and I expressly declined her trial counsel's request to submit a mitigating factor that she was under Honken's "substantial influence" for precisely that reason.

More specifically, Johnson argues that there *was* evidence available to trial counsel to support a "substantial influence" mitigating factor, including a letter from Dr. Logan suggesting that investigation of Johnson's family history would likely show her susceptibility to being dominated by a man as intelligent, forceful, and domineering as Honken, and Learned Counsel offered no reason for not developing such evidence. Similarly, she argues that there was substantial evidence in the discovery file and evidence developed by her experts, investigators, and mitigation specialist of Honken's calculating nature, including evidence from inmates incarcerated with Honken, her own reports to mental health experts and the mitigation specialist of how Honken lied to her and manipulated her, family members' descriptions of how Honken manipulated her, and mental health experts' own tests and evaluations, but that evidence also was not brought to the fore. Johnson argues that this error was compounded by trial counsel's introduction of evidence that Honken was sentenced to death for the killings of the children, because that decision was not supported by evidence that also lowered her culpability, so that it simply made it easier for jurors to impose the death sentence, where they knew that another jury had already found that the conduct at issue was death-worthy.

Johnson contends that she was prejudiced by trial counsel's failure to develop this

---

[65](...continued)

evidence, because I declined to submit any mitigating factor based on Honken's substantial influence or domination for lack of evidence. Thus, she argues, the jurors had only a prior jury's determination that Honken engaged in death-worthy conduct without evidence demonstrating that she was less culpable than Honken. She argues that, had trial counsel continuously emphasized and offered evidence of Honken's influence over her, and not given the jurors permission to return a death verdict, there is a reasonable probability that at least one juror would have voted against any death sentences.

The respondent points out that trial counsel offered a reasonable rationale for not offering the kind of evidence that Johnson now asserts should have been submitted to support a mitigating factor based on Honken's substantial influence over her, because trial counsel argued that the evidence of Honken's leadership was sufficient to show his domination. The respondent argues that my rejection of that argument at trial does not make counsel's rationale unreasonable. The respondent argues that evidence that Johnson now cites supposedly showing Honken's domination of her, consisting of testimony about Honken's conduct in prison and his influence over Cutcomp and Cobeen, actually has nothing to do with Honken's relationship with Johnson. Similarly, the respondent argues that evidence that Honken lied to her and manipulated her actually does not address Honken's influence over her in committing the crimes. The respondent argues that the same is true of the cited testimony from Dr. Hutchinson and family members. The respondent also argues that trial counsel made a strategic decision to introduce Honken's death sentences, believing that doing so would lessen the likelihood that Johnson would get death sentences for killings for which Honken either did or did not receive the death penalty. The respondent argues that only hindsight suggests that decision was unreasonable.

The respondent also argues that Johnson has failed to show prejudice, because the

evidence that she claims was missing simply would have made no difference in the totality of the evidence showing that she was *not* dominated by Honken and, to the contrary, that she influenced him. The respondent cites evidence of Johnson's manipulation of Honken into letting her take over from DeGeus in the methamphetamine operation; her manipulation of Gaubatz to let her use Gaubatz's car, babysit her child, and perhaps unknowingly hide her gun, while she and Honken hunted for Nicholson; her manipulation of DeGeus into the fatal meeting with Honken; Rick's testimony that Honken told Rick he was not strong enough to leave Johnson and was afraid of what Johnson was capable of; other evidence that Johnson pushed Honken to respond to the threats posed by possible cooperation by Nicholson and Cobeen; and other evidence of Johnson's hot temper and threats. The respondent contends that this evidence of domination by Johnson would have to be considered with evidence that Honken may have planned, but never engaged in violent acts until he met Johnson.

Johnson's lengthy reply consists primarily of arguments about the inferences that would have arisen from the evidence that she contends should have been submitted to show Honken's substantial influence over her. At the same time, she argues that the evidence cited by the respondent does not demonstrate Johnson's domination of Honken, because it does not relate to the relationship between them and relies on the most unreliable of informants, Honken himself, either directly or secondhand through others.

*ii.* ***Analysis***. There is no doubt that trial counsel can and should develop both expert and lay testimony to support a mitigation case, such as one based on a defendant's domination by or being under the substantial influence of a co-defendant, and that a defendant may be prejudiced by trial counsel's failure to do so. *See generally Ortiz*, 664 F.3d at 1170. I agree with the respondent, however, that relatively little of the "missing" evidence that Johnson cites in support of this allegation of error actually goes to or

provides reasonable inferences about *the relationship between Honken and Johnson* or *their roles in the offenses*, such that it shows or suggests that, at the time of the offenses, Johnson was acting under Honken's substantial influence.[66]

Specifically, evidence that was just about Honken—such as his leadership or manipulation of others in other contexts—is, in my view, not supportive of a "substantial influence of Honken" mitigating factor, only evidence about the relationship between Honken and Johnson and their roles in the offenses would have been supportive of that mitigating factor. In my view, the pertinent evidence must relate to the co-defendants' relationship and their roles in the offenses. Thus, I find that the pertinent portion of the cited evidence consists only of the following: expert testimony about Johnson's susceptibility to domination because of her mental impairments and prior traumas; evidence that Johnson reported to the prosecution's experts that Honken lied to her and manipulated her, for example, into going into debt to support his methamphetamine operation and into shaping their whole relationship to his benefit; Johnson's reports to Dr. Hutchinson about her inability to escape from Honken's influence, in part because of his use of fear for the safety of her children and fear of going to jail; and evidence from family members about how Honken manipulated Johnson in the course of their relationship. The question is whether trial counsel performed deficiently by failing to present that portion

---

[66]I have already concluded that much of the evidence that Johnson now also cites in support of this allegation of error, such as evidence purportedly showing that Honken was "worse" than Johnson, does not go to the conduct of the co-defendants at the time of the offenses. *See supra*, Section VII.A.3 (analysis of Claims **19**, **20**, and **21**). Similarly, as Johnson acknowledges, I rejected at trial her trial counsel's contentions that evidence of Honken's leadership was sufficient to show domination of or substantial influence over Johnson in committing the charged offenses to submit the jury the mitigating factors of duress, minor role, or substantial influence of Honken. *See* Johnson Trial Transcript at 3937-3940.

of the cited evidence that *does* relate to the co-defendants' relationship and their roles in the offenses.

I find that trial counsel did perform deficiently in failing to investigate, develop, and present this evidence adequately to support a "substantial influence of Honken" mitigating factor. The statutory mitigating factors listed in the statute under which Johnson and Honken were charged with capital offenses make clear that the relationship between co-defendants and their roles in the charged offenses are critical to the determination of the appropriate penalty by specifically recognizing duress and minor participation as mitigating factors. *See* 21 U.S.C. § 848(m)(2) and (3). Thus, any reasonable attorney would have sought to support these statutory mitigating factors or the related non-statutory mitigating factor that the defendant was under the substantial influence of a co-defendant at the time of and during the charged offenses. *Cf. Worthington*, 631 F.3d at 500 (stating that deficient performance is established only "'where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence.'" (quoting *Link*, 469 F.3d at 1203)). Trial counsel did not prepare or present this evidence. Moreover, I cannot accept that trial counsel's decision to offer evidence of Honken's leadership or manipulation of others as sufficient to support such mitigating factors, instead of the missing evidence, was a reasonable strategic one. First, I grant that decision no presumption of reasonableness, where there is no showing that it was based on reasonable investigation, or even an articulable and articulated rationale. *Compare id.* at 502. Second, the evidence actually offered that trial counsel argued supported such mitigating factors did not reasonably do so, as I ruled at trial, and no reasonable attorney would have considered it adequate to do so. *See* Johnson Trial Transcript at 3937-3940.

Whether Johnson was prejudiced by this deficiency is a much closer question. This is so, because the question is whether "the undiscovered 'mitigating evidence, taken as a

whole, "might well have influenced the jury's appraisal" of [Johnson's] culpability,'" *see Rompilla*, 545 U.S. at 393 (quoting *Wiggins*, 539 U.S. at 538, in turn quoting *Williams*, 529 U.S. at 398), such that "the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Id.* (quoting *Strickland*, 466 U.S. at 694). Of course, the possibility that a jury could have heard all of the missing evidence and still have decided on the death penalty, which I think is certainly the case here, is not the test. *See id.* The problem is that the cited undiscovered mitigating evidence here that I have concluded is actually pertinent to the question of whether Johnson was under Honken's substantial influence, while it does show that Honken attempted to and did manipulate Johnson in a number of ways and that she was susceptible, as a general matter, to domination, still does little to illuminate whether Johnson was actually acting under Honken's substantial influence *at the time of* and *in the conduct at issue in* the charged offenses. This evidence must also be weighed against considerable evidence that Johnson did participate in the planning and execution of the killings and evidence that Johnson also dominated and manipulated Honken in various ways. In light of the totality of the evidence, I cannot conclude that the likelihood of a different result if the missing evidence had gone in is sufficient, standing alone, to undermine confidence in the outcome actually reached at sentencing. *Id.*

Thus, Johnson is not entitled to relief on this allegation of error, standing alone.

### 2. Claim 38: Errors relating to statements of Phyllis Proscovec

Johnson also timely asserted, and briefed, her allegation that trial counsel erred by failing to introduce in the mitigation phase evidence of the statements of Phyllis Proscovec to support a residual doubt mitigating factor. *See* Claim **38** (Johnson's Claim One, § L.1). Proscovec, a neighbor of the Duncans, provided a statement to investigating officers concerning the events on July 25, 1993, that was purportedly inconsistent with the

prosecution's theory. Because I conclude that this allegation of error borders on, if it does not trespass well into, the frivolous, I will address it only briefly.

While trial counsel may have performed deficiently in failing to investigate whatever information Phyllis Proscovec might have provided before she died, based on what trial counsel knew at the time—simply because it was the only statement that appeared to contradict the prosecution's theory of events on the night of the Nicholson/Duncan killings—it is now clear that there are so many incongruities in Proscovec's statement that her testimony, if it had been obtained, would ultimately have added nothing to a "residual doubt" mitigator. For example, Proscovec's assertion that she went to the Duncan residence to take the Duncan girls to school on the morning that the Duncans disappeared is implausible, because there is no evidence that the Duncan girls were in summer school in late July 1993. Moreover, evidence supporting Johnson's participation in the Nicholson/Duncan killings is so overwhelming, that Johnson cannot show that she was prejudiced by any deficient performance in failing to obtain Proscovec's statement, because there is simply no reasonable probability that this undiscovered mitigating evidence might have had any influence on the jury's appraisal of Johnson's culpability or that it would have been sufficient to undermine confidence in the outcome actually reached in the sentencing. *See Rompilla*, 545 U.S. at 393.

This allegation of error does not warrant relief, standing alone, and adds nothing to the aggregate prejudice from trial counsel's errors in failing to present mitigating evidence.

### 3.      *Claim 41: Failure to introduce Johnson's offer to plead guilty*

Johnson's last timely allegation of error in the mitigation phase stands on much firmer ground. In Claim **41** (Johnson's Claim One, § V), Johnson alleges that trial counsel erred in failing to introduce her offer—indeed, *offers*—to plead guilty as evidence in

mitigation.  The respondent denies that this allegation of error warrants any relief.

### a.    *Arguments of the parties*

Johnson argues that she not only offered to plead guilty in exchange for a life sentence, but that trial counsel was aware that her offer could be introduced as mitigating evidence in the mitigation phase, for example, through the testimony of one of Honken's attorneys who had participated in plea negotiations, and that the original prosecutor in her case acknowledged that, if a plea deal fell through, that would be a factor in mitigation. She argues that trial counsel had no reasonable tactical or strategic reasons not to present this evidence and, indeed, that trial counsel discussed doing so among themselves, but none of her trial attorneys remembered why they opted not to do so.  She argues that, had evidence of her offer to plead to a life sentence been presented to the jurors, there is a reasonable probability that at least one juror would have reached a different sentencing verdict.

The respondent counters that trial counsel researched whether or not they could offer Johnson's offer to plead to a life sentence into evidence and made a tactical decision not to do so.  The respondent argues that the law was not clear at the time, nor is it now, that a defendant's offer to plead guilty is admissible as mitigating evidence.  The respondent also points out that it is not clear what plea offer Johnson is relying on, since the nearest thing to a plea offer was made by her trial counsel on the eve of trial, which hardly amounts to an admission of guilt and acceptance of responsibility by Johnson, not least where Johnson continued to deny her true involvement and role in the murders even after she was convicted.  The respondent also argues that Johnson was not prejudiced by trial counsel's failure to introduce her offer to plead guilty, if there was such a thing. First, the respondent argues that the terms of the supposed plea offer that Honken's attorney could have described involved Johnson's offer to plead to a 20-year sentence, and

Johnson never made a factual proffer to support that plea offer. Second, the respondent argues that evidence of another plea offer on the eve of trial would have opened the door to evidence that it was an offer from trial counsel, not from Johnson herself, that it also minimized Johnson's role, and that it was inconsistent with the evidence of the offenses. In short, the respondent argues that a true picture of each of these supposed plea offers would have had no impact on the outcome of the case.

In reply, Johnson asserts that the respondent has not identified any tactical reason for failing to introduce her plea offer or offers as mitigation evidence, even if trial counsel researched the admissibility of a plea offer. She also argues that the scope of admissible evidence in the mitigation phase is certainly broad enough to include an offer to plead guilty and, in any event, that there was some authority at the time of her trial that a plea offer was admissible as mitigation evidence. She also argues that she herself made at least two unequivocal statements to her lawyers that she wanted to plead guilty, citing Exhibit 67 at MCN 02-002750-53 and MCN 03-002970, and various offers to cooperate, as well as offers specifically conveyed to the prosecution. She argues that her trial counsel insisted on the 20-year sentence in the joint offer with Honken, she did not. She argues that there is plenty of evidence that she also offered to plead to a life sentence that was not contingent on any proffer. Thus, she argues that trial counsel's failure to introduce her offer or offers to plead guilty as evidence in mitigation is sufficient to undermine confidence in the penalty decision.

### b.    Analysis

Whether trial counsel performed deficiently in failing to introduce Johnson's plea offers as mitigating evidence depends, at least in part, on the following inquiries:  (1) Have federal courts recognized the admissibility in the mitigation phase of a capital trial of a defendant's offer to plead guilty in exchange for a life sentence, and (2) had federal courts

done so at the time of Johnson's trial?  For example, if the federal courts had uniformly concluded that a defendant's offer to plead guilty in exchange for a life sentence was *not* admissible as mitigating evidence, then trial counsel's decision not to try to introduce Johnson's offer to plead guilty in return for a life sentence might be more reasonable. "'Reasonable performance of counsel includes an adequate investigation of facts, consideration of *viable* theories, and development of evidence to support those theories,'" *Cagle*, 474 F.3d at 1097 (emphasis added) (quoting *Lyons*, 403 F.3d at 594), but failure to raise an "unwinnable" or frivolous issue does not constitute ineffectiveness.  *See Strickland*, 466 U.S. at 689; *Davis*, 406 F.3d at 510; *Glass v. Higgins*, 959 F.2d 88, 91 (8th Cir. 1992).  On the other hand, if the federal courts had uniformly concluded that a defendant's offer to plead guilty *was* admissible as mitigating evidence, then trial counsel's failure to do so in Johnson's case would be all the more suspect.

As a general matter, even recently, some federal courts have held that evidence of failed plea negotiations is not relevant as mitigating evidence in the mitigation phase of a capital case, because it is not evidence relevant to the defendant's character, prior record, or circumstances of the offense.  *See Wright v. Bell*, 619 F.3d 586, 598-601 (6th Cir. 2010) (holding that the state court reasonably determined that a state prisoner was not permitted to introduce during the penalty phase evidence of plea negotiations, in which the state offered a life sentence, to rebut the prosecution's argument that he might pose a danger to other inmates if he received a life sentence, citing *Owens v. Guida*, 549 F.3d 399 (6th Cir. 2008)); *Owens*, 549 F.3d at 418-22 (holding that the state courts did not violate the petitioner's rights when they refused to admit purportedly mitigating evidence to show acceptance of responsibility consisting of the state's offer and the defendant's acceptance of an offer to plead to a life sentence, even though the offer fell through only because a co-defendant rejected it).  On the other hand, some courts have held that

evidence that the prosecution offered to allow the defendant to plead guilty to a lesser charge was mitigating evidence admissible in the sentencing phase of a capital case after the defendant had been convicted. *See Scott v. Schriro*, 567 F.3d 573, 584 (9th Cir. 2009) (holding that, regardless of the reasons that the defendant's counsel rejected a plea offer from the prosecution, evidence of the plea offer could have been introduced during the sentencing phase of a capital trial as mitigating evidence, citing *Summerlin v. Schriro*, 427 F.3d 631-40 (9th Cir. 205); *Summerlin*, 427 F.3d at 631-40 (holding that evidence of a plea offer from the prosecution was mitigating because it showed that the prosecution thought the case was not a clear-cut death penalty case). Thus, it is fair to say that, even since Johnson's trial, there has been no consensus in the federal courts on the admissibility of evidence of plea negotiations as mitigating evidence in a capital case.[67]

---

[67] I note that each of the cases cited above involved the *prosecution's* plea offers, only *Owens* involved the defendant's attempt to accept such an offer, and none of the cases involved a *defendant's* plea offer. I also note that there is evidence that some courts have allowed capital defendants to introduce their offer to plead guilty to a life sentence as mitigating evidence, albeit in cases in which the admissibility of the offer was not necessarily addressed. *See United States v. Johnson*, 713 F. Supp. 2d 595, 604 (E.D. La. 2010) (noting "all the jurors found non-statutory mitigating factors that the defendant offered to plead guilty to a life sentence at the inception of the prosecution," but not discussing whether such a mitigating factor was legally or factually permissible); *United States v. Rodriguez*, 2007 WL 466752, *44 (D.N.D. 2007) (holding that it was clearly improper for the prosecution to inform the jurors that it had rejected a defendant's offer to plead guilty, despite a pretrial ruling that "[a] defendant's offer to plead guilty is therefore relevant to the issue of acceptance of responsibility and it may be admitted during the selection phase. . . . However, the scope of this evidence is strictly limited to a defendant's offer to plead guilty. The government's response to a defendant's offer is not admissible. In addition, any assertions of personal belief by a prosecutor are not admissible. . . . [T]he Court will limit this evidence to Defendant's offer to plead guilty."), *aff'd*, 581 F.3d 775, 800 (8th Cir. 2009) (noting that the district court had

(continued...)

The parties are correct that, in 2004, prior to Johnson's trial, the Eleventh Circuit Court of Appeals observed, in dicta, that "[t]he mitigating weight of a defendant's attempt to avoid a death sentence by offering to plead guilty is so slight, if it exists at all, that even undiminished the effect would hardly register." *Gonzalez v. Secretary of Dep't of Corrections*, 366 F.3d 1253, 1285 (11th Cir. 2004). However, that case actually involved a claim for a new trial under the fraud exception to the bar on second and successive petitions in 28 U.S.C. § 2244(b), based on a claim that a former prosecutor, who testified at the sentencing stage, gave false testimony about the position of the victim's family regarding whether or not the defendant should receive a death sentence for the murder. *Id.* at 1282. Thus, it did not directly address the question that confronted Johnson's trial counsel (accepting trial counsel's representations that they researched the question) of whether Johnson's offer to plead guilty would be admissible as mitigating evidence.

---

[67](...continued)
admitted the defendant's offer to plead guilty in return for a life sentence as a mitigating factor showing acceptance of responsibility, that 18 U.S.C. § 3592(a) allowed the jurors to consider "any mitigating factor," and that no juror found that mitigating factor, but not reviewing that ruling, only whether the district court had properly denied a mistrial when the prosecution made improper references to its rejection of the plea offer).

I also note that, just after Johnson's trial was completed, a federal district court addressed a petitioner's claim that his counsel was ineffective for failing to offer his guilty plea on the merits as mitigating evidence before the close of evidence in the mitigation phase before a jury, where he argued that his "most persuasive" mitigating evidence was the "original" indictment showing his guilty plea, and that the failure of counsel to do so likely led jurors to view his mitigation claim as an attempt at misrepresentation. *See Crowe v. Terry*, 426 F. Supp. 2d 1310, 1319 (N.D. Ga. 2005). The claim was rejected on the ground that trial counsel had tried to offer the guilty plea into evidence and objected when the trial court decided not to give the original indictment showing the guilty plea to the jury, so that no ineffective assistance of counsel had kept the jury from hearing evidence of the defendant's guilty plea as mitigating evidence. *Id.* Thus, the court did not address the issue here.

The parties are also correct that, on May 26, 2005, in the hiatus between the merits phase guilty verdicts and the eligibility phase in Johnson's own trial, a federal district court in Vermont addressed motions in limine in a capital case, including the question of whether or not the defendant could present evidence that he had offered to plead guilty in exchange for a sentence to life in prison without possibility of parole as relevant to the mitigating factor of acceptance of responsibility. *See United States v. Fell*, 372 F. Supp. 2d 773, 784 (D. Vt. 2005). That decision deserves some further discussion here.

In *Fell*, the district court agreed that the defendant's plea offer was admissible, but rejected the defendant's claim that the prosecution's statements in the proposed plea agreement were relevant to his acceptance of responsibility. *Id.* In other words, the court stated, "It is [the defendant's] *offer* to plead guilty that bears on his acceptance of responsibility. The Government's *response* to [the defendant's] offer is not relevant." *Id.* (emphasis in the original). On the other hand, the court likened a defendant's offer to plead guilty to his own statements in plea negotiations—which were not absolutely barred by Rule 410 of the Federal Rules of Evidence, which only bars use of evidence of plea negotiations *against* the defendant, leaving open the possibility that a defendant may offer such statements—and that the defendant's own statements in plea negotiations indicated the defendant's state of mind. *Id.* at 785. The court also concluded, "If presented separately from other evidence concerning the plea negotiations, information relating to [the defendant's] offer to plead guilty is unlikely to confuse the jury. Thus, as it is relevant to acceptance of responsibility, [the defendant's] offer to plead guilty is admissible at the sentencing hearing under 18 U.S.C. § 3593(c)." *Id.* at 784 (footnote omitted). In a footnote, the court elaborated on its conclusion that the plea offer would not be unduly confusing, as follows:

> Obviously, if Fell informs the jury that he offered to plead

> guilty to Count 2, then the jury will know that the Government ultimately rejected this offer. This may lead some jurors to speculate as to the content of the negotiations and to second-guess the Government's decision to reject the plea offer. Nevertheless, the danger that the jury will be distracted by this evidence is far less serious than the danger created by admitting the Government's internal deliberations. The jury would be much more likely to be confused and distracted by evidence suggesting that the Attorney General overruled a recommendation by local prosecutors.

*Fell*, 372 F. Supp. 2d at 784 n.6.

The subsequent history of the *Fell* case may also be instructive here, even though the decision on appeal came down well after Johnson's trial was completed. The district court had ultimately allowed Fell to introduce in the penalty phase a stipulation that he had offered to plead guilty to the capital charge against him (in Count 2 of the indictment) in exchange for a sentence of life imprisonment without parole, but that the prosecution had refused that offer, in light of the district court's ruling that his offer was relevant to the mitigating factor of acceptance of responsibility. *United States v. Fell*, 531 F.3d 197, 218 (2d Cir. 2008). However, on appeal of his conviction and death sentence, Fell attacked the district court's exclusion of the draft plea agreement itself, on the ground that it was mitigation evidence that rebutted the prosecution's position that he had not accepted responsibility. *Id.* at 216-17.

The Second Circuit Court of Appeals observed that the Federal Death Penalty Act evidentiary standards for the mitigation phase "do 'not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes.'" *Fell*, 531 F.3d at 219 (quoting *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005)). The court concluded that the trial court had properly excluded the draft plea agreement, because, pursuant to 18 U.S.C. § 3593(c), "the draft agreement's inclusion of unadopted statements of the prosecutors

lacked evidentiary value and it would distract the jury from an independent assessment of the mitigating factors," and would also "authorize a confusing and unproductive inquiry into incomplete plea negotiations." *Id.* The court also held that "[t]o the extent Fell sought to introduce the draft agreement to bolster his mitigation defense that he accepted responsibility and to counter the prosecution's comments that he did not, the agreement was cumulative of the stipulation informing the jury that the government refused his offer to plead guilty [and] [i]n any event, the record is virtually conclusive that the jury was clearly aware of Fell's willingness to plead guilty." *Id.* at 220. In light of the jurors' findings on mitigating and aggravating factors, the court also held that "even if the agreement had been admitted and an additional six jurors had found that Fell had admitted responsibility, the result of the penalty phase would not have been different." *Id.* Interestingly, the court also concluded that the prosecution reasonably responded to the defendant's attempt to use his offer to plead guilty as mitigating evidence showing acceptance of responsibility by arguing that the defendant only offered to plead guilty in exchange for the minimum penalty when faced with overwhelming evidence of his guilt and that, when the prosecution did not accept his offer, he could have pleaded unconditionally, but he did not, thus rejecting a claim of prosecutorial misconduct. *Id.* at 221.

Thus, both the district court's decision in *Fell*, available before Johnson's mitigation phase, and the appellate court's decision in *Fell*, not available until well after Johnson's trial, stand for the proposition that the defendant may be able to introduce his or her offer to plead guilty as mitigation evidence supporting acceptance of responsibility, but not the plea offer itself or any statements of the prosecution reflected in the plea offer. The parties have not identified, and I have not found, any other federal cases prior to Johnson's trial specifically addressing whether a capital defendant's offer to plead guilty in return for a

life sentence is admissible as mitigating evidence.

Turning specifically to the reasonableness of Johnson's trial counsel's failure to try to introduce her offer or offers to plead guilty as mitigating evidence, it appears that Johnson, like the defendant in *Fell*, believes that this evidence would have been relevant to a mitigating factor based on acceptance of responsibility. *See, e.g.,* Johnson's Post-Hearing Brief (docket no. 314) at 196 ("Ms. Johnson was prepared to admit her role in the offenses, take responsibility for her actions, accept a sentence of life without possibility of release, and spare all parties the anguish of trial."). I agree. *See Fell*, 372 F. Supp. 2d at 784-85; *Fell*, 531 F.3d at 219-20; *contra Wright*, 619 F.3d at 598-601; *Owens*, 549 F.3d at 418-22. Where the offer to plead guilty *comes from the defendant*, it may or may not be illuminating of the circumstances of the offense or the defendant's prior record, but it does have some bearing on the defendant's character and, more specifically, on the defendant's acceptance of responsibility for the charged offense. *Contra Wright*, 619 F.3d at 598-601; *Owens*, 549 F.3d at 418-22. Furthermore, I agree with the district court in *Fell* that a defendant's offer to plead guilty is comparable to his own statements in plea negotiations, and that they are not absolutely barred by Rule 410 of the Federal Rules of Evidence, which only bars use of evidence of plea negotiations *against* the defendant, leaving open the possibility that a defendant may offer such statements. *Fell*, 372 F. Supp. 2d at 785. I also agree that a defendant's own statements in plea negotiations indicate the defendant's state of mind. *Id.* Finally, where there was no consistently contrary authority, and certainly no controlling contrary authority in the Eighth Circuit, there was no bar to admissibility of the evidence. While trial counsel was not required to make a frivolous argument, *see Strickland*, 466 U.S. at 689, counsel must show that a decision to forego a colorable argument was reasoned and based on adequate investigation.

Even accepting that trial counsel here researched the question of whether or not

411

Johnson's offers to plead guilty were admissible, there is no evidence of any *actual* rationale on which the decision not to offer that evidence in mitigation was based. Thus, I cannot grant that decision any presumption of reasonableness. *Compare Worthington*, 631 F.3d at 502 (noting that the reasonable investigation of mental health evidence clothed the decision not to mount a mental health mitigation case with a presumption of reasonableness). Moreover, I believe that any reasonable counsel would have attempted to present evidence that a capital defendant offered to plead guilty as mitigating evidence to show acceptance of responsibility. *Id.* at 500 (stating that deficient performance is established only "'where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence.'" (quoting *Link*, 469 F.3d at 1203)). Thus, Johnson's trial counsel performed deficiently in failing to attempt to introduce her offer to plead guilty to a life sentence as mitigating evidence showing acceptance of responsibility.

Turning to the question of *Strickland* prejudice, just as "[l]ogic dictates . . . that to establish . . . prejudice [from counsel's failure to advise a defendant regarding a plea agreement], the petitioner must begin by proving that a plea agreement was formally offered by the government," *Kingsberry*, 202 F.3d at 1032-33, I believe that logic dictates that, to prove that counsel was ineffective for failing to introduce a defendant's offer to plead guilty as mitigation evidence, the petitioner must begin by proving that she made a formal offer to the prosecution to plead guilty. Only a plea offer actually conveyed to the prosecution could have any relevance to a capital defendant's acceptance of responsibility or otherwise be mitigating; "internal" communications between a defendant and defense counsel involve no public admission of guilt or responsibility. While it is not clear from Johnson's initial arguments what "plea offer" she believes trial counsel should have introduced into evidence, in her reply to the prosecution's argument on this point, Johnson seems to rely on evidence of statements that she made *to her trial counsel* about her desire

to plead guilty, as well as indications of a desire to plead guilty and to cooperate actually conveyed *to the prosecution* by telephone on June 7, 2003, *see* Exhibit 48, PLSP 41; by letter on February 17, 2005, *see id.* at PLSP 118-123; by letter on March 17, 2005, *see* Exhibit 67 at MCN 05-005546; and by "attorney proffer" dated March 19, 2005, *see id.* at PLSP 128-29; *see also* Exhibit 53, RS 9-516—9-518 (another copy). I conclude that only the offers conveyed to the prosecution are relevant, but it is clear that such offers existed.

In my view, the mitigating effect of an offer to plead guilty depends to a large extent upon the following: (1) *the timing of the offer*, which may indicate whether it suggests a genuine attempt to take responsibility, cooperate, avoid further anguish to the victim's family, and avoid for all parties the difficulties and expense of trial, or simply a last-ditch attempt to avoid a death sentence in the face of overwhelming evidence of guilt, and (2) *the nature of the offer*, including, for example, the extent to which it involved a complete and truthful factual proffer and required the defendant to cooperate, or was a "naked" offer to plead guilty. I also acknowledge, as did the Second Circuit Court of Appeals in *Fell*, that the prosecution would likely have responded to Johnson's use of her offer to plead guilty as mitigating evidence showing acceptance of responsibility by arguing that she only offered to plead guilty in exchange for a life sentence when faced with overwhelming evidence of her guilt and that, when the prosecution did not accept her offer, she could have pleaded unconditionally, but she did not. 531 F.3d at 221. I do not agree with the Eleventh Circuit Court of Appeals that, in *every* capital case, "[t]he mitigating weight of a defendant's attempt to avoid a death sentence by offering to plead guilty is so slight, if it exists at all, that even undiminished the effect would hardly register." *Gonzalez*, 366 F.3d at 1285. Nevertheless, here, Johnson's earlier offers to plead guilty that were actually conveyed to the prosecution, even to the extent that they

included an indication of willingness to cooperate against Honken, were essentially "naked" offers to plead guilty that lacked sufficient detail to demonstrate any genuine attempt to take responsibility, and certainly do not suggest any attempt to avoid further anguish to the victim's family or to avoid anything other than a lengthy trial. Her last two offers conveyed to the prosecution in March 2005, including her "attorney proffer," are so close to trial that they look like little more than an attempt to avoid a death sentence in the face of overwhelming evidence of guilt. *Cf. Gonzalez*, 366 F.3d at 1285. Furthermore, even to the extent that Johnson's offers to plead guilty suggest acceptance of responsibility, they do not, by themselves, suggest remorse, and I have already observed that nothing else in the record does so, either. Finally, a mitigation phase defense based on Johnson's willingness to plead guilt to life imprisonment would have been so contrary to her defense on the merits that she either was present, but did not participate, or was not present, and did not participate before the fact, as to risk a further inference that the offers to plead guilty were just ploys to avoid death sentences, not genuine expressions of remorse or acceptance of responsibility.

In short, while I can say that a competent attorney could, should, and would have introduced Johnson's offer or offers to plead guilty—at least offers made to the prosecution—I cannot say that, "'had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" *Sinisterra*, 600 F.3d at 906 (quoting *Belmontes*, ___ U.S. at ___, 130 S. Ct. at 386, in turn quoting *Wiggins*, 539 U.S. at 535, 536).

Therefore, I conclude that Johnson has proved only deficient performance, but not prejudice as to this allegation of error, and that it does not warrant relief from her death sentences.

### 4.    *Claims 36, 39, 40, 42, and 43:  Untimely allegations of error*

While I will not address in depth any of the untimely allegations of error that I have included in this multifaceted claim of ineffective assistance of counsel in failing to investigate, prepare, and present mitigation evidence—Claims *36**, 39**, 40**, 42,* and *43*—I will briefly comment on them. While I conclude that, even if timely, most of these allegations of error would have made no difference, one of those untimely claims is very troubling.

Claim *36* is that trial counsel failed to introduce evidence of and give the trial experts records concerning the 1996 diagnosis of Johnson with depression and dependent personality features. Even if timely, the evidence identified in Claim *36* as missing from her mitigation case would have added nothing, because it was not, in fact, missing. As noted above, the Corrected Amended § 2255 Motion actually alleges, and the record shows, that Dr. Hutchinson, one of Johnson's trial experts, *did* testify about Johnson's 1996 diagnosis of major depression, which causes, among other things, irritability, affect vulnerability, and thoughts of suicide. *See* Corrected Amended § 2255 Motion at 33-34.

Even if timely, Claims *39* and *40*, which allege failure to impeach jailhouse informant Steven Vest with letters from Honken and evidence that Honken lied about Johnson's role in the offense, respectively, would have added nothing to Johnson's case, because I cannot conclude that, had the jury been confronted with the missing evidence, there is a reasonable probability that the jury would have returned with a different sentence. Similarly, even if Claim *42* had been timely, I do not believe that counsel's failure to offer evidence of Johnson's remorse through expert testimony was prejudicial, because, even now, the evidence that Johnson has identified is so weak and tenuous that, even if I had been persuaded to admit it and to submit a mitigating factor on remorse to the jurors on the basis of that evidence—which I doubt—I cannot conclude that, had the jury been confronted with the missing evidence, there is a reasonable probability that the

jury would have returned a different sentence.

Much more troubling is untimely Claim *43*, which alleges that trial counsel were ineffective in failing to elicit evidence of the effect of Johnson's execution on her family members. Johnson points out that, despite calling ten family members during the penalty phase, trial counsel did not ask any of them directly how Johnson's execution would affect them, thus missing the opportunity to present powerful mitigation evidence. The respondent counters that, while trial counsel did not ask any of those family members that question directly, trial counsel nevertheless did elicit from many of them evidence of how they would be affected by Johnson's execution, including testimony from Marvea, Johnson's youngest daughter, which I described as the most powerful mitigation evidence I could imagine. *See* Hearing Transcript at 1000. The respondent also points out that, despite all or significant numbers of jurors finding mitigating factors relating to the continuation of Johnson's relationships with her family members if she were imprisoned for life and the severe effects on them if she were not,[68] the jurors still imposed the death

---

[68] The respondent points to the jurors' findings on the following mitigating factors: All 12 jurors found mitigating factor (3), that "there is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela Johnson is sentenced to life imprisonment without possibility of parole"; 6 jurors found mitigating factor (11), that "Angela Johnson has loving, lasting relationships with her mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobson, Jamie Jo Hayes, Jimmy Johnson, and Holly Dirksen, which will continue into old age if Angela Johnson is sentenced to life imprisonment without possibility of parole"; all 12 jurors found mitigating factor (13), that "Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and that her death would have a profoundly disturbing effect on their young lives, now and for years to come"; and 4 jurors found mitigating factor (15), that "Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings, Wendy Jacobson, Jamie Jo Hayes, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should

(continued...)

penalty for four of the killings, so that there is no reason to imagine that additional evidence about the effect of her execution on her family members would have made a difference. While logic may favor the respondent's argument, I conclude that a reasonable attorney, who had available evidence of the severe effect of Johnson's execution on her family members, would have recognized its potentially powerful effect to humanize Johnson, or at least to give jurors a sense that the death penalty has human consequences, and, therefore, would have presented it directly to the jurors, not simply by inference, as Johnson's trial counsel did. I also think that there is a reasonable probability that, if confronted with such evidence, at least one juror would have reached a different result. Nevertheless, the claim is untimely, and cannot be considered as a basis for relief, either standing alone or in the aggregate with other errors. Furthermore, any relief that this claim might warrant would be duplicative of the relief that I have concluded is warranted on other, timely allegations of error.

### 5. Claim 44: Unbriefed allegation of error concerning failure to prepare mitigation evidence from lay witnesses

Johnson also asserts, as timely, but unbriefed Claim 44 (her Claim One, § AA), allegations of error concerning the failure to prepare mitigation evidence based on ineffective presentation of mitigation evidence from lay witnesses. In this allegation of error, Johnson asserts that, despite the availability of detailed "scripts" for questioning of family members and other lay witnesses prepared by her mitigation specialist, her trial counsel instead presented limited and ineffective mitigation evidence from these witnesses. She uses as an example the testimony of Johnson's sister, Wendy Jacobson. She alleges

---

[68](...continued)

Angela Johnson be sentenced to death." *See* "Penalty Phase" Verdict Form, Step Two, "Mitigating Factors."

that, instead of using Jacobson to show that Johnson's home life was horrible and the effects of that horrible home life on Johnson throughout the rest of her life, trial counsel's questioning focused on Jacobson, not Johnson. Moreover, she alleges that trial counsel's questioning showed that, despite Jacobson's terrible upbringing (much like Johnson's terrible upbringing), Jacobson was not a criminal, and that Jacobson believed that Honken was a good part of Johnson's life. Johnson alleges that, had trial counsel properly prepared for his examination of Jacobson and other lay witnesses, it is reasonably probable that at least one juror would have voted to spare her life.

With the exception of the example of the testimony of Wendy Jacobson, Johnson's allegations that trial counsel were ineffective in failing to prepare to present mitigation evidence from lay witnesses, Johnson's allegations of error in support of Claim 44 are too vague and conclusory to merit relief, *see, e.g., United States v. Robinson*, 64 F.3d 403, 405 (8th Cir. 1995), and they were not further clarified by briefing or argument. Even were I to assume that counsel performed deficiently in preparing for and presenting the testimony of Jacobson, and that assumption might well be correct in light of so much other deficient preparation, investigation, and presentation of mitigation evidence apparent from the record, I cannot find that the deficiency prejudiced Johnson. Johnson's argument that she was prejudiced by this deficiency turns on speculation about what inferences jurors drew from Jacobson's actual testimony, or could have drawn from what Johnson asserts Jacobson would have said if trial counsel had been better prepared for and had made a better presentation of her testimony. Moreover, even supposing jurors would have drawn the inferences that Johnson now asserts could have been drawn from adequate examination of Jacobson, there were other sources for those inferences in other evidence that was presented, and I cannot conclude that there is a reasonable probability, in light of all of the evidence, that the outcome would have been different, if Jacobson's testimony had been

different.  *See Sinisterra*, 600 F.3d at 906.

Therefore, this claim does not warrant relief.

### 6.     *Aggregate prejudice*

I have concluded that timely Claims **34** (concerning evidence of Johnson's mental state at the time of the offenses) and **35** (concerning Dr. Gelbort) each involve sufficient prejudice to warrant relief, standing alone, and that, while Claim **37** (concerning evidence that Johnson was under Honken's influence) and Claim **41** (concerning evidence of Johnson's offers to plead guilty) each involve deficient performance, neither involves sufficient prejudice, standing alone, to warrant relief.  Even if I consider the aggregate prejudice of the claims involving deficient performance, but insufficient prejudice, standing alone, I conclude that, considered in the aggregate, there is *not* "a reasonable probability that, absent the[se] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.

Therefore, of the claimed errors of counsel in failing to investigate, prepare, and present mitigation evidence, I grant relief from all of Johnson's death sentences only on the basis of the errors alleged in Claims **34** and **35**.

### E.  Claim 45:  Counsel's Errors In Failing To Object To The Mitigation Phase Determination And Evident Juror Confusion

Johnson's fifth and last mitigation phase claim (Claim 45, Johnson's Claim One, § DD.h-i) to be considered on the merits involves ineffective assistance of counsel in failing to object to the mitigation phase determination and evident juror confusion.[69]  This

---

[69]As noted above, Johnson did assert a sixth mitigation phase claim (Claim *64*),

(continued...)

claim was not clarified in Johnson's Second Amended § 2255 Motion, nor was it briefed on the merits, although it was timely asserted. I do not find that it warrants any relief.

The nature of this claim can be gleaned only from arguments that I rejected in my ruling on Johnson's post-trial motions, *see Johnson*, 403 F. Supp. 2d at 886 and 890, respectively: (1) that trial counsel failed to assert, prior to trial, that, if the jurors were unable to reach a unanimous verdict for death, the statute, former 21 U.S.C. § 848(k) and (*l*), did not *require* the jury to recommend a sentence other than death (such as life imprisonment without parole), and the sentence could have been left to the court to determine, and (2) that trial counsel failed to assert, when the verdicts came down, that the jury determinations on mitigating factors were against the weight of the evidence, so that they must have been the result of confusion. Johnson has not shown how the jury determinations on mitigating factors were against the weight of the evidence at trial, nor has she shown that there is a reasonable probability that the jury would have reached a non-unanimous verdict for death on the evidence that they did hear. She also has not shown that, even though I might have disagreed with the imposition of the death penalty on the facts of this case as they were proved at trial, *see Johnson*, 403 F. Supp. 2d at 896-97, I would have imposed any sentence less than life imprisonment without parole, if the ultimate sentencing decision had been left to me—indeed, I would not have imposed any lesser sentence, even had I been aware of all of the evidence that Johnson contends her trial counsel should have presented. *See* 21 U.S.C. § 848(p) (2005) (providing that, in a capital case pursuant to § 848(e) in which the death penalty is not sought or imposed, "the

---

[69](...continued)
which involves application of an improper burden of proof for the weighing of aggravating and mitigating factors. However, as noted above, I did not allow the amendment to assert this claim, so it will not be considered on the merits.

court may impose a sentence of life imprisonment without possibility of parole").

This claim does not warrant relief.

## VIII.  ERRORS IN THE POST-TRIAL PHASE

I concluded, above, that Claims 47 and 48 (Johnson's Claims One, §§ DD.d and FF.2, respectively) constitute a single, multifaceted claim of ineffective assistance of trial counsel in the post-trial phase.  Claim 47 asserts that trial counsel erred in failing to timely and effectively make a number of meritorious arguments in post-trial motions, and Claim 48 asserts that trial counsel erred by failing to raise post-trial Juror No. 55's failure to answer questions honestly on voir dire.  Although neither of these allegations of error was briefed on the merits, I have considered them independently and conclude that, while they may involve deficient performance—consistent with the pattern of deficient performance of trial counsel in this case—they do not involve *Strickland* prejudice, either alone or in the aggregate.  Nothing more than hindsight suggests that the arguments that trial counsel failed to raise post-trial, identified in Claim 47, could reasonably have led to a different result, if they had been asserted, and I have already rejected the contention that Juror No. 55 failed to answer questions honestly, as alleged in Claim 48.  *See supra* at 217.

Thus, these claims do not warrant § 2255 relief.

## IX.  ERRORS ON APPEAL

I concluded, above, that Claims 49, 50, *51*, and 52 (Johnson's Claims One, §§ GG, HH, II, and DD.j-o, respectively) constitute a single, multifaceted claim of ineffective assistance of appellate counsel.  These allegations of error are, respectively, that appellate counsel failed to raise all components of the misconduct of Juror No. 55, to litigate the prosecution's inconsistent theories as to Honken and Johnson, to raise the unconstitutional

skewing effect of multiplicitous counts, and to raise a number of meritorious arguments.

Again, although none of these allegations of error were briefed on the merits, I have considered them independently, and I conclude that, even if these allegations of error involve deficient performance, they do not involve *Strickland* prejudice. Indeed, with the exception of Claim *51*, which has no correlate in the claims of ineffective assistance of counsel at trial, but is untimely, all fail for essentially the same reasons that the underlying claims of ineffective assistance of trial counsel or misconduct of the prosecution failed. Even if Claim *51* had been timely, Johnson has pointed to nothing but speculation suggesting that she was prejudiced by the "skewing effect" of determining the penalties on multiplicitous counts of "murder in furtherance of a CCE" and "murder while engaging in a drug-trafficking conspiracy,"[70] where the jurors were made very aware that there were two counts relating to each murder, but the jurors weighed each aggravating factor only once for each count. *Compare United States v. McCullah*, 76 F.3d 1087, 1111-12

---

[70]Both the Supreme Court and the Eighth Circuit Court of Appeals had recognized some years before Johnson's trial that "murder while engaging in a drug-trafficking conspiracy" is a lesser-included offense of "murder in furtherance of a CCE," *see Rutledge v. United States*, 517 U.S. 292, 306-07 (1996), so that counts charging both offenses were "potentially multiplicitous." *See Moore*, 149 F.3d at 779; *see also United States v. Johnson*, 495 F.3d 951, 957-60 (8th Cir. 2007) (remanding this case to me to vacate the multiplicitous convictions for "murder while engaging in a drug-trafficking conspiracy"). Nevertheless, had I withdrawn consideration of penalties on the "murder while engaging in a drug-trafficking conspiracy" counts, after the jurors convicted Johnson on all counts of "murder in furtherance of a CCE," and then I or an appellate court had thrown out the convictions on the "murder in furtherance of a CCE" charges, for example, for lack of proof of a CCE, then there would have been no jury determination of the penalties on the lesser-included offenses of "murder while engaging in a drug-trafficking conspiracy," and a retrial on penalties would have been inevitable. Allowing the jury to determine the penalties on both the greater and lesser offenses for each murder at least potentially avoided the need for any retrial on penalties.

(10th Cir. 1996) (holding that weighing the same aggravating factor twice for the same capital offense unconstitutionally skewed the weighing process).

Moreover, these allegations of error on appeal do not warrant relief in the aggregate or considered as "cumulative error" on appeal, as alleged in Claim 53.

## X. *EIGHTH AMENDMENT VIOLATIONS*

In addition to her claims of errors in her trial, Johnson alleges a series of Eighth Amendment claims attacking imposition of the death penalty, her execution while mentally ill, or the manner in which she would be executed. I concluded, above, that Claims 54, 55, **56**, 60, and 63 (Johnson's Claims Eight, Nine, Ten, Ten § B, and Eleven, respectively) are *separate* claims of Eighth Amendment violations, as each involves a different issue relating to the Eighth Amendment. On the other hand, I concluded that Claims 57, 58, 59, 61, and 62 (Johnson's Claims Ten §§ A.1, A.2, and A.3, Ten § C, and Ten § D, respectively) are facets of a *single* claim of violation of *Baze v. Rees*, 553 U.S. 35 (2008). The only Eighth Amendment claim that was briefed is Claim **56**, which alleges that the method of carrying out an execution by lethal injection used by the Bureau of Prisons violates the Fifth and Eighth Amendments, the Administrative Procedures Act, and the Controlled Substances Act, but the briefing did not address the merits of that claim, only its procedural footing.

The respondent argues that all of these Eighth Amendment claims have been procedurally defaulted, because none were raised on direct appeal, and that the claims are without merit, either because they have no case law to support them or because they have been expressly rejected by the Supreme Court. Johnson contends that the briefed claim is not procedurally defaulted, for the following reasons: (1) the respondent has conceded that Honken's comparable Eighth Amendment claim is not ripe, (2) she argues that the

claim may not be cognizable as a § 2255 claim, and (3) she argues that, in any event, further investigation and discovery is required before that claim can be resolved, so that it should be dismissed without prejudice.

### A. Cognizability In § 2255 Proceedings

I observed, in passing, *supra* note 23, that the essential difference between § 2255 and 28 U.S.C. § 2241, which still expressly refers to the power of the federal courts to grant "writs of habeas corpus," is this: "A petitioner may attack the execution of his sentence through § 2241 in the district where he is incarcerated; a challenge to the validity of the sentence itself must be brought under § 2255 in the district of the sentencing court." *Matheny v. Morrison*, 307 F.3d 709, 711 (8th Cir. 2002) (citing *Bell v. United States*, 48 F.3d 1042, 1043 (8th Cir. 1995)). To put it another way, "a collateral challenge to a federal conviction or sentence must generally be raised in a motion to vacate filed in the sentencing court under § 2255." *Hill v. Morrison*, 349 F.3d 1089, 1091 (8th Cir. 2003). On the other hand, "a federal prisoner may challenge the manner of execution of his sentence by bringing his petition under § 2241 rather than § 2255." *Singleton v. Norris*, 319 F.3d 1018, 1022 (8th Cir. 2003) (citing *Crouch v. Norris*, 251 F.3d 720, 722-23 (8th Cir. 2001), as considering cases so holding).[71]

_____

[71] I recognize that the Eighth Circuit Court of Appeals has also observed that "'[a] prisoner cannot raise, in a § 2241 motion filed in the district of incarceration, an issue which could or was actually raised in the § 2255 motion filed in the sentencing court.'" *Nichols v. Symmes*, 553 F.3d 647, 650 (8th Cir. 2009) (quoting *Hill*, 349 F.3d at 1092). Consequently, if a claim raised by a § 2241 petitioner is one that could have been raised in a § 2255 proceeding, a federal court is prohibited from considering it. *Id.* In light of this principle, it is understandable that Johnson would raise such claims here. What I do not pretend to address is whether doing so, then having those claims either denied on the
(continued...)

In *Matheny*, the Eighth Circuit Court of Appeals identified claims correctly framed as § 2241 claims as including the petitioners' challenges to the payment schedule for financial obligations pursuant to their sentences under the Inmate Financial Responsibility Program of the BOP. *Matheny*, 307 F.3d at 711. Similarly, in *Crouch*, the Eighth Circuit Court of Appeals identified claims properly cognizable under § 2241 as claims that implicate the fact or duration of confinement, but do not stem from the original conviction or sentence. *Crouch*, 251 F.3d at 722-23. At least one federal court, the United States District Court for the District of Maryland, has expressly held that a federal capital defendant's claim challenging the method of executing a federal prisoner as cruel and unusual punishment in violation of the Eighth Amendment is not properly brought as a § 2255 claim, but must, instead, be brought, when ripe, pursuant to § 2241. *See Higgs v. United States*, 711 F. Supp. 2d 479, 555 (D. Md. 2010); *see also Mitchell v. United States*, 2010 WL 3895691, *42 (D. Ariz. 2010) (dismissing without prejudice a claim by a federal prisoner that Arizona's current lethal injection protocol would violate his rights under the Eighth Amendment, because the claim was not ripe, and could be presented, when ripe, in a separate civil rights action "under 42 U.S.C. § 1983").

---

[71](…continued)
merits or dismissed as premature could also bar her from raising them again for another court to consider on a subsequent § 2241 petition. *See id.* (a claim that was actually raised in prior § 2255 proceedings could not be considered by a federal court on a § 2241 motion); *but see Abdullah v. Hedrick*, 392 F.3d 957, 959-60 (8th Cir. 2004) (explaining that a § 2241 claim may not be barred if a prior § 2255 motion could not provide an adequate or effective remedy); *Hill*, 349 F.3d at 1091-93 (same).

### B. Claims Not Cognizable Under § 2255

With the exception of Claims 54 and 63, Johnson's Eighth Amendment claims all challenge the method or manner of execution of her death sentences, or her execution while mentally ill, not the imposition of those sentences.[72] Assuming that these claims are cognizable as § 2255 claims, the respondent is correct that Johnson could have raised these claims on direct appeal, and has not asserted any "cause and prejudice" or "actual innocence" that might excuse her failure to do so, so that the claims are procedurally defaulted. *See Bousley*, 523 U.S. at 622. However, the real problem with reaching these claims here is that I conclude that they are not cognizable as § 2255 claims. *See Matheny*, 307 F.3d at 711 (stating, "A petitioner may attack the execution of his sentence through § 2241 in the district where he is incarcerated," and holding that claims challenging the payment schedule for financial obligations pursuant to the petitioner's sentences under the Inmate Financial Responsibility Program of the BOP had been correctly framed as § 2241 claims); *Higgs*, 711 F. Supp. 2d at 555 (holding that Eighth Amendment challenges to the method of execution by lethal injection were cognizable as § 2241 claims, not as § 2255

---

[72]Specifically, in Claim 55 (Johnson's Claim Nine), Johnson asserts that she suffers from mental illness and that the Eighth Amendment, therefore, precludes her execution; Claim 56 (Johnson's Claim Ten) alleges that the BOP's method of carrying out her execution by lethal injection violates the Fifth and Eighth Amendments, the Administrative Procedures Act, and the Controlled Substances Act; Claims 57 through 59 (Johnson's Claims Ten § A.1-3) all challenge the method of executing her as violating *Baze*; Claim 60 (Johnson's Claim Ten § B) alleges that her execution using the BOP's current method violates the Eighth Amendment because there are readily available alternatives that would reduce the risks of maladministration and inhumane execution; Claim 61 (Johnson's Claim Ten § C) alleges that whether the BOP's new execution protocol is constitutional even under *Baze* cannot be answered without further discovery; and Claim 62 (Johnson's Claim Ten § D) alleges that the *Baze* decision does not have any impact on her Administrative Procedures Act and Controlled Substances Act claims.

claims). Also, as in *Higgs*, these claims are not ripe for review, as Johnson expressly argues with regard to Claim **56**, because Johnson has not yet been given an execution date, and litigation or other circumstances may modify the BOP's current method of execution by lethal injection prior to Johnson's actual execution, so that "there is no 'direct and immediate dilemma for the parties' that compels judicial resolution of the issues at this time." *Higgs*, 711 F. Supp. 2d at 555 (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)). Therefore, I will dismiss these claims without prejudice.

### C. Cognizable Claims

I find that Claims 54 and 63 challenge the circumstances under which Johnson's death sentences were imposed, so that they are cognizable as § 2255 claims. *Matheny*, 307 F.3d at 711 ("A . . . challenge to the validity of the sentence itself must be brought under § 2255 in the district of the sentencing court."). Specifically, Claim 54 alleges that the Eighth Amendment requires a heightened standard of proof—not "beyond a reasonable doubt," but "to a certainty"—for imposition of the death penalty, while Claim 63 alleges that the death penalty violates the Eighth Amendment, because it is cruel and unusual punishment. The respondent is correct that Johnson could have raised these claims on direct appeal, and has not asserted any "cause and prejudice" or "actual innocence" that might excuse her failure to do so, so that the claims are procedurally defaulted. *See Bousley*, 523 U.S. at 622. In addition or in the alternative, these claims fail on the merits.

As to Claim 54, Justice O'Connor recognized three decades ago that "[n]othing in our cases mandates the imposition of this heightened burden of proof [that is, proof to 'an absolute certainty'] at capital sentencing." *See Franklin v. Lynaugh*, 487 U.S. 164, 188 (1988) (O'Connor, J., concurring). The Eighth Circuit Court of Appeals recently

427

recognized that nothing has changed, even if the question is one of the requirements for proof under the Federal Death Penalty Act, specifically 18 U.S.C. § 3592(a), which now provides the death penalty procedures for a § 848(e) capital offense, rather than an instruction based on "residual doubt," as in *Franklin*. *See United States v. Rodriguez*, 581 F.3d 775, 814-15 (8th Cir. 2009). Thus, as the respondent contends, there is presently no authority supporting a "heightened proof" standard for the death penalty in either the Supreme Court or the Eighth Circuit, so that this claim fails under existing Supreme Court and Eighth Circuit precedent.

As to Claim 63, the respondent argues that the Supreme Court has concluded that capital punishment does not violate the "cruel and unusual" clause of the Eighth Amendment, citing *Gregg v. Georgia*, 428 U.S. 153, 177 (1976). Johnson candidly admits that Claim 63 is contrary to prevailing law, but nevertheless argues that the death penalty is contrary to evolving standards of decency. Over the last three-and-a-half decades, the Supreme Court has held that the death penalty does not violate the Eighth Amendment. *See Gregg*, 428 U.S. at 176-79, 187 (joint opinion by Stewart, Powell, and Stevens, JJ.) (recognizing and rejecting the argument that "evolving standards of decency" barred the death penalty under the Eighth Amendment's "cruel and unusual" clause and holding "that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it"); *accord Baze*, 553 U.S. at 47 ("We begin with the principle, settled by *Gregg*, that capital punishment is constitutional." (citing *Gregg*, 428 U.S. at 177)); *Nooner v. Norris*, 594 F.3d at 598-99 (recognizing that the Supreme Court has held that capital punishment does not necessarily violate the Eighth Amendment, although the method of execution may do so). Thus, this claim fails under existing Supreme Court and Eighth Circuit precedent, and

provides no basis for § 2255 relief, even if it is not procedurally defaulted.

In short, none of Johnson's Eighth Amendment claims warrant § 2255 relief.

## XI.  SUMMARY OF CLAIM DISPOSITION

In the table that follows, I reiterate the disposition of each of Johnson's claims for § 2255 relief.  However, I can briefly summarize the disposition of those claims.  Johnson is not entitled to any relief from her convictions; to the contrary, the unassailable evidence of Johnson's participation in these murders is overwhelming.  Johnson is, however, entitled to a new mitigation or penalty phase to determine the appropriate sentence for her murder convictions.  While I have rejected Johnson's claims of juror misconduct, prosecutorial misconduct, and other stand alone constitutional errors, I have found that relief is warranted on some of Johnson's claims of ineffective assistance of counsel.  Here, the mitigation phase of Johnson's trial was not only riddled with deficient performance—by what I had believed was a "dream team" of defense attorneys—but four of trial counsel's deficiencies were prejudicial, that is, there is a reasonable probability that, had her trial counsel not performed deficiently, the outcome of Johnson's mitigation phase would have been different.

Somewhat more specifically, as to the ineffective assistance of counsel claims, allegations of error relating only to the evidence presented or not presented *about Johnson's co-defendant Honken* do not, in my view, warrant any relief either from Johnson's convictions or her death sentences.  On the other hand, allegations of error relating *to Johnson*, and more specifically still*, to the evidence of Johnson's mental state at the time of the offenses*, were errors on which I found sufficient prejudice to warrant § 2255 relief from Johnson's death penalties.  The four ineffective assistance of counsel claims on which I have granted relief stand alone.  In other words, even if the Eighth

429

Circuit Court of Appeals recognized cumulative error as a theory for *habeas* relief, if I were to consider the cumulative prejudice of all of the claims of ineffective assistance of counsel on which I found deficient performance, but insufficient prejudice to warrant relief, standing alone, I still would not find that the cumulative prejudice from those claims provided another or alternative basis for relief from Johnson's convictions or sentences.

A brief statistical summary of the disposition of claims is appropriate. I found as follows:

- Johnson asserted 64 claims
  - 16 were untimely
  - 3 were timely "cumulative error" claims barred by Eighth Circuit precedent
  - 48 of Johnson's 64 claims were "ineffective assistance of counsel claims"
  - 3 were "prosecutorial misconduct" claims
  - 1 was a "juror misconduct" claim
  - 12 were other "stand alone" Fifth and/or Eighth Amendment claims
  - I granted relief on 4, all of them "ineffective assistance of counsel" claims
- Of the 48 "ineffective assistance of counsel" claims
  - 3 were barred "cumulative error" claims
  - 14 were untimely
  - 20 involved deficient performance
    - 5 of those 20 were untimely
    - 6 of those 20 also involved prejudice, and would have warranted relief, but 2 of those 6 claims were untimely
    - 10 of those 20 did not involve prejudice
    - 3 of those 20 did not require a determination of prejudice, because they were untimely

- 8 did not involve deficient performance

- 20 did not require a determination of deficient performance

  - 17 of those 20 did not involve prejudice, even if performance was deficient

  - 3 of those 20 were "barred" "cumulative error" claims

- 7 did not require a determination of prejudice

  - 1 of those 7 did not involve deficient performance

  - 3 of those 7 did involve deficient performance, but were untimely

  - 3 of those 7 were "barred" "cumulative error" claims

- 4 warranted relief, *i.e.*, were timely and involved both deficient performance and prejudice

- Of the 3 "prosecutorial misconduct" claims

  - All 3 were timely

  - None warranted relief

- The 1 "juror misconduct" claim was timely, but did not warrant relief

- Of the 12 other "stand alone" Fifth and/or Eighth Amendment claims

  - 1 was untimely

  - 3 were timely and ripe

  - 8 were not ripe, and were dismissed without prejudice

  - None warranted relief

Again, I find that the most useful way to summarize my conclusions on each of Johnson's 64 claims for post-conviction relief pursuant to § 2255 is to reiterate the Claim Chart, with some modifications. This time, I have again indicated in **bold** which claims were ultimately briefed in Johnson's Corrected Post-Hearing Brief, and in *italics* which claims I find *do not* "relate back" or otherwise were not considered on the merits. In

addition, I have now indicated whether ineffective assistance of counsel claims involved deficient performance, prejudice, or both, and I have "shaded" or "grayed out" claims on which I find that relief is not warranted, leaving in "white" only claims on which I find that relief is warranted.

| GROUNDS FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL | | | | |
|---|---|---|---|---|
| PRETRIAL PHASE | | | | |
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits; "shaded" claims warrant no relief) | **Deficient Performance** | **Prejudice** |
| **1.** | **One, § A** | **Failure to pursue a disposition for a sentence of less than death** | **Yes** | **No** |
| 2. | One, § B | Failure to proceed to trial at a time that would have precluded the government from filing a timely notice of intent to seek the death penalty | No | No |
| 3. | One, § DD.a-c, f | Failure to timely and effectively make a number of meritorious motions, objections, and arguments | Yes | No |
| JURY SELECTION | | | | |
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| 4. | One, § C.1 | Juror No. 55:  Ineffective *voir dire* | No | Not decided |
| 5. | Six | Juror No. 55:  Misconduct by Juror | | |

| JURY SELECTION (continued) | | | | |
|---|---|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| 6. | one, § C.2 | Failure to structure *voir dire* to identify jurors with prejudicial views on Pentecostal religion and women | Not decided | No |
| 7. | One, § DD.e, g | Failure to timely and effectively (a) re-urge Johnson's motion for change of venue and (b) object to the manner in which peremptory challenges were allocated | Yes (a. yes; b. no) | No |
| MERITS PHASE | | | | |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| **8.** | **One, § D** | **Demeanor and competence: Failure to reduce petitioner's medication or to address the effects of the medication on (a) her demeanor at trial and (b) her ability to participate in her own defense, in violation of her right to due process and a fair trial** | **No (a. no; b. no)** | **No** |
| 9. | One, § E | Demeanor and competence: Failure to seek a competency hearing | No | No |

| | | MERITS PHASE (continued) | | |
|---|---|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| 10. | Five | Demeanor and competence: Petitioner was tried while incompetent, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution | | |
| *11.* | *One, §§ F, H.1* | *Investigation and presentation: Failure to investigate Robert McNeese or to impeach him with the court's findings regarding his credibility at the Massiah hearing* | *Yes* | *No* |
| *12.* | *One, §§ F, H.2* | *Investigation and presentation: Failure to investigate and effectively examine Christie Gaubatz* | *Not decided* | *No* |
| *13.* | *One, § T* | *Investigation and presentation: Failure to effectively cross-examine Wendy Jensen* | *Not decided* | *No* |
| *14.* | *One, §§ F, I* | *Investigation and presentation: Failure to present evidence of Terry DeGeus's involvement in the killing of Gregory Nicholson and the Duncans* | *Not decided* | *No* |
| 15. | One, § F | Investigation and presentation: Failure to use a forensic expert or to investigate Phyllis Proscovec, the gun shop owner, an after-acquired evidence theory, or an alibi | Yes | No |

| **MERITS PHASE (continued)** |
|---|---|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| *16.* | *One, § G* | *Investigation and presentation: Presentation of a "mere presence" defense without investigation and despite petitioner's repeated assertions that she was not present at the Nicholson/Duncan killings* | *Not decided* | *No* |
| 17. | One, § JJ, Seven | Cumulative errors render the petitioner's conviction constitutionally infirm | (Barred by 8th Cir. precedent) | |
| **MITIGATION PHASE** |
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| **18.** | **One, § J** | **Confrontation of aggravating evidence: Failure to present evidence of battered woman's syndrome to explain the relationship between petitioner and Terry DeGeus to rebut the prosecution's theory of her motive for killing him** | **Yes** | **Yes** |

436

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| **19.** | **One, § M** | **Confrontation of aggravating evidence: Failure to present readily available evidence about Dustin Honken to refute the prosecution's argument that Angela Johnson was "worse" than Honken** | **Yes** | **No** |
| **20.** | **One, § N** | **Confrontation of aggravating evidence: Failure to use the prosecution's arguments at Dustin Honken's trial as party admissions to rebut the government's evidence that petitioner was "worse" than Honken** | **Yes** | **No** |
| **21.** | **One, § P** | **Confrontation of aggravating evidence: Failure to discover and present information regarding Dustin Honken's plans to kill prosecutor Reinert and his family and Honken's membership in a white supremacist prison organization** | **Yes** | **No** |
| **22.** | **One, § Q** | **Confrontation of aggravating evidence: Failure to address aggravating evidence at the merits and mitigation phases of the trial** | **Yes** | **No** |

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | Deficient Performance | Prejudice |
| *23.* | *One, § R* | *Confrontation of aggravating evidence: Failure to limit future dangerousness evidence to future danger in prison* | *Yes* | *Not decided* |
| *24.* | *One, § S* | *Confrontation of aggravating evidence: Failure to object to Kathy Rick's triple hearsay testimony about petitioner's alleged possession of a gun* | *Yes* | *Not decided* |
| *25.* | *One, § U* | *Confrontation of aggravating evidence: Failure to object to Kyla Davis's testimony that petitioner tried to find out where she lived and what car she drove* | *Yes* | *Not decided* |
| 26. | Two | **Prosecutorial misconduct: The prosecution's failure to correct false testimony at Angela Johnson's trial violated the Fifth and Eighth Amendments to the United States Constitution** | | |
| 27. | Three | **Prosecutorial misconduct: The prosecution's violation of *Brady v. Maryland* by failing to disclose Dustin Honken's planned violent attack on the trial prosecutor and his association with a white supremacist prison organization** | | |

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | Deficient Performance | Prejudice |
| **28.** | **Four** | **Prosecutorial misconduct: The prosecution's violation of the petitioner's rights under the Sixth and Eighth Amendments and the Due Process Clause by presenting inconsistent arguments at her trial and that of her co-defendant** | | |
| **29.** | **One, § BB.1** | **Ineffective mitigation: The testimony of Holly Dirksen** | **No** | **No** |
| **30.** | **One, § BB.2** | **Ineffective mitigation: The testimony of Douglas Book** | **No** | **No** |
| **31.** | **One, § BB.3** | **Ineffective mitigation: The testimony of Susan Marsolek** | **No** | **No** |
| **32.** | **One, § CC** | **Ineffective mitigation: Failure to provide psychiatric pharmacologist Roswell Lee Evans with data regarding petitioner's drug history, rendering his expert testimony virtually irrelevant** | **Yes** | **Yes** |

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | Deficient Performance | Prejudice |
| *33.* | *One, § EE* | *Ineffective mitigation:  Use of multi-faceted, overly-complicated yet incomplete mitigating factors for the jury to weigh rather than simple, straight-forward facts that encompassed all of the mitigation* | *Yes* | *Yes (Relief barred by untimeliness)* |
| 34. | One, § K | **Failure to prepare mitigation:  Failure to investigate and present evidence regarding Angela Johnson's mental state at the time of the offenses** | **Yes** | **Yes** |
| 35. | One, § Y | **Failure to prepare mitigation:   Delay in hiring Dr. Gelbort, and failure to follow-up on his recommendations, to instruct him to conduct a more thorough battery of neuropsychological tests, to retain another neuropsychologist when Dr. Gelbort inexplicably refused to testify, to incorporate his helpful findings and diagnosis into the testimony of the experts who did testify, and to conduct additional neuropsychological and neuroimaging testing of petitioner** | **Yes** | **Yes** |

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | Deficient Performance | Prejudice |
| *36.* | *One, § Z* | *Failure to prepare mitigation: Failure to introduce evidence of, and give the trial experts records concerning, the 1996 diagnosis of petitioner with depression and dependent personality features* | *No* | *No* |
| 37. | One, § O | **Failure to prepare mitigation: Failure to offer expert and lay testimony that Angela Johnson was under the substantial influence of Dustin Honken** | **Yes** | **No** |
| 38. | One, § L.1 | **Failure to prepare mitigation: Failure to introduce the statements of Phyllis Proscovec to support residual doubt** | **Not decided** | **No** |
| *39.* | *One, § L.2* | *Failure to prepare mitigation: Failure to offer Dustin Honken's letters to impeach the mitigation phase testimony of Steven Vest to support residual doubt* | *Not decided* | *No* |
| *40.* | *One, § L.3* | *Failure to prepare mitigation: Failure to impeach Steven Vest by presenting evidence that Honken lied about petitioner's role in the offenses to support residual doubt* | *Not decided* | *No* |

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| **41.** | **One, § V** | **Failure to prepare mitigation:  Failure to introduce petitioner's offer to plead guilty as evidence in mitigation** | **Yes** | **No** |
| *42.* | *One, § W* | *Failure to prepare mitigation:   Failure to present evidence of remorse through expert testimony* | *Not decided* | *No* |
| *43.* | *One, § X* | *Failure to prepare mitigation:   Failure to elicit evidence of the effect of petitioner's execution on her family members* | *Yes* | *Yes (Relief barred by untimeliness)* |
| 44. | One, § AA | Failure to prepare mitigation:  Ineffective presentation of mitigation evidence through the lay witnesses | Not decided | No |
| 45. | One, § DD.h-i | Failure to timely and effectively object to the mitigation phase determination and confusion evident from the jury's findings | Not decided | No |
| 46. | One, § JJ, Seven | Cumulative errors render the petitioner's sentence constitutionally infirm | (Barred by 8th Cir. precedent) | |

| MITIGATION PHASE (continued) | | | | |
|---|---|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | Deficient Performance | Prejudice |
| *64.* | *(3rd § 2255 Motion) Twelve* | *"Weighing instruction" claim that Johnson was constitutionally entitled to have her penalty jury instructed that they must find beyond a reasonable doubt that aggravating factors sufficiently outweighed mitigating factors to impose the death penalty and any procedural default of this claim resulted from ineffective assistance of counsel* | | |
| POST-TRIAL AND APPEAL | | | | |
| Court's Claim No. | Petitioner's Claim No. | Claim (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | Deficient Performance | Prejudice |
| 47. | One, § DD.d | Ineffective post-trial motions: Failure to timely and effectively make a number of meritorious arguments in post-trial motions | Not decided | No |
| 48. | One, § FF.2 | Ineffective post-trial motions: Failure to raise Juror No. 55's failure to honestly answer questions on *voir dire* | Not decided | No |

| POST-TRIAL AND APPEAL (continued) | | | | |
|---|---|---|---|---|
| Court's Claim No. | Petitioner's Claim No. | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Deficient Performance** | **Prejudice** |
| 49. | One, § GG | Ineffective appeal:  Failure to raise all components of the misconduct by Juror No. 55 | Not decided | No |
| 50. | One, § HH | Ineffective appeal:  Failure to litigate the prosecution's inconsistent theories as to Dustin Honken and Angela Johnson | Not decided | No |
| *51.* | *One, § II* | *Ineffective appeal: Failure to raise the unconstitutional skewing effect of multiplicitous counts* | *Not decided* | *No* |
| 52. | One, § DD.j-o | Ineffective appeal:  Failure to raise a number of meritorious arguments | Not decided | No |
| 53. | One, § JJ, Seven | Ineffective appeal:  Cumulative errors of appellate counsel render the petitioner's sentence constitutionally infirm | (Barred by 8th Cir. precedent) | |

| EIGHTH AMENDMENT VIOLATIONS | | | |
|---|---|---|---|
| **Court's Claim No.** | **Petitioner's Claim No.** | **Claim**  (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Disposition** |
| 54. | Eight | The Eighth Amendment requires a heightened standard of proof for imposition of the death penalty | Denied on the merits |
| 55. | Nine | Petitioner suffers from severe mental illness and the Eighth Amendment precludes her execution | Dismissed without prejudice |
| **56.** | **Ten** | **The Bureau of Prisons' method of carrying out the petitioner's execution by lethal injection violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act** | **Dismissed without prejudice** |
| 57. | Ten, § A.1 | *Baze* claim:  Executioner incompetence | Dismissed without prejudice |
| 58. | Ten, § A.2 | *Baze* claim:  Drug administration deficiencies | Dismissed without prejudice |
| 59. | Ten, § A.3 | *Baze* claim:  Lack of safeguards | Dismissed without prejudice |
| 60. | Ten, § B | There are readily available alternatives that would substantially reduce the risks of maladministration and inhumane executions | Dismissed without prejudice |

| Court's Claim No. | Petitioner's Claim No. | **Claim** (Claims in **bold** were briefed; claims in *italics* do not "relate back" and will not be considered on the merits) | **Disposition** |
|---|---|---|---|
| 61. | Ten, § C | Whether the BOP's new protocol is constitutional even under *Baze* cannot be answered without further discovery | Dismissed without prejudice |
| 62. | Ten, § D | The *Baze* decision does not have any impact on petitioner's Administrative Procedures Act and Controlled Substances Act Claims | Dismissed without prejudice |
| 63. | Eleven | The death penalty violates the Eighth Amendment | Denied on the merits |

(table title) **EIGHTH AMENDMENT VIOLATIONS (continued)**

## XII.  CONCLUSION

I do not doubt that this disposition of Johnson's § 2255 Motion, granting her relief from her death sentences, albeit on only four of the sixty-four grounds that she asserted, will cause grave disappointment to the prosecution, which presented an exceptionally well-tried case, and to the respondent, which presented a strong and well-prepared defense of the constitutionality and correctness of Johnson's convictions and sentences.  That this decision will also cause even greater renewed pain to the victim's families weighs heavily on me.  I also do not lightly set aside any jury verdict, but especially not this one.  I have nothing but the greatest admiration and respect for the trial jurors in this case.  Their service to this court and our nation was beyond exceptional.  Moreover, the relief I am granting here *is not about the case that the jurors heard*, or the appropriateness of their verdict based on that evidence (which I affirmed on post-trial motions in a 297-page ruling),[73] *but about the case that the jurors did not but should have heard*, but for trial counsel's woefully unconstitutional performance.

I doubt that the victim's families' pain will be assuaged in the slightest by my assertion that I have done what I believed I was required to do in light of the "awesome responsibility entrusted to the federal judiciary in its habeas jurisdiction," *Stouffer*, 168 F.3d at 1173, and my heightened duties of painstaking care and attention in a capital *habeas* case.  *See id.*; *Smith*, 379 F.3d at 939.  My heart does go out to them.  Nevertheless, I believe that I have done my duty, in light of what is required by the Constitution—the foundational document of our Nation's enduring freedoms, including the right not to be put to death when trial counsel's performance was so grossly constitutionally inadequate.

---

[73] *See United States v. Angela Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005) (297-page (175-page printed) opinion denying defendant's request for post-trial relief).

Upon the foregoing,

1.    Petitioner Angela Johnson's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody, as amended, is **granted in part, denied in part, and dismissed without prejudice in part**, as follows:

a.    Johnson's convictions of five counts of "murder in furtherance of a CCE," in **Counts 6** through **10** of the Indictment, as amended, in Case No. CR 01-3046-MWB, shall stand; but

b.    the Amended Judgment (docket no. 777) in Case No. CR 01-MWB, imposing a sentence of life imprisonment on **Count 6** and sentences of death on **Counts 7**, **8**, **9**, and **10**, on Johnson, is **vacated**; and

c.    Claims 55 through 62, asserting violations of the Eighth Amendment arising from Johnson's execution, are **dismissed without prejudice**.

2.    The respondent shall have **sixty days** from the date of this order within which to notify the court and the petitioner whether it will demand a new hearing, pursuant to 21 U.S.C. § 848(g)-(o) (2005), before the court or a jury, to determine the penalty for Johnson's convictions or will, instead, withdraw the notice of intent to seek the death penalty, filed pursuant to 21 U.S.C. § 848(h) (2005), and allow the court to set a hearing to impose sentences of life imprisonment without parole, pursuant to 21 U.S.C. § 848(p) (2005), on the convictions on **Counts 6** through **10**.  This sixty-day time period may be extended for good cause.

**IT IS SO ORDERED.**

**DATED** this 22nd day of March, 2012.

_Mark W. Bennett_

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA